No. 25-7187

---

In the

# United States Court of Appeals
## for the Ninth Circuit

---

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D/B/A CRYPTO.COM | DERIVATIVES NORTH AMERICA,

*Plaintiff-Appellant*,

v.

THE STATE OF NEVADA, ET AL.,

*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee.*

---

On Appeal from the United States District Court for the
District of Nevada, Case No. 2:25-cv-00978-APG-BNW
Hon. Andrew P. Gordon, *Chief United States District Judge*

---

**PLAINTIFF-APPELLANT NORTH AMERICAN DERIVATIVES
EXCHANGE, INC. D/B/A CRYPTO.COM | DERIVATIVES NORTH
AMERICA'S OPENING BRIEF**

---

David Meister
Robert A. Fumerton
Chad E. Silverman
Judith A. Flumenbaum
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Shay Dvoretzky
 *Counsel of Record*
Parker Rider-Longmaid
Sylvia O. Tsakos
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Ave. NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Plaintiff-Appellant North American Derivatives Exchange, Inc. d/b/a
Crypto.com | Derivatives North America
(additional counsel information on inside cover)*

*Counsel information continued from front cover*

Bradley Austin
SNELL & WILMER
1700 South Pavilion Center Dr.
 Ste. 700
Las Vegas, NV 89135

Nowell D. Bamberger
Matthew C. Solomon
CLEARY GOTTLIEB STEEN &
 HAMILTON LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037

*Counsel for Plaintiff-Appellant North American Derivatives Exchange, Inc. d/b/a*
*Crypto.com | Derivatives North America*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America (CDNA), states that Foris DAX Markets, Inc., is its parent company. No publicly held corporation or other publicly held entity owns 10% or more of CDNA's stock.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ............................................................................ i

TABLE OF AUTHORITIES ....................................................................... vii

REQUEST FOR ORAL ARGUMENT ........................................................ xvii

INTRODUCTION ........................................................................................ 1

JURISDICTION .......................................................................................... 6

STATEMENT OF THE ISSUES ................................................................ 6

PERTINENT STATUTES AND REGULATIONS ................................... 7

STATEMENT OF THE CASE .................................................................... 7

    A.    Legal background ..................................................................... 7

        1.    In 1922, Congress centralizes futures trading on federally regulated markets, without preempting state laws regulating futures contracts trading. .................. 8

        2.    Congress enacts the CEA in 1936 to strengthen federal oversight of trading on designated markets, while preserving state laws regulating futures trading .................................................................... 10

        3.    In 1974, Congress overhauls the CEA, creating the CFTC and granting it exclusive jurisdiction over trading on DCMs. .............................................. 11

        4.    Further amendments reinforce the CFTC's exclusive jurisdiction over trading on DCMs, while recognizing a role for state regulation of off-DCM transactions. .......................................................... 14

# TABLE OF CONTENTS
## (continued)

Page

5.　Congress expands the CFTC's exclusive jurisdiction to reach event contracts and swaps. ..................... 15

6.　The CEA and its implementing regulations continue to extensively regulate trading on DCMs. ........................ 19

B.　Factual and procedural background ............................. 21

1.　CDNA certifies and lists sports-event contracts on its federally regulated DCM. ................................. 21

2.　Nevada regulators, threatening criminal penalties, order CDNA to stop offering sports-event contracts to Nevada residents. .............................................. 24

3.　CDNA sues in district court and seeks a preliminary injunction because the CEA preempts Nevada gaming laws as applied to CDNA's sports-event contracts, but the district court denies the motion. .......... 25

SUMMARY OF ARGUMENT ............................................................ 28

STANDARD OF REVIEW ................................................................. 36

ARGUMENT ...................................................................................... 37

I.　CDNA will likely succeed on the merits because the CEA preempts the application of Nevada's gaming laws to trading on DCMs, including the trading of CDNA's sports-event contracts. ........................................................................ 37

A.　Federal law can preempt state law when Congress expressly says so, or impliedly when state regulation cannot coexist. ...................................................... 38

## TABLE OF CONTENTS
### (continued)

Page

B.  Section 2(a)(1)(A) expressly preempts state law as applied to swap-trading on DCMs by placing regulatory authority within the CFTC's "exclusive jurisdiction." ................................39

    1.  Courts must interpret statutes according to their plain meaning, without any presumption against preemption. ............................................................40

    2.  Section 2(a)(1)(A)'s text and context make clear that the CEA expressly preempts state law as applied to swap-trading on DCMs. .......................................41

    3.  Statutory and legislative history confirm that § 2(a)(1)(A) expressly preempts state law as applied to swap-trading on DCMs. .................................44

C.  Section 2(a)(1)(A) expressly preempts Nevada gaming laws as applied to the trading of CDNA's sports-event contracts, as conflict preemption confirms. ................................45

    1.  CDNA's sports-event contracts are swaps traded on a DCM. ......................................................46

    2.  Section 2(a)(1)(A) expressly preempts Nevada gaming laws as applied to the trading of CDNA's sports-event contracts. ...........................................49

    3.  Obstacle and impossibility preemption illustrate why Congress enacted § 2(a)(1)(A) and confirm that the CEA leaves no room for Nevada's gaming laws. .......49

D.  Beyond express and conflict preemption, the CEA preempts the field of *all* trading on DCMs—no matter whether the derivatives are swaps or something else— including Nevada gaming laws as applied to CDNA's sports-event contracts. ...................................51

# TABLE OF CONTENTS
### (continued)

Page

    E.    The district court's reasoning and Nevada's arguments fail. ...................................................................54

        1.    CDNA's sports-event contracts are swaps, and the district court's and Nevada's contrary reasoning fails. ...................................................................54

               a.    The district court's reasoning that "event" does not mean "outcome" fails.................................55

               b.    Events need not be "inherently" associated with financial consequences, as Nevada incorrectly claims. ..........................................58

               c.    The CFTC's exclusive jurisdiction doesn't extend to all sports wagering just because CDNA's sports-event contracts are swaps. .............60

               d.    In any event, states cannot second-guess whether the sports-event contracts are swaps. .......62

        2.    Swaps or not, CDNA's sports-event contracts are "options" subject to the CFTC's exclusive jurisdiction.................................................................63

        3.    Nevada is wrong that its gaming laws govern CDNA's sports-event contracts even if they are swaps.........................................................................64

II.    The balance of harms and public interest favor a preliminary injunction. .................................................................68

CONCLUSION .........................................................................71

STATEMENT OF RELATED CASES .....................................72

CERTIFICATE OF COMPLIANCE ........................................73

# TABLE OF CONTENTS
(continued)

**Page**

CERTIFICATE OF SERVICE ...............................................................74

INDEX OF ADDENDUM ...................................................................76

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alliance for the Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023) ........................................................ 36, 37

*American Agriculture Movement, Inc. v.
Board of Trade of Chicago*,
977 F.2d 1147 (7th Cir. 1992) .............................................. 2, 7, 12,
........................................................................................ 31, 50, 53, 54

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................................ 4, 28, 32, 38,
........................................................................................ 39, 43, 49, 50, 54

*Big Lagoon Rancheria v. California*,
789 F.3d 947 (9th Cir. 2015) (en banc) ................................. 34, 35, 63

*Board of Trade of Chicago v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905) .................................................................... 9

*Board of Trade of Chicago v. Olsen*,
262 U.S. 1 (1923) ........................................................................ 10

*Botsford v. Blue Cross & Blue Shield of Montana, Inc.*,
314 F.3d 390 (9th Cir. 2002) ..................................................... 50, 51

*Brotherhood of Locomotive Engineers &
Trainmen v. Federal Railroad Administration*,
972 F.3d 83 (D.C. Cir. 2020) ..................................................... 63

*California Save Our Streams Council, Inc. v. Yeutter*,
887 F.2d 908 (9th Cir. 1989) ..................................................... 42

*CFTC v. Co Petro Marketing Group, Inc.*,
680 F.2d 573 (9th Cir. 1982) ..................................................... 12

*Chamber of Commerce v. Whiting*,
563 U.S. 582 (2011) .................................................................... 40

*Connecticut National Bank v. Germain*,
503 U.S. 249 (1992) .................................................................... 40

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Cothran v. Ellis,*
    16 N.E. 646 (Ill. 1888) ........................................................9

*Da Silva v. Attorney General,*
    948 F.3d 629 (3d Cir. 2020) ....................................... 47, 48

*Dickson v. Uhlmann Grain Co.,*
    288 U.S. 188 (1933) ..........................................................10

*Duke Energy Trading & Marketing, LLC v. Davis,*
    267 F.3d 1042 (9th Cir. 2001) .........................................42

*Effex Capital, LLC v. National Futures Ass'n,*
    933 F.3d 885 (7th Cir. 2019) ...........................................10

*Epic Systems Corp. v. Lewis,*
    584 U.S. 497 (2018) ..........................................................62

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,*
    458 U.S. 141 (1982) ..........................................................38

*FTC v. Ken Roberts Co.,*
    276 F.3d 583 (D.C. Cir. 2001) .........................................12

*Hughes v. Talen Energy Marketing, LLC,*
    578 U.S. 150 (2016) .................................................... 42, 49

*Hunter v. FERC,*
    711 F.3d 155 (D.C. Cir. 2013) ............................. 11, 13, 42

*Industrial Truck Ass'n v. Henry,*
    125 F.3d 1305 (9th Cir. 1997) .........................................39

*Irwin v. Williar,*
    110 U.S. 499 (1884) ............................................................9

*KalshiEX LLC v. CFTC,*
    119 F.4th 58 (D.C. Cir. 2024) ..........................................20

*Leist v. Simplot,*
    638 F.2d 283 (2d Cir. 1980) ....................................... 14, 45

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
   456 U.S. 353 (1982) ................................................................ 1, 2, 7, 8,
   ................................................................................... 9, 10, 11, 12,
   .......................................................................... 13, 14, 32, 43, 51

*Mississippi v. Louisiana,*
   506 U.S. 73 (1992) ................................................................41

*Monsalvo v. Bondi,*
   604 U.S. 712 (2025) ..............................................................47

*Montalvo v. Spirit Airlines,*
   508 F.3d 464 (9th Cir. 2007) ...............................................39

*Morales v. Trans World Airlines, Inc.,*
   504 U.S. 374 (1992) ..............................................................68

*Murphy v. National Collegiate Athletic Ass'n,*
   584 U.S. 453 (2018) ..............................................................66

*National Federation of the Blind v. United Airlines, Inc.,*
   813 F.3d 718 (9th Cir. 2016) ...............................................39

*NIH v. American Public Health Ass'n,*
   145 S. Ct. 2658 (2025) ..........................................................68

*Oklahoma v. Castro-Huerta,*
   597 U.S. 629 (2022) ..............................................................58

*Olympic Pipe Line Co. v. Seattle,*
   437 F.3d 872 (9th Cir. 2006) ...............................................37

*Omnipoint Communications, Inc. v. Huntington Beach,*
   738 F.3d 192 (9th Cir. 2013) ...............................................43

*Oregon Right to Life v. Stolfi,*
   158 F.4th 1013 (9th Cir. 2025) ............................................37

*Public Utility District No. 1 v. IDACORP Inc.,*
   379 F.3d 641 (9th Cir. 2004) ...............................................53

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Puerto Rico v. Franklin California Tax-Free Trust,*
  579 U.S. 115 (2016)........................................................ 28, 29, 40, 65

*Shaw v. Delta Air Lines, Inc.,*
  463 U.S. 85 (1983)................................................................................6

*Stanley v. Trustees of California State University,*
  433 F.3d 1129 (9th Cir. 2006) ..........................................................69

*Stuhlbarg International Sales Co. v.*
*John D. Brush & Co., Inc.,*
  240 F.3d 832 (9th Cir. 2001) ....................................................... 68, 69

*Swinomish Indian Tribal Community v. BNSF Railway Co.,*
  951 F.3d 1142 (9th Cir. 2020) ..................................................... 65, 66

*Ting v. AT&T,*
  319 F.3d 1126 (9th Cir. 2003) ..........................................................38

*United States v. Alvarez-Hernandez,*
  478 F.3d 1060 (9th Cir. 2007) ..........................................................45

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ...................................................... 36, 70

*Wolicki-Gables v. Arrow International, Inc.,*
  634 F.3d 1296 (11th Cir. 2011) ........................................................65

*Yellow Freight System, Inc. v. Donnelly,*
  494 U.S. 820 (1990)...........................................................................42

CONSTITUTION AND STATUTES

U.S. Const. art. VI, cl. 2 .................................................................6, 38

Administrative Procedure Act (APA)
  5 U.S.C. § 551 *et seq.*................................................................ 34, 63

  5 U.S.C. § 551(13) ..................................................................... 34, 63

  5 U.S.C. § 704.....................................................................................63

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Commodity Exchange Act (CEA)
7 U.S.C. § 1 *et seq.*............................................................ 1, 2, 3, 4, 5,
......................................................................... 7, 8, 10, 11, 12, 14,
......................................................................... 16, 17, 19, 20, 21, 22, 25,
......................................................................... 28, 29, 31, 32, 33, 35, 36, 37,
......................................................................... 40, 41, 42, 43, 44, 46, 49, 50, 51, 52,
......................................................................... 53, 54, 57, 60, 61, 62, 63, 64, 65, 68, 70

7 U.S.C. § 1a(9) ................................................................ 12, 57

7 U.S.C. § 1a(19)(i) ........................................................... 15, 16, 57

7 U.S.C. § 1a(19)(ii) .......................................................... 15, 16

7 U.S.C. § 1a(19)(iii) ......................................................... 15, 16

7 U.S.C. § 1a(19)(iv) ..........................................................16

7 U.S.C. § 1a(36) ..............................................................64

7 U.S.C. § 1a(47) .............................................................. 32, 54, 55

7 U.S.C. § 1a(47)(A)(i) ....................................................... 33, 57

7 U.S.C. § 1a(47)(A)(ii) ...................................................... 2, 3, 4, 5, 7,
......................................................................... 8, 17, 26, 25, 30,
......................................................................... 46, 47, 56, 57, 58

7 U.S.C. § 1a(47)(A)(iii) ..................................................... 33, 58

7 U.S.C. § 1a(47)(A)(iv) ...................................................... 2, 3, 7, 8,
......................................................................... 17, 57, 59

7 U.S.C. § 1a(51) ............................................................. 15, 16

7 U.S.C. § 2 (1976) ...........................................................13

7 U.S.C. § 2(a) ...............................................................60

7 U.S.C. § 2(a)(1) ............................................................45

7 U.S.C. § 2(a)(1)(A).......................................................... 1, 4, 5, 6, 7, 14, 17,
......................................................................... 28, 29, 30, 31, 32, 35,

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

.............................................................. 37, 39, 40, 41, 42, 43, 44,
.............................................................. 45, 46, 49, 50, 53, 63, 64, 65

7 U.S.C. § 2(e) .................................................................61

7 U.S.C. § 6a ...................................................................54

7 U.S.C. § 6b ...................................................................54

7 U.S.C. § 6c ...................................................................54

7 U.S.C. § 6c(C) (1940) ...................................................11

7 U.S.C. § 7(a) .................................................................52

7 U.S.C. § 7(d) .................................................................19

7 U.S.C. § 7a-1 ......................................................... 19, 52

7 U.S.C. § 7a-2(c)(1) ................................... 3, 20, 22, 43

7 U.S.C. § 7a-2(c)(4)(A) ..................................................20

7 U.S.C. § 7a-2(c)(4)(C) ..................................................20

7 U.S.C. § 7a-2(c)(5)(C) .................................................8, 45

7 U.S.C. § 7a-2(c)(5)(C)(i) ............................... 18, 33, 34,
.............................................................. 59, 61, 62, 66

7 U.S.C. § 7a-2(c)(5)(C)(ii) .............................................18

7 U.S.C. § 8(b) .......................................................... 20, 21

7 U.S.C. § 9 ............................................................... 20, 21

7 U.S.C. § 13a-2 ....................................................... 14, 53

7 U.S.C. § 16(e)(1) ..........................................................15

7 U.S.C. § 16(e)(1)(B)(i) ..................................................60

7 U.S.C. § 16(e)(2) ................................................... 16, 53

12 U.S.C. § 1828(y) ........................................................67

Wire Act,
    18 U.S.C. § 1084 .......................................................67

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

18 U.S.C. § 1084(a) ...................................................................67

Indian Gaming Regulatory Act (IGRA),
25 U.S.C. § 2701 *et seq.*...........................................................66

25 U.S.C. § 2701(5) .................................................................66

25 U.S.C. § 2703(7) .................................................................66

25 U.S.C. § 2703(8) .................................................................66

28 U.S.C. § 1292(a)(1) ..............................................................6

28 U.S.C. § 1331 ......................................................................6

Professional and Amateur Sports Protection Act (PASPA)
28 U.S.C. § 3701 *et seq.*...........................................................66

Unlawful Internet Gaming Enforcement Act of 2006 (UIGEA)
31 U.S.C. § 5361 *et seq.*...........................................................60

31 U.S.C. § 5362(10) ...............................................................60

31 U.S.C. § 5362(1)(E)(ii)........................................................60

Act of Feb. 19, 1968,
Pub. L. No. 90-258, 82 Stat. 26 ..........................................11

Commodity Exchange Act,
Pub. L. No. 74-675, 49 Stat. 1491 (1936)..................... 10, 11

Commodity Futures Modernization Act,
Pub. L. No. 106-554, 114 Stat. 2763A-365 (2000) ..................... 15, 16

Commodity Futures Trading Commission Act of 1974,
Pub. L. 93-463, 88 Stat. 1389......................... 12, 13, 29, 44

Dodd-Frank Act,
Pub. L. No. 111-203, 124 Stat. 1376 (2010)................. 17, 18

Futures Trading Act of 1978,
Pub. L. No. 95-405, 92 Stat. 865 .......................................14

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Futures Trading Act of 1982,
Pub. L. No. 97-444, 96 Stat. 2294 (1983) .......................................15

Grain Futures Act of 1922,
Pub. L. No. 67-331, 42 Stat. 998.......................................................10

Nev. Rev. Stat. Ann. § 463.160.........................................................49

Nev. Rev. Stat. Ann. § 463.245.........................................................49

Nev. Rev. Stat. Ann. § 463.0193.......................................................49

**REGULATIONS AND RULE**

17 C.F.R. § 1.31(d)(1) ............................................................... 19, 52

17 C.F.R. pt. 38 .................................................................................19

17 C.F.R. § 38.5(b) ..................................................................... 20, 52

17 C.F.R. § 38.150 ................................................................ 19, 32, 51

17 C.F.R. § 38.150(b)........................................................................52

17 C.F.R. § 38.151(b) ................................................. 19, 32, 51, 69, 70

17 C.F.R. § 38.155(a)........................................................................52

17 C.F.R. § 38.156 ....................................................................... 19, 52

17 C.F.R. § 38.250 ....................................................................... 19, 52

17 C.F.R. § 38.251 ....................................................................... 19, 52

17 C.F.R. § 38.255 ....................................................................... 19, 52

17 C.F.R. § 38.450 ....................................................................... 19, 52

17 C.F.R. § 38.601 ....................................................................... 19, 52

17 C.F.R. § 38.650 ....................................................................... 19, 52

17 C.F.R. § 38.1101(a)(2) ............................................................ 19, 52

17 C.F.R. § 40.2 .................................................................................3

17 C.F.R. § 40.2(a) ...........................................................................22

# TABLE OF AUTHORITIES
## (continued)

Page(s)

17 C.F.R. § 40.2(a)(2) .................................................................20

17 C.F.R. § 40.2(c) ............................................................... 20, 43

17 C.F.R. § 40.11(c) ............................................................. 20, 43

17 C.F.R. § 40.11(c)(2) .............................................................20

17 C.F.R. § 180.1 ......................................................................54

17 C.F.R. § 180.2 ......................................................................54

*Activities and Operations of National Banks
and Federal Savings Associations*,
85 Fed. Reg. 40,794 (July 7, 2020) ........................................67

*Concept Release on the Appropriate Regulatory Treatment
of Event Contracts*,
73 Fed. Reg. 25,669 (May 7, 2008) ................. 47, 56, 58, 59, 64

*Further Definition* of *"Swap,"*
77 Fed. Reg. 48,208 (Aug. 13, 2012) .................... 5, 34, 55, 61

Fed. R. App. P. 4(a)(1)(A) .........................................................6

OTHER AUTHORITIES

Charles Archer,
*Trading event contracts*, https://crypto.com/
us/prediction/learn/how-to-trade-event-
contracts (last visited Jan. 12, 2026) ................................ 21, 22

*Futures Glossary*, CFTC, https://
www.cftc.gov/LearnAndProtect/
AdvisoriesAndArticles/CFTCGlossary/
index.htm#D (last visited Jan. 12, 2026) ..................................1

*Hearings Before the House Committee on Agriculture*,
93d Cong. 121 (1973) ....................................... 11, 12, 13

*Hearings Before the Senate Committee on Agriculture & Forestry*,
93d Cong. 685 (1974) ...............................................................13

# TABLE OF AUTHORITIES
(continued)

Page(s)

H.R. Rep. No. 93-1383 (1974) .................................................. 13, 14, 44

H.R. Rep. No. 97-565 (1982) ............................................................15

H.R. Rep. No. 106-711, pt. 2 (2000) .............................................. 16, 17

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ...................47

*Oxford American Dictionary*
  *and Thesaurus* (2d ed. 2009) ...................................................... 46, 47

*Oxford English Dictionary* (3d ed. 2011) ...................................... 47, 48

John V. Rainbolt II,
  *Regulating the Grain Gambler and His Successors*,
  6 Hofstra L. Rev. 1 (1977) ..............................................................9

*Random House Webster's
  Pocket American Dictionary* (5th ed. 2008)................................ 46, 47

*Random House Webster's
  Unabridged Dictionary* (2d ed. 2001) ..........................................46

S. Rep. No. 93-1131.............................................. 29, 30, 44, 45

A. Scalia & B. Garner,
  *Reading Law* (2012)................................................................53

*The American Heritage Dictionary* (1st ed. 1973)....................... 41, 42

Kevin T. Van Wart,
  *Preemption and the Commodity Exchange Act*,
  58 Chi.-Kent L. Rev. 657 (1982) ............................................ 11, 16

*Webster's II New College Dictionary* (3d ed. 2005) ..................... 46, 47

*Webster's New International Dictionary* (2d ed. 1934) ................. 41, 42

## REQUEST FOR ORAL ARGUMENT

This case involves important questions about statutory interpretation and federal preemption that the district court incorrectly resolved. Plaintiff-Appellant North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America respectfully submits that oral argument would help the Court resolve this appeal.

## INTRODUCTION

This case is about whether the Commodity Exchange Act's (CEA) grant of "exclusive jurisdiction" to the Commodity Futures Trading Commission (CFTC) over trading on federally regulated designated contract markets (DCMs), 7 U.S.C. § 2(a)(1)(A), means what it says. Nevada claims it can regulate the trading of sports-event contracts that North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America (CDNA) offers on its federally regulated derivatives market. That's wrong. The CEA preempts state law as applied to on-DCM trading, as statutory text, context, and history make clear.

1. The CEA gives the CFTC authority to regulate commodities-related derivatives markets. A derivative is a financial instrument whose price depends on—is derived from—other assets, like "securities, equity indices, debt instruments, [and] commodities." *Futures Glossary*, CFTC, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#D (last visited Jan. 12, 2026). Derivatives allow contracting parties to transfer or manage specific risks. The classic example of a derivative is a grain futures contract, which allows buyers and sellers to lock in prices at which to buy or sell a specified amount of a crop on a future date, helping

to hedge against risks associated with market volatility. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357 (1982).

Congress designed the CEA's 1922 predecessor to allow parties to manage those risks. As derivatives markets have grown more complex, Congress has responded with "comprehensive" federal oversight and consolidated federal control over an ever-broadening range of derivatives. *Id.* at 356. Although states historically regulated some derivatives trading under gambling and other laws, Congress has brought "the markets under a uniform set of regulations," *American Agriculture Movement, Inc. v. Board of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992). The CEA gives the CFTC "exclusive jurisdiction" over transactions on DCMs. The CFTC regulates every aspect of a DCM's activity, from imposing daily disclosure obligations to pursuing enforcement actions against DCMs.

The CFTC's exclusive jurisdiction covers the trading of "swaps," which the CEA defines broadly as including contracts providing for payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii), plus any

"transaction that is, or in the future becomes, commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv).

**2.** CDNA has operated a federally regulated DCM since 2004. In early 2025, CDNA certified a new kind of contract—live sports-event contracts—under the CEA's self-certification process. *See id.* § 7a-2(c)(1); 17 C.F.R. § 40.2. Those contracts allow parties to hedge against financial risks associated with the outcomes of sport events. For example, merchandisers decide how to distribute products for a sports event that many Americans might watch or attend. Those decisions involve financial risk, because supply and demand could turn on what happens at the event. State-licensed sportsbooks might also use sports-event contracts to manage financial exposure from an influx of wagers on a particular side of a wager. After CDNA's self-certification, CDNA began listing the sports-event contracts on its DCM.

Despite the CFTC's exclusive jurisdiction over on-DCM trading, Nevada claimed that CDNA's sports-event contracts violated its gaming laws. The state threatened CDNA with civil and criminal penalties. So CDNA sued Nevada and moved for a preliminary injunction, explaining that the CEA preempts Nevada law as applied to CDNA's sports-event contracts, which are "swaps" under § 1a(47)(A)(ii). The district court denied the

- 3 -

motion, holding that the contracts are not "swaps," because payment depends on the *outcome* of an event, rather than an event itself.

**3.** That was error. The CEA preempts Nevada's gaming laws as to trading on DCMs, including the trading of CDNA's sports-event contracts. Federal law can preempt state law expressly, or it can do so impliedly by displacing state laws that purport to regulate conduct subject to exclusive federal control. *Arizona v. United States*, 567 U.S. 387, 399 (2012). Section 2(a)(1)(A) expressly preempts state laws as applied to swap-trading on DCMs by granting the CFTC "exclusive jurisdiction" to regulate that trading. That makes sense, because the CEA by deliberate design also impliedly preempts the field of swap-trading on DCMs, leaving "no room for [Nevada] to supplement" federal law. *Id.*

The CFTC's exclusive jurisdiction over on-DCM trading covers CDNA's sports-event contracts and preempts Nevada law. *First*, those contracts are swaps because they "provide[] for … payment … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event"—like who wins game seven of the Stanley Cup. 7 U.S.C. § 1a(47)(A)(ii). The events also are "associated with a potential financial, economic, or commercial consequence"—like whether retailers in the winning

- 4 -

team's hometown profit from increased tourism and celebrations. *Id. Second*, CDNA's swaps are traded on a DCM, and thus fall within the CFTC's "exclusive jurisdiction." Nevada law has no role.

The district court's contrary conclusion and Nevada's arguments ignore the text and context of § 2(a)(1)(A), plus statutory and legislative history making clear that Congress designed the CEA to broadly reach, and preempt state law as applied to, trading on DCMs. The court's reasoning and Nevada's arguments also conflate sports-event-contract trading with sports wagering, but those activities are distinct. Swaps—like CDNA's sports-event contracts—are typically "traded on organized markets" (DCMs) "and over the counter" (which refers to trades with "financial entities" and other sophisticated institutions). *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,217, 48,247-48 (Aug. 13, 2012) [hereinafter *Further Definition*]. Sports wagers, in contrast, fall within the category of "customary consumer" transactions, *id.* at 48,246-47, which aren't swaps, and aren't traded on DCMs or over-the-counter.

The district court's erroneous preemption ruling was its core reason for denying a preliminary injunction. Correcting that error shows that Nevada has no legitimate interest in enforcing its laws against CDNA, which

will suffer irreparable harm from lost business and goodwill and exposure to civil and criminal penalties without a preliminary injunction. This Court should reverse.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331, because this action arises under the Supremacy Clause, U.S. Const. art. VI, cl. 2; *see Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) over this appeal from the district court's October 14, 2025, order denying CDNA's preliminary injunction motion. ER-10-36. CDNA timely appealed on November 13, 2025. ER-190-94; *see* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1.      Whether CDNA is likely to succeed on its claim that the CEA, which gives the CFTC "exclusive jurisdiction" over transactions "on a [DCM]," 7 U.S.C. § 2(a)(1)(A), preempts Nevada's gaming laws as applied to CDNA's sports-event contracts, which are traded on a DCM.

2.      Whether the public interest in not enforcing preempted state laws and the irreparable monetary and reputational harm, plus risk of civil

and criminal sanctions, CDNA will suffer without an injunction, weigh in favor of a preliminary injunction.

## PERTINENT STATUTES AND REGULATIONS

The addendum reproduces relevant statutes and regulations.

## STATEMENT OF THE CASE

### A.    Legal background

The CEA establishes "a comprehensive regulatory structure" to oversee the "futures trading complex." *Curran*, 456 U.S. at 356. Since enacting the CEA in 1936, Congress has amended the statute to expand federal oversight of derivatives markets and to broaden the kinds of derivatives and transactions the statute regulates. The CEA has brought "the markets under a uniform set of regulations," *American Agriculture*, 977 F.2d at 1156—a sea change following decades of state regulation of derivatives-trading under state gambling and other laws. Today, the CEA gives the CFTC "exclusive jurisdiction" over transactions on derivatives markets—knowns as DCMs, 7 U.S.C. § 2(a)(1)(A)—and Congress has given the agency robust regulatory and enforcement authority over those markets. That exclusive jurisdiction covers the trading of "swaps." Swaps include contracts providing for payment "dependent on the occurrence, nonoccurrence, or the extent of the

occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," *id.* § 1a(47)(A)(ii), plus any "transaction that is, or in the future becomes, commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv). The CEA also established a "special rule" for the CFTC to review whether certain swaps are contrary to the public interest. *Id.* § 7a-2(c)(5)(C).

### 1.  In 1922, Congress centralizes futures trading on federally regulated markets, without preempting state laws regulating futures contracts trading.

Commodity futures trading began as a way to hedge against risks associated with price fluctuations in agricultural markets. Before "the advent of futures trading, agricultural products generally were sold at central markets." *Curran*, 456 U.S. at 357. But farmers and others experienced "severe hardship" when, because of unforeseen circumstances like weather events, "an entire crop was harvested and marketed within a short timespan," producing "dramatic price fluctuations." *Id.* Parties could mitigate the risks associated with those price fluctuations by "forward contracting"—*i.e.*, entering into "contracts fixing the terms of sale in advance of the time of delivery" of the grain. *Id.*

Speculators also recognized an "opportunity to make a profit" based on those price fluctuations, so they began "buying and selling 'futures contracts.'" *Id.* Eventually, exchanges and boards of trade began providing markets for trading futures contracts. *Id.* at 358. People bought and sold futures contracts "to make a profit (or to minimize the risk of loss) from a change in the market price." *Id.*

States soon claimed that trading in futures contracts was "gambling in grain," *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888), and sought to prohibit the activity as illegal gambling, John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977). The Supreme Court initially opined that a futures contract was "nothing more than a wager" if the contracting parties didn't intend to deliver the underlying commodity but instead intended only to profit from price fluctuations. *Irwin v. Williar*, 110 U.S. 499, 508-09 (1884). But the Court later recognized the legitimacy of futures contracts even when the only purpose was to profit on price fluctuations: Such "speculation" allowed "avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Board of Trade of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 246-49 (1905).

Congress eventually "recognized the potential hazards" and "benefits of futures trading" and began regulating the exchanges. *Curran*, 456 U.S. at 360. Congress passed the Grain Futures Act of 1922, which regulated grain futures contracts and centralized trading on federally approved "contract markets." Pub. L. No. 67-331, 42 Stat. 998, 998, 1000-02 (1922); *see Board of Trade of Chicago v. Olsen*, 262 U.S. 1, 3 (1923). But the Act didn't preempt state law. So states continued prohibiting "gambling in grain futures." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

> **2.    Congress enacts the CEA in 1936 to strengthen federal oversight of trading on designated markets, while preserving state laws regulating futures trading.**

In 1936, Congress passed the CEA, Pub. L. No. 74-675, 49 Stat. 1491 (1936), and strengthened federal oversight of futures-contract trading. The goal was to facilitate "interstate commerce in grains and other commodities by regulating transactions therein on commodity futures exchanges, to limit or abolish short selling, [and] to curb manipulation.'" *Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 885, 886 n.6 (7th Cir. 2019). The CEA expanded federal oversight to additional types of agricultural futures "and added detailed provisions regulating trading in futures contracts." *Curran*, 456 U.S. at 362. Even so, the CEA "covered only a fraction of commodity

futures," and oversight responsibility rested "in a commission composed of the Attorney General and the Secretaries of Commerce and Agriculture." *Hunter v. FERC*, 711 F.3d 155, 157 (D.C. Cir. 2013). The CEA also preserved "any State law applicable to any transaction" that the CEA regulated. 7 U.S.C. § 6c(C) (1940); 49 Stat. at 1494.

Congress amended the CEA in 1968, Act of Feb. 19, 1968, Pub. L. No. 90-258, 82 Stat. 26, expanding the Act's coverage and bolstering the Secretary of Agriculture's enforcement authority, *Curran*, 56 U.S. at 364. The amendments required "contract markets … to enforce their rules," and the Secretary was authorized to suspend contract markets and "issue … cease-and-desist order[s]" for failure to enforce the rules. *Id.*

### 3. In 1974, Congress overhauls the CEA, creating the CFTC and granting it exclusive jurisdiction over trading on DCMs.

By 1974, "[g]rain shortages had caused food prices to soar," with many "accus[ing] commodity traders of manipulating prices." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 672-73 (1982). Regulation of futures-contract trading was a "hodgepodge," "cover[ing] only a fraction of commodity futures" and lacking a central federal regulatory body. *Hunter*, 711 F.3d at 157. Exchanges began calling for a

"uniform" "federal policy" nationwide that wouldn't subject futures trading "to the vagaries of" laws in "different jurisdictions." *Hearings Before the House Committee on Agriculture*, 93d Cong. 121 (1973) [hereinafter 1973 Hearings].

Recognizing the need for "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," Congress overhauled the CEA in the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974), *Curran*, 456 U.S. at 355-56, "to bring the markets under a uniform set of regulations," *American Agriculture*, 977 F.2d at 1156. The Act "brought *all* commodities under federal regulation" "for the first time." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). It expanded the definition of "commodity" to include "all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). And it implemented "expansive federal regulation" of federal designated contract markets through several key features. *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 579 (9th Cir. 1982).

One key feature was the establishment of the CFTC and its grant of exclusive jurisdiction to regulate trading on DCMs. *See* 88 Stat. at 1389-92. Congress gave the agency broad authority "to assure that the market is free of manipulation and other practices" that distort an accurate reflection of

supply and demand. S. Rep. No. 93-1131, at 21 (1974); *see Curran*, 456 U.S. at 365-66. It did so by vesting the CFTC with "exclusive jurisdiction" to regulate trading on DCMs. 7 U.S.C. § 2 (1976); *accord Hunter*, 711 F.3d at 157.

Congressmembers recognized that federal regulation would be ineffective unless it "prevent[ed] any possible conflicts over jurisdiction." 1973 Hearings at 128. Witnesses opined that without "Federal law preempting State laws," overlapping laws would cause "total chaos." *Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong. 685 (1974) (statement of Glenn Willett Clark). The solution was to "[b]ring all futures trading under federal regulation." *Id.* at 848. The amendments thus struck the 1936 act's language that preserved "any State law applicable to any transaction" covered by the CEA. H.R. Rep. No. 93-1383, at 35 (1974). Instead, the amendments granted the CFTC "exclusive jurisdiction with respect to" transactions on DCMs. 88 Stat. at 1395. Immediately following that language, in the same section, Congress added that, "except as hereinabove provided, nothing contained in this section shall … supersede or limit the jurisdiction" of state "regulatory authorities." *Id.* Thus, "the exclusive grant of jurisdiction to the Commission … would preempt the field insofar as futures regulation is concerned," and that jurisdiction "supersedes State as well as Federal

agencies." H.R. Rep. No. 93-1383, at 23, 35. Courts soon recognized that § 2(a)(1)(A) "preempts the application of state law" as to trading on DCMs. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980).

### 4. Further amendments reinforce the CFTC's exclusive jurisdiction over trading on DCMs, while recognizing a role for state regulation of off-DCM transactions.

Two key amendments to the CEA reinforced the CFTC's exclusive jurisdiction over on-DCM trading, while recognizing a role for state regulation of off-DCM transactions.

*First*, in 1978, Congress "authorized the States to bring *parens patriae* actions, seeking injunctive or monetary relief for certain violations of the CEA" and CFTC regulations and orders. *Curran*, 456 U.S. at 366-67; Futures Trading Act of 1978, Pub. L. No. 95-405, 92 Stat. 865, 872. That authority doesn't extend to suits against "a contract market." 92 Stat. 872; 7 U.S.C. § 13a-2.

*Second*, in 1982, Congress made clear that states could regulate *off*-DCM transactions: "Nothing in this Act shall supersede or preempt … the application of" state law "to any transaction in or involving any commodity, product, right, service, or interest … that is not conducted on or subject to the rules of a contract market," or "to any person required to be registered

- 14 -

or designated under this Act" who fails to do so. Futures Trading Act of 1982, Pub. L. No. 97-444, 96 Stat. 2294, 2318 (1983); 7 U.S.C. § 16(e)(1). House Reports recognized that the 1974 amendments had "bestowed on the CFTC exclusi[ve] jurisdiction to regulate futures trading [on DCMs] … , thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44 (1982). But the 1982 amendments underscored that "States should be extensively involved in … policing transactions outside those preserved exclusively" for the CFTC, like "off-exchange commodities activities," while the CFTC would continue exercising "exclusive … jurisdiction over exchange-traded futures." *Id.* at 44-45.

> **5.** **Congress expands the CFTC's exclusive jurisdiction to reach event contracts and swaps.**

Over time, Congress has expanded the definition of "commodity" to reach a broad range of derivatives. Important here, Congress has extended the CFTC's exclusive jurisdiction to reach what are known as "event contracts" and "swaps."

**a.** In 2000, Congress added the term "excluded commodity" to the CEA and provided that certain market participants can enter into transactions involving excluded commodities if those transactions aren't conducted

- 15 -

on a "trading facility," like a DCM. Commodity Futures Modernization Act, Pub. L. No. 106-554, 114 Stat. 2763A-365, 371, 377 (2000); *see* 7 U.S.C. § 1a(19)(i)-(iii), (51). Excluded commodities include intangibles like interest rates and "an occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties" to a "transaction" and is "associated with a financial, commercial, or economic consequence." 114 Stat. 2763A–371; 7 U.S.C. § 1a(19)(i), (iv).

Congress also made clear that the CFTC would retain jurisdiction to regulate transactions in excluded commodities. The Act would "supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops" (firms allowing customers to bet on future market-price fluctuations outside of a contract market), as to transactions "excluded" from the CEA's coverage. 114 Stat. 2763A-403; 7 U.S.C. § 16(e)(2); *see* Van Wart, *supra*, at 659. Thus, the amendment "restates" that the "CEA supersedes and preempts other laws in the case of transactions conducted on a registered entity or subject to regulation by the CFTC … , and adds that in the case of … any agreements, contracts or transactions that are excluded commodities … , the CEA supersedes and

preempts State gaming and bucket shop laws (except State antifraud laws of general applicability)." H.R. Rep. No. 106-711, pt. 2, at 71 (2000).

**b.** In 2010, after the 2008 financial crisis, Congress enacted the Dodd-Frank Act, bringing swaps within the CFTC's exclusive jurisdiction and establishing a "special rule" for CFTC review to determine whether certain swaps and event contracts are contrary to the public interest. Pub. L. No. 111-203, 124 Stat. 1376, 1666, 1672, 1736-37 (2010). Section 2(a)(1)(A) thus now provides that the CFTC "shall have exclusive jurisdiction … with respect to … transactions involving swaps or contracts of sale for a commodity for future delivery … traded or executed on a contract market designated" by the CFTC. Congress defined "swap" to include contracts providing for payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Swaps also include any "transaction that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

Congress also established a "special rule" allowing the CFTC to review and prohibit certain event contracts and swaps that the CFTC determines are

"contrary to the public interest." 124 Stat. 1736-37; 7 U.S.C. § 7a-2(c)(5)(C)(i).

The special rule provides that:

> In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency … , by a designated contract market … , the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—
>
> (I) activity that is unlawful under any Federal or State law;
>
> (II) terrorism;
>
> (III) assassination;
>
> (IV) war;
>
> (IV) gaming; or
>
> (V) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

7 U.S.C. § 7a-2(c)(5)(C)(i). If the CFTC decides that an event contract is "contrary to the public interest," the contract cannot be listed or traded on a DCM. *Id.* § 7a-2(c)(5)(C)(ii).

### 6. The CEA and its implementing regulations continue to extensively regulate trading on DCMs.

The CEA and its implementing regulations continue to extensively regulate on-DCM trading.

**a. Complying with core principles.** To become a DCM, an exchange must comply with 23 "core principles." *See id.* § 7(d); 17 C.F.R. pt. 38. A DCM must "provide its members … with impartial access to its markets and services." 17 C.F.R. §§ 38.150, 38.151(b). It must "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and market disruptions." *Id.* §§ 38.250, 38.255. It must comply with recordkeeping and daily disclosure obligations. *Id.* §§ 38.450, 38.950. And it must make records available to federal regulators, *id.* § 1.31(d)(1); maintain capital reserves covering "operating costs for … at least one year," *id.* § 38.1101(a)(2); create and maintain a "system capable of detecting and investigating potential trade practice violations," *id.* § 38.156; monitor for potential manipulation, *id.* § 38.251; and use a CFTC-registered (and federally regulated) clearinghouse, *id.* § 38.601; 7 U.S.C. § 7a-1. The CFTC also may require a DCM to provide a "written demonstration" of compliance with the core principles. 17 C.F.R. § 38.5(b).

**b.** **Certifying a new contract.** To offer a new contract or instrument, a DCM has two options for obtaining CFTC approval.

One option is to provide the CFTC with a self-certification that the new contract or instrument complies with the CEA and CFTC regulations. 7 U.S.C. § 7a-2(c)(1). After filing the self-certification, the DCM can begin offering the new contracts the next business day. 17 C.F.R. § 40.2(a)(2); *KalshiEX LLC v. CFTC*, 119 F.4th 58, 61 (D.C. Cir. 2024). The CFTC "may stay the listing of a contract … during the pendency of Commission proceedings for filing a false certification," among other circumstances. 17 C.F.R. § 40.2(c). The CFTC also can subject certain event contracts to a 90-day public-interest review if it determines that the contract may fall within one of the categories in the special rule. *See id.* § 40.11(c). After review, the CFTC "shall issue an order approving or disapproving" the contract. *Id.* § 40.11(c)(2).

Alternatively, a DCM "may request" prior CFTC approval to offer a new contract or instrument. 7 U.S.C. § 7a-2(c)(4)(A). The CFTC then "shall take final action on the request not later than 90 days after" the DCM submits the request. *Id.* § 7a-2(c)(4)(C).

**c.** **Enforcement.** The CEA gives the CFTC robust enforcement authority. For example, the CFTC can seek civil penalties for violations of the

CEA, *id.* § 9; revoke the contract market's designation, *id.* § 8(b); and refer the DCM for criminal enforcement, *see id.* § 13.

## B. Factual and procedural background

CDNA has operated a federally regulated DCM since 2004. In January 2025, CDNA self-certified a new kind of contract—live sports-event contracts that allow contract parties to hedge against financial risks associated with the outcome of live sport events. Nevada sent CDNA a cease-and-desist letter, claiming that CDNA's sports-event contracts violated Nevada gaming laws. CDNA sued Nevada and sought a preliminary injunction, which the district court denied.

### 1. CDNA certifies and lists sports-event contracts on its federally regulated DCM.

CDNA is a financial services company that has operated a CFTC-regulated DCM since 2004 where users can trade a variety of derivatives products. ER-158-60, 172-73. CDNA offers a variety of event contracts, including political-event contracts (like whether a particular political figure will be the party nominee for an upcoming election) and market-event contracts (like whether the Federal Reserve will raise interest rates at its next

meeting). Charles Archer, *Trading event contracts*, https://crypto.com/us/ prediction/learn/how-to-trade-event-contracts (last visited Jan. 12, 2026).

In early 2025, CDNA self-certified to the CFTC under 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. § 40.2(a) a new category of event contracts: "Industry Event - Live Presentations Contracts." ER-126. CDNA explained that the contracts comply with the CEA and relevant CFTC regulations. ER-137-42. The contracts became effective that same day. ER-173. The contracts allow users to trade on the outcome of lawful live events in the performing arts, spectator sports, and other industries, if the users themselves aren't event participants. ER-173. Examples include contracts where payment depends on the winner of the Academy Award for Best Picture, or the location of the next World Cup. *See* ER-173. CDNA designed its live-event contracts to allow businesses that "face economic consequences based on the outcome of a respective Industry Event" to manage those risks, "and to enable price discovery for related commercial enterprises." ER-133.

Among the live-event contracts that CDNA self-certified are sports-event contracts, which are tied to the outcomes of live sports events. ER-173. Trading on sports-event contracts allows stakeholders and individuals to hedge against the financial risk associated with a particular outcome of a

sports event. ER-126-27, ER-133-36, ER-168. For example, vendors and merchandisers often must decide how to distribute products and services for a sports event that many Americans might watch or attend. ER-134. Those decisions involve financial risk, because supply and demand could turn on whether the game occurs and on how it unfolds and ends. ER-134. In addition, a municipality might enjoy increased tourism revenue if it hosts the championship game. But hosting an event also exposes the municipality to risks from fan unrest, and addressing safety concerns can be expensive. ER-134. State-licensed sportsbooks, too, might see an influx of wagers on one particular side of a wager in a regular season game, and anticipate losing revenue if those wagers are successful. Sports-event contracts allow those stakeholders to hedge against the risks associated with sports events. (And CDNA bars players, coaches, agents, staff, and others with close connections to industry participants from trading in sports-event contracts. ER-130.)

Sports-event contracts differ from sports wagering. For example, DCMs like CDNA provide a transparent and neutral marketplace to match counterparties to sports-event contracts. ER-127, ER-167-68. Unlike casinos, DCMs don't make a profit depending on the outcome of an event and they don't set the odds. *See* ER-127, ER-167-68. And licensed sportsbooks can use

sports-event contracts to hedge against the risks the sportsbooks face from sports wagers, including a large volume of wagers going one way.

### 2. Nevada regulators, threatening criminal penalties, order CDNA to stop offering sports-event contracts to Nevada residents.

On May 20, 2025, the Nevada Gaming Control Board ordered CDNA "to immediately cease and desist from offering in Nevada any event-based wagering contracts concerning sporting events." ER-121-22. The Board alleged that CDNA's sports-event contracts are sporting event wagers under Nevada law, and that CDNA was operating an unlicensed sports pool—a business "accepting wagers on sporting events or other events by any system or method of wagering." ER-121-22. The Board claimed that CDNA's offering "event-based wagering contracts is unlawful in Nevada, unless and until approved as licensed gaming by the Nevada Gaming Commission." ER-121. The letter warned that offering the contracts was a felony and that it could subject CDNA to civil and criminal penalties. ER-122.

> ### 3. CDNA sues in district court and seeks a preliminary injunction because the CEA preempts Nevada gaming laws as applied to CDNA's sports-event contracts, but the district court denies the motion.

**a.** CDNA sued the Chairman of the Nevada Gaming Control Board and members of the Board, the State of Nevada, and the Attorney General of Nevada (collectively, Nevada), seeking a declaration that (1) Nevada lacks "authority to regulate the offering or listing of event contracts by CDNA conducted in accordance with federal law in its capacity as a DCM and pursuant to the CEA"; and (2) the CEA preempts Nevada law to the extent it "purport[s] to prohibit or otherwise regulate the trading of derivatives by CDNA in its capacity as a federally regulated DCM." ER-162-63, ER-186. CDNA sought a permanent injunction prohibiting Nevada from enforcing Nevada laws purporting to regulate trading on CDNA's DCM. ER-186. CDNA moved for a preliminary injunction, ER-186; Dist. Ct. Doc. 15, and for judgment on the pleadings, Dist. Ct. Doc. 42.

**b.** The district court denied both motions, holding that CDNA's live-event contracts "are not 'swaps' falling within the CFTC's exclusive jurisdiction." ER-11. The court focused on the definition of "swap" in § 1a(47)(A)(ii) and its reference to "the occurrence, nonoccurrence, or the

extent of the occurrence of an event." The court concluded that CDNA's sports-event contracts "turn on the outcome of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event." ER-24. In the court's view, the ordinary meaning of "occurrence is [that] something happened," whereas "[t]he ordinary meaning of event is a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." ER-23-24. And, the court reasoned, "the ordinary meaning of event in terms of sports would be the sporting event itself, not who wins it." ER-24. For example, "who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself." ER-24. Thus, the court held, payment under CDNA's sports-event contracts doesn't "depend[] on the occurrence, nonoccurrence, or the extent of the occurrence of an event." 7 U.S.C. § 1a(47)(A)(ii).

The district court also concluded that sports-event contracts couldn't be swaps because that would mean that the CFTC's exclusive jurisdiction would extend to "nearly all sports wagering … even though the states historically have regulated gambling through their police power." ER-26. In that case, "nearly every sports bet would be a transaction in which payment

is dependent on the outcome of a sporting event and is associated with a potential financial, economic, or commercial consequence." ER-26. Sports wagering thus could be conducted only on a DCM, even though sports wagering happens at casinos and on other non-DCM platforms. ER-26. The court reasoned that Congress didn't make clear that it "intended such a sea change in the regulatory landscape," and "[t]he CEA's language and legislative history show that Congress … did not want gambling to take place on CFTC-designated exchanges." ER-27.

The district court held that because CDNA failed to show likelihood of success on the merits, it didn't need to address the other preliminary injunction factors. ER-30. It nonetheless concluded that allowing CDNA "to offer sports wagers guised as swaps on its exchange unfettered by state regulation" harms Nevada, which is responsible for enforcing its gaming laws. ER-30. The court also concluded that "the public has an interest in ensuring that unlicensed sports wagering does not occur on CFTC-designated exchanges" in violation of the CEA and Nevada law. ER-30. The court thus denied CDNA's preliminary injunction motion.

The parties agreed that, pending appeal, CDNA wouldn't offer sports-event contracts in Nevada and that Nevada thus wouldn't enforce its gaming

laws with respect to those contracts. *See* ER-5-8. CDNA timely appealed. ER-190-94.

## SUMMARY OF ARGUMENT

**I.** CDNA will likely succeed on its claim that the CEA preempts Nevada's gaming laws as applied to the on-DCM trading of CDNA's sports-event contracts.

**A.** Federal law preempts state law when Congress "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." *Arizona*, 567 U.S. at 399. Federal law also impliedly displaces state laws that purport to regulate conduct subject to exclusive federal control, and state laws that conflict with federal law. *Id.*

**B.** Statutory text, structure, and context make clear that § 2(a)(1)(A) expressly preempts state laws as applied to swap-trading on DCMs by placing regulatory authority within the CFTC's "exclusive jurisdiction," as statutory and legislative history confirm.

**1.** The touchstone for an express preemption analysis is "the language of the statute itself." *Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 125 (2016). Courts "focus on the plain wording of the clause" and "do not invoke any presumption against preemption." *Id.*

- 28 -

**2.** Section 2(a)(1)(A)'s text and statutory context make clear that the CEA expressly preempts state law as applied to swap-trading on DCMs by granting the CFTC "exclusive jurisdiction" to regulate "all transactions involving swaps … traded or executed on a contract market designated pursuant to section 7 of the [CEA]." 7 U.S.C. § 2(a)(1)(A). A savings clause allows states to regulate conduct falling *outside* the CFTC's exclusive jurisdiction, confirming preemption for conduct *within* that jurisdiction. *See id.* § 2(a)(1)(A). The express preemption clause makes sense, because the CEA preempts the field of swap-trading on DCMs, leaving no room for state law.

**3.** Statutory and legislative history confirm that § 2(a)(1)(A) expressly preempts state law as applied to swap-trading on DCMs. When Congress overhauled the CEA in 1974, it gave the CFTC "exclusive jurisdiction" over DCMs. It also struck statutory language that had preserved state law, instead providing that state law would be preserved only "except as hereinabove provided," 88 Stat. at 1395, thus confirming that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies," S. Rep. No. 93-1131, at 6. And in 2010, Congress brought swaps transactions on DCMs under the CFTC's exclusive jurisdiction.

**C.**    Section 2(a)(1)(A) expressly preempts Nevada gaming laws as applied to CDNA's sports-event contracts, as conflict preemption confirms.

**1.**    CDNA's sports-event contracts are swaps traded on a DCM, and thus fall within the CFTC's exclusive jurisdiction. CDNA's sports-event contracts "provide[] for … payment … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). An "event" includes an outcome. And a "contingency" includes something that may happen as a result of something else. To be "associated with a potential financial, economic, or commercial consequence," the event must simply be "connected" to such a potential consequence. Here, payment under CDNA's sports-event contracts "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event"—like who wins the Super Bowl. The occurrence (or nonoccurrence) of such an event also is "associated with a potential financial, economic, or commercial consequence," because it's connected to the possibility that stakeholders will benefit financially, commercially, or economically. For instance, the winning team's hometown might experience increased tourism revenue, plus the hometown itself may need to devote

more resources to address the increased traffic. Or a local pizza chain might offer free pizza when a home team wins a regular season game, triggering financial and commercial consequences. CDNA's sports-event contracts are thus swaps traded on a federally regulated DCM.

**2.** Section 2(a)(1)(A) preempts Nevada gaming laws as applied to CDNA's sports-event contracts. The CFTC has "exclusive jurisdiction" over the trading of CDNA's sports-event contracts. Nevada asserts that its gaming laws prohibit CDNA from offering sports-event contracts unless CDNA obtains a state license for operating a sports pool in Nevada, so that the State can "strictly regulat[e]" the trading of CDNA's sports-event contracts. ER-121-22. But the CFTC alone regulates that trading. Nevada law cannot.

**3.** Obstacle and impossibility preemption illustrate why Congress enacted § 2(a)(1)(A) and confirm that the CEA leaves no room for Nevada's gaming laws as applied to CDNA's sports-event contracts. *First*, applying Nevada's gaming laws would pose an obstacle to the CEA's central purpose of bringing derivatives "markets under a uniform set of regulations." *American Agriculture*, 977 F.2d at 1156. *Second*, CDNA cannot comply with both Nevada's gaming laws and the CEA with respect to its sports-event contracts. For instance, CDNA must "provide its members" "with impartial

access to its markets and services" 17 C.F.R. §§ 38.150, 38.151(b)—a requirement at odds with barring users in a given state from trading sports-event contracts. Congress added an express preemption provision to § 2(a)(1)(A) to address this very kind of conflict.

**D.** The CEA preempts the field of *all* trading on DCMs, so it preempts Nevada gaming laws as applied to that activity whether or not CDNA's sports-event contracts are swaps. The CEA establishes "a comprehensive" scheme for regulating every aspect of a DCM's activities, from start to finish, and makes clear that federal law governs on-DCM transactions, while states can regulate off-DCM transactions. *Curran*, 456 U.S. at 356. Federal regulation of on-DCM trading leaves "no room for [Nevada] to supplement it." *Arizona*, 567 U.S. at 399.

**E.** The district court's reasoning and Nevada's arguments fail.

**1. a.** The district court held that CDNA's sports-event contracts aren't swaps because they don't depend "on the occurrence, nonoccurrence, or the extent of the occurrence of an event." 7 U.S.C. § 1a(47). Instead, the court reasoned, payment turns on the *outcome* of an event. The reasoning fails. The ordinary meaning of "event" includes an outcome. For instance, the final game of the World Series is an event, but so is a player's record-

- 32 -

setting home run at the final game—even if that home run is also an outcome. The district court erred in artificially defining "event" by constructing an atextual, subjective, and unworkable standard requiring a "happening of some significance."

      **b.**    Nevada says sports events aren't "associated with a potential financial, economic, or commercial consequence," because they have only potential downstream, rather than "inherent," financial consequences. But nothing in the CEA's text requires an event to be "inherently" financial. That word doesn't appear in the broad definition of "swap," which, to the contrary, includes weather and other events with no "inherent" financial consequence, *see* 7 U.S.C. § 1a(47)(A)(i), (iii). And the special rule addresses swaps that "involve" "terrorism" and "assassination," 7 U.S.C. § 7a-2(c)(5)(C)(i)—neither of which is "inherently" financial.

      **c.**    The district court concluded that CDNA's sports-event contracts couldn't be swaps, because if they were, all sports wagers would be swaps falling under the CFTC's exclusive jurisdiction. That is incorrect. The CFTC has exclusive jurisdiction over CDNA's sports-event contracts because they are traded on a DCM. And swaps are typically traded either on a DCM, or "over-the-counter" by financial institutions and other sophisticated entities.

- 33 -

Sports wagers, in contrast, are common consumer transactions not traded on DCMs or over-the-counter. *See Further Definition*, 77 Fed. Reg. at 48,246-47. Sports wagering fundamentally differs from sports-event contracts traded on DCMs, which provide an open and neutral market, because casinos or spots-wagering platforms set the odds and takes opposing sides of a bet. And the special rule's reference to "gaming" swaps, 7 U.S.C. § 7a-2(c)(5)(C)(i), makes clear that swaps must cover some gaming contracts—not none, as the district court thought.

d.     Whether or not CDNA's sports-event contracts are swaps isn't a question for states anyway, because it is committed to the CFTC's exclusive jurisdiction. On Nevada's theory, every state could interfere with trading on DCMs and subject trading to varying state standards. But Congress sought to avoid that very result. If Nevada thinks CDNA's sports-event contracts aren't swaps, it should file an Administrative Procedure Act (APA) suit against the CFTC. 5 U.S.C. § 551(13). Parties may not "use a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions." *Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015) (en banc).

**2.** CDNA's sports-event contracts are swaps. But they are also "options" and subject to the CFTC's exclusive jurisdiction for that reason, too. *See* 7 U.S.C. § 2(a)(1)(A). Binary options pay a fixed amount depending on whether an outcome occurs—like whether a particular person runs for office. Because CDNA's sports-event contracts pay a fixed amount depending on an outcome of a sports event, they are binary options. The CFTC thus has exclusive jurisdiction to regulate their trading on DCMs as options.

**3.** Nevada claims that even if CDNA's sports-event contracts are swaps, the CEA still doesn't preempt the application of Nevada gaming laws. Nevada claims that "exclusive jurisdiction" isn't preemptive language. That is incorrect. Preemption doesn't turn on magic words, and the "exclusive jurisdiction" language plainly displaces state authority. Nor does the proper understanding of swaps make the CEA conflict with other federal statutes that regulate gaming, but that don't purport to regulate trading of sports-event contracts on DCMs.

**II. A.** The balance of harms and public interest favor a preliminary injunction. Nevada has threatened CDNA with irreparable harm—civil and criminal consequences for failure to comply with state law. But complying would cost CDNA business and reputational harm in Nevada, plus

money to develop technology to bar Nevada users from trading in sports-event contracts. In fact, CDNA has experienced those harms already, having agreed not to offer sports-event contracts in Nevada pending appeal. Given Nevada's sovereign immunity, CDNA won't be able to later recoup those expenses. The public interest likewise favors a preliminary injunction, because "preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019).

**B.** The district court's contrary conclusion rests on the notion that CDNA's sports-event contracts are not swaps, but rather illegal sports wagers. That reasoning collapses once its premise is corrected. Because the CEA preempts applying Nevada law to CDNA's sports-event contracts, the interests favor enforcing federal law, not allowing Nevada to override it.

**C.** The CEA's preemption of Nevada law requires judgment on the pleadings for CDNA, no matter the irreparable harm or balance of equities.

## STANDARD OF REVIEW

A party seeking a preliminary injunction "must establish that (1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest." *Alliance*

*for the Wild Rockies v. Petrick*, 68 F.4th 475, 490 (9th Cir. 2023). This Court reviews a "district court's denial of a preliminary injunction for abuse of discretion." *Oregon Right to Life v. Stolfi*, 158 F.4th 1013, 1019 (9th Cir. 2025). But the Court reviews de novo any conclusions of law, *id.*, like "a district court's decision regarding preemption," *Olympic Pipe Line Co. v. Seattle*, 437 F.3d 872, 877 n.12 (9th Cir. 2006). The Court reviews the district court's factual findings for clear error. *Oregon Right to Life*, 158 F.4th at 1019.

## ARGUMENT

### I. CDNA will likely succeed on the merits because the CEA preempts the application of Nevada's gaming laws to trading on DCMs, including the trading of CDNA's sports-event contracts.

CDNA will likely succeed on its claim that the CEA preempts Nevada's gaming laws as applied to the trading of CDNA's sports-event contracts. Federal law can expressly or impliedly preempt state law. The CEA does both. Section 2(a)(1)(A) expressly preempts state laws, like Nevada's gaming laws, as applied to swap-trading on DCMs. That makes sense, because the CEA preempts the field of swap-trading on DCMs. And CDNA cannot comply with both federal law and Nevada law.

### A.   Federal law can preempt state law when Congress expressly says so, or impliedly when state regulation cannot coexist.

The Constitution provides that federal law "shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Congress thus "has the power to pre-empt state law." *Arizona*, 567 U.S. at 399. Congress may do so by "withdraw[ing] specified powers from the States by enacting a statute containing an express preemption provision." *Id.* Federal law also impliedly displaces state laws that purport to regulate conduct subject to exclusive federal control, and state laws that conflict with federal law, even absent an express preemption provision. *Id.*; *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

Implied preemption can happen in three ways, which all seek to "determine whether state regulation is consistent with the structure and purpose" of the federal statutory and regulatory scheme "as a whole." *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003).

*First*, "[s]tates are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Field preemption

thus applies when "there is a 'federal interest … so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* To determine the field, courts must focus on the conduct regulated by federal law, *National Federation of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 724 (9th Cir. 2016), and assess the "comprehensiveness of a statute" and the "pervasiveness of the regulations" promulgated to implement it, *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007). If that inquiry shows that Congress intended to preempt the field, then federal law displaces "any state law relating to the 'issue' or subject matter of a federal standard." *Industrial Truck Ass'n v. Henry*, 125 F.3d 1305, 1310 (9th Cir. 1997).

*Second*, impossibility preemption occurs where "compliance with both federal and state regulations is a physical impossibility." *Arizona*, 567 U.S. at 399. *Third*, courts find obstacle preemption "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.*

### B. Section 2(a)(1)(A) expressly preempts state law as applied to swap-trading on DCMs by placing regulatory authority within the CFTC's "exclusive jurisdiction."

Statutory text, structure, and context make clear that § 2(a)(1)(A) expressly preempts state laws, like Nevada's gaming laws, as applied to swap-

trading on DCMs because it grants the CFTC "exclusive jurisdiction" over that trading, as statutory and legislative history confirm. Congress's inclusion of an express preemption clause makes sense, both because the CEA preempts the field of on-DCM trading, and because CDNA cannot comply with both federal law and Nevada law as applied to that conduct.

### 1. Courts must interpret statutes according to their plain meaning, without any presumption against preemption.

The express preemption analysis focuses on "the language of the statute itself." *Franklin*, 579 U.S. at 125. Courts must "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011). When "the language of the statute" "is plain," that "is also where the inquiry should end." *Franklin*, 579 U.S. at 125. Thus, courts interpreting express preemption clauses "do not invoke any presumption against preemption." *Id.* That rule follows the bedrock principle that, as the Supreme Court "ha[s] stated time and again," "courts must presume that a legislature says in a statute what it means and means … what it says." *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

###### 2. Section 2(a)(1)(A)'s text and context make clear that the CEA expressly preempts state law as applied to swap-trading on DCMs.

Section 2(a)(1)(A)'s text and statutory context make clear that the CEA expressly preempts state law as applied to swap-trading on DCMs by granting the CFTC "exclusive" authority to regulate such trading. The provision states that "[t]he CFTC shall have exclusive jurisdiction … with respect to … all transactions involving swaps … traded or executed on a contract market designated pursuant to section 7 of the [CEA]." 7 U.S.C. § 2(a)(1)(A). A savings clause allows states to regulate conduct that *doesn't* fall within the CFTC's exclusive jurisdiction, confirming that what's under the CFTC's jurisdictional umbrella is for the CFTC alone to regulate. The CEA also preempts the field of swap-trading on DCMs, reinforcing that § 2(a)(1)(A) expressly preempts state laws as applied to swap-trading on DCMs.

a. By granting the CFTC "exclusive jurisdiction" over swap-trading on DCMs, § 2(a)(1)(A) "necessarily denies jurisdiction of such" conduct to other entities. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). That "follows from the plain meaning of 'exclusive,'" *id.* at 78: "Not divided or shared by others," *The American Heritage Dictionary* 458 (1st ed. 1973), or "limited to possession, control, or use by a single individual [or] organization,"

- 41 -

*Webster's New International Dictionary* 890 (2d ed. 1934). Thus, "giv[ing] federal courts exclusive jurisdiction over a federal cause of action" means that "under the Supremacy Clause," Congress has "affirmatively divest[ed] state courts" of jurisdiction. *Yellow Freight System, Inc. v. Donnelly*, 494 U.S. 820, 823 (1990). The same goes for statutes granting exclusive jurisdiction to federal agencies. In *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150, 163 (2016), the Supreme Court held that Maryland had "invade[d]" the Federal Energy Regulatory Commission (FERC)'s "regulatory turf" by setting a rate for interstate wholesale electricity sales, when FERC had "exclusive jurisdiction over 'rates and charges'" for "interstate wholesale [electricity] sales." *Accord Duke Energy Trading & Marketing, LLC v. Davis*, 267 F.3d 1042, 1057 (9th Cir. 2001). Here, "when Congress said" the CFTC's jurisdiction is "exclusive[,] it meant exactly that." *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911 (9th Cir. 1989); *see Hunter*, 711 F.3d at 157.

**b.** Section 2(a)(1)(A)'s savings clause preserves state authority for conduct falling outside the CFTC's jurisdiction, thus confirming that the CEA preempts state law as applied to conduct that falls within the CFTC's jurisdiction, including swap-trading on DCMs. By providing that "nothing contained in [section 2]" supersedes or limits the jurisdiction of state

agencies "except as hereinabove provided," the provision makes clear that the CFTC's exclusive jurisdiction—which is "hereinabove provided"—*does* preempt state authority. The "logical inference" from the provision is that § 2(a)(1)(A) preserves state authority "subject to" "the rest of" that section— including its definition of what falls within the CFTC's "exclusive jurisdiction." *Omnipoint Communications, Inc. v. Huntington Beach*, 738 F.3d 192, 196 (9th Cir. 2013).

    **c.**    It makes sense that Congress chose to provide § 2(a)(1)(A) for express preemption of state law as applied to swap-trading on DCMs, because the CEA preempts the field of swap-trading on DCMs. As noted, field preemption prevents states from regulating conduct in a field that the government pervasively regulates, leaving "no room" for supplemental state regulation. *Arizona*, 567 U.S. at 399. Here, there is no room for states to regulate swap-trading on DCMs. The CEA creates "a comprehensive regulatory structure" to oversee that trading, *Curran*, 456 U.S. at 356, displacing state law as applied to that same conduct. DCMs can self-certify and list swaps for trading, 7 U.S.C. § 7a-2(c)(1), and the CFTC alone has authority to stay, review, and delist them, *see* 17 C.F.R. §§ 40.2(c), 40.11(c). *Supra* pp. 19-20. The CEA also establishes comprehensive rules governing DCMs to prevent fraud

and manipulation, and grants the CFTC robust enforcement powers, including authority to pursue civil penalties, revoke a market's designation, and refer a market for criminal enforcement. *Supra* pp. 19-21. Given that the CEA preempts the field of swap-trading on DCMs, it makes sense that Congress added an express preemption provision to reinforce the supremacy of federal law.

### 3. Statutory and legislative history confirm that § 2(a)(1)(A) expressly preempts state law as applied to swap-trading on DCMs.

Statutory and legislative history confirm that § 2(a)(1)(A) expressly preempts state law as applied to swap-trading on DCMs. For instance, the 1974 overhaul of the CEA consolidated regulatory authority of DCMs in the CFTC, placing it in the agency's "exclusive jurisdiction." *Supra* pp. 11-14. The legislation also "struck" the language from the 1936 act that preserved "any State law applicable to any transaction" covered by the CEA. H.R. Rep. No. 93-1383, at 35. Instead, Congress added that, "except as hereinabove provided, nothing contained in this section [conferring exclusive jurisdiction on the CFTC] shall … supersede or limit the jurisdiction" of state "regulatory authorities." 88 Stat. at 1395. Thus, as the Senate Report confirms, "the

Commission's jurisdiction, where applicable, supersedes State as well as federal agencies." S. Rep. No. 93-1131, at 6, 23.

What's more, in 2010, Congress brought "swaps" traded on DCMs within the CFTC's exclusive jurisdiction, and crafted a "special rule" allowing the CFTC—and the CFTC alone—to determine whether certain swaps are contrary to the public interest and thus cannot be traded on DCMs. 7 U.S.C. § 7a-2(c)(5)(C); *supra* pp. 17-18. Those changes confirm that the CFTC alone regulates swap-trading on DCMs, and that § 2(a)(1)(A) preempts state law as applied to that conduct.

Before the 2010 amendments, courts had held that § 2(a)(1) "preempts the application of state law." *Leist*, 638 F.2d at 322. Given the presumption that "Congress acts 'with awareness of relevant judicial decisions,'" *United States v. Alvarez-Hernandez*, 478 F.3d 1060, 1065 (9th Cir. 2007), the amendments reaffirmed the CFTC's exclusive jurisdiction of on-DCM trading and that jurisdiction's preemption of state regulation of such trading.

**C.   Section 2(a)(1)(A) expressly preempts Nevada gaming laws as applied to the trading of CDNA's sports-event contracts, as conflict preemption confirms.**

Section 2(a)(1)(A) expressly preempts Nevada gaming laws as applied to the trading of CDNA's sports-event contracts. Those contracts are swaps

traded on a DCM, and thus fall within the CFTC's exclusive jurisdiction. But Nevada seeks to regulate that trading, claiming that it is unlawful unless CDNA obtains a state sports-pool license. But the CEA preempts Nevada's gaming laws as applied to the trading of CDNA's sports-event contracts. That makes sense: It's not possible for CDNA to comply with both federal and Nevada laws governing the trading of CDNA's sports-event contracts.

### 1. CDNA's sports-event contracts are swaps traded on a DCM.

CDNA's sports-event contracts are swaps because they are "contracts" traded on a DCM that "provide[] for … payment … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

*First*, an "event" includes the outcome of a competition or game. Indeed, the plain meaning of "event" includes "the outcome, issue, or result of anything." *Event*, *Random House Webster's Unabridged Dictionary* (2d ed. 2001); *see Event*, *Webster's II New College Dictionary* (3d ed. 2005) ("[t]he actual outcome or final result"). "Event" also means "[s]omething that happens." *Event*, *Random House Webster's Pocket American Dictionary* (5th ed. 2008); *see*

- 46 -

*Event*, Oxford American Dictionary and Thesaurus (2d ed. 2009) ("a thing that happens or takes place"). In 2008, the CFTC likewise considered events to include outcomes, explaining that "event contracts typically pay out a fixed amount when an outcome either occurs or does not occur." *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008) [hereinafter *Concept Release*]; *see id.* at 25,669 ("event contracts may be based on eventualities and measures," like "the results of political elections, or the outcome of particular entertainment events"). Congress added the definition of "swap" in 2010 "against the backdrop" of that interpretation, which "should be understood to work in harmony" with the later inclusion of "event" in § 1a(47)(A)(ii). *Monsalvo v. Bondi*, 604 U.S. 712, 725 (2025).

*Second*, the ordinary meaning of "contingency" includes an outcome. It means "something liable to happen as an adjunct to or result of something else." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).

*Finally*, an event or contingency is "associated with a potential financial, economic, or commercial consequence" when it is connected to such a consequence. *Associated*, Oxford English Dictionary (3d ed. 2011); *see Da Silva*

- 47 -

*v. Attorney General*, 948 F.3d 629, 635-36 (3d Cir. 2020) ("connected" means "related, associated (in idea or nature)").

Here, payment under CDNA's sports-event contracts "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency"—like who wins the World Cup or whether a particular player will break a record during a game. The occurrence (or nonoccurrence) of those events also is "associated with a potential financial, economic, or commercial consequence," because it is connected to the possibility that stakeholders will benefit financially, commercially, or economically. For example, local retailers might expect to sell more of the winning team's merchandise in the team's hometown, but stand to lose if the team doesn't win. Hotels and restaurants in the city hosting the Super Bowl might also expect more business, but their property might also be damaged if there's fan unrest. Licensed sportsbooks might also expect lost revenues if there is a large volume of one particular bet that cashes out for the bettors. *Supra* pp. 22-24.

CDNA's sports-event contracts are traded on its federally regulated DCM. *Supra* p. 22. The CFTC thus has exclusive jurisdiction over trading of CDNA's sports-event contracts.

- 48 -

### 2. Section 2(a)(1)(A) expressly preempts Nevada gaming laws as applied to the trading of CDNA's sports-event contracts.

Section 2(a)(1)(A) preempts Nevada gaming laws as applied to CDNA's sports-event contracts. As explained (at 39-44), the CFTC has "exclusive jurisdiction" over the on-DCM trading of CDNA's sports-event contracts, preempting otherwise applicable state law. Nevada claims its gaming laws prohibit CDNA from offering sports-event contracts unless CDNA obtains a Nevada sports-pool license, so that the State can "strictly regulat[e]" the trading of CDNA's sports-event contracts. ER-121-22 (citing Nev. Rev. Stat. Ann. §§ 463.160, 463.245, 463.0193). That attempt to invade the CFTC's "regulatory turf," *Hughes*, 578 U.S. at 163, is preempted.

### 3. Obstacle and impossibility preemption illustrate why Congress enacted § 2(a)(1)(A) and confirm that the CEA leaves no room for Nevada's gaming laws.

Two implied preemption doctrines confirm what § 2(a)(1)(A) makes express: The CEA preempts Nevada gaming laws as applied to the trading of CDNA's sports-event contracts. *First*, applying Nevada gaming laws to CDNA's sports-event contracts would pose an obstacle to the CEA's purpose. *See Arizona*, 567 U.S. at 399. *Second*, CDNA cannot comply with both Nevada's gaming laws and the CEA with respect to its sports-event

- 49 -

contracts. *See id.* That reality shows why it makes sense that Congress added an express preemption provision to make clear that § 2(a)(1)(A) preempts state law as applied to trading on DCMs.

    **a.**    Applying Nevada's gaming laws to CDNA's sports-event contracts poses an obstacle to the CEA's objective of bringing derivatives "markets under a uniform set of regulations." *American Agriculture*, 977 F.2d at 1156. "When application of state law would directly affect trading on or the operation of" a DCM, it poses "an obstacle to the accomplishment and execution of [Congress's] full purposes and objectives" "and hence is preempted." *Id.* at 1156–57. Here, applying Nevada gaming laws "would directly affect trading on or the operation of" CDNA's DCM. *Id.* Indeed, Nevada seeks to stop the trading of CDNA's sports-event contracts, or to require CDNA to become a state-licensed sports-pool operator. *Supra* pp. 24. But Congress crafted the CEA to establish robust and uniform federal regulation of trading on DCMs, including swap-trading. *Supra* pp. 11-21. If the CEA didn't preempt state gaming laws as applied to sports-event contracts, then trading in those contracts would be subject to "different state standards." *Botsford v. Blue Cross & Blue Shield of Montana, Inc.*, 314 F.3d 390, 395 (9th Cir. 2002), *opinion amended on denial of reh'g*, 319 F.3d 1078 (9th Cir. 2003).

That, in turn, "would disrupt the [CFTC's] nationally uniform administration" of DCMs and swap-trading. *Id.*

**b.** CDNA also cannot comply with both the CEA and its implementing regulations, on the one hand, and Nevada gaming laws, on the other. Core Principle 2, for example, requires DCMs to "provide its members … with impartial access to its markets and services." 17 C.F.R. §§ 38.150, 38.151(b). But barring Nevada residents from trading in sports-event contracts is at odds with that requirement.

> **D. Beyond express and conflict preemption, the CEA preempts the field of *all* trading on DCMs—no matter whether the derivatives are swaps or something else—including Nevada gaming laws as applied to CDNA's sports-event contracts.**

In any event, whether CDNA's sports-event contracts are swaps is not a question for Nevada. To the contrary, the CEA establishes "a comprehensive" scheme for regulating every aspect of a DCM's activities, from start to finish, *Curran*, 456 U.S. at 356, and makes clear that federal law governs the field of on-DCM transactions, while states can regulate off-DCM transactions. *Supra* pp. 39-45. The CEA thus preempts Nevada gaming laws as applied to CDNA's on-DCM sports-event contracts.

For starters, an exchange must receive CFTC designation to list derivatives contracts. 7 U.S.C. § 7(a). The exchange must establish that it can satisfy a number of rigorous requirements, like the ability to detect violations of CFTC rules. *See, e.g.*, 17 C.F.R. §§ 38.150(b), 38.155(a), 38.156.

After an exchange becomes a DCM, it has continuing obligations, including maintaining "risk control mechanisms," keeping records, and providing daily disclosures about trading on the exchange. *Id.* §§ 38.250, 38.255, 38.450, 38.950. DCMs must also make records available to federal regulators for inspection, *id.* § 1.31(d)(1); maintain capital reserves covering a year's worth of operating costs, *id.* § 38.1101(a)(2); monitor for potential manipulation, *id.* § 38.251; and use a CFTC-registered (and extensively regulated) clearinghouse, *id.* § 38.601; 7 U.S.C. § 7a-1. The CFTC also may require a DCM to provide a "written demonstration" of its compliance with agency rules. 17 C.F.R. § 38.5(b). *Supra* p. 19.

The CEA also governs the process for a DCM's listing a new kind of contract by establishing processes and rules for DCMs to self-certify a new contract or to seek prior agency approval. And the CFTC also can stay the listing of certain event contracts, and subject them to a public-interest review. *Supra* p. 20.

As for trading, the CEA draws a "bright line … between state and federal jurisdiction." *Public Utility District No. 1 v. IDACORP Inc.*, 379 F.3d 641, 646-47 (9th Cir. 2004). States can regulate and seek enforcement with respect to off-DCM transactions. For example, states may bring *parens patriae* actions seeking injunctive or monetary relief for CEA violations, but they can't sue "a contract market." 7 U.S.C. § 13a-2. And the CEA expressly provides that "[n]othing in this chapter shall supersede or preempt … the application of" state law "to any transaction in or involving any commodity … that is not conducted on or subject to the rules of a registered entity or exempt board of trade"—that is, on a DCM. *Id.* § 16(e)(1). In other words, states may apply their laws to off-DCM transactions. *Id.*

The negative implication is that the CEA *does* supersede and preempt state laws as applied to transactions that *are* "conducted on or subject to the rules of" a DCM. *See, e.g.*, A. Scalia & B. Garner, *Reading Law* 107 (2012) (negative-implication canon). That negative implication tracks § 2(a)(1)(A)'s express "exclusive jurisdiction" language making clear that the CFTC alone regulates and can pursue enforcement actions as to on-DCM transactions. Indeed, courts have recognized that the CEA preempts state laws when applying them "would directly affect trading on or the operation of a futures

market." *American Agriculture*, 977 F.2d at 1156. Unsurprisingly, CFTC rules govern trading on DCMs, *see* 7 U.S.C. §§ 6a, 6b, 6c; 17 C.F.R. §§ 180.1, 180.2, and the CFTC can seek civil penalties, revoke designations, and refer cases to the Department of Justice for criminal enforcement. *Supra* pp. 20-21.

In sum, the CEA's comprehensive regulatory scheme as to on-DCM trading leaves "no room for [Nevada] to supplement it." *Arizona*, 567 U.S. at 399. But Nevada seeks to do that here in claiming that its gaming laws apply to CDNA's on-DCM sports-event contracts. The CEA preempts that attempt.

### E. The district court's reasoning and Nevada's arguments fail.

The district court held that the CEA doesn't preempt Nevada's gaming laws as applied to CDNA's sports-event contracts because those contracts aren't "swaps." Nevada also argued that, even if the contracts are swaps, the CEA doesn't preempt its gaming laws, because the CFTC cannot exclusively regulate sports-wagering. The district court's reasoning and Nevada's arguments lack merit.

#### 1. CDNA's sports-event contracts are swaps, and the district court's and Nevada's contrary reasoning fails.

The district court held that CDNA's sports-event contracts are not swaps because they depend on the *outcome* of an event and not "on the

occurrence, nonoccurrence, or the extent of the occurrence of an event." 7 U.S.C. § 1a(47); ER-24. The district court also reasoned that sports-event contracts can't be swaps, because that would mean the CFTC has exclusive jurisdiction over sports wagering, even though states, including Nevada, have long licensed and regulated sports wagering. Nevada, for its part, also claims that the sport events aren't "associated with a potential financial, economic, or commercial consequence." Dist. Ct. Doc. 63 at 14-16. Those arguments fail as a matter of text and statutory history. They also overlook that, unlike sports wagers, swaps are typically "traded on organized markets and over the counter" with financial and other sophisticated institutions. *Further Definition*, 77 Fed. Reg. at 48,217.

### a. The district court's reasoning that "event" does not mean "outcome" fails.

The district court reasoned that CDNA's sports-event contracts "turn on the outcome of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event." ER-24. In the court's view, "[t]he ordinary meaning of event is a happening of some significance that took place or will take place, ... such as a particular sporting event," and "event"

doesn't also mean the "outcome" of an event. ER-23-24. That atextual reading is incorrect.

As explained (at 46-47), the ordinary meaning of "event" includes an "outcome." "Event" might *also* mean "a happening of some significance," but there's no reason the word "event," as used in § 1a(47)(A)(ii), doesn't mean *both* a happening of some significance and an outcome. To the contrary, it means exactly that. Payment could turn on whether game seven of the Stanley Cup finals "occurs," but it also could turn on the Capitals' winning game seven. Or one might say, "In the event Jane Smith wins the next presidential election, she will become the first female president in U.S. history." The presidential election is an event, but Jane Smith's winning the election would be, too. And a historic flood could be an event, but so could losing a home in the flood—even though losing a home is also an outcome of the flood. The question is whether the ordinary meaning of "event" or "occurrence" covers the outcome of a game (it does)—not whether, the term "event" or "occurrence" applies to a game rather than its outcome if it can apply to only one. The word isn't so limited, as the CFTC itself recognized nearly two decades ago in explaining that event contracts can turn on outcomes. *See Concept Release*, 73 Fed. Reg. at 25,669-71.

Statutory history—Congress's consistent broadening of the CEA's reach—supports reading "event" to include both a happening of some significance *and* an outcome, and a "contingency" includes an outcome, too. Congress expanded the definition of "commodity" to include "all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). Congress also added the term "excluded commodities," which includes intangibles like interest rates, *id.* § 1a(19)(i), and expanded the CFTC's jurisdiction to reach swaps. And a "swap" is itself defined as including any "transaction that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). What's more, § 1a(47)(A)(ii)'s inclusion of "contingency" confirms the broad reach of "swap." Interpreting "event" to include both a happening of some significance and an outcome adheres to the CEA's broad design. The district court's arbitrary decision to restrict the definition of "event" contravenes it.

The district court's interpretation also leads to unnecessary and difficult line-drawing problems. If an event is "a happening of some significance," parties will have to litigate, and courts will need to decide, whether a particular event is significant enough to satisfy § 1a(47)(A)(ii). Many events also can be recharacterized as an outcome: Game seven of the

Stanley Cup is an event, but whether it happens depends on the outcome of the earlier games in the series. The district court's distinction doesn't work.

> **b.** **Events need not be "inherently" associated with financial consequences, as Nevada incorrectly claims.**

Nevada claims that sports-event contracts are not swaps because they are not "based on inherently financial, economic, or commercial events," and have only downstream financial consequences. Dist. Ct. Doc. 63 at 14-16. That argument fails.

*First*, § 1a(47)(A)(ii) "says no such thing." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). The statute says that the event must be "associated with"—*i.e.* connected with—"a potential financial, economic, or commercial consequence"—not that the event itself must be "inherently" financial, economic, or commercial. Nevada's argument adds language to the statute.

*Second*, context shows that there is no requirement that a swap be based on an event that is "inherently" financial. For example, § 1a(47)(A)(iii) lists swaps tied to events that are not "inherently" financial—including "a weather swap." A weather event has only downstream financial consequences—it might affect tourism or energy prices in a particular area. Indeed, the CFTC has recognized that event contracts may be based on

"environmental measures"—like rainfall or the temperature—that "do not predictably correlate to commodity market prices or other measures of broad economic or commercial activity." *Concept Release*, 73 Fed. Reg. at 25,671. "[P]olitical or entertainment … events" aren't necessarily "inherently" financial events either. But who wins a presidential election will have downstream financial and economic consequences. And who wins the Best Picture award could have downstream commercial consequences at the box office or for streaming services.

What's more, § 1a(47)(A)(iv) broadly defines "swap" to include an agreement "that is, or in the future becomes, commonly known to the trade as a swap." Artificially limiting "swap" to reach only events that are "inherently" financial would contravene the term's purposefully broad reach.

*Third*, the special rule, 7 U.S.C. § 7a-2(c)(5)(C)(i), confirms that events need not be "inherently" associated with financial consequences. The special rule contemplates the CFTC's exercising jurisdiction over swaps that "involve" "terrorism" and "assassination," but neither terrorism nor assassination is an "inherently" financial event—although both certainly have potential downstream financial consequences.

*Finally*, requiring an event to be "inherently" financial likewise raises difficult line-drawing problems. It would require courts to discern what financial consequences are "inherent" to a particular event, and what instead might be only "downstream." That's not an administrable standard (nor the one Congress wrote).

> ### c. The CFTC's exclusive jurisdiction doesn't extend to all sports wagering just because CDNA's sports-event contracts are swaps.

The district court also concluded that CDNA's sports-event contracts can't be swaps, because then all sports wagers are swaps falling under the CFTC's exclusive jurisdiction, even though states like Nevada have long licensed and regulated sports wagering. ER-26-29. That reasoning fails.

*First*, the CFTC has exclusive jurisdiction over CDNA's sports-event contracts because they are traded on a DCM. Sports wagers are bets placed *off* of a DCM, and states—not the CFTC—thus regulate that activity. *Supra* pp. 14-15; *see* 7 U.S.C. §§ 2(a), 16(e)(1)(B)(i). Indeed, when Congress enacted the Unlawful Internet Gaming Enforcement Act (UIGEA) in 2006, it generally incorporated state definitions of "bet or wager," *see* 31 U.S.C. § 5362(10), but expressly *excluded* from the definition "any transaction conducted on or subject to the rules of a [DCM] under the [CEA]," *id.* § 5362(1)(E)(ii). That

legislative choice confirms that bets or wagers under state law are distinct from on-DCM transactions.

*Second*, sports wagers aren't swaps. Swaps are typically "traded on organized markets" (DCMs), "and over the counter" with "financial entities" and other sophisticated institutions. *Further Definition*, 77 Fed. Reg. at 48,217, 48,247-48. Sports bets are not. Instead, they fall within the category of "customary consumer" transactions, which are *not* swaps. *Id.* at 48,246-47. That's also why sports-wagering isn't unlawful trading in swaps under 7 U.S.C. § 2(e)—they're not swaps to begin with. *See* ER-26 & n.12. Indeed, sports wagering fundamentally differs from sports-event contracts, which parties trade with each other on an open and neutral market—rather than placing wagers with entities (like sportsbooks) that set the odds. And sportsbooks can use sports-event contracts to hedge against financial risks associated with offering sports-wagering services, thus underscoring the difference between sports wagers and sports-event contracts. *Supra* pp. 23-24.

*Third*, even if sports-event contracts resemble gaming, Congress didn't prohibit gaming contracts on DCMs. To the contrary, the special rule makes clear that the CEA doesn't forbid such contracts. Instead, the special rule contemplates that the CFTC "may determine" that transactions involving

"gaming" are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The special rule's contemplation of gaming "agreements, contracts, transactions, or swaps" shows that the CEA's definition of derivatives, including "swaps," could cover some gaming-related contracts. Given that coverage, it makes sense to understand swaps and other transactions involving gaming as covering only on-DCM transactions. The special rule's contemplation of transactions involving gaming and the CEA's authority to review and prohibit them also means that gaming contracts *can* be listed under the CEA, unless and until the CFTC prohibits them. Cherry-picked legislative statements about preventing gambling and sports wagering on futures markets, *see* ER-28-29, are, of course, "not the law," *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 523 (2018).

> **d.** **In any event, states cannot second-guess whether the sports-event contracts are swaps.**

Whether or not CDNA's sports-event contracts are swaps is not an issue for the states anyway, because the CFTC has exclusive jurisdiction to regulate all trading on DCMs. *Supra* pp. 51-54. Under Nevada's position, every state, with its own standards, could interfere with trading on DCMs—a result Congress specifically sought to avoid. *Supra* pp. 11-13.

At bottom, then, Nevada's complaint must be that the CFTC should prohibit CDNA from listing sports-event contracts on its DCM. But that's a claim that can be brought only by an aggrieved party under the APA against the CFTC—not against CDNA—for the agency's "action"—like a license approval—or "failure to act." 5 U.S.C. § 551(13). Here, for example, the CEA's self-certification process is a "passive approval system" for new contracts that a DCM seeks to list, but it is an approval—and thus a final agency action—nonetheless. *Brotherhood of Locomotive Engineers & Trainmen v. Federal Railroad Administration*, 972 F.3d 83, 89 (D.C. Cir. 2020); *see* 5 U.S.C. § 704. And the APA doesn't allow parties to "use a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions." *Big Lagoon*, 789 F.3d at 953. That's what Nevada seeks to do here.

### 2. Swaps or not, CDNA's sports-event contracts are "options" subject to the CFTC's exclusive jurisdiction.

CDNA's sports-event contracts are swaps. But regardless, they are also "options" subject to the CFTC's exclusive jurisdiction. Under § 2(a)(1)(A), the CFTC "shall have exclusive jurisdiction … with respect to" "option" contracts traded on a DCM. The CEA broadly defines "option" to mean "an agreement, contract, or transaction that is of the character of, or is commonly

known to the trade as, an 'option,'" among other things. 7 U.S.C. § 1a(36).
One kind of option is a "binary option," which "pay[s] out a fixed amount
when an outcome either occurs or does not occur." *Concept Release*, 73
Fed. Reg. at 25,670. For example, a contract might pay $100 "based on
whether a particular person will run for the presidency." *Id.* In 2008, the
CFTC recognized that event contracts often "are structured as all-or-nothing
binary transactions commonly described as binary options." *Id.*

CDNA's sports-event contracts are binary options: A party who pur-
chases a sports-event contract can win a fixed amount depending on what
happens at a game. Sports-event contracts thus fall within the CFTC's exclu-
sive jurisdiction as options, even if the contracts aren't swaps.

### 3. Nevada is wrong that its gaming laws govern CDNA's sports-event contracts even if they are swaps.

Nevada argued below that even if CDNA's sports-event contracts are
swaps, the CEA still doesn't preempt Nevada gaming laws as applied to
those contracts. That is incorrect.

**a.** Nevada first says that other provisions in the CEA providing
that state law is preempted show that § 2(a)(1)(A)'s reference to the CFTC's

"exclusive jurisdiction" does *not* preempt state law. Dist. Ct. Doc. 63 at 19-20. That argument fails.

Preemption doesn't turn on "magic words." *Wolicki-Gables v. Arrow International, Inc.*, 634 F.3d 1296, 1301 (11th Cir. 2011). It turns on the meaning of the statutory text under ordinary statutory interpretation principles, *Franklin*, 579 U.S. at 125. As discussed (at 41-42), the ordinary understanding of "exclusive jurisdiction" means the CFTC alone—not the states or other federal agencies—may regulate swap-trading on DCMs. And § 2(a)(1)(A)'s savings clause preserves state jurisdiction for conduct falling outside the CFTC's jurisdiction (like off-DCM transactions), thus confirming that the CEA preempts state laws seeking to regulate swap-trading *on* DCMs. *Supra* pp. 42-43. It would have been unnecessary to include a clause preserving state law if the "exclusive jurisdiction" provision didn't preempt state law.

**b.** Nevada claims that if the CEA preempted the field of derivatives trading on DCMs, which includes sports wagering on DCMs, the CEA would conflict with federal statutes relating to gaming and financial institutions. Dist. Ct. Doc. 63 at 26-27. Not so. The statutes can be harmonized with the CEA. And because Congress hasn't "clearly expressed [an] intention" that the CEA impliedly repeal those statutes, it is this Court's "duty … to

- 65 -

regard each as effective." *Swinomish Indian Tribal Community v. BNSF Railway Co.*, 951 F.3d 1142, 1156 (9th Cir. 2020).

*i.* **PASPA.** Nevada says the Dodd-Frank Act couldn't have authorized sports betting on DCMs when, at the time, the Professional and Amateur Sports Protection Act (PASPA), 28 U.S.C. § 3701 *et seq.*, prevented states, except Nevada and a few others, from authorizing sports wagering. Dist. Ct. Doc 63 at 26; *see Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 462 (2018). But PASPA doesn't speak to sports-event contracts listed on federally regulated DCMs. Had Congress understood PASPA to prohibit listing them, it wouldn't then have enacted a special rule governing them, *see* 7 U.S.C. § 7a-2(c)(5)(C)(i).

*ii.* **IGRA.** Nevada also claims that the Dodd-Frank Act couldn't permit trading of sports-event contracts, because it would have impliedly repealed the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, which gives tribes the "exclusive right" to determine whether and to what extent to allow authorized gaming on tribal lands, *id.* § 2701(5). Dist. Ct. Doc. 63 at 26-27. There is no conflict. IGRA's definition of "gaming" doesn't include sports-event contracts traded on a DCM. *See id.* § 2703(7)-(8). Under IGRA, tribes can thus still regulate off-DCM sports wagering, without

interfering with the CFTC's "exclusive jurisdiction" to regulate the trading of sports-event contracts on DCMs.

*iii.* **The Wire Act.** Nevada asserts that if the Dodd-Frank Act allows DCMs to list sports-event contracts, then it impliedly repealed the Wire Act's prohibition on using wire communication facilities to place bets or wagers on "any sporting event," 18 U.S.C. § 1084(a). Again, there is no conflict, because the Wire Act doesn't prohibit sports-event contracts traded on DCMs.

*iv.* **Federal banking regulations.** Nevada also claims that, if the Dodd-Frank Act allows sports-event contracts to be traded on DCMs, then the Act conflicts with federal banking laws, which "expressly recognize[] that States can regulate the sponsors of swaps" and "authorize[] federal banking regulators to oversee the swap activities of national banks." Dist. Ct. Doc. 63 at 21 (citing 12 U.S.C. § 1828(y)); *Activities and Operations of National Banks and Federal Savings Associations*, 85 Fed. Reg. 40,794, 40,806 n.76 (July 7, 2020). But 12 U.S.C. § 1828(y) is about the conditions under which insured state banks can themselves enter into derivative transactions—not whether DCMs can list sports-event contracts or swaps more generally. Likewise, authorizing federal regulators to oversee national banks' swap activities isn't the same as regulating DCMs' listing of swaps.

**II.** **The balance of harms and public interest favor a preliminary injunction.**

The balance of harms and public interest also favor a preliminary injunction. The district court's contrary conclusion rests on the notion that CDNA's sports-event contracts are illegal sports wagers rather than swaps. That's wrong. The CEA preempts state law as applied to swap- and derivative-trading on DCMs, and CDNA's sports-event contracts are swaps traded on a DCM, not sports wagers (which are made off of DCMs). The district court's reasoning unravels after correction of its legal error.

**A.** The balance of harms and public interest favor a preliminary injunction.

**1.** CDNA will suffer irreparable harm without an injunction. A plaintiff can establish irreparable harm if the plaintiff faces a "Hobson's choice: continually violate the [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Monetary harm is irreparable "if the funds [later] 'cannot be recouped.'" *NIH v. American Public Health Ass'n*, 145 S. Ct. 2658, 2659 (2025). The "loss of … goodwill" also can constitute irreparable

harm. *Stuhlbarg International Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001).

Here, CDNA will suffer irreparable harm if it doesn't comply with Nevada's demands, because Nevada has threatened civil and criminal legal consequences for failure to comply. *Supra* p. 42. But CDNA likewise will suffer harm if it *does* comply—as it is currently doing per agreement not to offer contracts in Nevada pending appeal. *See supra* pp. 27-28. For starters, CDNA also has lost business in Nevada since October as a result of that agreement. Terminating contracts in Nevada has also undermined CDNA's goodwill and reputation. What's more, to fully comply with Nevada law, in Nevada's view, CDNA must invest significant sums to develop technology preventing access to and use of the platform anywhere in Nevada. ER-148-51. Restricting that access would also cause further lost business by barring access to the platform for non-sports-event-contract trades, including by potentially disrupting open positions and other instruments by non-Nevada residents traveling to and from Nevada. Given state sovereign immunity, CDNA cannot later recoup any of those losses or expenses. *See Stanley v. Trustees of California State University*, 433 F.3d 1129, 1133 (9th Cir. 2006). And as explained (at 51), terminating those contracts risks violating CDNA's

obligation to provide "impartial access" to its exchange, 17 C.F.R. § 38.151(b).

Nevada, on the other hand, won't be harmed by an injunction. Nevada simply won't be able to enforce its preempted state laws with respect to CDNA's sports-event contracts—something federal law means it cannot do.

**2.** The public interest also weighs in favor of a preliminary injunction, because "preventing a violation of the Supremacy Clause serves the public interest." *California*, 921 F.3d at 893.

**B.** The district court concluded that the balance of harms weigh in Nevada's favor, because it has an interest in ensuring the CDNA doesn't unlawfully "offer sports wagers guised as swaps." ER-30. The court likewise reasoned that "the public has an interest in ensuring that unlicensed sports wagering does not occur on CFTC-designated exchanges." *Id.* That reasoning fails for the same reasons that CDNA is likely to succeed on the merits. The CEA preempts state law as applied to swap- and derivative-trading on DCMs, and CDNA's sports-event contracts are swaps traded on a DCM or over-the-counter, rather than sports wagers (which are customary consumer transactions).

**C.** Irreparable harm and balance of equities aside, the correct result on preemption also requires judgment on the pleadings for CDNA, and thus a permanent injunction. This Court should say as much.

## CONCLUSION

The Court should reverse the district court's order denying CDNA's preliminary injunction motion.

Dated: January 12, 2026

Respectfully submitted,

*/s/ Shay Dvoretzky*

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Sylvia O. Tsakos

David Meister
Robert A. Fumerton
Chad E. Silverman
Judith A. Flumenbaum
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

Bradley Austin
SNELL & WILMER
1700 South Pavilion Center Dr.
  Ste. 700
Las Vegas, NV 89135

Nowell D. Bamberger
Matthew C. Solomon
CLEARY GOTTLIEB STEEN &
  HAMILTON LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037

*Counsel for Plaintiff-Appellant North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)**  | 25-7187 |

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the
  case(s) identified in the initial brief(s) filed by the other party or parties.

⦿ I am aware of one or more related cases currently pending in this court. The
  case number and name of each related case and its relationship to this case are:

> The following cases raise the same or closely related issues:
> (1) *KalshiEX LLC v. Hendrick*, No. 25-7516 (9th Cir.); (2) *Robinhood Derivatives, LLC v. Dreitzer et al.*, No. 25-7831 (9th Cir.); and (3) *Blue Lake Rancheria, et al. v. Kalshi, Inc. et al.*, No. 25-7504 (9th Cir.).

**Signature** | s/ Shay Dvoretzky |  **Date** | 1/12/2026 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17** - 72 - *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-7187

I am the attorney or self-represented party.

**This brief contains** 13,997 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Shay Dvoretzky **Date** 1/12/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

- 73 -

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2026, I electronically filed this brief and addendum with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: January 12, 2026        Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky

*Counsel for Plaintiff-Appellant North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America*

[This page intentionally left blank.]

# INDEX OF ADDENDUM

**Page**

7 U.S.C. § 2(a)(1)(A). ..............................................................Add. 1

7 U.S.C. § 1a(19)..................................................................Add. 2

7 U.S.C. § 1a(47)..................................................................Add. 3

7 U.S.C. § 2(e). ....................................................................Add. 13

7 U.S.C. § 7a-2(c)................................................................Add. 13

7 U.S.C. § 13a-2. ................................................................Add. 19

7 U.S.C. § 16(e). ................................................................Add. 23

17 C.F.R. § 40.2..................................................................Add. 24

17 C.F.R. § 40.11................................................................Add. 29

# ADDENDUM

**7 U.S.C. § 2(a)(1)(A).**

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission

and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

**7 U.S.C. § 1a(19).**

The term "excluded commodity" means—

(i)     an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii)     any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

(I)     not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

(II)     based solely on one or more commodities that have no cash market;

(iii)     any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

(iv)   an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

(I)   beyond the control of the parties to the relevant contract, agreement, or transaction; and

(II)   associated with a financial, commercial, or economic consequence.

**7 U.S.C. § 1a(47).**

(A)   In general

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

(i)   that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii)   that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event

or contingency associated with a potential financial, economic, or commercial consequence;

(iii)   that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—

(I)      an interest rate swap;

(II)     a rate floor;

(III)    a rate cap;

(IV)     a rate collar;

(V)      a cross-currency rate swap;

(VI)    a basis swap;

(VII)    a currency swap;

(VIII)    a foreign exchange swap;

(IX)    a total return swap;

(X)    an equity index swap;

(XI)    an equity swap;

(XII)    a debt index swap;

(XIII)    a debt swap;

(XIV)    a credit spread;

(XV)    a credit default swap;

(XVI)    a credit swap;

(XVII)    a weather swap;

(XVIII)    an energy swap;

(XIX)    a metal swap;

(XX)    an agricultural swap;

(XXI)    an emissions swap; and

(XXII)    a commodity swap;

(iv)   that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v)   including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi)   that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

(B)   Exclusions

The term "swap" does not include—

(i)   any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 23 of this title, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(ii)   any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled;

(iii)  any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to —

(I)  the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II)  the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(iv)  any put, call, straddle, option, or privilege relating to a foreign currency entered into on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a));

(v) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to —

(I)  the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II)  the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(vi)  any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a contingent basis that is subject to the Securities Act of 1933 (15 U.S.C. 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), unless the

agreement, contract, or transaction predicates the purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction;

(vii)   any note, bond, or evidence of indebtedness that is a security, as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1));

(viii)  any agreement, contract, or transaction that is—

(I)    based on a security; and

(II)   entered into directly or through an underwriter (as defined in section 2(a)(11) of the Securities Act of 1933 (15 U.S.C. 77b(a)(11))[] by the issuer of such security for the purposes of raising capital, unless the agreement, contract, or transaction is entered into to manage a risk associated with capital raising;

(ix)   any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States; and

(x)    any security-based swap, other than a security-based swap as described in subparagraph (D).

(C)    Rule of construction regarding master agreements

(i)    In general

Except as provided in clause (ii), the term "swap" includes a master agreement that provides for an agreement, contract, or transaction that is a swap under subparagraph (A), together with each supplement to any master agreement, without regard to whether the master agreement contains an agreement, contract, or transaction that is not a swap pursuant to subparagraph (A).

(ii)    Exception

For purposes of clause (i), the master agreement shall be considered to be a swap only with respect to each agreement, contract, or transaction covered by the master agreement that is a swap pursuant to subparagraph (A).

(D)    Mixed swap

The term "security-based swap" includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) and also is based on the value of

1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).

    (E)    Treatment of foreign exchange swaps and forwards

    (i) In general

Foreign exchange swaps and foreign exchange forwards shall be considered swaps under this paragraph unless the Secretary makes a written determination under section 1b of this title that either foreign exchange swaps or foreign exchange forwards or both—

    (I)    should be not be regulated as swaps under this chapter; and

    (II)    are not structured to evade the Dodd-Frank Wall Street Reform and Consumer Protection Act in violation of any rule promulgated by the Commission pursuant to section 721(c) of that Act. [15 U.S.C. 8321(b)].

(ii)     Congressional notice; effectiveness

The Secretary shall submit any written determination under clause (i) to the appropriate committees of Congress, including the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives. Any such written determination by the Secretary shall not be effective until it is submitted to the appropriate committees of Congress.

(iii)    Reporting

Notwithstanding a written determination by the Secretary under clause (i), all foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the Commission pursuant to section 6r of this title within such time period as the Commission may by rule or regulation prescribe.

(iv)    Business standards

Notwithstanding a written determination by the Secretary pursuant to clause (i), any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 6s(h) of this title.

(v)  Secretary

For purposes of this subparagraph, the term "Secretary" means the Secretary of the Treasury.

(F) Exception for certain foreign exchange swaps and forwards

(i)  Registered entities

Any foreign exchange swap and any foreign exchange forward that is listed and traded on or subject to the rules of a designated contract market or a swap execution facility, or that is cleared by a derivatives clearing organization, shall not be exempt from any provision of this chapter or amendments made by the Wall Street Transparency and Accountability Act of 2010 prohibiting fraud or manipulation.

(ii)  Retail transactions

Nothing in subparagraph (E) shall affect, or be construed to affect, the applicability of this chapter or the jurisdiction of the Commission with respect to agreements, contracts, or transactions in foreign currency pursuant to section 2(c)(2) of this title.

**7 U.S.C. § 2(e).**

It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

**7 U.S.C. § 7a-2(c).**

    (1)    In general

A registered entity may elect to list for trading or accept for clearing any new contract, or other instrument, or may elect to approve and implement any new rule or rule amendment, by providing to the Commission (and the Secretary of the Treasury, in the case of a contract of sale of a government security for future delivery (or option on such a contract) or a rule or rule amendment specifically related to such a contract) a written certification that the new contract or instrument or clearing of the new contract or instrument, new rule, or rule amendment complies with this chapter (including regulations under this chapter).

    (2)    Rule review

The new rule or rule amendment described in paragraph (1) shall become effective, pursuant to the certification of the registered entity and

notice of such certification to its members (in a manner to be determined by the Commission), on the date that is 10 business days after the date on which the Commission receives the certification (or such shorter period as determined by the Commission by rule or regulation) unless the Commission notifies the registered entity within such time that it is staying the certification because there exist novel or complex issues that require additional time to analyze, an inadequate explanation by the submitting registered entity, or a potential inconsistency with this chapter (including regulations under this chapter).

    (3)    Stay of certification for rules

        (A)    A notification by the Commission pursuant to paragraph (2) shall stay the certification of the new rule or rule amendment for up to an additional 90 days from the date of the notification.

        (B)    A rule or rule amendment subject to a stay pursuant to subparagraph (A) shall become effective, pursuant to the certification of the registered entity, at the expiration of the period described in subparagraph (A) unless the Commission—

            (i)    withdraws the stay prior to that time; or

(ii)    notifies the registered entity during such period that it objects to the proposed certification on the grounds that it is inconsistent with this chapter (including regulations under this chapter).

(C)    The Commission shall provide a not less than 30-day public comment period, within the 90-day period in which the stay is in effect as described in subparagraph (A), whenever the Commission reviews a rule or rule amendment pursuant to a notification by the Commission under this paragraph.

(4)    Prior approval

(A)    In general

A registered entity may request that the Commission grant prior approval to any new contract or other instrument, new rule, or rule amendment.

(B)    Prior approval required

Notwithstanding any other provision of this section, a designated contract market shall submit to the Commission for prior approval each rule amendment that materially changes the terms and conditions, as determined by the Commission, in any contract of sale

for future delivery of a commodity specifically enumerated in section 1a(10)[] of this title (or any option thereon) traded through its facilities if the rule amendment applies to contracts and delivery months which have already been listed for trading and have open interest.

(C)    Deadline

If prior approval is requested under subparagraph (A), the Commission shall take final action on the request not later than 90 days after submission of the request, unless the person submitting the request agrees to an extension of the time limitation established under this subparagraph.

(5)    Approval

(A)    Rules

The Commission shall approve a new rule, or rule amendment, of a registered entity unless the Commission finds that the new rule, or rule amendment, is inconsistent with this chapter (including regulations).

(B)    Contracts and instruments

The Commission shall approve a new contract or other instrument unless the Commission finds that the new contract or other instrument would violate this chapter (including regulations).

(C)    Special rule for review and approval of event contracts and swaps contracts

(i)    Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i)[] of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I)    activity that is unlawful under any Federal or State law;

(II)    terrorism;

(III)    assassination;

(IV)  war;

(V)   gaming; or

(VI)  other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii)   Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii)  Swaps contracts

(I)    In general

In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

(II)    Requirements

Any such criteria, conditions, or rules shall consider—

(aa)   the financial integrity of the derivatives clearing organization; and

(bb)   any other factors which the Commission determines may be appropriate.

(iv)   Deadline

The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

## 7 U.S.C. § 13a-2. Jurisdiction of States

(1)    Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) has engaged in, is engaging or is

about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this chapter, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

(2)  The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia, shall have jurisdiction of all suits in equity and actions at law brought under this section to enforce any liability or duty created by this chapter or any rule, regulation, or order of the Commission thereunder, or to obtain damages or other relief with respect thereto. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that the defendant take such action as is necessary to remove the danger of violation of this chapter or of any

such rule, regulation, or order. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

(3)     Immediately upon instituting any such suit or action, the State shall serve written notice thereof upon the Commission and provide the Commission with a copy of its complaint, and the Commission shall have the right to (A) intervene in the suit or action and, upon doing so, shall be heard on all matters arising therein, and (B) file petitions for appeal.

(4)     Any suit or action brought under this section in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

(5)     For purposes of bringing any suit or action under this section, nothing in this chapter shall prevent the attorney general, the administrator of the State securities laws, or other duly authorized State officials from exercising the powers conferred on them by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(6)    For purposes of this section, "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

(7)    Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State.

(8)(A) Nothing in this chapter shall prohibit an authorized State official from proceeding in a State court against any person registered under this chapter (other than a floor broker, floor trader, or registered futures association) for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.

(B)    The State shall give the Commission prior written notice of its intent to proceed before instituting a proceeding in State court as described in this subsection and shall furnish the Commission with a copy of its complaint immediately upon instituting any such proceeding. The Commission shall have the right to (i) intervene in the proceeding and, upon doing so, shall be heard on all matters arising therein, and (ii) file a petition for appeal. The Commission or the defendant may remove such proceeding to the district court of the United States for the proper district by following the

procedure for removal otherwise provided by law, except that the petition for removal shall be filed within sixty days after service of the summons and complaint upon the defendant. The Commission shall have the right to appear as amicus curiae in any such proceeding.

**7 U.S.C. § 16(e).**

(1)     Nothing in this chapter shall supersede or preempt—

(A)     criminal prosecution under any Federal criminal statute;

(B)     the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

(i)     that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii)     (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii)     that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C)    the application of any Federal or State statute, including

any rule or regulation thereunder, to any person required to be regis-

tered or designated under this chapter who shall fail or refuse to obtain

such registration or designation.

(2)    This chapter shall supersede and preempt the application of any

State or local law that prohibits or regulates gaming or the operation of

bucket shops (other than antifraud provisions of general applicability) in the

case of—

(A)    an electronic trading facility excluded under section 2(e)[1]

of this title; and

(B)    an agreement, contract, or transaction that is excluded

from this chapter under section 2(c) or 2(f) of this title or sections 27 to

27f of this title, or exempted under section 6(c) of this title (regardless

of whether any such agreement, contract, or transaction is otherwise

subject to this chapter).

## 17 C.F.R. § 40.2. Listing products for trading by certification.

(a)    *Submission requirements*. A designated contract market or a swap

execution facility must comply with the submission requirements of this

section prior to listing a product for trading that has not been approved under § 40.3. A submission shall comply with the following conditions:

(1)     The designated contract market or the swap execution facility has filed its submission electronically in a format and manner specified by the Commission;

(2)     The Commission has received the submission by the open of business on the business day preceding the product's listing; and

(3)     The submission includes:

(i)     The information required by appendix D to this part;

(ii)     A copy of the rules that set forth the contract's terms and conditions;

(iii)     The intended listing date;

(iv)     A certification by the designated contract market or the swap execution facility that the product to be listed complies with the Act and Commission regulations thereunder;

(v)     A concise explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the

Commission's regulations thereunder. This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(vi)    A certification that the registered entity posted a notice of a pending product certification with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(vii)   A request for confidential treatment, if appropriate, as permitted under § 40.8.

(b)    *Additional information*. If requested by Commission staff, a registered entity shall provide any additional evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the

requirements of the Act or the Commission's regulations or policies thereunder.

(c) *Stay*. The Commission may stay the listing of a contract pursuant to paragraph (a) of this section during the pendency of Commission proceedings for filing a false certification or during the pendency of a petition to alter or amend the contract terms and conditions pursuant to Section 8a(7) of the Act. The decision to stay the listing of a contract in such circumstances shall not be delegable to any employee of the Commission.

(d) *Class certification of swaps*.

(1) A designated contract market or swap execution facility may list or facilitate trading in any swap or number of swaps based upon an "excluded commodity," as defined in section 1a(19)(i) of the Act, not including any security, security index, and currency other than the United States Dollar and a "major foreign currency," as defined in § 15.03(a) of this chapter, or an "excluded commodity," as defined in section 1a(19)(ii)-(iv) of the Act, provided the designated contract market or swap execution facility certifies, under paragraphs (a)(1) and (2) and (a)(3)(i), (iv), and (vi) of this section, the following:

(i)     Each particular swap within the certified class of swaps is based upon an excluded commodity specified in paragraph (d)(1) of this section;

(ii)     Each particular swap within the certified class of swaps is based upon an excluded commodity with an identical pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations;

(iii)    The pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in each particular swap within the certified class of swaps is identical to a pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in a product previously submitted to the Commission and certified or approved pursuant to this section or § 40.3; and

(iv)    Each particular swap within the certified class of swaps is based upon an excluded commodity involving an identical currency or identical currencies.

(2) The Commission may in its discretion require a registered entity to withdraw its certification under paragraph (d)(1) of this section

and to submit each individual swap or certain individual swaps within the submission for Commission review pursuant to this section or § 40.3.

**17 C.F.R. § 40.11. Review of event contracts based upon certain excluded commodities.**

(a) *Prohibition*. A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

    (1)    An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

    (2)    An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b)    [Reserved]

(c)    *90-day review and approval of certain event contracts*. The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day review. The 90-day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1)    The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90-day review period. The Commission shall post on the Web site a notification of the intent to carry out a 90-day review.

(2)    *Final determination*. The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences

- Add. 30 -

review, or if applicable, at the conclusion of such extended period

agreed to or requested by the registered entity.