**No. 25-7187**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D/B/A CRYPTO.COM | DERIVATIVES NORTH AMERICA
*Plaintiff - Appellant,*

v.

STATE OF NEVADA, ON RELATION OF THE NEVADA GAMING CONTROL BOARD; MIKE DRETIZER, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE NEVADA GAMING CONTROL BOARD; GEORGE ASSAD, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE NEVADA GAMING CONTROL BOARD; CHANDENI K. SENDALL, DEPUTY CITY ATTORNEY, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE NEVADA GAMING CONTROL BOARD; AARON D. FORD, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF NEVADA,
*Defendants – Appellees,*

NEVADA RESORT ASSOCIATION,
*Intervenor - Defendant - Appellee.*

---

On appeal from the U.S. District Court
for the District of Nevada
Case No. 2:25-cv-00978-APG-BNW

**BRIEF OF *AMICUS CURIAE* PARADIGM OPERATIONS LP
IN SUPPORT OF APPELLANT**

Tyler R. Green
Conor D. Woodfin
Olivia C. Rogers
Consovoy McCarthy PLLC
222 S. Main Street
5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

January 15, 2026

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Ninth Circuit Rule 26.1-1, *Amicus* discloses that it has no parent corporations and that no publicly held corporations hold 10% or more of its stock. No publicly held corporation not a party to this proceeding has a financial interest in the outcome of this proceeding.

Dated: January 15, 2026

*/s/ Tyler R. Green*
Tyler R. Green
*Counsel for Amicus*

## TABLE OF CONTENTS

Corporate Disclosure Statement ..... ii
Table of Authorities ..... iv
Interest of *Amicus Curiae* ..... 1
Introduction ..... 2
Argument ..... 4
I. Congress preempted state regulation of instruments within the CFTC's jurisdiction. ..... 5
A. Over the last century, Congress brought a largely unregulated market under a single federal regulatory regime. ..... 5
B. Congress made preemption of state regulations a central pillar of the 1974 CFTC Act. ..... 11
C. The 1978 CEA amendments reaffirmed the CFTC's exclusive jurisdiction over futures. ..... 17
II. The Dodd-Frank Act extended the CFTC Act's preemptive reach to swaps. ..... 20
III. Event contracts on designated contract markets fall within the CFTC's "exclusive jurisdiction." ..... 21
A. The district court failed to apply Congress's broad definition of a "swap." ..... 22
B. Defendants' counterarguments don't revive the district court's narrow reading of the statute. ..... 27
Conclusion ..... 31
Certificate of Compliance ..... 32
Certificate of Service ..... 33

# TABLE OF AUTHORITIES

## Cases

*Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905) .......... 8, 21, 31

*Beecham v. United States*, 511 U.S. 368 (1994) .......... 29

*CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29 (D.D.C. 2015) .......... 24

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) .......... 9

*EPA v. Calumet Shreveport Refining LLC*, 145 S. Ct. 1735 (2025) .......... 23

*Gatewood v. North Carolina*,
203 U.S. 531 (1906) .......... 6, 7

*KalshiEX LLC v. CFTC*,
2024 WL 4164694 (D.D.C. Sept. 12, 2024) .......... 22, 24

*MacDonald v. Gessler*,
57 A. 361 (Pa. 1904) .......... 6

*North Carolina v. McGinnis*,
51 S.E. 50 (N.C. 1905) .......... 6

*Rice v. Bd. of Trade of Chi.*,
331 U.S. 247 (1947) .......... 10

## Statutes

1923 N.J. Laws 125 .......... 6

7 U.S.C. §1a .......... passim

7 U.S.C. §2 .......... 2, 21

Pub. L. No. 67-331, 42 Stat. 998 (1922) .......... 8, 22

Pub. L. No. 74-675, 49 Stat. 1491 (1936) .......... 9, 10, 22

Pub. L. No. 93-463, 88 Stat. 1389 (1975) .......... 10, 11

**Legislative History**

119 Cong. Rec. H41333 (1973) .......... 13

93 Cong. Rec. S16133 (1974) .......... 17

*CFTC Act of 1974: Statement by the President on Signing the Bill Into Law*, 10 Wkly. Comp. of Pres. Docs. (No. 44) (1974) .......... 17

*Commodity Futures Trading Commission Act of 1974: Hearings Before the H. Comm. on Agriculture*, 93d Cong. (1974) .......... 13

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture and Forestry*, 93d Cong. (1974) .......... 15, 17

*Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agriculture*, 95th Cong. (1978) .......... 18, 31

H.R. Rep. No. 93-975 (1974) .......... 14, 22, 27

*Review of Commodity Exchange Act and Discussion of Possible Changes, Hearings Before the H. Comm. on Agriculture*, 93d Cong. (1973) .......... 12, 13

S. Rep. No. 93-1131 (1974) .......... 15

S. Rep. No. 93-1194 (1974) .......... 16

S. Rep. No. 95-850 (1978) .......... 19, 31

**Rules**

Fed. R. App. P. 29 .......... 1

**Regulations**

*Statement of Policy Concerning Swap Transactions*, 54 Fed. Reg. 30,694 (July 21, 1989) .......... 20

*Concept Release*, 73 Fed. Reg. 25,669 (May 7, 2008) .......... 24

*Event Contracts*, 89 Fed. Reg. 48,968 (June 10, 2024) .......... 25

**Secondary Sources**

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) .......... 30

Am. Heritage Dictionary (3d. ed. 1994)....................................................................23

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1 (2019).......................................20, 21, 31

CFTC Release No. 8478-22, *CFTC Orders Event-Based Binary Options Markets Operator to Pay $1.4 Million Penalty* (Jan. 2, 2022)........................................22

Concise Oxford English Dictionary (12th ed. 2011) .......................................23

Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53 (2021) .........................................................................23

David Hochfelder, *"Where the Common People Could Speculate": The Ticker, Bucket Shops, and the Origins of Popular Participation in Financial Markets, 1880-1920*, 93 J. Am. Hist. 335 (2006) ..............................................................5

John Hill, Jr., *Gold Brick of Speculation* (1903) ....................................................6

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) ........................................................................ passim

Michael Greenberger, *Overwhelming a Financial Regulatory Black Hole with Legislative Sunlight*, 6 J. Bus. & Tech. L. 127 (2011)......................................20

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976)............................14, 16

Telford Taylor, *Trading in Commodity Futures—A New Standard of Legality?*, 43 Yale L.J. 63 (1933)..............................................................................9

Webster's Third New Int'l Dictionary (1993) .................................................23

## INTEREST OF *AMICUS CURIAE*

Paradigm Operations LP is a research-driven crypto investment firm that backs entrepreneurs, companies, and protocols at the frontier of innovation. Paradigm has an interest in this case because prediction markets are a cutting-edge application of crypto technology and are driving innovation in a field in which Paradigm invests. Paradigm also has an interest in supporting the broad availability of regulated prediction markets, which are a valuable source of public information and allow market participants (including investors and entrepreneurs) to hedge exposure to specific events. As a market participant in this developing field, Paradigm brings a valuable perspective and a wealth of experience that the other parties and regulatory authorities do not offer.

No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution toward the preparation or submission of this brief.

## INTRODUCTION

The birth and growth of the country's financial markets in the 20th century led to a corresponding birth and growth of financial market regulations. In some specific areas, the resulting tangle of conflicting state regulations left Congress no choice but to intervene and set uniform, national rules, including on telecommunications and much of finance. One such area was the futures market, where Congress created the Commodity Futures Trading Commission and gave it "exclusive jurisdiction" over derivatives, which includes a wide swath of predictive financial instruments. 7 U.S.C. §2(a)(1)(A). Over time, those categories have expanded to include some of the newest futures instruments known as "event contracts," such as those Crypto.com offers.

Though derivatives have changed form, states' objections to them have not. Some of what the CFTC regulates as financial instruments the states call gambling. Nevada sounds that same horn here, mimicking objections that long precede the CFTC: When farmers traded the first futures contracts on Chicago exchanges in the 19th century, the states called that gambling, too. But even before creating the CFTC, Congress quashed those earlier objections with the Commodity Exchange Act of 1936, adopting uniform federal regulations governing then-developing financial instruments like

commodity futures contracts. And as the industry developed more sophisticated contracts, Congress expanded federal jurisdiction.

Since 1974—when Congress passed the CFTC Act establishing the CFTC—the preemptive force of federal rules governing derivatives markets hasn't been subject to reasonable dispute. In the CFTC Act, Congress preempted state regulation of instruments traded on CFTC-designated exchanges. Congress has consistently reasserted since then that the CFTC has exclusive regulatory authority over contracts traded on those designated exchanges. Defendants' contrary policy arguments, still focused largely on gambling, just rehash arguments Congress first rejected over a century ago when it concluded that national financial markets require a set of uniform national rules.

Crypto.com's event contracts are thus subject to the CFTC's "exclusive jurisdiction," not to disparate regulation in each state. Those event contracts plausibly fit in a number of the CFTC's exclusive jurisdictional buckets—be they futures, options, swaps, or excluded-commodities contracts. This case focuses on the sub-definition of "swap," failing to consider those other definitions that represent a wide swath of the Commission's jurisdiction.

The district court erred in concluding that Crypto.com's contracts do not qualify as "swaps." The district court decided that Crypto.com's event contracts were not "swaps" because they turned on the *outcome* of events,

not on the "occurrence, nonoccurrence, or the extent of the occurrence" of a live event. ER-24. The court's analysis takes a strained reading of clear text and would strip the CFTC of some of its critical jurisdiction over commodity futures. Defendants, for their part, would go further, claiming the CFTC's authority extends only to events that are "inherently 'financial, economic, or commercial'" in nature, Dist. Ct. Doc. 63 at 14-15, even though Congress gave the CFTC broad authority over events "*associated* with a potential financial, economic, or commercial *consequence*," 7 U.S.C. §1a(47)(A)(ii) (emphasis added).

The district court's conclusion and Defendants' arguments disregard the statutory text. This Court should reverse.

## ARGUMENT

In 1974, Congress preempted state regulation of financial instruments that fall under the CFTC's jurisdiction. Four years later, it doubled down on the CFTC's exclusive jurisdiction. And in 2010, Congress extended that broad preemption to a type of financial instrument called a swap. Because Crypto.com's event contracts are traded on CFTC-approved exchanges, the CFTC's regulatory authority preempts Nevada's regulatory authority over those instruments. Text, context, and history support that conclusion.

## I. Congress preempted state regulation of instruments within the CFTC's jurisdiction.

Congress passed the Commodity Futures Trading Commission Act of 1974 to resolve the tension between state gambling laws and federal financial regulation. Investors and business owners were developing new financial technologies to manage risk, but states sought to quash those practices as unlawful gambling. The CFTC Act overrode the states' objections, bringing order and national uniformity. Over time, Congress strengthened the CFTC Act's preemptive scope by granting the CFTC exclusive jurisdiction and expanding its authority to new financial instruments. Each of those succeeding steps untangled a morass of state and federal regulation by preempting state laws where they overlap with the CFTC's "exclusive jurisdiction."

### A. Over the last century, Congress brought a largely unregulated market under a single federal regulatory regime.

The story of futures-market regulations begins with so-called "bucket shop" laws of the early 20th century. That term originally referred to "abandoned shops" that resold "drained beer kegs thrown out by pubs." David Hochfelder, *"Where the Common People Could Speculate": The Ticker, Bucket Shops, and the Origins of Popular Participation in Financial Markets, 1880-1920*, 93 J. Am. Hist. 335, 335 (2006). In the late 19th century, investors appropriated the derogatory term to refer to shops that took "bets or wagers

… on the rise or fall of the prices of stocks, grain, oil, etc.," without facilitating the "transfer or delivery of the stock or commodities nominally dealt in.'" *Gatewood v. North Carolina*, 203 U.S. 531, 536 (1906). In other words, "customers simply gamble upon stocks, and never have any intention of purchasing outright." *MacDonald v. Gessler*, 57 A. 361, 362 (Pa. 1904). The practice was popular but controversial. A Chicago Board of Trade member at the time called the bucket shop "a gambling den, and nothing else." John Hill, Jr., *Gold Brick of Speculation* 20 (1903). He dedicated his anti-bucket-shop book to "exposing the methods of a class of vampires whose enterprises differ in no way from those of the highwayman or the burglar." *Id.* at xv.

States thus passed laws prohibiting trades that didn't require the purchaser to take physical delivery. North Carolina's 1905 law, for example, "made void all contracts for the sale of articles therein named for future delivery, wherein … it is not intended that the articles agreed to be sold and delivered shall be actually delivered." *North Carolina v. McGinnis*, 51 S.E. 50, 51 (N.C. 1905). New Jersey passed a similar law in 1923 declaring "[a]ll contracts and agreements" for the sale of "securities" and "commodities" "utterly void and of no effect whatsoever" if they were made without "intending a bona fide purchase or sale or the actual bona fide receipt or delivery." 1923 N.J. Laws 125. "These statutes treated 'bucketing' as a form of gambling and made futures contracts criminally illegal where the parties

to the agreement never intended delivery of the underlying commodity but were dealing only for its prospective rise or fall in price." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663 (1982).

But the bucket-shop laws were "ill-suited to determining the validity of commodity futures contracts entered into on organized exchanges." *Id.* at 664. Even at that time, "actual delivery on futures contracts occurred on less than three percent of all such transactions." *Id.* Policymakers and jurists were equally flummoxed at distinguishing the financial-instrument wheat from the gambling chaff. Courts thus "experienced great difficulty in trying to distinguish between valid commodity transactions and those which were simply wagers on the price movement of specified commodities." *Id.* And in the absence of federal legislation, constitutional challenges to those bucket-shop laws failed. *See Gatewood*, 203 U.S. at 542-43 (rejecting Fourteenth Amendment challenge to a conviction under North Carolina's bucket-shop law).

Justice Holmes is credited for reversing "the rigid, if not unthinking, application of … bucket-shop statutes" to contracts that divorced trading from physical delivery. Van Wart, *supra*, at 665. In a case challenging the Chicago Board of Trade as a bucket shop, the Supreme Court held that futures contracts serve "a legitimate and useful purpose" by allowing a

transaction to "be offset before the time of delivery in case delivery should not be needed or desired." *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905). The practice allows "collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, [to] secure themselves against the fluctuations of the market by counter contracts for the purchase or sale." *Id.* The Court distinguished futures contracts traded on the exchange from other bucket-shop contracts that were "merely a speculation entered into for its own sake." *Id.* The result "was to exempt from state bucket-shop laws those transactions executed on exchanges between brokers." Van Wart, *supra*, at 665. But courts continued to wrestle with bucket-shop laws as applied to various futures contracts.

So in 1922, Congress stepped in. Responding to the manipulation of grain prices, Congress enacted the Grain Futures Act. *See* Pub. L. No. 67-331, 42 Stat. 998 (1922). The Act made it a misdemeanor to execute certain grain futures contracts unless performed through exchanges designated as "contract markets" by the Secretary of Agriculture—a precursor to the CFTC's modern designated contract markets.

This Act was the first modern financial regulatory law, passed more than a decade before the more famous financial regulatory laws governing securities. When faced with a case about the Grain Futures Act's preemptive

scope, the Supreme Court held that the "Act did not supersede any applicable provisions of the Missouri law making gambling in grain futures illegal." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). That was because the Act set a compliance floor, not a ceiling—Congress established minimum regulatory conditions for grain futures, but it "[did] not purport to validate any dealings." *Id.* "Nor [was] there any basis for the contention that Congress occupied the field in respect to contracts for future delivery; and that necessarily all state legislation in any way dealing with that subject is superseded." *Id.* Contemporary commentators feared that the decision would let states loose against futures traders, and the bucket-shop statutes "would render speculation impossible, hedging illegal, and subject all brokers to criminal liability." Telford Taylor, *Trading in Commodity Futures—A New Standard of Legality?*, 43 Yale L.J. 63, 101 (1933).

Congress responded to *Uhlmann Grain Co.* by enacting the Commodity Exchange Act. *See* Pub. L. No. 74-675, 49 Stat. 1491 (1936). The Act expanded regulation to the "'transactions and dealings of brokers and of customers'" and activities that might "'affect such trading on the futures exchanges.'" Van Wart, *supra*, at 669. It "contained its own anti-bucketing provision," and violations "would result in the federal government withholding designation of the exchange as a contract market." *Id.* The Act also liberalized speculative investing by prohibiting only "*[e]xcessive* speculation in any commodity

under contracts of sale … for future delivery … causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity." §5, 49 Stat. at 1492 (emphasis added).

Still, Congress didn't include a preemption provision. So when the Supreme Court heard another preemption challenge to Illinois regulations, it held that the Commodity Exchange Act didn't supersede state trade laws. *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247 (1947). The Act provided that "[n]othing in this section or section 4b shall be construed to impair any State law applicable to any transaction enumerated or described in such sections." §5, 49 Stat. at 1494. That provision "preserv[ed] state control in two areas where state and federal law overlap." *Rice*, 331 U.S. at 255. So absent "any conflict with the federal law," Illinois could enforce its own regulations. *Id.* Largely due to *Rice*, commodity futures were almost entirely self-regulated into the 1970s.

So Congress put its foot down once again. In 1974, Congress passed the Commodity Futures Trading Commission Act, creating the CFTC and empowering it to regulate the futures trading industry. Pub. L. No. 93-463, 88 Stat. 1389 (1975). The Act enlarged the definition of "commodity" to include not just agricultural products but also "all other goods and articles … and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt." *Id.* §201.

And this time, Congress directly addressed the preemption problems identified in *Uhlmann* and *Rice*. The Act gave the CFTC "exclusive jurisdiction with respect to accounts, agreements … and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated" under the Act. *Id.* The Act "wholly and unequivocally eliminated each of the bases the Supreme Court had relied on in *Rice v. Board of Trade* to hold that the CEA did not preempt state regulation of commodities trading." Van Wart, *supra*, at 692-93. Given the history of prior legal fights over preemption, the inclusion of clear preemptive language cannot be taken as anything other than Congress' clear intent to broadly and comprehensively preempt state regulations of commodity futures.

### B. Congress made preemption of state regulations a central pillar of the 1974 CFTC Act.

Congress meant what it said when it gave the CFTC "exclusive jurisdiction" over the instruments it regulated. 88 Stat. 1389, §201. "[P]reemption was a central issue in the proceedings which culminated in the 1974 amendments to the CEA." Van Wart, *supra*, at 692. From the first committee witness to the final reports to early cases interpreting the CFTC Act, virtually everyone recognized that the Act preempted state regulation of instruments traded on CFTC-approved exchanges.

The Committee on Agriculture kicked off the hearings in 1973. The first witness, Congressman Neal Smith, recommended "that trading in all futures should be under Federal regulation." *Review of Commodity Exchange Act and Discussion of Possible Changes, Hearings Before the H. Comm. on Agriculture*, 93d Cong. 10-11 (1973) (statement of Rep. Neal Smith). Representative Smith's testimony started a wave of support for federal legislation superseding state regulations. The chairman of the Chicago Board of Trade—one of the major players (and targets) in the industry—placed "particular emphasis" on the provision that "would give the commodity regulatory agency exclusive jurisdiction over futures trading." *Id.* at 128 (statement of Frederick G. Uhlmann). Uniform, exclusive federal regulation "would prevent any possible conflicts over jurisdiction over futures trading." *Id.*

Several witnesses called for stronger federal regulation of commodities. Several New York commodities exchanges submitted a comment summing up the rationale: Because previous laws were "virtually silent on those questions," the commodities industry had been mired in confusion, conflict, and mounting legal fees. *Id.* at 121 (statement of Reed Clark). "In addition to the unfairness which is inherent in exposing exchanges to this sort of civil liability, it is extremely important that federal policy regarding commodities futures trading be uniform throughout the

United States…." *Id.* at 121 (statement of Reed Clark). The message was clear: remove the jurisdictional mist that had ensnared commodities futures regulation for decades.

"On the basis of these hearings," Representative Bob Poage, Chairman of the House Committee on Agriculture, introduced H.R. 11955 to amend the Commodity Exchange Act. Van Wart, *supra*, at 675. When introducing the bill, Representative Poage explained that "many State laws are exercising jurisdiction over these same markets to fill what had become a vacuum of regulation." 119 Cong. Rec. H41333 (1973). The resulting "[v]aried and often conflicting regulation," he feared, "could become a burden on commerce, if it is not already." *Id.* Yet H.R. 11955 did little to address the states' concurrent jurisdiction over derivatives. "The only provision … directly related to jurisdictional issues was one which preserved the jurisdiction of the Securities Exchange Commission." Van Wart, *supra*, at 676. Yet that omission was not overlooked for long. The Continental Grain Company sent a letter warning that "[f]ailure to clarify … the exclusive and preemptive jurisdiction of the CFTC over regulation of all aspects of commodities and commodity trading will result in major conflicts of policy and regulation between the CFTC and the S.E.C. and between Federal and State regulatory bodies." *Commodity Futures Trading Commission Act of 1974: Hearings Before the H. Comm. on Agriculture*, 93d Cong. 322 (1974).

The committee responded by strengthening the preemption provisions. "Recognition of the need for exclusive federal jurisdiction pervaded" the committee report. Van Wart, *supra*, at 677-78. The report concluded that "[i]t is abundantly clear that all futures trading must be brought under a single regulatory umbrella." H.R. Rep. No. 93-975, at 41-42 (1974). The new version thus "provide[d] for the exclusive jurisdiction of the CFTC over all futures transactions and all cash transactions related thereto which are executed on not only domestic boards of trade but also 'on any other board of trade, exchange, or market.'" *Id.* at 7-8. The committee spent a good deal of time writing and rewriting that "exclusive jurisdiction" provision, mostly to clarify the relationship between the jurisdiction of the CFTC and of the Securities and Exchange Commission. Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 11-13 (1976). In the end, the express purpose was to "put all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, *supra*, at 76. It was thus "apparent that the committee intended that the proposed amendments to the CEA would serve as a check on renewed state regulatory efforts." Van Wart, *supra*, at 678.

The Senate hearings were even clearer about the need to rein in state regulations. One Senator asked a witness whether "[f]ederal legislation

really ought to preempt State legislation so that we do not have the 50 different States legislating in this area." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture and Forestry*, 93d Cong. 396 (1974) (statement of Sen. Dick Clark). The witness, a Minnesota commodities exchange executive, responded, "Very definitely." *Id.* at 384-85, 396. He observed that "State legislation would make an impossible situation for exchanges." *Id.* at 396. Many witnesses highlighted the need for "'federal legislation'" that would "'preempt the states in making a determination that the various commodity contracts are, in fact, classified, regulated and traded as commodities and not as securities.'" Van Wart, *supra*, at 683 (collecting cites from *1974 S. Comm. Hearings*, *supra*). Neglecting to give the CFTC exclusive jurisdiction would result in "'confusion'" and a regulatory "'nightmare'" for exchanges. *Id.* at 682-83.

The Senate committee report confirmed that the Act would "supersede" state laws on commodity futures. S. Rep. No. 93-1131, at 23 (1974). In fact, the Senate added "clarifying amendments" confirming that "the Commission's jurisdiction over futures contract markets or other exchanges is exclusive." *Id.* at 6, 23. And "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies," including the SEC. *Id.*

The conference report was even clearer about what this meant for state laws: "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned." S. Rep. No. 93-1194, at 35 (1974). So "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." *Id.* at 35-36. The conference committee thus did "not contemplate that there will be a need for any supplementary regulation by the States." *Id.* at 36.

When it came time to reconcile the bills, "the Senate version prevailed in the Conference," with one exception. Johnson, *supra*, at 17. "The one exception was that the House's language bringing all domestic and foreign commodity markets under the CFTC's exclusive jurisdiction was accepted in lieu of the Senate's narrower provision limiting that exclusive authority to 'contract markets.'" *Id.* Most of the concern was over whether the CFTC Act would divest the SEC of jurisdiction over traditional stocks—it was accepted as a given that the Act divested states of regulatory authority over derivatives. *Id.* at 18-21.

In fact, Congress was generally of one mind about superseding state authority. The Senate rejected an amendment trying to introduce a presumption that the law shouldn't "be construed to impair any State law

applicable to any transaction enumerated or described in such sections." 93 Cong. Rec. S16133 (1974). In fact, "the strongest statement *in favor* of a state regulatory role was not submitted until after the formal Senate hearings had concluded." Van Wart, *supra*, at 685. That sole witness advocated "the need and urgency to decentralize the structure of the commodity futures industry." *1974 S. Comm. Hearings*, *supra*, at 814. But the witness missed the "major feature of the proposed amendments," which was to bring "all commodities under federal regulatory authority," calling doubt on the "validity" of his "remarks." Van Wart, *supra*, at 686.

With this clear design of federal supremacy, Congress passed the CFTC Act by a 281–43 margin in the House and by voice vote in the Senate. On October 23, 1974, President Ford signed it into law, noting that he "fully support[ed]" the "new regulatory structure to apply to all commodity futures trading." *CFTC Act of 1974: Statement by the President on Signing the Bill Into Law*, 10 Wkly. Comp. of Pres. Docs. (No. 44), at 1366 (1974).

### C. The 1978 CEA amendments reaffirmed the CFTC's exclusive jurisdiction over futures.

It wasn't long before Congress took up the CFTC's exclusive jurisdiction again. Just four years later, the House Subcommittee on Conservation and Credit held hearings on additional amendments to the Commodity Exchange Act. "Battle lines over the issue of the CFTC's exclusive jurisdiction began to form quite early in these hearings." Van Wart,

*supra*, at 699. The CFTC Commissioner explained that "[t]he idea behind the exclusive jurisdiction provisions of the Commission was to simplify and centralize regulation of the commodity market." *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agriculture*, 95th Cong. 80 (1978) (statement of John Rainbolt).

Even critics of the Act demonstrated their awareness that Congress had established preemption over state law. A Texas securities commissioner criticized the "grant of exclusive jurisdiction to the CFTC," which he claimed had "dismantled an effective regulatory system within the states that was adequately policing the commodity option problem." *Id.* at 364. The Minnesota Secretary of State urged Congress to "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud." *Id.* at 379. But he was mainly concerned with state efforts "to help protect investors from commodities frauds." *Id.* at 380. He claimed that "[t]he simple abolition of the CFTC's exclusive jurisdiction would immediately bring fifty-one more experienced regulatory agencies into the field and vastly expand the available funding and manpower." *Id.* Even those recommendations demonstrated "virtual unanimity among participants in the [House and] Senate hearings that the 1974 amendments had preempted a state regulatory role." Van Wart, *supra* at 712.

The Senate committee report concluded that clearer, stronger regulation was necessary. The report observed that the 1974 Act "reflects the congressional awareness that futures markets would not remain static." S. Rep. No. 95-850, at 22 (1978). New technologies and financial instruments were reasons to give the CFTC more leeway, not clamp down on its jurisdiction. "So long as the futures contract serves a legitimate function, Congress has vested the Commodity Futures Trading Commission with jurisdiction." *Id.* As for the states' authority, the committee clarified that "it will remain possible, as it has been in the past, for an authorized State official to proceed in State court on the basis of an alleged violation of any *general* civil or criminal antifraud statute." *Id.* at 25. But "[t]he States would not, in these actions, be involved in enforcement of their local laws" regulating futures. *Id.* "As to the question of state jurisdiction," both chambers thus decided "in favor of the CFTC." Van Wart, *supra*, at 718.

Even today, Congress understands the significant political consequences that accompany preempting the states on policymaking and regulation. To preempt the states from using some of their existing regulatory powers is a major step. For the CFTC Act's statutory text to so clearly preempt "any state or local law" on the subject of commodities futures regulation shows that Congress intended to establish strong federal preemption.

## II. The Dodd-Frank Act extended the CFTC Act's preemptive reach to swaps.

In the 1980s, swaps gained traction as a popular variant of derivative. Michael Greenberger, *Overwhelming a Financial Regulatory Black Hole with Legislative Sunlight*, 6 J. Bus. & Tech. L. 127, 131-32 (2011). The CFTC first defined "swaps" through rulemaking: "an agreement between two parties to exchange a series of cash flows measured by different interest rates, exchange rates, or prices with payments calculated by reference to a principal base (notional amount)." *Statement of Policy Concerning Swap Transactions*, 54 Fed. Reg. 30,694 (July 21, 1989). Over time, the industry developed more complex variants that became increasingly popular. *See* Greenberger, *supra*, at 136-43.

After the 2008 financial crisis, Congress stepped in again. The Dodd-Frank Wall Street Reform and Consumer Protection Act "transform[ed] the regulation of OTC derivatives." *Id.* at 152. The Act defined a "swap," "swap dealer," and other key terms. And it imposed a variety of restrictions, "generally requiring that swaps be subject to clearing and exchange-like trading." *Id.* "The basic rule of the Dodd-Frank Act is that swaps must be cleared and exchange traded." *Id.* at 156.

Once again, Congress "revisited the question of state law preemption." Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 1 (2019). It faced a familiar choice—

whether to "maintain or repeal" the "protections against gaming and bucket shop laws for qualifying contracts." *Id.* And once again, "[i]nstead of backing away from preemption, Congress embraced it." *Id.*

Congress couldn't have been clearer in taking swaps regulation out of the states' hands. "The Commission shall have exclusive jurisdiction" over transactions "involving swaps or contracts of sale of a commodity for future delivery … traded or executed on a [designated] contract market." 7 U.S.C. §2(a)(1)(A). The law is the same today. This provision grafted swaps into the federal preemption framework, putting swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures." Taylor-Brill, *supra*, at 3. The CFTC thus "received an explicit congressional mandate to carry out regulation of the swap markets under federal law free from potential state interference, potentially including a patchwork of conflicting laws." *Id.* at 13.

### III. Event contracts on designated contract markets fall within the CFTC's "exclusive jurisdiction."

That Crypto.com is a CFTC-designated exchange brings its event-contract offerings under the CFTC's "exclusive jurisdiction." 7 U.S.C. §2(a)(1)(A). That necessarily follows from the 20th century's federal regulatory evolution traced above. From the Supreme Court's exempting legitimate exchanges from state bucket shop laws, *Christie Grain & Stock*, 198 U.S. at 249; to Congress's exempting designated exchanges from grain

futures regulations, *1922 Act*, 42 Stat. 998; to Congress's expanding federal jurisdiction over designated exchanges, *1936 Act*, 49 Stat. 1491; to Congress's creating the CFTC and giving it "exclusive jurisdiction" over designated exchanges, H.R. Rep. No. 93-975, *supra*, at 7-8—if it's traded on a CFTC exchange, it's exempt from state regulation.

But the district court rejected the CFTC's exclusive authority. The court concluded that the CFTC doesn't have jurisdiction over event contracts because event contracts don't qualify as "swaps." ER-19. The CFTC itself disagrees. The CFTC itself disagrees. As early as 2008, it recognized that event contracts, including those based on "varied" eventualities such as the "results of political elections, or the outcome of particular entertainment events," could be structured as "futures" or "options." *Concept Release*, 73 Fed. Reg. 25,669, 25,669-71 (May 7, 2008). The CFTC is correct on the law; the district court is not.

### A. The district court failed to apply Congress's broad definition of a "swap."

The district court first erred by failing to recognize that Crypto.com's event contracts plausibly qualify as one of several financial instruments over which the CFTC has exclusive jurisdiction. "Event contracts are subject to regulation under the CEA as excluded commodities, and thus by the CFTC." *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *2 (D.D.C. Sept. 12, 2024) (cleaned up). Commentators have even suggested that sports contracts could

be classified as "swaps" under §1a(47)(A) or "options" under §4c(b). *See* Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53, 79-86 (2021). So a narrow focus on one sub-definition of "swap" isn't even dispositive.

The "ordinary meaning" of "swap" encompasses Crypto.com's event contracts. *See EPA v. Calumet Shreveport Refining LLC*, 145 S. Ct. 1735, 1747 (2025). The district court focused on one *part of* the definition of "swap." It ruled that event contracts are not based on "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A)(ii); ER-24. It reasoned that the contracts instead "turn on the outcome of the live event," not on the "occurrence" of the event itself. ER-24. That reading confuses two definitions of "event."

The district court recognized that dictionaries define "event" broadly to mean "a happening or occurrence." ER-21 (citing Webster's New College Dictionary (2009)); *see also Event*, Am. Heritage Dictionary (3d. ed. 1994) ("An occurrence or incident, esp. one of significance."); Webster's Third New Int'l Dictionary (1993) ("something that happens"); Concise Oxford English Dictionary (12th ed. 2011) ("a thing that takes place").

The outcome of an event is something that "happen[s]." Far from an "archaic" definition, ER-24, many modern dictionaries define "event" this

way. Modern language is replete with this usage, which is why phrases such as "in any event" are prevalent in legal briefs and opinions, including the district court's own order. *See* ER-11.

Crypto.com's event contracts qualify as swaps even under the district court's preferred definition. After all, the outcome of the Kentucky Derby or a professional baseball game could be described as a "happening of some significance that took place or will take place, in a certain location, during a particular interval of time." ER-23. But the district court's reading leads to the illogical conclusion that the Raiders winning the Super Bowl is not a "significant occurrence or happening." *See* ER-22 n.5. A Raiders victory is both the outcome of a sporting "event" (game, match, contest) and an "event" in its own right (occurrence, happening, result). The district court confused those two usages of the word "event."

Courts, too, recognize that contracts turning on outcomes are subject to CFTC jurisdiction. "[E]vent contracts" are "a type of derivative contract whose payoff is based on the outcome of a contingent event." *KalshiEX*, 2024 WL 4164694, at *1. They involve the "outcome of real-world events." *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 32, 35 (D.D.C. 2015). The CFTC has long recognized the same, explaining that "event contracts may be based on eventualities" such as "the outcome of particular entertainment events." *Concept Release*, 73 Fed. Reg. 25,669, 25,669 (May 7, 2008). And even in a

recent proposed rule that was hostile to prediction markets, the CFTC stated that "event contracts are generally understood to be a type of derivative contract … based on the outcome of an underlying occurrence or event." *Event Contracts*, 89 Fed. Reg. 48,968, 48,969 (June 10, 2024). The proposed rule defined gaming related swaps to be those based on the "outcome of an awards contest" or "game in which one or more athletes compete." *Id.* at 48,975. The rule would have prohibited gaming contracts as contrary to the public interest, but it clearly contemplated that outcome-based event contracts fell within the CFTC's jurisdiction. That even a CFTC regulatory proposal opposition to prediction markets accepts the same definition of "event" as Crypto.com proffers shows how off-base the district court was.

Additionally, distinguishing "outcomes" from "events" creates unwieldy problems. Almost every event can be framed as the outcome of another event. For example, "whether a game 5 of the Stanley Cup Finals will occur" is an event that depends on who wins the first four games. ER-24 n.9. The District court thought that made game 5 a "contingent event." *Id.* But that reasoning just collapses "contingency" into "event," when Congress intended both words to meet the definition of "swap." 7 U.S.C. §1a(47)(A)(ii) ("'swap' means any agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an *event or*

*contingency* associated with a potential financial, economic, or commercial consequence") (emphasis added). Whether Philadelphia will host a Super Bowl parade depends on whether the Eagles win the Super Bowl. Even aside from the difficulties in parsing contingent events, it's natural to describe sporting outcomes as "events." The Chicago Cubs winning their first World Series in over a century was a major event in baseball. Sir Roger Bannister breaking the 4-minute mile was a historic event in its own right. And whether Travis Kelce will score exactly 3 touchdowns in his next game is an "event" that will either occur, or not.

The district court's reading would lead to considerable uncertainty about almost every type of event contract. DCMs might offer contracts that they think are permissible "swaps" turning on "events," but that a court later determines are actually "outcomes" of events instead. Combine this uncertainty with state criminal laws penalizing DCMs for offering this type of contract and chaos will ensue. Asking courts to construe which particular outcome in a sport is an event is dragooning the judiciary into a never-ending assignment of counting angels on the heads of pins, to the detriment of market participants, the CFTC, and judges themselves.

While Congress chose a broad definition of "swap," it is not as boundless as the district court fears. *See* ER-25. For one thing, any "swap" must be "associated with" a potential "financial, economic, or commercial

consequence," limiting the universe of potential contracts that qualify. 7 U.S.C. §1a(47)(A)(ii).

It is true that the definitions of "swaps" overlap. But overlap does not mean surplusage. Here, it demonstrates Congress's intent to define "swap" broadly—a conclusion self-evident from the statutory text, where Congress provided five definitions of "swap" to cover a wide variety of financial arrangements. 7 U.S.C. §1a(47)(A)(i)-(v). And it removed any doubt by providing a sixth definition "that is any combination or permutation of, or option on, any agreement, contract, or transaction described in" the other five definitions. *Id.* §1a(47)(A)(vi); *cf.* H.R. Rep. No. 93-975, at 76 (1974) (noting congressional purpose to ensure the CEA would cover "all futures trading that might now exist or might develop in the future").

### B. Defendants' counterarguments don't revive the district court's narrow reading of the statute.

Defendants, for their part, focused their district court briefing on a different part of the definition of "swap." They argue that Crypto.com's contracts do not count as "swaps" because they are not *inherently* "financial, economic, or commercial" in nature. Blue Br. at 58. The district court did not address this argument, but it's nothing more than a carve-out for state gambling laws. Defendants suggest that preemption of state gambling laws would be some new or unintended extension of federal law. Dist. Ct. Doc. 36 at 11-14. But the clash between federal financial regulation and state

gambling laws is at least as old as the bucket-shop laws that Congress preempted in the early 1900s. *See supra* Section I.A. Congress regulated commodities futures precisely *because* it sought to preempt state gambling laws, which were insufficient for addressing this new area.

On the text, Defendants claim that the better reading is that something is a "swap" when the referenced "event or contingency" is "inherently 'financial, economic, or commercial'" in nature. Blue Br. at 58. But that's not what the text says. Congress used the phrase "associated with." 7 U.S.C. §1a(47)(A)(ii). Defendants' preferred phrase—"is inherently"—appears nowhere in the text. Nor do Defendants do any interpretive work to show that the statutory phrase "associated with" in fact *means* "is inherently." Defendants' proffered interpretation merely embodies their policy preference, but that's "no basis for disregarding or changing the text." Scalia & Garner, *supra*, at 237. If Congress had wanted the CFTC's jurisdiction to extend only to events that "are inherently" financial, economic, or commercial, it could have said that. But it didn't. So as long as the "event or contingency" is "*associated with* a potential financial, economic, or commercial *consequence*," it fits the definition of a swap. 7 U.S.C. §1a(47)(A)(ii) (emphasis added).

Defendants argue that Congress's definition lists examples of "swaps" that share similar attributes. Dist. Ct. Doc. 63 at 15 (citing *Beecham v. United*

*States*, 511 U.S. 368, 371 (1994)). But the argument proves too much. Defendants claim that "all parts of Section 1a(47)(A) describe financial instruments," and thus "an event-based swap must involve an event that is inherently financial, economic, or commercial." Dist. Ct. Doc. 63 at 15. Their premise is false. Defendants ignore other examples in the list that *don't* refer to inherently financial, economic, or commercial events: "a weather swap" or "an emissions swap," for example. 7 U.S.C. §1a(47)(A)(iii). The "weather" is not "inherently 'financial, economic, or commercial' in nature." *Contra* Dist. Ct. Doc. 63 at 15. Those events are nonetheless covered because they are "associated" with "consequence[s]" that are "financial, economic, or commercial." Dating back to famous storms, floods, and droughts of antiquity, weather events have had tremendously important financial, economic, and commercial consequences on humans and human civilization. The non-financial events in the list justify rejecting Defendants' effort to engraft an "inherently financial" limitation on Congress's definition.

Defendants' last-ditch argument is that interpreting the definition of "swaps" to include Crypto.com's event contracts would lead to absurd results. Dist. Ct. Doc. 36 at 10. But Defendants don't even satisfy the "necessary" conditions "for correct application of the absurdity doctrine." Antonin Scalia & Bryan A. Garner, *Reading Law* 237-38 (2012) (Absurdity

Doctrine). They don't point to "a disposition that no reasonable person could intend." *Id.* Nor do they supply "a particular word or phrase whose inclusion or omission was obviously a technical or ministerial error." *Id.* Because Defendants don't satisfy those elements, their absurdity arguments invite "disregarding or changing the text" according to their policy preferences. *Id.*

* * *

Defendants' objections are not new. Neither is their desire to treat CFTC-regulated instruments as illegal gambling. By 1978, a CFTC Commissioner observed that the country "always had a problem throughout history with State regulation of commodity markets." *1978 H. Subcomm. Hearings*, *supra*, at 80. The problem "goes back quite a ways to when they declared futures contract[s] as illegal gambling contracts and could not be enforced." *Id.* Defendants would have this Court revive that "patchwork of conflicting laws." Taylor-Brill, *supra*, at 13. But Congress ended that period long ago.

Congress has also known "that futures markets would not remain static." S. Rep. No. 95-850, *supra*, at 22. That's why, for example, Congress defined "swap" to include instruments that "in the future become[] commonly known to the trade as a swap." 7 U.S.C. §1a(47)(A)(iv). Those flexible provisions "sought to foster a climate in which the economic benefits

of futures trading could be extended to other areas where such trading would be of value." S. Rep. No. 95-850, *supra*, at 22.

All this comports with Justice Holmes's observation more than a century ago: "People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Christie Grain & Stock*, 198 U.S. at 247 (1905). States don't have to like what the CFTC allows. But they can't regulate it.

## CONCLUSION

For these reasons, the Court should reverse the district court's denial of the preliminary injunction motion.

January 15, 2026

Respectfully submitted,

*/s/ Tyler R. Green*

Tyler R. Green
Conor D. Woodfin
Olivia C. Rogers
CONSOVOY MCCARTHY PLLC
222 S. Main Street
5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I certify the following:

1. I am a member in good standing of the Bar of this Court.
2. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,741 words, excluding the parts exempted by Fed. R. App. P. 32(f).
3. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared using Microsoft Word in 14-point Palatino.
4. The text of the electronic brief is identical to the text in the paper copies.

Dated: January 15, 2026

*/s/ Tyler R. Green*
Tyler R. Green
*Counsel for Amicus*

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2026, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system, which will provide notice and service on counsel for all parties.

Dated: January 15, 2026

*/s/ Tyler R. Green*
Tyler R. Green
*Counsel for Amicus*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7187

I am the attorney or self-represented party.

**This brief contains** 6,741 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ______.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Tyler Green **Date** 01/15/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*