No. 25-7187

# In The United States Court of Appeals for the Ninth Circuit

———————————————

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D / B / A CRYPTO.COM | DERIVATIVES NORTH AMERICA,

*Plaintiff-Appellant,*
v.
THE STATE OF NEVADA, ET AL.,

*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee.*

———————————————

On Appeal from the United States District Court for the District of Nevada,
Case No. 2:25-cv-00978-APG-BNW

———————————————

## AMICUS BRIEF OF COMMODITY FUTURES TRADING COMMISSION, A FEDERAL GOVERNMENT AGENCY, IN SUPPORT OF APPELLANT AND IN SUPPORT OF REVERSAL

Tyler S. Badgley, *General Counsel*
Anne Stukes, *Acting Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5127
*Counsel for Amicus Curiae*
*Commodity Futures Trading Commission*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................................1

BACKGROUND .................................................................................................3

I.   The Commodity Exchange Act Provides the Regulatory Framework
     for Commodity Derivatives Market in the United States. ................................3

II.  The Development of Federal Regulation of U.S. Futures and
     Swaps Markets. ..........................................................................................5

     A.  The Origins of Federal Oversight of Derivatives Regulation. ....................5

     B.  Congress Gave the CFTC "Exclusive" Jurisdiction over Futures
         Trading in 1974. .....................................................................................8

     C.  Congress Reinforced and Clarified the CFTC's Exclusive
         Jurisdiction after 1974. ...........................................................................9

     D.  Congress Embraced Preemption as to Swaps Transactions
         in the Dodd Frank Act. ..........................................................................13

ARGUMENT ...................................................................................................14

I.   Event Contracts Trading on CFTC-Regulated Markets Is Subject
     to the CFTC's Exclusive Jurisdiction. ...........................................................14

     A.  Under the Plain Language of CEA Section 1(a)(47), Event
         Contracts Are "Swaps." ..........................................................................14

     B.  Sports Event Contracts Are Associated with Potential Financial,
         Economic, and Commercial Consequences. ..............................................19

II.  The CEA Preempts Other Federal and State Actors from Exercising
     Regulatory Authority over Swaps, Including Event Contracts, on
     CFTC-Regulated Markets. ...........................................................................21

i

A. *The CEA Was Intended to, and Does, Occupy the Field of Regulating Commodity Derivatives Exchanges.* ...........................................................21

B. *The "Savings Clause" in CEA § 2(a)(1)(A) Does Not Nullify Its Field Preemptive Effect; It Preserves Traditional State Powers over State-Regulated Gambling.* ...............................................................24

C. *State Gambling Laws Are Conflict Preempted.* ...........................................26

III. Subjecting Derivatives Listed on a CFTC-Registered DCM to State Regulation Would Have Destabilizing Economic Effects. ....................28

CONCLUSION ............................................................................................29

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alabama Power Co. v. Costle*,
   636 F.2d 323 (D.C. Cir. 1979)..................................................................19

*Ali v. Federal Bureau of Prisons*,
   552 U.S. 214 (2008)............................................................................14

*Altria Group, Inc. v. Good*,
   555 U.S. 70 (2008)........................................................................22, 27

*American Agriculture Movement, Inc. v. Board of Trade of Chicago*,
   977 F.2d 1147 (7th Cir. 1992) ..............................................................22

*Arizona v. United States*,
   567 U.S. 387 (2012)..............................................................................21

*Board of Trade of Chicago v. Christie Grain & Stock Co.*,
   198 U.S. 236 (1905)..........................................................................2, 6

*Bostock v. Clayton County, Ga.*,
   590 U.S. 644 (2020)..............................................................................15

*Chicago Mercantile Exchange v. SEC*,
   883 F.2d 537 (7th Cir. 1989) ................................................................23

*Cothran v. Ellis*,
   16 N.E. 646 (Ill. 1888) .........................................................................6

*Crosby v. National Foreign Trade Council*,
   530 U.S. 363 (2000)..............................................................................26

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   622 F.2d 216 (6th Cir. 1980),
*aff'd Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353 (1982)..............................................................................23

*Dickson v. Uhlmann Grain Co.*,
   288 U.S. 188 (1933)..............................................................................7

*Duke Energy Trading & Marketing, LLC v. Davis*,
  267 F.3d 1042 (9th Cir. 2001) ...............................................................21

*Effex Capital, LLC v. National Futures Association*,
  933 F.3d 882 (7th Cir. 2019) ................................................................22

*English v. General Electric Co.*,
  496 U.S. 72 (1990) ................................................................................26

*Florida Lime & Avocado Growers, Inc. v. Paul*,
  373 U.S. 132 (1963) ..............................................................................26

*FTC v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001) .............................................................25

*Hillman v. Maretta*,
  569 U.S. 483 (2013) ..............................................................................26

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ................................................................................26

*Hughes v. Talen Energy Marketing, LLC*,
  578 U.S. 150 (2016) ..............................................................................21

*Hunter v. FERC*,
  711 F.3d 155 (D.C. Cir. 2013) .............................................................25

*International Trading, Ltd. v. Bell*,
  556 S.W.2d 420 (Ark. 1977) ................................................................23

*Irwin v. Williar*,
  110 U.S. 499 (1884) ................................................................................5

*Leist v. Simplot*.
  638 F.2d 283 (2d Cir. 1980) .................................................................22

*Los Angeles Memorial Coliseum Commission v. NFL*,
  726 F.2d 1381 (9th Cir. 1984) .............................................................19

*Nevada, et al. v. Coinbase Financial Markets, Inc.*,
  No. 26-OC-0030-1B (Nev. 1st Judic. Dist. Feb. 5, 2026) ..................2-3

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
515 F. Supp. 202 (N.D. Ala. 1981) .................................................................23

*Pennsylvania v. National Collegiate Athletic Association*,
948 F. Supp. 2d 416 (M.D. Pa. 2013) .............................................. 19-20

*Point Landing, Inc. v. Omni Capital International, Ltd.*,
795 F.2d 415, 422 (5th Cir. 1986)*,
aff'd sub nom. Omni Capital International, Ltd. v. Rudolf Wolff & Co.*,
484 U.S. 97 (1987) .........................................................................................23

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......................................................................................27

*Richardson v. Kruchko & Fries*,
966 F.2d 153 (4th Cir. 1992) .....................................................................21

*Rumsey v. Berry*,
65 Me. 570 (Me. 1876) ...................................................................................6

*Stuber v. Hill*,
170 F. Supp. 2d 1146 (D. Kan. 2001) ......................................................23

*Texas v. Monex International, Ltd.*,
527 S.W.2d 804 (Tex. Civ. App. 1975),
*writ refused* (Dec. 17, 1975) .......................................................................23

*Time Warner Cable v. Doyle*,
66 F.3d 867 (7th Cir. 1995)...........................................................................22

*Transcontinental Gas Pipe Line Co. v. Pennsylvania Environmental
Hearing Board*,
108 F.4th 144 (3d Cir. 2024) ......................................................................21

Statutes

7 U.S.C. §§ 1-26, CEA §§ 1-23 ....................................................................1

7 U.S.C. § 1a(9), CEA § 1a(9) .....................................................................16

7 U.S.C. § 1a(47), CEA § 1a(47) ...............................................................14

7 U.S.C. § 1a(47)(A), CEA § 1a(47)(A) ........................................14

7 U.S.C. § 1a(47)(A)(i), CEA § 1a(47)(A)(i) ...............................14

7 U.S.C. § 1a(47)(A)(ii), CEA § 1a(47)(A)(ii) .............................14

7 U.S.C. § 1a(47)(A)(iv), CEA § 1a(47)(A)(iv) ...........................14

7 U.S.C. § 1a(47)(A)(vi), CEA § 1a(47)(A)(vi) ...........................14

7 U.S.C. § 1a(47)(B), CEA § 1a(47)(B) ......................................16

7 U.S.C. § 2(a)(1), CEA § 2(a)(1) ..........................................1, 19

7 U.S.C. § 2(a)(1)(A), CEA § 2(a)(1)(A) ........................ 1, 4, 13, 21-25

7 U.S.C. § 2(d), CEA § 2(d) .....................................................13

7 U.S.C. § 5, CEA § 3 ...............................................................1

7 U.S.C. § 6(a), CEA § 4(a) .......................................................4

7 U.S.C. § 13a-2, CEA § 6d ......................................................10

31 U.S.C. § 5362(1)(E)(ii) ........................................................24

Commodity Exchange Act,
  Pub. L. No. 74-675, 49 Stat. 1491 (1936) .................................7

Commodity Futures Trading Commission Act of 1974,
  Pub. L. No. 93-463, 88 Stat. 1389 (1974) .................................8

Commodity Futures Modernization Act of 2000,
  Pub. L. No. 106-554, 114 Stat. 2763A-365 (2000) ....................12

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010) .............................13

Future Trading Act of 1921,
  Pub. L. No. 67-66, 42 Stat. 187 (1921) .....................................6

Futures Trading Act of 1978,
  Pub. L. No. 95-405, 92 Stat. 865 (1978) ..................................10

vi

Futures Trading Act of 1982,
  Pub. L. No. 97-444, 96 Stat. 2294 (1982)........................................11

Futures Trading Practices Act of 1992,
  Pub. L. No. 102-546, 106 Stat. 3590 (1992)...................................11

Grain Futures Act of 1922,
  Pub. L. No. 67-331, 42 Stat. 998 (1922)......................................6-7

Regulations

17 C.F.R. § 1.3 .........................................................................16

17 C.F.R. § 32.2(a) ...................................................................16

17 C.F.R. § 38.151(b)................................................................26

17 C.F.R. § 40.2 .......................................................................28

CFTC Commodity Options,
  77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) .......................16

CFTC Further Definition of "Swap", "Security Based-Swap", and
"Security-Based Swap Agreement"; Mixed Swaps; Security Based-Swap
Agreement Recordkeeping,
  77 Fed. Reg. 48208, 48209 (Aug. 13, 2012) ...........................18

CFTC Concept Release on the Appropriate Regulatory Treatment of
Event Contracts,
  73 Fed. Reg. 25669, 25671 (May 7, 2008)................................18

Legislative Materials

H. Rep. No. 67-1095 (1922) (Conf. Rep.) ...................................7

H.R. Rep. No. 93-975 (1974)........................................................1

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.),
  *as reprinted in* 1974 U.S.C.C.A.N. 5894...................................9

H.R. Rep. No. 97-565 (1982), pt 1,
  *as reprinted in* 1982 U.S.C.C.A.N. 3871 ...........................10, 11

H.R. Rep. No. 102-978 (1992) (Conf. Rep.),
*as reprinted in* 1992 U.S.C.C.A.N. 3179 ................................................................ 12

S. Rep. No. 67-871 (1922) ................................................................................ 5

S. Rep. No. 93-1131 (1974),
*as reprinted in* 1974 U.S.C.C.A.N. 5843 .................................................................. 1

S. Rep. No. 95-850 (1978),
*as reprinted in* 1978 U.S.C.C.A.N. 2087 ............................................................... 10

120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974)
(statement of Sen. Curtis) ........................................................................ 9

156 Cong. Rec. S5923 (daily ed. July 15, 2010)
(statement of Sen. Lincoln) .................................................................... 18

Review of Commodity Exchange Act and Discussion of Possible Changes:
Hearings Before the H. Comm. on Agric*., 93d Cong., 1st Sess. 121 (1973) ........ 7-8

Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric.
& Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685
(1974) (statement of Sen. Clark) ............................................................... 9

<u>Other Authorities</u>

CFTC, Designated Contracts Markets (DCMs),
https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?St
atus=Designated&Date_From=&Date_To=&Show_All=1 ............................ 5, 20

CFTC, Futures Glossary,
https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/
CFTCGlossary/index.htm .................................................................... 16

CFTC, History of the CFTC,
https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html .................. 5

*Event*, Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/event ........................................... 15

*Contingency*, Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/contingency ................................ 15

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*,
  6 Hofstra L. Rev. 1, 6 (1977) ......................................................................6

Ryan Grandeau, *Securing the Best Odds: Why Congress Should Regulate Sports Gambling Based on Securities Style Mandatory Disclosure*,
  41 Cardozo L. Rev. 1229, 1247 (2000)...............................................19

William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848
(U.M. Rose ed., 1884)................................................................................6

## INTEREST OF AMICUS CURIAE

The Commodity Futures Trading Commission ("CFTC" or "Commission") is the federal agency charged with administering and enforcing the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§ 1-26.  Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the existing patchwork of state-by-state regulation had critically impaired the development and functioning of national commodities markets.  *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885.  "[T]ransactions subject to [the CEA] are entered into regularly in interstate and international commerce and are affected with a national public interest," including in "liquid, fair, and financially secure trading facilities."  7 U.S.C. § 5.

Congress vested the CFTC with "exclusive jurisdiction" to protect that national interest by overseeing the regulation of futures, options, and swaps traded on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  The CFTC's jurisdiction "supersedes State as well as Federal agencies" because commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, surveillance, and enforcement of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case.  *See* S. Rep. No. 93-1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. at 5848.

Appellees' views and the district court's decision, if accepted, present a fundamental threat to Congress's statutory design. As Justice Holmes presciently noted in 1905:

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value is well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247-48 (1905).

States cannot invade the CFTC's exclusive jurisdiction over CFTC-regulated designated contract markets ("DCMs") by re-characterizing swaps trading on DCMs as illegal gambling. The decision below is inconsistent with the text, structure, and history of the CEA and, if affirmed, would reintroduce precisely the regulatory fragmentation Congress deliberately displaced.

It is Appellees' theory of the case that presents a seismic shift in the longstanding status quo between CFTC and state authority. This court need only look at many of these same parties' temporary restraining order against Coinbase, where they requested, and received, an injunction barring the offering of "event-based contracts relating to sporting *and other events*." Ex Parte Temporary

Restraining Order at 2, 7 *Nevada, et al. v. Coinbase Financial Markets, Inc*., No. 26-OC-0030-1B (Nev. 1st Judic. Dist. Feb. 5, 2026) (emphasis added) (prohibiting Coinbase "from offering or facilitating the offering of event contract[s] in Nevada"). Unable to articulate any limiting principle to their theory, they have upended decades of well-settled and Congressionally-mandated exclusive jurisdiction across the full spectrum of event contracts.

While subsequent litigation may require resolution of complicated follow-on questions, this case presents two narrow, yet exceptionally important, questions: (1) are Appellant's CFTC exchange-traded event contracts swaps, and (2) may such swaps also be regulated, or prohibited, under state law, thereby displacing the CEA's express preemption of state and other federal laws or rules? The CFTC submits this brief to assist the Court in resolving these fundamental issues.

## BACKGROUND

## I. The Commodity Exchange Act Provides the Regulatory Framework for Commodity Derivatives Markets in the United States.

The CEA is a federal statute that provides the comprehensive federal framework governing transactions in United States commodity derivatives markets. A derivative is a financial instrument, the value of which depends on (*i.e.*, is derived from) the value of some underlying asset, index, or other measure. In general, market participants use derivatives to hedge risks or speculate on commodity price movements. The most common derivatives are "futures

3

contracts" and "swaps." While derivatives markets are distinct from "cash" or "physical" markets in which the assets themselves are bought and sold, the prices of those assets and derivatives are typically closely linked. If a price disparity arises, arbitrageurs will take advantage of the difference, and the gap disappears. In the ordinary course, these price movements contribute to "price discovery," the mechanism by which supply and demand set the price of a commodity.

A futures contract is a standardized agreement to purchase or sell a "commodity" at a future date for a price determined at the contract's inception. Although the CEA uses the term of art "contract[] of sale of a commodity for future delivery," most contracts are structured for financial settlement and are discharged by executing a contract that reverses the obligation to purchase or sell. *See, e.g.*, 7 U.S.C. § 2(a)(1)(A). Under the CEA, a futures contract must be traded on a DCM, the statutory term for a registered derivatives exchange. 7 U.S.C. § 6(a). A swap includes a broad array of financial instruments, such as "event contracts." Swap transactions are also traded on CFTC-registered DCMs.

Futures markets originated in the United States at transportation hubs for agricultural products like grain, butter, and eggs. Over time, exchanges began to offer contracts for other physical commodities like metals, oil, and gas, and later introduced cash-settled futures linked to less tangible measures like interest rates and price indices. While the range of underlying commodities has expanded (and

4

continues to do so) over time, the fundamental regulatory structure governing futures markets has remained consistent. Today there are 24 exchanges (DCMs) in the United States, including North American Derivatives Exchange d/b/a Crypto.com.[1]

## II. The Development of Federal Regulation of U.S. Futures and Swaps Markets.

### A. The Origins of Federal Oversight of Derivatives Regulation.

By the mid-nineteenth century, exchanges in major commodity trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation.[2] But there was tension between state regulation of gambling and the growth of futures markets. States and courts often failed to distinguish between futures trading and "gambling" or "wagering," with many states even prohibiting futures trading as a

---

[1] *See* CFTC, Designated Contracts Markets (DCMs), https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?Status=Designated&Date_From=&Date_To=&Show_All=1 (last visited February 8, 2026).

[2] *See* CFTC*,* History of the CFTC, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html (last visited February 8, 2026); *see also Regulating Transactions on Grain-Future Exchanges*, S. Rep. No. 67-871, at 3 (1922): "Transactions in grain futures are utilized by the public for speculation and by the grain trade for the purpose of eliminating or reducing, as far as practicable, the hazards in the merchandising of grain and its products and by-products due to price fluctuations. Public speculation helps to carry the risk for the producers, dealers, and millers who wish to hedge their cash grain transactions."

form of gambling. *See, e.g., Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain"); s*ee also Rumsey v. Berry*, 65 Me. 570, 574 (Me. 1876) (finding futures contracts to be void as contrary to public policy). For example, an Arkansas law declared that "[t]he buying or selling or otherwise dealing in what is known as futures . . . with a view to profit, is hereby declared to be gambling" and made dealing in futures illegal. *See* William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848 (U.M. Rose ed., 1884).

Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop. A futures contract's "value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices and providing for periods of want." *Bd. of Trade of Chi.*, 198 U.S. 236 at 247-48.[3] And Congress ultimately centralized the oversight and regulation of futures trading on federally regulated contract markets. The first federal legislation designed to create a comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No.

---

[3] Even after the Supreme Court recognized the legitimacy of futures trading on organized exchanges, states continued to characterize commodity futures markets as illegal gambling. *See* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977).

67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act"). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, despite concerns by some members of Congress who objected to the proposed law because it would interfere with state police powers. H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.).

But the Supreme Court found that this preemptive design was not sufficiently explicit in the statute, which resulted in states continuing to regulate or even prohibit futures trading. *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198-99 (1933) (rejecting "the contention that Congress occupied the field in respect to contracts for future delivery; and that necessarily all state legislation in any way dealing with that subject is superseded.") And when Congress expanded federal oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936), the boundary between federal and state authority remained unsettled as futures markets expanded beyond their agricultural origins. Market participants continued to face the persistent threat of state prosecution through a patchwork of state laws and regulations.

In 1973, futures exchanges recommended that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." Review of Commodity Exch. Act and

Discussion of Possible Change: Hearings Before the H. Comm. on Agric., 93d
Cong., 1st Sess. 121 (1973).  And the very next year, Congress explicitly spoke on
the question in the Commodity Futures Trading Commission Act of 1974, Pub. L.
93-463, 88 Stat. 1389 (1974) ("74 Act").

### B. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974.

The 74 Act amendments to the CEA worked a sea change in the regulation
of U.S. derivatives markets in three critical ways.  First, Congress established the
CFTC, vesting in it the authority to administer the CEA.  Second, Congress
expanded the scope of the CEA to cover "all commodities."  Third, Congress
expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures
and options markets.  The 74 Act amended Section 2 of the CEA to provide that
"the Commission shall have exclusive jurisdiction with respect to accounts,
agreements (including any transaction which is of the character of, or is commonly
known to the trade as, an 'option' . . ., and transactions involving contracts of sale
of a commodity for future delivery, traded or executed on a contract market
designated pursuant to section 5 of this Act or any other board of trade, exchange,
or market."  74 Act, Section 201(b), 88 Stat. at 1395 (codified at 7 U.S.C.
§ 2(a)(1)).

Preemption was an express goal of the 74 Act.  Congress recognized the
need for uniform nationwide regulation of futures and options markets because

concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos."[4]  Potential limiting language was stricken from the statute "to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis).  All commodity futures markets were to be under the CFTC's exclusive jurisdiction.  The 74 Act "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern."  H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11.

### C. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974.

Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the CFTC's exclusive jurisdiction over futures and options.  In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the CFTC's exclusive authority over futures transactions on CFTC-registered DCMs while clarifying the states' ability to pursue certain violations of the CEA against actors other than federally regulated exchanges.  The 78 Act added a section to the CEA authorizing

---

[4] See Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes.  *See* 78 Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978).[5]  Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974.  Proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority."  S. Rep. No. 95-850, at 111-12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11.  Just because "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC."  *Id*.  Congress also further added to the list of justifications supporting exclusive jurisdiction citing concerns over "costly duplication and possible conflict of regulation or over-regulation."  *Id.*

The Futures Trading Act of 1982 (the "82 Act") further clarified the scope of the CEA's preemption of other federal and state laws and the role of the states in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the

---

[5] This "Jurisdiction of the States" provision is now found in CEA Section 6d, 7 U.S.C. § 13a-2.  The language of subsection (7) remains the same in the current version of the CEA.

provisions of the Act, thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, at 44-45 & 102-03 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3893-94 & 3951-52. First, the 82 Act clarified the procedures for states to pursue violations of the CEA's anti-fraud provisions in state court. Second, the 82 Act clarified the role of states with respect to off-exchange futures transactions. Language was added to permit "criminal prosecution under any federal criminal statute" or the application of federal or state laws to *off-exchange* transactions or *unregistered* market participants. 82 Act, Pub. L. 97-444, § 229, 96 Stat. 2294, 2318 (1982). The broad preemption of other potentially applicable state or federal laws remained as to transactions *on* DCMs and as to market participants registered with the CFTC. *See* H.R. Rep. No. 97-565, at 44-45 & 102-103, 1982 U.S.C.C.A.N. at 3893-94, 3951-52. Adding again to the reasons for exclusive jurisdiction, the Committee report noted it "was done in recognition of the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act" before ultimately concluding that "[t]he Committee . . . continues to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures."

In 1992, Congress began grappling with the advent of a new type of derivative financial product, swaps. In the Futures Trading Practices Act of 1992 ("92 Act"), Pub. L. 102-546, 106 Stat. 3590 (1992), Congress gave the CFTC

11

authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") swap transactions from the CEA's mandatory exchange trading regime for futures and options. The 92 Act added language to CEA Section 12(e) to preempt the application of state gambling and bucket shop laws as applied to OTC derivatives (swaps) transactions that the CFTC exempted pursuant to its new authority in CEA Section 4(c). While the 82 Act allowed the states authority to apply state and local laws to off-exchange transactions, the 92 Act limited this authority at least as to off-exchange swaps that received an exemption from the CFTC. The goal was to provide "legal certainty under both the Act and state gaming and bucket shop laws for transactions covered by the terms of an exemption." H.R. Rep. No. 102-978, at 80 (1992) (Conf. Rep.), *reprinted in* 1992 U.S.C.C.A.N. 3179, 3212.

The next evolution of the scope of the CEA occurred in 2000 with the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, Appendix E & § 103, 114 Stat. 2763A-365, 2763A-377 (2000). The CFMA exempted or excluded swap transactions from the CEA's exchange trading requirements. However, in so doing, the CFMA also preempted the application of state and local laws to those "excluded" swap transactions. The preemption of state and local laws as to on-exchange transactions remained as is, and the preemption of state and local laws as to off-exchange transactions (exempt or excluded swaps) was expanded.

12

### D. Congress Embraced Preemption as to Swaps Transactions in the Dodd Frank Act.

In the wake of the 2008 financial crisis, Congress created a framework within the CEA for the on-exchange execution, clearing and reporting of vast portions of the previously "OTC" swaps markets. In the 2010 Dodd-Frank Act, Congress expressly extended the CFTC's "exclusive jurisdiction" to encompass "transactions involving swaps."[6] The Dodd-Frank Act also added a new subsection, 2(d), which specifies that certain CEA provisions do not apply to swaps. Section 2(d) eliminated the concurrent jurisdiction of states as to off-exchange swap transactions. The authority for state regulation of swaps (whether on- or off-exchange) is now based on Section 12(e)(2), which applies to any swap that the CFTC may exempt pursuant to Section 4(c). This new preemption model is consistent with the one originally created in 1974 for commodity futures, *except* this model was even broader. Congress did not carve out a role for states to regulate off-exchange swaps through a grant of concurrent jurisdiction, despite having done so for off-exchange commodity futures in 1982.

\*      \*      \*

---

[6] *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).

13

# ARGUMENT

## I. Event Contracts Trading on CFTC-Regulated Markets Is Subject to the CFTC's Exclusive Jurisdiction.

### A. Under the Plain Language of CEA Section 1(a)(47), Event Contracts Are "Swaps."

After Dodd-Frank, the statutory definition of "swap" is deliberately broad. As such, it encompasses event contracts within multiple sub-definitions of CEA § 1a(47)(A). CEA § 1a(47)(A)(i) defines the term "swap," in relevant part, to include "any agreement, contract, or transaction . . . that is a[n] . . . option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . quantitative measures, or other financial or economic interests or property of any kind," and CEA § 1a(47)(A)(ii) defines swap to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."[7]

Congress's use of the word "any" in multiple sub-definitions of § 1a(47) confirms the statute's breadth. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008) (observing that the word "any," read naturally carries an expansive

---

[7] *See also* §§ 1a(47)(A)(iv) (including transactions "commonly known to the trade as swaps") and (vi) ("any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)").

14

meaning). The word "*any*" in the swap definition reflects a conscious decision to avoid a narrow construction that could limit the purpose of derivatives markets. Thus, as an example, an event contract that is settled based on the outcome of a sporting event is therefore an agreement providing for a payment dependent on a future occurrence, and nothing in the statutory text excludes such instruments.

The plain meaning of the statute includes event contracts even though the terms "event" and "contingency" are undefined. Where a statute does not define a term, courts interpret it according to its ordinary meaning. *Bostock v. Clayton County, Ga.,* 590 U.S. 644, 654-55 (2020). Dictionary definitions confirm the breadth of the relevant terms "event" and "contingency." An event is "something that happens: occurrence,"[8] and a "contingency" is an "event that may but is not certain to occur."[9] The final score of a sporting event is a future occurrence whose outcome is uncertain until the game concludes and falls easily within the broad language of the swap definition as well as the broad definitions of "event" or "contingency." Moreover, Congress did not limit covered swaps to binary outcomes; instead, it expressly encompassed contracts measured by the *extent* of the occurrence of an event. This broad language encompasses contracts based on the margin of victory or any other quantifiable result of a sports event.

---

[8] https://www.merriam-webster.com/dictionary/event.
[9] https://www.merriam-webster.com/dictionary/contingency.

An event contract is also a binary option. See 17 C.F.R. 1.3 (defining commodity option). A binary option is a "type of option whose payoff is either a fixed amount or zero. For example, there could be a binary option that pays $100 if a hurricane makes landfall in Florida before a specified date and zero otherwise." CFTC Futures Glossary, https://www.cftc.gov/LearnAndProtect/Advis oriesAndArticles/CFTCGlossary/index.htm#B (last visited Feb. 17, 2026). Commodity option transactions must be conducted in compliance with the CEA and the Commission's regulations related to swaps. 17 C.F.R. 32.2(a); *see also* Commodity Options, 77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) ("the swap definition . . . includes options . . . (whether or not traded on a DCM)").

Importantly, when Congress has limited the Commission's jurisdiction over derivatives it has only done so by expressly embedding narrow exclusions in the statutory commodity definition itself (*i.e.*, onions and movie box office receipts).[10] Here, Congress wrote specific, enumerated exclusions into the definition of swap in § 1a(47)(B), confirming that when it intended to limit the Commission's jurisdiction, it did so expressly, not by inviting courts or states to create additional, atextual carve-outs.[11]

---

[10] *See* 7 U.S.C. § 1a(9).

[11] 7 U.S.C. § 1a(47)(B) (excluding, inter alia, physically settled forward transactions, certain insurance and consumer arrangements, and other ordinary-course commercial agreements).

16

The CEA's text is designed to account for financial innovation. Futures were novel at one point. But even as financial derivatives markets have developed and grown, Congress has chosen to vest the CFTC with broad jurisdiction. That a derivative is novel or different cannot be an excuse for a Court to re-write existing law. The law should be faithfully applied. And if it needs to be amended, that is the job of Congress, not the Courts.

Excluding event contracts from the definition of swap would leave no principled boundary preventing any other event-based derivatives, including currently listed contracts tied to weather, energy, economic indices, and political outcome contracts, from falling outside the CEA. The consequences of such a ruling would be immediate and substantial. States could characterize any derivative as prohibited gambling, thereby subjecting nationally (and internationally) traded swaps to a patchwork of state restrictions. This concern is not hypothetical. Nevada's cease and desist letter to KalshiEX LLC at issue in a related case orders it to "immediately cease and desist from offering any event-based contracts in Nevada," without limitation to sports. If Nevada's approach were permitted to stand, event contracts referencing agricultural, metal, energy, and financial outcomes could likewise all become subject to state-by-state bans across the country. The resulting market fragmentation would erode the nationally uniform framework Congress established to reduce risk, promote transparency, and

17

safeguard market integrity within the financial system.  *See* Further Definition of "Swap", "Security-Based Swap", and "Security-Based Swap Agreement"; Mixed Swaps; Security Based-Swap Agreement Recordkeeping, 77 Fed. Reg. 48208, 48209 (Aug. 13, 2012).

The CFTC has treated event contracts as measuring the level of the outcome of an event for nearly two decades.[12]  Moreover, Congress deliberately adopted an expansive definition of "swap" following the 2008 financial crisis to ensure a comprehensive regulatory oversight of derivatives markets.  *See* 156 Cong. Rec. S5923 (daily ed. July 15, 2010) (Statement of Sen. Lincoln) ("Section 721 includes a broad and expansive definition of the term 'swap' that is subject to the new regulatory regime established in Title VII.").  Nothing in the statutory text or legislative history suggests that the occurrence of an event, or extent of its occurrence, excludes an event's outcome.  The swap definition is written broadly to capture contracts that shift risk based on uncertain future developments.  Event contracts do exactly that.

---

[12] *See* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25671 (May 7, 2008).

### B. Sports Event Contracts Are Associated with Potential Financial, Economic, and Commercial Consequences.

As the statutory definition makes clear, the relevant inquiry is intentionally broad. The statute is framed in expansive terms, requiring only that the contract be "associated with *potential* financial, economic, or commercial consequence." That definitional framework reflects Congress's recognition that derivatives markets serve a wide spectrum of market participants whose economic exposures are not limited to any specific market participant. *See Alabama Power Co. v Costle*, 636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential . . . will always and inherently exceed actual"). Because the statute does not demand certainty, sports event contracts fall comfortably within the statute's reach.

Broadly speaking, sporting events are economic enterprises that generate billions of dollars in economic activity and materially affect both regional and national markets. *See* Ryan Grandeau, *Securing the Best Odds: Why Congress Should Regulate Sports Gambling Based on Securities-Style Mandatory Disclosure*, 41 Cardozo L. Rev. 1229, 1247 (2020). Stadiums function as regional economic anchors around a network of businesses, including hotels, restaurants, transportation providers, retailers, and event management firms. *See, e.g.*, *Los Angeles Mem'l Coliseum Comm'n v. NFL,* 726 F.2d 1381, 1397 (9th Cir.1984) (discussing claim that a professional sporting team's presence generates local business activity) and *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp.

2d 416, 433 (M.D. Pa. 2013) (summarizing the Commonwealth's allegations that the sanctions would cause a loss of football-related hospitality revenue for surrounding businesses).  For these reasons, hotels likely adjust pricing models, restaurants expand staffing to accommodate increased demand, vendors increase supply orders, and cities allocate resources to accommodate projected crowds.  All of these decisions pose economic risk, which is precisely the type of economic exposure that derivatives markets are designed to mitigate.[13]

The issues presented on appeal do not require this Court to resolve the outer limits of the definition of a swap or engage in line drawing between a swap and a wager.  That line drawing exercise presents complicated fact questions concerning the exact structure and mechanics of the instruments, who is the price maker, the difference between an open exchange and a bilateral arrangement, and unrelated legal questions, including the applicability of the CEA to purely intrastate transactions, among others.  It is sufficient to resolve this case that the transactions conducted on a CFTC-registered DCM qualify as swaps under the CEA.

---

[13] *See, e.g.,* KalshiEx's "February 2026 Sportsbook Hedging Rebate Program" filing with the CFTC, available on the CFTC's website at: https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationRules/59640 (last visited 2/17/2026).

II. **The CEA Preempts Other Federal and State Actors from Exercising Regulatory Authority Over Swaps, Including Event Contracts, on CFTC-Regulated Markets.**

CEA § 2(a)(1)(A)'s "exclusive jurisdiction" includes "transactions involving swaps" trading on a CFTC-registered DCM. The "exclusive jurisdiction" provision of 7 U.S.C. § 2(a)(1) preempts application of state gambling laws to event contracts trading on DCMs governed by the CEA, whether the question is evaluated as a matter of field preemption or conflict preemption. Congress intended the CFTC to have exclusive jurisdiction over federally registered DCMs and transactions conducted on those exchanges, displacing state gambling laws that would otherwise apply.

### A. *The CEA Was Intended to, and Does, Occupy the Field of Regulating Commodity Derivatives Exchanges.*

Where Congress has declared federal authority to be exclusive, state laws attempting to regulate the same subject matter must give way. *See Arizona v. United States*, 567 U.S. 387, 399 (2012); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Duke Energy Trading & Mktg., L.L.C. v. Davis,* 267 F.3d 1042, 1057 (9th Cir. 2001); *see also Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024) (an "explicit statutory conferral of exclusive jurisdiction . . . withdraws any concurrent jurisdiction"), *Richardson v. Kruchko & Fries,* 966 F.2d 153, 158 (4th Cir. 1992) (state-law claims preempted where they fell within federal agency's "exclusive jurisdiction").

21

The inquiry does not turn on whether Congress anticipated every possible form of state interference; it turns on whether state law intrudes into a field Congress has reserved to federal regulation. While not needed given the explicit statutory language, preemptive intent may be inferred "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Such is the case here. CEA § 2(a)(1)(A) makes plain that Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

CEA § 2(a)(1)(A)'s "exclusive jurisdiction" over futures and swaps traded on a DCM "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "Precisely, preemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. Nat'l Futures Ass'n,* 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Agric. Movement, Inc v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995)). Offering event contracts on a DCM cannot, in and of itself,

be an activity that is unlawful under any state law. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001).

This is not a new or novel concept. For decades courts have recognized that the CEA preempts application of other federal or state laws to instruments trading on CFTC-regulated markets.[14] Again, this is part and parcel of Congress's intent

---

[14] *See Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 544, 548 (7th Cir. 1989) (recognizing that the CFTC is "the sole lawful regulator" where "its jurisdiction is exclusive"--i.e., if the at-issue derivative falls within Section 2(a)(1)(A)'s reach); *Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*, 795 F.2d 415, 422 (5th Cir. 1986), *aff'd sub nom. Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987) (finding the CEA preempted private rights of action under securities laws because "[a]ny other result would frustrate the intent of Congress to preempt the field insofar as futures regulation is concerned."); *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982) ("[T]he thrust of the [CEA's exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation."); *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 205-06 (N.D. Ala. 1981) (holding that the CEA preempted private plaintiff's counterclaim under Alabama gambling statute purporting to void all futures transactions in which delivery of the commodity is not intended); *Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (1977) (finding the "vesting of exclusive jurisdiction is a clear indication that Congress intended no regulation in this field except under the authority of the [A]ct"); *Texas v. Monex Int'l, Ltd.*, 527 S.W.2d 804, 806 (Tex. Civ. App. 1975), *writ refused* (Dec. 17, 1975) (holding the CEA preempted Texas securities laws over margined commodity transactions).

for the CEA to occupy the field of commodity derivatives, as the very purpose of the 74 Act was to "assure that Federal preemption is complete." 120 Cong. Rec. S. 30,458, 30,464 (daily ed. Sept. 9, 1974) (statement of Sen. Curtis). That the instruments at issue here involve swaps on sports events does not change the preemption framework.[15]

### B. The "Savings Clause" in CEA § 2(a)(1)(A) Does Not Nullify its Field Preemptive Effect; It Preserves Traditional State Powers Over State-Regulated Gambling.

The grant of "exclusive jurisdiction" in § 2(a)(1)(A) does not permit a state to define federally regulated derivatives transactions as illegal under state law. The "savings clause" in § 2(a)(1)(A) does not nullify this conclusion. Specifically, that subsection provides, "[e]xcept as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred . . . on . . . other regulatory authorities under the laws of the United States or of any State," or "(II) restrict . . . such other authorities from carrying out their duties and responsibilities in accordance with such laws," or "supersede or limit the jurisdiction conferred on courts of the United States or any State."

---

[15] Notably, the Unlawful Internet Gambling Enforcement Act of 2006 specifically excludes transactions "conducted on or subject to the rules of a registered entity" under the CEA, reinforcing the field-preemptive effect of the CFTC's exclusive jurisdiction. 31 U.S.C. § 5362(1)(E)(ii).

As a matter of plain language interpretation, this "savings clause" only applies "[e]xcept as hereinabove provided" in CEA § 2(a)(1)(A). That means other laws that would ordinarily apply outside the field of "accounts, agreements . . . and transactions . . . traded or executed on a contract market" still apply, just not to transactions that are trading on CEA-governed markets. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001) (observing that other agencies like the FTC "retain their jurisdiction over all matters beyond the confines" of "accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery") (quoting CEA § 2(a)(1)(A)). The "savings clause" preserves traditional, non-conflicting state powers, but does not empower states to use state powers against transactions on CEA-governed markets. *Hunter v. FERC*, 711 F.3d 155, 159 (D.C. Cir. 2013) ("To be clear, there are limits to what comes within CEA section 2(a)(1)(A)'s orbit, but once a scheme crosses the statute's event horizon, the CFTC has exclusive jurisdiction."). Thus the "savings clause" does not allow states to prohibit the very types of contracts that the CFTC is exclusively empowered to regulate.

Properly interpreted, the "savings clause" means that the CEA does not displace traditional state authority to enforce state criminal or civil antifraud laws, nor does it displace state authority to regulate purely intrastate conduct or transactions. But the CEA explicitly displaces state attempts to regulate swaps that

are conducted on a CFTC-registered contract market. To the specific question in this case, the CEA expressly bars state laws from regulating or prohibiting these transactions that are conducted on CFTC-regulated DCM.

### C. State Gambling Laws Are Conflict Preempted.

Application of gambling laws is also preempted under the concept of conflict preemption. State law is pre-empted "to the extent of any conflict with a federal statute." *Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)). Conflict preemption occurs when compliance with both federal and state law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 66-67 (1941). Field preemption can be understood as a type of conflict preemption, because a state law falling within a preempted field conflicts with Congress's intent to exclude state regulation, making the categories not "rigidly distinct." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990).

Here, gambling laws are preempted under both impossibility and obstacle conflict preemption. As for impossibility, a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). If a state bans the contract, the DCM cannot fulfill its federal

mandate to provide impartial national access. As for obstacle preemption, gambling laws often require local licensing, fees, and specific hardware (like localized servers). Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent.

Nor does the presumption against preemption alter this conclusion. Even accepting arguendo that regulation of gambling is a historic police power of the states, the Court should not apply a presumption against preemption. The entire purpose of the exclusive jurisdictional provision in CEA § 2(a)(1)(A) is to provide national uniformity for derivatives trading and to prevent 50 different states from undermining this national regulatory structure by claiming derivatives markets are subject to state gambling laws. Congress's "clear and manifest purpose" was indeed to preempt these historic police powers. *Altria Grp., Inc.*, 555 U.S. at 77 (noting "the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The plain language of the text, underscored by the consistent legislative history to preempt states from applying 50 state requirements on national markets, indicates this "clear and manifest purpose" to preempt state police powers.

27

**III.    Subjecting Derivatives Listed on a CFTC-Registered DCM to State Regulation Would Have Destabilizing Economic Effects.**

If this Court holds that sports event contracts listed on CFTC-registered DCMs do not qualify as swaps or are outside the CFTC's exclusive jurisdiction within the meaning of the statute, the consequences would not be confined to a single category of event contracts.  The interpretation would redraw the statutory boundary Congress established to ensure a comprehensive federal oversight of derivatives markets, inviting the public to characterize an expanding universe of event contracts as beyond the CEA's reach.  At least eight DCMs have collectively self-certified with the CFTC more than 3,000 event based contracts with the CFTC pursuant to CFTC Rule 17 C.F.R. § 40.2, with a notable increase in such filings during the last two years.[16]  Importantly, the vast majority of these contracts are tied to non-sport outcomes involving measurable commodity indicators, including cryptocurrency price levels and related indices, GDP releases, benchmark interest-rate decisions, election outcomes, temperature forecasts, electricity usage, and the price movements of precious metals.  *Id*.  These event contracts rest on objectively measurable outcomes no less than sports event contracts.  A finding excluding such

---

[16] *See* CFTC Designated Contact Market Products, *available at* https://www.cftc.gov/IndustryOversight/Industry Filings/TradingOrganizationProducts?Organization=CM (last visited February 13, 2026).

contracts from the definition of swap would therefore risk destabilizing the settled

expectations upon which these markets depend, fostering uncertainty in an area

where Congress sought uniformity and regulatory clarity. It could introduce the

"chaos" Congress sought to prevent by providing the CFTC with exclusive

jurisdiction over futures trading in 1974. Because even modest ambiguity in the

scope of the CEA can move rapidly through interconnected financial markets, the

CFTC respectfully requests that the Court not adopt a construction that could

generate systemic consequences for CEA preemption far removed from the case at

hand.

## CONCLUSION

For the foregoing reasons, the CFTC respectfully submits that this Court

should reverse and remand the judgment of the district court.

Dated: February 17, 2026        Respectfully Submitted,

/s/ Anne Stukes_____
D.C. Bar 469446
Tyler S. Badgley, *General Counsel*
Anne Stukes, *Acting Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5127

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. 29(a)(5), the foregoing brief complies with the type-volume limitations, in that it has 6,652 words, excluding the parts of the brief, exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Word 365 and is set in 14-point sized Times New Roman type style.

/s/ Anne Stukes

## CERTIFICATE OF SERVICE

I certify that on February 17, 2026, I electronically filed this Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ Anne Stukes