No. 25-7831

# United States Court of Appeals for the Ninth Circuit

ROBINHOOD DERIVATIVES, LLC,
*Plaintiff – Appellant*,

v.

MIKE DREITZER, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE NEVADA
GAMING CONTROL BOARD, ET AL.,
*Defendants – Appellees*,
and
NEVADA RESORT ASSOCIATION,
*Intervenor – Defendant-Appellee*.

———————————————

Appeal from the U.S. District Court
for the District of Nevada
The Honorable Andrew P. Gordon (No. 2:25-cv-01541-APG-DJA)

———————————————

## APPELLANT'S REPLY BRIEF

———————————————

Kevin J. Orsini
Antony L. Ryan
Brittany L. Sukiennik
CRAVATH, SWAINE & MOORE LLP
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

Todd L. Bice
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
(702) 214-2100

*Counsel for Appellant Robinhood Derivatives, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

PRELIMINARY STATEMENT ............................................................ 1

ARGUMENT ......................................................................................... 5

I.    ROBINHOOD DEMONSTRATED A LIKELIHOOD OF
SUCCESS ON THE MERITS OR AT LEAST RAISED
SERIOUS QUESTIONS ................................................................. 5

     A.    Sports-Related Event Contracts Traded on DCMs Are Swaps
and Transactions in Excluded Commodities. ......................... 6

         1.    The Court's Decision That Sports-Related Event
Contracts Are Not Swaps Was an Impermissible
Collateral Attack on the CFTC. ..................................... 7

         2.    Sports-Related Event Contracts Are Swaps................ 10

         3.    Sports-Related Event Contracts Are Also
Transactions in "Excluded Commodities." .................. 14

         4.    Sports-Related Event Contracts Are "Associated
With" "Financial, Economic, or Commercial
Consequences."............................................................ 17

         5.    Every Sports Wager Is Not a "Swap." ......................... 21

     B.    The CEA Preempts State Law as Applied to DCM-Traded
Sports-Related Event Contracts. ......................................... 23

         1.    Section 2(a)(1)(A) Expressly Preempts State Law. ..... 25

         2.    Congress Preempted the Field of Derivatives
Trading on DCMs.......................................................... 29

i

3.    Nevada Gaming Laws Are Also Conflict
Preempted. ................................................................. 34

II.   ROBINHOOD WILL SUFFER IRREPARABLE HARM
ABSENT AN INJUNCTION............................................. 36

III.  THE BALANCE OF HARDSHIPS TIPS SHARPLY IN
ROBINHOOD'S FAVOR AND AN INJUNCTION IS IN THE
PUBLIC INTEREST. ...................................................... 40

CONCLUSION .................................................................... 44

CERTIFICATE OF SERVICE................................................ 46

# TABLE OF AUTHORITIES

**Page**

*AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586 (D. Md. 2007)................................................................25

*Al Otro Lado v. Wolf,* 952 F.3d 999 (9th Cir. 2020)...........................38, 39

*Bennett v. Spear*, 520 U.S. 154 (1997)..........................................................9

*Big Lagoon Rancheria v. California*, 789 F.3d 947 (9th Cir. 2015)..................................................................................................7, 8

*Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390 (9th Cir. 2002)......................................................................35

*Bowles v. Russell*, 551 U.S. 205 (2007) ....................................................39

*Cal. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908 (9th Cir. 1989)..................................................................................25

*California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960 (9th Cir. 2018)..................................................................................33

*Capron v. Off. of Att'y Gen.*, 944 F.3d 9 (1st Cir. 2019) ...........................34

*Champion Int'l Corp. v. Brown*, 731 F.2d 1406 (9th Cir. 1984)....................................................................................................42

*Coinbase Fin. Markets, Inc. v. Ford*, No. 2:26-CV-00256-CDS-MDC, 2026 WL 327316 (D. Nev. Feb. 7, 2026)...........................24

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992).................................19

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).................35

*Danielson v. Inslee*, 945 F.3d 1096 (9th Cir. 2019).................................39

*DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, No. 01 Civ. 11602 (RWS), 2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002)..............34

iii

*Fisher v. Dean Witter Reynolds, Inc.*, 526 F. Supp. 558
(E.D. Pa. 1981) ................................................................ 16

*FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001) ................... 26, 27

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) .................................. 29

*John Doe Co. v. CFPB,* 235 F. Supp. 3d 194 (D.D.C. 2017) ............ 39, 40

*KalshiEx LLC v. CFTC*, No. 23-3257, 2024 WL 4164694
(D.D.C. Sept. 12, 2024), *stay denied*, 119 F.4th 58
(D.C. Cir. 2024) ............................................................... 11

*KalshiEx LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS,
2025 WL 1218313 (D.N.J. Apr. 28, 2025) .............................. 38

*KalshiEx LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869
(M.D. Tenn. Feb. 19, 2026) ........................................... *passim*

*Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980) ....................................... 26

*LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d
943 (9th Cir. 2020) ......................................................... 14

*Loving v. IRS*, 742 F.3d 1013 (D.C. Cir. 2014) ..................................... 20

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014) ................... 32

*Mississippi v. Louisiana*, 506 U.S. 73 (1992) ....................................... 25

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .................. 40

*Morton v. Mancari*, 417 U.S. 535 (1974) ............................................. 33

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach*,
738 F.3d 192 (9th Cir. 2013) ............................................. 27

*Padgett v. Surface Transp. Bd.*, 804 F.3d 103 (1st Cir. 2015) ............... 25

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515
F. Supp. 202 (N.D. Ala. 1981) ...................................... 28, 31

*PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467 (4th Cir. 2014) ................................................................... 30

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115 (2016) ........................................................... 28, 29

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) ............................ 5

*United States v. Brien*, 617 F.2d 299 (1st Cir. 1980) ............... 26

**Statutes & Rules**

17 C.F.R. § 38.156 ........................................................... 30

17 C.F.R. § 38.250 ........................................................... 30

17 C.F.R. § 38.255 ........................................................... 30

17 C.F.R. § 38.450 ........................................................... 30

17 C.F.R. § 38.950 ........................................................... 30

17 C.F.R. § 40.11(a) ......................................................... 37

17 C.F.R. § 40.11(a)(1) ..................................................... 35

5 U.S.C. § 704 ................................................................... 9

7 U.S.C. § 1a(19)(iv) ............................................. 14, 16, 18

7 U.S.C. § 1a(47)(A)(ii) ........................................ 14, 17, 20

7 U.S.C. § 1a(47)(A)(iii) ............................................ 19, 20

7 U.S.C. § 1a(47)(A)(iv) .................................................. 20

7 U.S.C. § 2(a)(1)(A) ............................................. 25, 27, 28

7 U.S.C. § 2(c)(2)(D) .......................................................... 9

7 U.S.C. § 2(c)(2)(D)(iii) ..................................................... 9

7 U.S.C. § 7a-2(c)(5)(B) ................................................... 31

7 U.S.C. § 7a-2(c)(5)(C) ................................................................ 31

7 U.S.C. § 7a-2(c)(5)(C)(i) .......................................................... 35

7 U.S.C. § 16(e)(2) ....................................................................... 28

18 U.S.C. § 1084(a) ....................................................................... 33

25 U.S.C. § 2701 *et seq.* ......................................................... 32, 33

30 U.S.C. § 1254(g) ....................................................................... 28

31 U.S.C. § 5362(1)(E)(ii) ............................................................ 33

31 U.S.C. § 5363 ........................................................................... 33

**Legislative Materials**

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) .......................... 13, 32

H.R. Rep. No. 93-1383 (1974) ....................................................... 26

H.R. Rep. No. 97-565, pt. 1 (1982) .............................................. 31

Hearings Before the H. Comm. on Agric., 93d Cong.,
     1st Sess. 121 (1973) ............................................................. 26, 31

Hearings Before the S. Comm. on Agric. & Forestry,
     93d Cong., 2d Sess. 685 (1974) .......................................... 26

S. Rep. No. 93-1131 (1974) ...................................................... 26, 27

**Other Authorities**

91 Fed. Reg. 5386 (Feb. 6, 2026) ................................................ 12

CFTC, *CFTC Withdraws Event Contracts Rule Proposal and
     Staff Sports Event Contracts Advisory*, Press Release No.
     9179-26 (Feb. 4, 2026),
     https://www.cftc.gov/PressRoom/PressReleases/9179-26 ................... 10

CFTC, *Concept Release on the Appropriate Treatment of
     Event Contracts*, 73 Fed. Reg. 25,669 (May 7, 2008) .................... 15, 20

vi

CFTC, *Further Definition of "Swap,"* 77 Fed. Reg. 48,208
(Aug. 13, 2012) ............................................................................ 22

CFTC, *Prediction Markets Advisory*, Release No. 9185-26,
https://www.cftc.gov/PressRoom/PressReleases/9185-26 .................. 44

CFTC, *Withdrawal of CFTC Staff Advisory 25-36*, CFTC
Letter No. 26-04 (Feb. 4, 2026),........................................................ 10

*CME Rulebook*, Ch. 13,
https://www.cmegroup.com/rulebook/CME/I/13.pdf ........................... 9

*CME Rulebook*, Ch. 365,
https://www.cmegroup.com/rulebook/CME/IV/400/460.pdf ............... 16

*CME Rulebook*, Ch. 460,
https://www.cmegroup.com/rulebook/CME/IV/400/460.pdf ............... 16

*Contingency*, Merriam-Webster's Collegiate Dictionary
(11th ed. 2003) ............................................................................ 14

Department of Justice, *31 Defendants, Including Members
and Associates of Organized Crime Families and National
Basketball Association Coach Chauncey Billups, Charged
in Schemes to Rig Illegal Poker Games* (Oct. 23, 2025),
https://www.justice.gov/usao-edny/pr/31-defendants-
including-members-and-associates-organized-crime-
families-and-national.................................................................... 44

*Exclusive*, American Heritage Dictionary (1st ed. 1973)........................ 25

*Exclusive*, Webster's New International Dictionary (2d ed.
1934)............................................................................................ 25

Indictment, *United States v. Clase De La Cruz* (No. 25-CR-
346), https://www.justice.gov/usao-edny/media/1417041/dl .............. 44

*Inherent*, Random House Webster's Unabridged Dictionary
(2d ed. 2001).................................................................................. 17

Nevada Gaming Control Board, Notice to Licensees,
KalshiEx and Robinhood Update (Nov. 25, 2025),
https://www.gaming.nv.gov/siteassets/content/about/indust
ry-notices/2025-100.pdf.................................................................. 36, 43

*Potential*, Merriam Webster's Collegiate Dictionary (11th ed.
2003)....................................................................................................... 17

# PRELIMINARY STATEMENT[1]

Defendants concede that if sports-related event contracts are "*bona fide*" commodity derivatives, state law is preempted. (Nev. 52.) While Defendants invented the term "*bona fide*" commodity derivatives, this concession confirms that their entire position rises and falls on the argument that sports-related event contracts are not swaps or transactions in excluded commodities. That position is inconsistent with the CEA, its legislative history and prior statements of the Commodity Futures Trading Commission ("CFTC"). Now, the CFTC has reaffirmed its longstanding view that outcome-based event contracts are swaps and options over which it has exclusive jurisdiction.[2] The CFTC is regulating these products and intends to continue doing so.

Defendants paint a dire picture, warning that affirming the CFTC's exclusive jurisdiction over on-DCM trading would somehow transform

---

[1] "Defendants" refers to Defendants other than Intervenor-Defendant Nevada Resort Association ("NRA"). "Nev." is Defendants' Answering Brief (ECF No. 25); "NRA" is NRA's Answering Brief (ECF No. 27); and "Br." is Robinhood's Opening Brief (ECF No. 15).

[2] *See* Amicus Brief of Commodity Futures Trading Comm'n at 1-2, ECF No. 38-2 (hereinafter "CFTC"), *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026).

the CFTC into the Nation's lone gaming regulator.  They also contend this would mean Congress "hid an elephant in a mouse hole."  None of this is true.

As states have argued for more than a century, Nevada's fundamentally flawed position is that *it* should have the authority to regulate commodity derivatives it deems to be "gambling."  When Congress amended the CEA in 1974, however, it expressly preempted the field of regulation of trading on DCMs and determined that all state laws must give way to the CFTC's exclusive jurisdiction in that field.  Congress thus decided, and courts have repeatedly confirmed, that states' views as to what is allowed to trade on federally regulated derivatives markets must yield to federal law.  Then, when Congress added swaps to the CEA's exclusive jurisdiction provision in Dodd-Frank, with the definition of "swap" encompassing event contracts, it expressly intended to vest the CFTC—rather than the states—with exclusive jurisdiction to decide whether event contracts are in the public interest.  There is no elephant and no mouse hole.

Enjoining Nevada from interfering with derivatives traded on DCMs will not make the CFTC the *de facto* national gambling regulator.

2

The CFTC regulates *tradeable* products that are approved for listing on DCMs. *That* is the exclusive jurisdiction the CFTC seeks to protect as an *amicus*, and nothing other than Defendants' rhetoric suggests the CFTC believes it has the authority or intent to regulate sportsbooks.

Robinhood will succeed on the merits. The district court's event vs. outcome distinction cannot be squared with the statutory text, legislative history or CFTC regulatory actions. No other court has adopted the purported event/outcome distinction, and for good reason. Defendants' theory that derivatives must involve events "inherently" connected to financial consequences is also wrong—the CEA requires only that swaps be "associated with" "potential" financial consequences, not "inherent" ones, and the outcomes of sports contests are plainly associated with potential financial consequences. Sports-related event contracts are also transactions in "excluded commodities." Defendants' assertion that a futures contract must involve something "that can be delivered" ignores the CFTC's extensive regulation of many intangible derivatives that do not depend at all on delivery of physical underlying commodities.

The grant of "exclusive jurisdiction" expressly preempts anyone other than the CFTC from regulating trading on DCMs. Congress's

3

choice of the term "exclusive jurisdiction" was intended to avoid the very chaos Nevada and other states are now causing. Alternatively, field preemption applies given the extensive federal regulation of the field of trading on DCMs. Conflict preemption also exists, as "[i]t is hard to see how a federally regulated nationwide derivatives exchange could function" while being subject to state regulation. *KalshiEx LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869, at *10 (M.D. Tenn. Feb. 19, 2026).

The remaining injunctive factors also favor reversal. In offering sports-related event contracts in Nevada, Robinhood relied on the district court's original injunction (and State Defendants' decision not to appeal it), and Robinhood is now suffering non-speculative, unrecoverable monetary damages. The balance of equities tips sharply in Robinhood's favor, as Defendants have provided no evidence that they will suffer any harm and have no interest in enforcing preempted law.

In sum, "[s]tates cannot invade the CFTC's exclusive jurisdiction" over sports-related event contracts by simply "re-characterizing swaps trading on DCMs as illegal gambling." (CFTC 2.) Recently, another district court preliminarily enjoined state officials from enforcing state gaming law against a DCM because "sports event contracts are 'swaps,'"

4

and therefore, "preemption applies." *Orgel*, 2026 WL 474869, at \*7. As the CFTC noted, any contrary holding would present "a seismic shift in the longstanding status quo between CFTC and state authority" and "upend[] decades of well-settled and Congressionally-mandated exclusive jurisdiction across the full spectrum of event contracts." (CFTC 2-3.)

ARGUMENT

## I. ROBINHOOD DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OR AT LEAST RAISED SERIOUS QUESTIONS.

Defendants do not contest the finding below that Robinhood has raised serious questions on the merits. (ER-5.) Robinhood is thus entitled to a preliminary injunction under this Court's "sliding scale" approach based on a showing that the balance of equities tips "sharply" in Robinhood's favor. *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018).

Having conceded this point, Defendants focus on arguing that Robinhood has not shown a likelihood of success on the merits. Those arguments fail. The event contracts at issue are swaps and transactions in excluded commodities that trade on DCMs. (Section I.A.) They therefore fall within the CFTC's exclusive jurisdiction, and Nevada gaming laws are preempted. (Section I.B.)

### A. Sports-Related Event Contracts Traded on DCMs Are Swaps and Transactions in Excluded Commodities.

The district court erred in holding that sports-related event contracts traded on DCMs are not swaps or transactions in excluded commodities. There are two separate and independent grounds for reversal.

*First*, the district court's ruling that sports-related event contracts are not swaps constituted an impermissible collateral attack on the CFTC's determination to allow these contracts to trade on DCMs—a final agency action that can be challenged only through the Administrative Procedure Act ("APA"). (Section I.A.1.)

*Second*, sports-related event contracts satisfy the definition of "swap" under the plain text of the CEA, which broadly encompasses contracts based on the "occurrence" of an "event or contingency"—a phrase that, consistent with the CFTC's longstanding view, includes outcomes of sporting contests. The event/outcome distinction, which is fundamental to the district court's decision, is baseless. (Section I.A.2.) Alternatively, sports-related event contracts are also transactions in "excluded commodities," a definition that cannot turn on the supposed event/outcome distinction because it does not use the word "event."

6

(Section I.A.3.) In either case, these contracts are "associated with" financial consequences, including "potential" financial consequences. Defendants' effort to impose an "inherent" financial-consequence requirement is untethered to the text and contradicts Congress's chosen word, "potential." (Section I.A.4.) Finally, recognizing sports-related event contracts as swaps does not, as Defendants suggest, transform every sports wager into a federally regulated derivative, because the CFTC's exclusive jurisdiction encompasses only tradeable products on organized markets—not bets placed with casinos or sportsbooks. (Section I.A.5.)

### 1. The Court's Decision That Sports-Related Event Contracts Are Not Swaps Was an Impermissible Collateral Attack on the CFTC.

The district court ruled that Nevada can apply its gaming laws to sports-related event contracts because, in its view, they are not swaps. Under *Big Lagoon Rancheria v. California*, 789 F.3d 947 (9th Cir. 2015), that was an impermissible collateral attack on the CFTC's actions allowing these contracts to trade on DCMs. The district court erred in concluding to the contrary. (ER-13–18.)

7

Defendants first argue *Big Lagoon* is distinguishable because Robinhood is the plaintiff. (Nev. 40-41.) Not so. In *Big Lagoon*, as here, the defendant sought to collaterally attack an agency decision. 789 F.3d at 952-53. Robinhood sued only because Nevada threatened an enforcement action. It makes no sense to suggest Nevada is free to collaterally attack the CFTC's decision to treat sports-related event contracts as swaps just because Robinhood brought this *Ex parte Young* action, but to maintain Nevada would have been precluded from making that argument if it had acted first.

Defendants speciously argue they do not seek to compel CFTC action, enforce the CEA or "police" what items are traded on DCMs. (Nev. 39-41.) Policing what trades on DCMs is *exactly* what Defendants are trying to do. Further, by arguing that sports-related event contracts are not swaps, Defendants seek a ruling that the CFTC was wrong to accept Kalshi's self-certifications and permit those contracts to trade on DCMs. Kalshi self-certified the relevant event contracts as swaps. (Nev. 33.) By allowing the review period to expire, the CFTC is deemed to have taken final action. (Br. 58.) This self-certification process is a "passive approval system" and *is* a final agency action because it marks "the consummation

8

of the agency's decision making process" as to each individual contract and "legal consequences flow" from that decision. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotations omitted); *see also* 5 U.S.C. § 704.[3]

Defendants claim that a CFTC advisory letter issued last year confirms the CFTC has not taken action on Kalshi's sports-related event contracts. (Nev. 40.) As Robinhood explained, however, that reference concerned whether sports-related contracts should be prohibited based on the public-interest exception, not whether they are swaps. (Br. 59.) The CFTC has withdrawn that letter, specifically because it caused

---

[3] Defendants contend that some products on DCMs are not within the CFTC's exclusive jurisdiction (Nev. 20-21), but their examples do not support this assertion. "[S]pot contracts on foreign currencies" (*id.* at 21) are executed not on the Chicago Mercantile Exchange ("CME"), which is a DCM, but through an affiliated company called EBS, which is not. *See CME Rulebook*, Ch. 13, https://www.cmegroup.com/rulebook/CME/I/13.pdf. And the CEA requires "[r]etail commodity transactions" that are "entered into, or offered … on a leveraged or margined basis, or financed by the offeror" to be executed on DCMs. 7 U.S.C. § 2(c)(2)(D). Therefore, "spot contracts on cryptocurrencies" (Nev. 21) are regulated "as if" they are "contract[s] of sale of a commodity for future delivery"—*i.e.*, futures, *id.* § 2(c)(2)(D)(iii)—which means they can be traded on DCMs if they are leveraged, margined or financed.

"confusion and uncertainty."[4]  And it has now confirmed what Robinhood has always argued:  the CFTC is aware sports-related event contracts trade on DCMs, is aware they were self-certified as swaps, and has concluded that they *are* swaps and therefore fall within its exclusive jurisdiction.  (CFTC 1-3.)  If Nevada wants to challenge the CFTC's final action—as confirmed by the CFTC's *amicus* brief—the path to do so is through an APA challenge to that action.

This does not mean there is no role for the courts in this case.  (Nev. 39.)  The core issue presented is still ripe for determination: whether Section 2(a) of the CEA preempts state law as to swaps or transactions in excluded commodities traded on DCMs.  (*See infra* Section I.B.)

## 2.  Sports-Related Event Contracts Are Swaps.

Defendants' argument adopting the district court's purported distinction between events and outcomes (Nev. 22; ER-5, ER-45–57) relies on errors of fact and law.  As a factual matter, Defendants are simply wrong that the CFTC has not determined these contracts are

---

[4] *See* CFTC, *CFTC Withdraws Event Contracts Rule Proposal and Staff Sports Event Contracts Advisory*, Press Release No. 9179-26 (Feb. 4, 2026), https://www.cftc.gov/PressRoom/PressReleases/9179-26; CFTC, *Withdrawal of CFTC Staff Advisory 25-36*, CFTC Letter No. 26-04 (Feb. 4, 2026).

swaps. As a legal matter, Defendants' interpretation requires ignoring both the plain meaning of Congress's words in the CEA and the legislative history surrounding their adoption, and produces unworkable legal standards. Nor can Defendants explain why a sporting event outcome is not a "contingency."

*First*, Defendants place great weight—as did the court below—on the assumption that the CFTC has not determined whether sports-related event contracts are swaps. That assumption is wrong. The CFTC confirmed it has long viewed these contracts as swaps, explaining that the broad language Congress used to define swaps "encompasses contracts based on the margin of victory or any other quantifiable result of a sports event." (CFTC 15.) Indeed, "[t]he CFTC has treated event contracts as measuring the level of the outcome of an event for nearly two decades." (*Id.* at 18); *see also KalshiEx LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2 (D.D.C. Sept. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024). The CFTC has also withdrawn the proposed 2024

11

rulemaking upon which Defendants rely (Nev. 26), and the 2025 letter notice (*id.* at 40).[5]

*Second*, consistent with the CFTC's long-held understanding, dictionaries define "event" to include an "outcome" or "result." (Br. 36.) Defendants argue that the "event (or contingent event) is the thing that happens, and the outcome is the result." (Nev. 25.) That changes nothing, even if true. The Super Bowl is a "thing that happens," but so was the Seahawks' victory. Defendants complain that if the Court faithfully applies the commonly understood meaning of event to include an outcome, "swap" will be broadly—rather than narrowly—defined. (*Id.* at 25.) That was Congress's intent in adding "swaps" to the CFTC's exclusive jurisdiction in Dodd-Frank: to broadly capture a wide swath of financial instruments. (Br. 39; CFTC 17-18.) It is not for states—or courts—to substitute their preference for a narrow definition for Congress's broad one.

*Third*, the legislative history confirms Congress intended to capture sports-related event contracts that turn on the outcome of games within

---

[5] *See supra* n.4; 91 Fed. Reg. 5386 (Feb. 6, 2026).

the CFTC's exclusive jurisdiction. (Br. 41-44.) Congress added the Special Rule to the CEA, and the Special Rule's author specifically discussed that the CFTC would have exclusive jurisdiction to decide whether to ban event contracts based on sporting events. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) ("It would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament."). Congress clearly contemplated the outcome of sporting events would be covered by the definition of "swaps" and the CFTC would evaluate the public interest under the Special Rule. To this, Defendants have no answer.

*Fourth,* the district court's event vs. outcome rubric requires semantic gymnastics that are unworkable as a legal standard. Defendants concede that the same thing can be both an "event" and an "outcome," admitting that the "fact that an event (*e.g.*, a mortgage default) could be the outcome of an underlying event (*e.g.*, a recession) does not negate the fact that the first event is a significant independent event." (Nev. 26.) This fatally undermines the purported events vs. outcomes distinction. The fact that a recession itself is an event does not and cannot mean that the "outcome" of that event—a mortgage default—

13

is not also *itself* an event.  Was Donald Trump being elected president not an "event" because it was the outcome of an election, itself also an "event"?  Of course not.  *See Orgel*, 2026 WL 474869, at *7.  Nothing in the CEA requires this absurd result.

*Fifth*, outcomes of sporting contents are also contingencies.  *See* 7 U.S.C. § 1a(47)(A)(ii) ("occurrence of an event or contingency").  A contingency means "something liable to happen as an adjunct to or result of something else."  *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).  Here, the artificial event/outcome distinction breaks down even further.  Tellingly, the definitions Defendants cite define contingency as "an 'event' that 'depends on' 'another.'"  (Nev. 24.)  Defendants offer no reason why an outcome is not a "contingency."

### 3. Sports-Related Event Contracts Are Also Transactions in "Excluded Commodities."

Robinhood explained that because the word "event" does not appear in the definition of "excluded commodities," 7 U.S.C. § 1a(19)(iv), the supposed event/outcome distinction has no bearing on whether sports-related event contracts fit this definition.  (Br. 48-49.)  Defendants did not argue otherwise and thus conceded the point.  *See LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 950 (9th Cir. 2020).

14

Defendants' primary argument is that sports-related event contracts are not transactions in excluded commodities because they are not sufficiently associated with financial outcomes. (Nev. 35.) That argument—which also applies to swaps—is wrong for the reasons described in Section I.A.4. Defendants' other arguments fare no better.

*First*, Defendants assert Robinhood should be estopped from arguing sports-related event contracts are transactions in "excluded commodities" because Kalshi certified its contracts as "swaps." (*Id.* at 33.) But a product can be both a "swap" and a transaction in an "excluded commodity" notwithstanding the technological limitations of the CFTC's self-certification platform. The CFTC recognizes that products can be multiple types of derivatives, *see* CFTC, *Concept Release on the Appropriate Treatment of Event Contracts,* 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008) (event contracts could be "futures" or "options"), and has reiterated this view as an *amicus*. (CFTC 14-16.) Defendants also cite no authority for the proposition that Robinhood could somehow be estopped from making a legal argument because of a form that Kalshi submitted.

15

*Second*, Defendants' argument that event contracts are not options (Nev. 35) is wrong. A binary option can be structured to pay $100 if a hurricane hits Florida by a certain date or $0 if one does not. That is no different from a sports-related event contract that pays $100 if the Warriors win a game but $0 if they lose. *See Orgel*, 2026 WL 474869, at *8 (analogizing sports-related event contracts to one-touch barrier options). As the CFTC explained, citing its own glossary, "[a]n event contract is also a binary option." (CFTC 16.)

*Third*, Defendants are wrong in arguing event contracts cannot be contracts in excluded commodities because there is no future delivery of a tangible product. (Nev. 35-36.) The CEA's plain text covers futures based on undeliverable intangibles, including "occurrence[s]" or "contingenc[ies]." 7 U.S.C. § 1a(19)(iv). The single case Defendants cite, *Fisher v. Dean Witter Reynolds, Inc.*, 526 F. Supp. 558 (E.D. Pa. 1981), is inapposite because it applied *securities* law. It says nothing about the multitude of CFTC-regulated futures based purely on benchmarks, with no underlying physical deliverable. *See, e.g., CME Rulebook*, Chs. 365, 460, https://www.cmegroup.com/rulebook/CME/IV/350/365/365.pdf, https://www.cmegroup.com/rulebook/CME/IV/400/460.pdf. Defendants

16

address none of the cases Robinhood cited, which confirm that cash settlement constitutes "future delivery." (Br. 50.)

### 4. Sports-Related Event Contracts Are "Associated With" "Financial, Economic, or Commercial Consequences."

Defendants say a swap or contract on an excluded commodity must be "inherently" joined to a "financial, economic, or commercial consequence" to be subject to the CFTC's exclusive jurisdiction. (Nev. 27.) Congress included no such requirement in the CEA, and the district court's ruling, which reads the word "inherent" into the statute, is error. (ER-5, ER-19–27.)

*First*, the word "inherent" appears nowhere in the CEA. The definition of swap requires only an association with a "potential" financial consequence. 7 U.S.C. § 1a(47)(A)(ii). "Inherent" refers to a "permanent" or "inseparable" characteristic. *Inherent,* Random House Webster's Unabridged Dictionary (2d ed. 2001). "Potential" means something "existing in possibility: capable of development into actuality." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003). A requirement for an "inherent" financial consequence is irreconcilable with Congress's

17

chosen word, "potential." *See Orgel*, 2026 WL 474869, at *8 ("Congress chose to use 'potential,' which is broad.").

While "potential" is not in the "excluded commodity" definition, "associated with" is also inconsistent with "inherent" (*see* Br. 52-53 (citing dictionary definitions)), and the requirement that the contract be "associated with" financial or economic consequence is easily satisfied. *See* 7 U.S.C. § 1a(19)(iv). Defendants argue that "each of the economic consequences that [Robinhood] alludes to concerns only the occurrence of a sporting event, not the result." (Nev. 28.) That is wrong. Who wins an NBA game, for instance, impacts team values, media rights, and hospitality and merchandise demand. (Br. 51.) Defendants also argue contracts tied to events within events, such as "the number of points scored" within a game, cannot be associated with financial outcomes. (*See* Nev. 28; NRA 32-33.) But scoring a certain number of points *is* the occurrence of an event that has financial consequences impacting, for instance, television ratings or ticket demand for future games. *See Orgel*, 2026 WL 474869, at *8 ("a contract providing for payment … if 'at any point during the game one team leads another by at least 20 points' would fall squarely within the CEA's regulation of swaps").

*Second*, Defendants seek refuge in canons of statutory construction, but canons are unnecessary because the CEA is unambiguous. Canons are "no more than rules of thumb," and courts "should always turn first to one, cardinal canon before all others." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992). That is, "a legislature says in a statute what it means and means in a statute what it says." *Id*. at 253-54. "When the words of a statute are unambiguous," the "first canon is also the last: judicial inquiry is *complete*." *Id*. at 254 (emphasis added) (internal quotation marks omitted).

Regardless, the primary point Defendants try to make by invoking canons of construction is that other portions of the "swap" definition somehow confirm that it must include "inherent" financial consequences. Not so. While some provisions "cover specific financial instruments that involve 'financial or economic interests'" such as "interest or other rates, currencies, commodities, [or] securities or property of any kind" (Nev. 29), other neighboring subsections list swaps tied to events that are not "inherently" economic, such as "weather" or "emissions swap[s]." 7 U.S.C. § 1a(47)(A)(iii). Economic consequences connected with weather or emissions events are only downstream, such as impacts on travel in a

19

given area or expected harvests.[6]  By listing "weather" and "emissions" swaps, Congress foreclosed Defendants' argument by providing examples of events that are not "inherently" economic.  *Id.* § 1a(47)(A)(ii)-(iii).

*Third*, Robinhood's interpretation of subsection (ii) of the swap definition does not render "all other parts superfluous."  (Nev. 29-30.) Legislators "sometimes employ overlap or redundancy," but "modest overlap is far more reasonable than interpreting the statute" in a way that contradicts the plain meaning of words.  *Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) (Kavanaugh, J.).  The other subsections are not superfluous, and they confirm Congress's intent to define "swap" broadly to capture an array of derivatives.  Subsection (iv) covers a contract "that is *or in the future becomes*, commonly known to the trade as a swap."  7 U.S.C. § 1a(47)(A)(iv) (emphasis added); *see also* CFTC 17 ("The CEA's text is designed to account for financial innovation.").  Far

---

[6] The CFTC recognizes that event contracts may turn on "environmental measures," like temperature, that "do not predictably correlate to commodity market prices or other measures of broad economic or commercial activity."  *Concept Release*, 73 Fed. Reg. at 25,671.

from narrowing subsection (ii), the surrounding subsections confirm its breadth.[7]

Indeed, reading subsection (ii) to require "inherent" financial consequences, as the district court did, actually creates more superfluity than reading the statute the way it is written. Given that, as Defendants admit (Nev. 29), the other subsections already largely cover transactions with inherent financial consequences, it is hard to see what would be covered by subsection (ii) that is not already covered by the other subsections, if subsection (ii) is limited to requiring inherent financial consequences. Congress's broad "swap" definition in subsection (ii) would be pointless.

### 5. Every Sports Wager Is Not a "Swap."

Treating sports-related event contracts as swaps would not federalize sports betting or make the CFTC the Nation's sole sports-betting regulator. (Nev. 36.)

---

[7] The definition of "swap" is not, however, unlimited. The underlying event itself must be associated with a potential financial, economic, or commercial consequence. Despite the NRA's suggestion (NRA 31), a coinflip where the only financial consequence is the parties' own decision to wager on it would *not* qualify.

Robinhood does not argue the CEA preempts state sports gambling laws as applied to casinos and sportsbooks. The CEA covers *tradeable* products. *See* CFTC, *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,217, 48,248 (Aug. 13, 2012) (describing swaps as instruments "traded on organized markets and over the counter" and distinguishing swaps from consumer and commercial arrangements on the basis that the latter are not traded). Sports wagers are *not* tradeable and thus are not regulated derivatives. *See id.* at 48,247 (noting that "consumer and commercial transactions" that "are not traded on an organized market or over-the-counter" are not swaps). Even Defendants acknowledge sports bets "historically have not been traded." (Nev. 37.)

Defendants fail to identify any CFTC enforcement action arising from sportsbook bets or any statement by the CFTC suggesting it views such bets as within its jurisdiction. Conversely, in its *amicus* filing, the CFTC limits its interest in this case to *trading on DCMs*. (CFTC 1-3, 8-13, 21-27.)

\*        \*        \*

22

For these reasons, the district court erred in holding that sports-related event contracts traded on DCMs are not swaps or transactions in excluded commodities.

### B. The CEA Preempts State Law as Applied to DCM-Traded Sports-Related Event Contracts.

When it granted Kalshi a preliminary injunction in April 2025, the district court correctly recognized that Section 2 of the CEA preempts Nevada law with respect to swaps traded on DCMs. (ER-237–245.) That conclusion went undisturbed below; the court simply later concluded that sports-related event contracts are not swaps or transactions in excluded commodities. (ER-5; ER-18–31; ER-46–57.)

Defendants concede the district court was correct that *if* sports-related event contracts are swaps, state law is preempted. After explaining that they do not seek to regulate interest-rate swaps or pork futures, Defendants recognize that "state attempts to regulate *bona fide* commodity derivatives would be preempted." (Nev. 52.) Yet they simply have invented the term "*bona fide* commodity derivative" to hide the magnitude of their concession and further their argument that sports-related event contracts are not swaps or transactions in excluded commodities. But if Defendants are wrong about that—and they are—

23

then sports-related event contracts are, to use their term, *bona fide* commodity derivatives and, as they admit, preemption applies.[8]

Defendants' attempts to obfuscate that concession fail: preemption applies on three bases. *First*, express preemption applies because the CEA flatly states that the CFTC has "exclusive jurisdiction" over swaps and transactions in excluded commodities. (Section I.B.1.) *Second*, field preemption applies because the language and legislative history of the CEA evidence that Congress intended no supplement to the CFTC's jurisdiction over on-DCM trading—by the states or anyone else. (Section I.B.2.) *Third*, conflict preemption applies because it is impossible for a uniform federal market to be subject to the various laws of fifty states. (Section I.B.3.)

---

[8] Notably, Defendants' position is not limited to sports-related event contracts and is actually that no event contract constitutes a *bona fide* commodity derivative. In pending state court enforcement litigation against Coinbase, Nevada sought—and obtained—a temporary restraining order "enjoining Coinbase from operating a market that offers event-based contracts" in Nevada. *See Coinbase Fin. Markets, Inc. v. Ford,* No. 2:26-CV-00256-CDS-MDC, 2026 WL 327316, at *1 (D. Nev. Feb. 7, 2026).

### 1. Section 2(a)(1)(A) Expressly Preempts State Law.

Defendants argue an express preemption provision must contain a clear statement "that a State may not regulate on the subject." (Nev. 43.) Section 2(a)(1)(A) does just that.

The ordinary meaning of "exclusive" is "not divided or shared by others," *American Heritage Dictionary* 458 (1st ed. 1973), or "limited to possession, control, or use by a single individual [or] organization," *Webster's New International Dictionary* 890 (2d ed. 1934). By granting the CFTC "*exclusive* jurisdiction," Section 2(a)(l)(A) "necessarily denies jurisdiction" to any other entity, be it a state or anyone else. *Mississippi v. Louisiana,* 506 U.S. 73, 77-78 (1992) (emphasis in original). Congress's use of the word "exclusive" thus means "there can be little room for argument over whether the statutory scheme vests sole jurisdiction" in the CFTC. *Cal. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911 (9th Cir. 1989).[9]

---

[9] Other courts have also repeatedly held that "exclusive" jurisdiction language constitutes express preemption of state law. *See Padgett v. Surface Transp. Bd.*, 804 F.3d 103, 105 (1st Cir. 2015); *AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 598 (D. Md. 2007).

Congress deliberately chose the word "exclusive" because it was trying to simultaneously accomplish two goals: (1) ensure that no federal agency besides the CFTC had authority over commodity derivatives traded on DCMs; and (2) preclude the application of state law to those same DCM transactions. *See* S. Rep. No. 93-1131, at 6 (1974); H.R. Rep. No. 93-1383, at 35 (1974); Hearings Before the H. Comm. on Agric., 93d Cong., 1st Sess. 121 (1973). "[L]egislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures on organized contract markets.'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (quoting S. Rep. No. 93-1131, at 23 (1974)); *see also* CFTC 23 ("For decades courts have recognized that the CEA preempts application of other federal or state laws to instruments trading on CFTC-regulated markets."). This express preemption was designed to prevent precisely the "chaos" that Nevada and other states are now creating by attempting to apply a patchwork of state regulations to on-DCM trading. Hearings Before the S. Comm. on Agric. & Forestry, 93d Cong., 2d Sess. 685 (1974).[10]

---

[10] *See also Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) ("[T]he CEA preempts the application of state law."); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to

Defendants cannot escape Section 2(a)'s savings clause, which provides that Section 2(a) does not "supersede or limit the jurisdiction" of other regulators "[e]xcept as hereinabove provided" by the CFTC's exclusive jurisdiction over on-exchange trading. 7 U.S.C. § 2(a)(1)(A). Congress added this savings clause specifically to confirm that the "Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6 (1974); *see also Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 194-96 (9th Cir. 2013).

Defendants identify other preemption clauses in the CEA to suggest Congress decided to "preempt state gaming laws for certain transactions and state-insurance laws for swaps." (Nev. 43-45.) But those preemption provisions address issues beyond Section 2(a)(1)(A)'s *complete* preemption as to "swaps" and transactions in "excluded commodities" that trade on DCMs. For instance, because the CFTC's "exclusive jurisdiction" provision (enacted in 1974) applies only to on-exchange transactions, when the Commodity Futures Modernization Act of 2000

occupy the entire field of commodities futures regulation."); *Ken Roberts Co.*, 276 F.3d at 590-591 (similar).

27

permitted certain trading off-exchange, Congress amended what is now Section 16(e)(2) to "supersede and preempt the application of any State or local law that prohibits or regulates gaming" as to transactions otherwise "excluded" from the CFTC's exclusive jurisdiction, *i.e.*, *off*-exchange. 7 U.S.C. § 16(e)(2). Thus, Section 16(e)(2) extends preemption to certain specified *off*-DCM contexts, *in addition to* Section 2(a)(1)(A)'s complete preemption as to *on*-DCM trading. The provisions are complementary, not inconsistent.[11]

Section 2(a) has long been understood to expressly preempt the application of state regulations, including gaming laws, to products trading on DCMs. *See Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 206-07 (N.D. Ala. 1981) (finding that the CEA preempted the application of Alabama gaming law). Because of this express provision, there is no presumption against preemption. *Puerto*

---

[11] Defendants identify an unrelated statute containing an exclusive-jurisdiction provision and a separate preemption provision to argue the former does not equal express preemption. (Nev. 47.) But the exclusive-jurisdiction provision in 30 U.S.C. § 1254(g) was limited to preempting specific state programs only if a federal program was adopted, whereas the separate preemption provision was meant to address other situations. There is no similar limitation in Section 2(a)'s grant of "exclusive jurisdiction."

*Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *see* CFTC 27.  Derivatives markets have been federally regulated since even before enactment of the Commodity Exchange Act in 1936, and Congress created the CFTC and vested it with exclusive jurisdiction in 1974 precisely to ensure national uniformity in derivatives trading.  (CFTC 5-9.)

### 2. Congress Preempted the Field of Derivatives Trading on DCMs.

As the district court correctly held (ER-237–245), Congress also has preempted the field here.  Any attempt by the states to carve out a piece of the CFTC's exclusive jurisdiction to allow state regulation of DCM-traded derivatives would represent a sea change in the regulatory landscape and directly undermine Congressional intent and improperly narrow the CFTC's jurisdiction.  (CFTC 8-13.)

Unable to argue against the clear language and legislative intent to preempt the field, Defendants attempt to shift the focus to whether the CEA contains language specifically preempting state gaming laws.  That is the wrong inquiry.  The issue is what field Congress sought to occupy, not what state law is consequently preempted.  *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987) ("[I]t is not necessary for a federal

29

statute to provide explicitly that particular state laws are pre-empted."). The relevant field is the regulation of trading on DCMs. Congress was no more required to specify that the preempted state laws include gaming laws than it was to specify that any state law regulating pork futures would be preempted. Field preemption does not require such a "case-by-case analysis" of particular state laws. *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 475 (4th Cir. 2014) (citation omitted).

Defendants' complaint that the CFTC does not have regulations specific to gaming misses the mark. Because the preempted field is on-exchange derivatives transactions, not gaming, the CEA's provisions and the CFTC's regulations naturally target market integrity risks specific to exchanges. *See, e.g.*, 17 C.F.R. §§ 38.250, 38.255 (requiring risk control mechanisms); *id.* §§ 38.450, 38.950 (recordkeeping and disclosure obligations); *id.* § 38.156 (requiring capability of detecting and investigating trade practice violations).

Congress did not intend to make the CFTC the national regulator of all gaming, and, despite Defendants' disingenuous arguments to the contrary, that is not Robinhood's argument. Congress *did* intend to make the CFTC the sole regulator of trading on DCMs, and in doing so

preempted the application of all state laws to those DCM trades. That includes gaming laws when a state seeks to apply them to DCM transactions. This is unsurprising. For over 100 years, Congress and the states have been fighting over whether states get to regulate futures trading as unlawful gaming. (Br. 6-16.) Time and again, Congress and the courts have confirmed that the states have no role in substituting their view of what is gaming for Congress's view of what is appropriately traded on federal exchanges. *See, e.g.*, Hearings Before the H. Comm. on Agric., 93d Cong., 1st Sess. 121 (1973) (rejecting "unfairness" of subjecting DCMs to state-by-state civil liability); H.R. Rep. No. 97-565, pt. 1, at 45 (1982) ("The Committee … continues to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures."); *Paine*, 515 F. Supp. at 206-07.

When Congress adopted Dodd-Frank and added swaps to the CFTC's exclusive jurisdiction, it also intentionally vested the CFTC with the authority to decide which derivatives in specific categories should be traded on DCMs and which contracts should be barred as against the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(B)-(C) ("The Commission shall approve a new contract or other instrument **unless the Commission**

*finds* that the new contract or other instrument would violate this chapter … [T]he Commission *may* determine that such agreements, contracts, or transactions are contrary to the public interest ….” (emphasis added)); 156 Cong. Rec. S5906-07 (statements of Senators Lincoln and Feinstein) (discussing the importance of granting the CFTC discretion to identify and ban gaming contracts). Defendants’ sky-is-falling argument that Congress did not conceive that it was preempting state gaming laws is clearly wrong, ignoring both the history of state attempts to regulate derivatives and the text and legislative history of Dodd-Frank.

Field preemption of on-exchange derivatives trading also would not impliedly repeal other federal laws such as the Indian Gaming Regulatory Act (“IGRA”) and the Wire Act. (Nev. 52-53.) IGRA, 25 U.S.C. §§ 2701-2721, regulates conduct on Indian lands only; online conduct is covered by other federal statutes like the Unlawful Internet Gambling Enforcement Act (“UIGEA”). *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) (IGRA provides tools “to regulate gaming on

Indian lands, and nowhere else").[12]  While the Wire Act criminalizes using interstate wires to place "bets" or "wagers" on sporting events, 18 U.S.C. § 1084(a), an on-exchange trade of a swap is not a bet or a wager. The Wire Act does not define "bets" or "wagers," but UIGEA does.[13] UIGEA carves out from the definition of bet or wager "any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the [CEA]."  31 U.S.C. § 5362(1)(E)(ii).  Rather than repealing these statutes, the CEA intentionally coexists with them.  *See Morton v. Mancari*, 417 U.S. 535, 551 (1974).  And even if there were conflict (there is not), Congress expressly intended the CEA's regulatory regime to displace contradictory federal law.  (Br. 32 n.7.)

---

[12] IGRA's territorial focus is evident from the statute's text, including the phrase "on Indian lands," which appears in nearly every section.  25 U.S.C. § 2701 *et seq.*; *see also California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 967 (9th Cir. 2018) (finding that "bet or wager initiated through the internet" is subject to UIGEA, not IGRA).

[13] UIGEA governs online gaming that *crosses* state borders when it is lawful in one location (where the bet is made or received) but not the other.  *See generally* 31 U.S.C. § 5363.

33

### 3.  Nevada Gaming Laws Are Also Conflict Preempted.

Conflict preemption applies because enforcement of state gaming laws would frustrate Congress's purpose.  The essence of conflict preemption "is that the federal government would want a federal measure to be preemptive of any state law that stands as an obstacle to the accomplishment and execution of the full purposes and objectives of that federal measure." *Capron v. Off. of Att'y Gen.*, 944 F.3d 9, 26 (1st Cir. 2019) (internal quotations omitted).  By granting the CFTC "exclusive jurisdiction" over transactions on DCMs, Congress's explicit purpose was to exclude all other attempts to regulate transactions on those exchanges.  *See DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, No. 01 Civ. 11602 (RWS), 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) ("When application of state law would directly affect trading on or the operation of a futures market, it … is preempted.").  Allowing the application of state gaming laws would thus frustrate Congress's purpose in avoiding patchwork regulation.  *See Orgel*, 2026 WL 474869, at *10 (holding that state law "stands as an obstacle to the accomplishment of the CEA's primary objective: uniform regulation of the derivatives

34

market"); CFTC 27.[14] "It is hard to see how a federally regulated nationwide derivatives exchange could function" under such disparate state regulation. *Orgel*, 2026 WL 474869, at *10.

Moreover, the Special Rule gives the CFTC authority to prohibit event contracts that involve gaming or activity unlawful under state law, and the CFTC has not used that authority to prohibit sports-related event contracts. 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1). If Defendants are permitted to enforce Nevada laws against Robinhood for offering contracts authorized by the CFTC, there would thus be a direct conflict between federal and state regulation. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000) (recognizing conflict preemption where state law "undermines the congressional calibration of force").

Defendants' argument that Robinhood could become licensed in Nevada (Nev. 54) also misses the point. There is no guarantee Nevada

---

[14] Defendants argue that "uniformity is a field-preemption argument, not a conflict-preemption argument." (Nev. 55.) But where the "application of different state standards would disrupt the nationally uniform administration" provided by a federal statute, "conflict preemption" applies. *Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 395-96 (9th Cir. 2002).

would grant Robinhood a license.[15]  In any event, Defendants' position is that Robinhood needs Nevada's permission to offer already-approved event contracts.  That is a clear conflict with federal authorization.

## II.  ROBINHOOD WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

Defendants incorrectly assert that "Robinhood identifies no irreparable harm." (Nev. 56.)  Robinhood has identified three categories of irreparable harm: unrecoverable lost profits, loss of goodwill and reputation, and the imminent threat of being subject to an enforcement preceding. (Br. 60-64.)  Defendants' arguments misconceive the facts and law.

Lost profits constitute irreparable harm where, as here, they cannot be recovered because of sovereign immunity.  (*Id.* at 61-62.)  Defendants do not dispute this principle of law, nor could they.[16]  Robinhood has also

---

[15] Indeed, Nevada has explicitly stated it would not grant such a license.  *See* Nevada Gaming Control Board, Notice to Licensees, KalshiEx and Robinhood Update (Nov. 25, 2025), https://www.gaming.nv.gov/siteassets/content/about/industry-notices/2025-100.pdf.

[16] The NRA's argument that Robinhood has not produced evidence of its lost revenue is specious.  Robinhood submitted a sworn declaration explaining that it would lose money if it could not offer event contracts

shown that reputational harm is irreparable. (*Id.* at 62.) Again, Defendants do not dispute this principle of law.

Instead, Defendants argue that these irreparable harms should be ignored because they say Robinhood brought them on itself. That argument should be rejected. If this theory were correct, there would never be irreparable harm where a state has threatened to enforce preempted law because it would always be a "choice" by the plaintiff to continue engaging in the challenged conduct.

The argument that Robinhood began offering event contracts notwithstanding the CFTC's "express prohibition on those contracts" is also wrong. (Nev. 56.) Defendants claim these contracts are barred by the CFTC's Regulation 40.11 as event contracts that involve "gaming." 17 C.F.R. § 40.11(a). That is not how that regulation operates—the regulation permits the CFTC to review on a case-by-case basis whether an event contract should be barred under the Special Rule. (*See* Br. 12 n.4.) Moreover, whether the sports-related event contracts at issue constitute "gaming" under the Special Rule is not at issue in this lawsuit.

---

in Nevada. (Declaration of Adam Hickerson ("Hickerson Decl.") ¶¶ 4-8, ER-67.) This is also obvious.

Defendants contend that Robinhood's harms should be ignored because Robinhood proceeded even though its preemption theory was "untested." (Nev. 56.) As Defendants concede, however, Robinhood began offering sports-related event contracts in Nevada only *after* the district court preliminarily enjoined Nevada from enforcing its gaming laws against Kalshi and *after* Nevada's decision *not to appeal* that ruling.[17] (Hickerson Decl. ¶ 6, ER-67.) Defendants' only response is that in granting Kalshi injunctive relief, the district court "warned Kalshi that it was proceeding at its own risk and creating its own harms." (Nev. 56.)

Defendants do not cite a single case to explain how the district court's statement—which referred to the possibility that another court or the CFTC could reach a contrary conclusion—means that Robinhood's irreparable harms do not count. *Al Otro Lado v. Wolf* is inapposite. (Nev. 56 (citing 952 F.3d 999, 1008 (9th Cir. 2020)).) There, the government argued it would be irreparably harmed by ascertaining in asylum interviews whether an asylum applicant sought entry before a particular

---

[17] At that time, Kalshi had also obtained a preliminary injunction against enforcement of New Jersey gaming law. *KalshiEx LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025).

date. *Al Otro Lado*, 952 F.3d at 1007. This Court disagreed, noting that "[m]ere injuries" in terms of "time and energy" expended were generally insufficient to constitute irreparable harm, particularly given the short period before the merits appeal was resolved. *Id.* at 1008. Further, the government's claim was undermined by the fact that any harm was largely due to the government's own failure to maintain appropriate documentation. *Id.*

Here, Robinhood offered sports-related event contracts in direct reliance on the district court's initial ruling. Courts "permit private parties to rely on judicial pronouncements of what the law is, without exposing themselves to potential liability for doing so." *Danielson v. Inslee*, 945 F.3d 1096, 1099 (9th Cir. 2019); *see also Bowles v. Russell*, 551 U.S. 205, 220 n.7 (2007) (Souter, J., dissenting).

Finally, Defendants argue that submitting to an enforcement proceeding does not constitute irreparable harm. (Nev. 57-58.) *John Doe Co. v. CFPB* says nothing of the sort. There, the plaintiff sought to enjoin the CFPB from conducting an investigation that *could lead* to an enforcement proceeding. 235 F. Supp. 3d 194, 201 (D.D.C. 2017). Because participating in the *investigation* would not cause the plaintiff

irreparable harm—and any harm that might result from a subsequent enforcement proceeding could be addressed in future litigation—the court denied the injunction. *Id.* at 203. Here, there has been a credible threat of "imminent prosecution for a state violation that conflicts with federal law," ER-246, and such harm is irreparable, *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). In fact, Defendants have already brought enforcement proceedings against Kalshi and others. *See e.g.*, Complaint, *Nev. ex rel. Nev. Gaming Control Bd. v. KalshiEx LLC* (No. 26-OC-00050-1B) (Nev. 1st Dist. Ct.).

## III. THE BALANCE OF HARDSHIPS TIPS SHARPLY IN ROBINHOOD'S FAVOR AND AN INJUNCTION IS IN THE PUBLIC INTEREST.

Defendants' equities arguments contradict their core theory. Their strategic decision not to appeal the district court's grant of a preliminary injunction to Kalshi is entirely inconsistent with the idea that the CFTC will become the Nation's sole gaming regulator upon a ruling for Robinhood, or that Defendants have suffered monetarily from Kalshi and Robinhood offering event contract trading to Nevada customers. Defendants have shown no harm from Robinhood's presence in the market, and their actions, if anything, suggest a lack of harm. The

40

balance of equities tips sharply in Robinhood's favor (as required based on the conceded serious questions on the merits)—and therefore necessarily tips somewhat in Robinhood's favor, which is all that is needed based on Robinhood's showing of likelihood of success on the merits (*see supra* Section I).

*First,* Defendants try to excuse their decision not to appeal the district court's grant of a preliminary injunction in April 2025, arguing that they moved to dissolve the injunction once Kalshi "greatly expanded" its operations. (Nev. 60.) If that were true (it is not), it would be inconsistent with Defendants' argument that ruling in Robinhood's favor will convert the CFTC into the country's sole gaming regulator. In reality, Defendants were content to live with a decision they now argue would have the devastating consequence of displacing all state gaming regulation. Yet, while the injunction was in place (from April to November 2025), none of Defendants' catastrophic scenarios occurred. They continued to enforce state gaming laws against non-DCMs, and the CFTC did not seek to take over the regulation of casinos or sportsbooks.

*Second*, Defendants argue a state is harmed "any time" it cannot enforce its laws (*id.* at 58), but Nevada has no interest in enforcing

preempted state laws. *See Champion Int'l Corp. v. Brown*, 731 F.2d 1406, 1409 (9th Cir. 1984) ("no cognizable state interest in enforcing … laws that are preempted by federal law"); *Orgel*, 2026 WL 474869, at *11. If that were a basis to tip the equities, an injunction would never be appropriate in cases challenging state law as preempted.

Defendants also ignore the significant interest the CFTC has—and Congress recognized—in protecting against the "chaos" that would ensue from the patchwork application of state law. As the CFTC has explained, embracing Defendants' position risks "destabilizing the settled expectations upon which [derivatives] markets depend," which may "generate systemic consequences … far removed from the case at hand." (CFTC 29.) Destabilizing CFTC-regulated markets while this litigation proceeds cannot be within the public interest.

*Third*, Defendants present no evidence of financial harm to Nevada or its gaming industry. Defendants, like the district court, argue Nevada's interests in tax revenue and a competitive gaming industry weigh against injunction. (NRA 64; Nev. 58-59.) But Defendants make no showing at all that Nevada has lost any tax revenue or that competition has been harmed by Robinhood entering the market. (Nev.

42

58-59.) Instead, Defendants admit Nevada's sportsbook revenue has *increased* since Robinhood began offering sports-related event contracts in Nevada. (*Id.*; NRA 64-65.) Defendants' speculative assertion that Nevada sportsbooks *might* have seen even greater revenues but for the existence of event contracts (Nev. 58-59; NRA 63-66) is unsupported by any record evidence and should not be credited.

Defendants further speculate about the harm that might occur if sportsbooks forgo Nevada licensure. (Nev. 59.) Nevada cites two entities' decisions to withdraw applications, but does not present the facts of those cases. (*Id.*) The Board made clear to those entities that it would not grant them licenses because of their sports-related event contract activities *in other states*.[18] It was that overreach—rather than the existence of Robinhood's event contract trading—that caused those entities to withdraw their applications.

Defendants also fail to establish how Robinhood's operations "threaten the integrity of gaming." (*Id.*) Robinhood complies with a

---

[18] *See, e.g.*, Nevada Gaming Control Board, *Notice to Licensees, KalshiEx and Robinhood Update* (Nov. 25, 2025), https://www.gaming.nv.gov/siteassets/content/about/industrynotices/2025-100.pdf.

comprehensive federal regulatory regime (*see supra* Section I.B.2), and provides further consumer protections by offering personalized controls including self-exclusion from sports-related event contracts. (Supp. Declaration of Adam Hickerson (Dkt. No. 18-3) ¶¶ 4-6.) The only evidence Defendants offer to support their alleged harm are examples of scandals arising from wagers on sportsbooks and in illegal poker games, not on DCMs.[19]

## CONCLUSION

The Court should reverse the denial of Robinhood's motion for preliminary injunction.

---

[19] *See* Indictment, *United States v. Clase De La Cruz* ¶ 6 (No. 25-CR-346), https://www.justice.gov/usao-edny/media/1417041/dl ("[The betting platforms] … were sportsbooks … usually located at casinos."); DOJ, *31 Defendants, Including Members and Associates of Organized Crime Families and National Basketball Association Coach Chauncey Billups, Charged in Schemes to Rig Illegal Poker Games* (Oct. 23, 2025), https://www.justice.gov/usao-edny/pr/31-defendants-including-members-and-associates-organized-crime-families-and-national.

Moreover, the CFTC has reiterated its authority to "investigate and prosecute violations, as it always has with respect to conduct occurring on DCMs." CFTC, *Prediction Markets Advisory*, Release No. 9185-26, https://www.cftc.gov/PressRoom/PressReleases/9185-26.

Dated: February 27, 2026          Respectfully submitted,

                                             */s/ Kevin J. Orsini*
                                             Kevin J. Orsini

                                             Antony L. Ryan
                                             Brittany L. Sukiennik
                                             CRAVATH, SWAINE & MOORE LLP
                                             375 Ninth Avenue
                                             New York, NY 10001
                                             (212) 474-1000

                                             Todd L. Bice
                                             PISANELLI BICE PLLC
                                             400 South 7th Street, Suite 300
                                             Las Vegas, Nevada 89101
                                             (702) 214-2100

                                             *Counsel for Appellant Robinhood Derivatives, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system on February 27, 2026. All participants in the case are registered ACMS users, and service will be accomplished by the ACMS system.

*/s/ Kevin J. Orsini*
Kevin J. Orsini

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-7831

I am the attorney or self-represented party.

**This brief contains** | 8,341 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

⦿ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.

    ☒ a party or parties are filing a single brief in response to multiple briefs.

    ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [               ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Kevin J. Orsini | **Date** | 2/27/ 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                              *Rev. 12/01/22*