No. 25-7187

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

NORTH AMERICAN DERIVATIVES EXCHANGE, INC. d/b/a
CRYPTO.COM | DERIVATIVES NORTH AMERICA,

*Plaintiff-Appellant,*

v.

THE STATE OF NEVADA, ET AL.,

*Defendants-Appellees,*

and

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee.*

---

On Appeal from the U.S. District Court for the District of
Nevada, No. 2:25-cv-00978 (Hon. Andrew P. Gordon, C.J.)

---

## NEVADA RESORT ASSOCIATION'S ANSWERING BRIEF

---

Adam Hosmer-Henner
A.G. Burnett
Jane Susskind
Katrina Weil
Thaddeus C. Houston
**McDONALD CARANO LLP**
2300 West Sahara Avenue, Suite 1200
Las Vegas, NV 89102
Telephone: (702) 873-4100
ahosmerhenner@mcdonaldcarano.com

*Attorneys for Intervenor-Defendant-Appellee*
*Nevada Resort Association*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ............................................................................. 1

STATEMENT OF JURISDICTION ................................................... 3

STATEMENT OF ISSUE PRESENTED ........................................... 4

PERTINENT STATUTES AND REGULATIONS ............................ 4

STATEMENT OF THE CASE ......................................................... 4

    A.    Nevada's Longstanding Regulation of the Gaming
            Industry. ...................................................................... 4

    B.    The CFTC Regulates Futures and Derivatives
            Markets. ....................................................................... 7

    C.    Crypto.com Offers Sports Bets in Violation of Nevada's
            Laws. ......................................................................... 10

    D.    Procedural History ................................................... 15

SUMMARY OF THE ARGUMENT ............................................. 17

STANDARD OF REVIEW ........................................................... 20

ARGUMENT ............................................................................... 21

I.    Crypto.com Is Unlikely to Prevail on the Merits .......................... 21

    A.    Crypto.com's Sports Bets Are Not "Swaps," "Options,"
            or "Contracts of Sale of a Commodity for Future
            Delivery." ................................................................... 22

            1.    Federal Courts Have Authority to Interpret the
                    CEA. ............................................................... 23

            2.    The District Court Correctly Interpreted the
                    Statute. ............................................................ 26

            3.    Crypto.com's Sports Bets Are Not "Options." .............. 45

    B.    The CEA Does Not Preempt Nevada's Gaming Laws. ......... 48

            1.    The Presumption Against Preemption Applies. .......... 49

             2.    Express Preemption Does Not Apply. ........................ 51

             3.    Field Preemption Does Not Apply. ............................ 60

        4.      Conflict Preemption Does Not Apply............................ 63

II.    Crypto.com Will Not Suffer Irreparable Harm Without a Preliminary Injunction..................................................... 68

III.   The Balance of Hardships Weighs Against Crypto.com................ 71

CONCLUSION ........................................................................... 74

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Connects v. Bonta,*
   24 F.4th 1233 (9th Cir. 2022) ............................................................. 53

*Al Otro Lado v. Wolf,*
   952 F.3d 999 (9th Cir. 2020) .............................................................. 69

*Arizona v. United States,*
   567 U.S. 387 (2012) ........................................................................... 56

*Artichoke Joe's Cal. Grand Casino v. Norton,*
   353 F.3d 712 (9th Cir. 2003) .............................................................. 49

*Assurance Wireless USA, L.P. v. Reynolds,*
   100 F.4th 1024 (9th Cir. 2024) ..................................................... 50, 51

*Bennett v. Isagenix Int'l LLC,*
   118 F.4th 1120 (9th Cir. 2024) .......................................................... 71

*Bennett v. Spear,*
   520 U.S. 154 (1997) ........................................................................... 25

*Biden v. Nebraska,*
   600 U.S. 477 (2023) ............................................................................. 2

*Big Country Foods, Inc. v. Bd. of Educ. of
   Anchorage Sch. Dist.,*
   868 F.2d 1085 (9th Cir. 1989) ............................................................ 70

*Big Lagoon Rancheria v. California,*
   789 F.3d 947 (9th Cir. 2015) (en banc) .............................................. 26

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.,*
   153 F.4th 869 (9th Cir. 2025) ............................................................ 46

*CFTC v. Noble Metals Int'l, Inc.,*
   67 F.3d 766 (9th Cir. 1995) .................................................................. 8

iv

*CFTC v. White Pine Tr. Corp.,*
    574 F.3d 1219 (9th Cir. 2009) ............................................................ 46

*Chamber of Commerce v. Whiting,*
    563 U.S. 582 (2011) ............................................................................ 57

*Chi. Mercantile Exch. v. SEC,*
    883 F.2d 537 (7th Cir. 1989) ............................................................ 54

*Corley v. United States,*
    556 U.S. 303 (2009) ............................................................................ 31

*Credit Suisse First Boston Corp. v. Grunwald,*
    400 F.3d 1119 (9th Cir. 2005) ......................................... 20, 21, 61, 68

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    622 F.2d 216 (6th Cir. 1980) ........................................................ 54, 55

*Daniels-Hall v. Nat'l Educ. Ass'n,*
    629 F.3d 992 (9th Cir. 2010) ............................................................ 12

*Dubin v. United States,*
    599 U.S. 110 (2023) ...................................................................... 32, 35

*Dunn v. CFTC,*
    519 U.S. 465 (1997) ............................................................................ 7

*Effex Cap., LLC v. Nat'l Futures Ass'n,*
    933 F.3d 882 (7th Cir. 2019) ................................................... 9, 55, 62

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018) ............................................................................ 58

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ................................................................. 23, 32, 39

*Flynt v. Bonta,*
    131 F.4th 918 (9th Cir. 2025) ............................................................ 4

*FTC v. Ken Roberts Co.,*
    276 F.3d 583 (D.C. Cir. 2001) .......................................................... 54

*FTC v. Standard Oil Co.,*
    449 U.S. 232 (1980)........................................................................68

*Greater New Orleans Broad. Ass'n v. United States,*
    527 U.S. 173 (1999)..........................................................................5

*Hughes v. Talen Energy Mktg., LLC,*
    578 U.S. 150 (2016)........................................................................56

*Hunter v. FERC,*
    711 F.3d 155 (D.C. Cir. 2013) ......................................................54

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987)........................................................................61

*Jones v. Google LLC,*
    73 F.4th 636 (9th Cir. 2023) .........................................................51

*KalshiEX LLC v. Martin,*
    793 F. Supp. 3d 667 (D. Md. 2025) .................................... *passim*

*KalshiEX LLC v. Orgel,*
    2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)........................ 36, 66

*KalshiEX, LLC v. Hendrick (KalshiEX I),*
    2025 WL 1073495 (D. Nev. Apr. 9, 2025) ............................ 20, 69, 70

*KalshiEX, LLC v. Hendrick (KalshiEX II),*
    2025 WL 3286282 (D. Nev. Nov. 24, 2025)........................... *passim*

*Kansas v. Garcia,*
    589 U.S. 191 (2020)........................................................................61

*Keams v. Tempe Tech. Inst., Inc.,*
    39 F.3d 222 (9th Cir. 1994) ..........................................................56

*Learning Resources, Inc. v. Trump,*
    607 U.S. __, 2026 WL 477534 (2026)................................. 23, 32, 42

*Leist v. Simplot,*
    638 F.2d 283 (2d Cir. 1980) ..........................................................54

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................................ 24, 26, 34, 40

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ........................................................ 2, 49, 63, 64

*Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*,
971 F.3d 1021 (9th Cir. 2020) ........................................................ 1, 62

*Mont. Med. Ass'n v. Knudsen*,
119 F.4th 618 (9th Cir. 2024) ........................................................ 64

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012) ........................................................ 51

*NFIB v. OSHA*,
595 U.S. 109 (2022) ........................................................ 42, 43

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
515 F. Supp. 202 (N.D. Ala. 1981) ........................................................ 55

*Pennsylvania v. NCAA*,
948 F. Supp. 2d 416 (M.D. Pa. 2013) ........................................................ 37

*Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*,
795 F.2d 415 (5th Cir. 1986) ........................................................ 55

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
579 U.S. 115 (2016) ........................................................ 50

*Pulsifer v. United States*,
601 U.S. 124 (2024) ........................................................ 32

*Risotto v. Plumbers & Steamfitters Loc. 848*,
94 F.3d 597 (9th Cir. 1996) ........................................................ 46

*Saberi v. CFTC*,
488 F.3d 1207 (9th Cir. 2007) ........................................................ 46

*Stuber v. Hill*,
170 F. Supp. 2d 1146 (D. Kan. 2001) ........................................................ 55

vii

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*,
    108 F.4th 144 (3d Cir. 2024) ................................................................ 56

*United States v. Phillips*,
    155 F.4th 102 (2d Cir. 2025) .................................................................. 9

*Utility Air Reg. Grp. v. EPA*,
    573 U.S. 302 (2014) ................................................................... 2, 41

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., &*
    *Prods. Liab. Litig.*,
    959 F.3d 1201 (9th Cir. 2020) ............................................................ 62

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................. 21, 54

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ................................................................. 41, 43

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ........................................................................ 2

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................. 20, 21, 72

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ................................................................. 49, 62

*Yates v. United States*,
    574 U.S. 528 (2015) ............................................................. 34, 35, 48

**Statutes**

5 U.S.C. § 704 ............................................................................... 25

7 U.S.C. § 1a ........................................................................ *passim*

7 U.S.C. § 2 ......................................................................... *passim*

7 U.S.C. § 7a-2 ................................................................ 10, 35, 65

7 U.S.C. § 16 ............................................................................... 53

15 U.S.C. § 3001 ................................................................ 18

18 U.S.C. § 1955 .................................................................. 5

28 U.S.C. § 3702 ............................................................ 1, 59

28 U.S.C. § 3704 ................................................................ 63

Nev. Rev. Stat. § 463.0129 ................................................... 7

Nev. Rev. Stat. § 463.0193 ................................................... 5

Nev. Rev. Stat. § 463.160 ..................................................... 5

**Regulations**

17 C.F.R. § 38.4 ................................................................. 46

17 C.F.R. § 38.151 ............................................................. 67

17 C.F.R. § 40.2 ................................................................ 10

17 C.F.R. § 40.11 ........................................................ *passim*

**Other Authorities**

156 Cong. Rec. 13,173 (July 15, 2010) ................................. 58

*Core Principles and Other Requirements for Designated*
*Contract Markets,*
77 Fed. Reg. 36,612 (June 19, 2012) ................................... 67

CFTC Letter No. 25-36 ........................................... 24, 67, 70

*Concept Release on the Appropriate Regulatory Treatment of*
*Event Contracts,* 73 Fed. Reg. 25,669, 25,671 (May 7, 2008) ............ 47

Fed. R. Evid. 201 .............................................................. 12

*Further Definition of "Swap," "Security-Based Swap," and*
*"Security-Based Swap Agreement"; Mixed Swaps;*
*Security-Based Swap Agreement Recordkeeping,*
77 Fed. Reg. 48,208 (Aug. 13, 2012) ........................... 33, 40, 41

ix

*Provisions Common to Registered Entities,*
   76 Fed. Reg. 44,776 (July 27, 2011).................................................... 65

## INTRODUCTION

Crypto.com seeks to offer sports bets without obtaining a Nevada gaming license, complying with Nevada laws and regulations, or paying Nevada gaming taxes. The District Court correctly rejected Crypto.com's request to enjoin established state practices based on a strained, atextual reading of derivatives legislation passed in the wake of the 2008 financial crisis. This Court should reach the same common-sense conclusion: Federal law does not authorize Crypto.com to run a sportsbook or empower the Commodity Futures Trading Commission ("CFTC") to regulate sports betting and preempt state gaming laws.

The statutes invoked by Crypto.com and the CFTC—the Commodity Exchange Act ("CEA") and Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank")—say nothing about allowing nationwide sports betting through the derivatives markets. Instead, when Dodd-Frank was enacted, federal restrictions on most sports betting were still in effect, *see* 28 U.S.C. § 3702(1), and courts (including this Court) recognized that regulation of gambling "lies at the heart of [a] state's police power." *Monarch Content Mgmt. LLC v. Ariz.*

1

*Dep't of Gaming*, 971 F.3d 1021, 1028 (9th Cir. 2020) (quoting *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003)).

Accepting Crypto.com's position would require the Court to conclude that Congress silently turned the CFTC into the nation's sole sports betting regulator without the "clear and manifest" statement required to preempt areas of traditional state regulation. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). At bottom, Crypto.com's arguments contravene the principles that Congress "does not … hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), and courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance,'" *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Indeed, "[a] decision of … magnitude and consequence on a matter of earnest and profound debate across the country must rest with Congress itself, or an agency acting pursuant to a clear delegation from that representative body." *Biden v. Nebraska*, 600 U.S. 477, 504 (2023) (cleaned up).

Crypto.com's request for preliminary injunctive relief also fails based on the equities alone because allowing unlicensed sports betting would cause irreparable damage to the Nevada Resort Association

("NRA"), the NRA's members, and the interests of Nevada's citizens. The NRA's members would be forced to compete with Crypto.com in the same market and for the same customers but at a significant disadvantage, and the downstream effects would destabilize Nevada's economy. On the other hand, Crypto.com's proffered harms are largely monetary and self-inflicted, consisting primarily of lost revenue from wagers that it began offering only in February 2025 and has since agreed to discontinue.

Crypto.com presents this case as one where federal law preempts state regulations that would interfere with the operation of financial markets. But traditional sports wagers have never been treated as federally regulated financial products. Until 2025, sports wagers had *never* been offered on a futures exchange, yet Crypto.com now contends that bets on whether a team beats the point spread or the total number of points scored in a game is odd or even are traditional and central components of the financial system. There is no support in the statutory text, context, or history for erasing the lines between sports gambling and financial markets. This Court should affirm.

## STATEMENT OF JURISDICTION

Crypto.com's statement of jurisdiction is complete and correct.

## STATEMENT OF ISSUE PRESENTED

Whether the District Court correctly denied Crypto.com's preliminary injunction motion after determining that Crypto.com is not likely to succeed on the merits and that the other factors disfavor an injunction blocking enforcement of Nevada's gaming laws.

## PERTINENT STATUTES AND REGULATIONS

All applicable statutes and rules are contained in the briefs and addenda filed by Crypto.com and the State Defendants.

## STATEMENT OF THE CASE

### A. Nevada's Longstanding Regulation of the Gaming Industry.

Gaming regulation has traditionally been a matter of state and local concern. The Supreme Court thus explained in *Murphy v. NCAA* that federal law has long embraced a "coherent federal policy" that "respect[s] the policy choices of the people of each State on the controversial issue of gambling," 584 U.S. 453, 484 (2018), and this Court has likewise reasoned that "[g]ambling does not involve an inherently national system of regulation, given the states' long-understood authority in this area," *Flynt v. Bonta*, 131 F.4th 918, 932 (9th Cir. 2025).

4

In keeping with that principle, Congress has generally limited federal policy to specific interstate gambling issues, while facilitating enforcement of state laws. Put differently, federal law "defer[s] to, and even promote[s], differing gambling policies in different States." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 187 (1999); *see* 18 U.S.C. § 1955(b)(1)(i) (outlawing multi-state gambling conspiracies only for activities that violate state laws); *id.* § 1084 (prohibiting interstate sports betting, but exempting transactions where bets are permitted by state laws).

Nevada has an especially longstanding history of gaming regulation, dating back to 1869.[1] In 1949, Nevada enacted the Gaming Control Act, which covers all forms of gaming, including "sports pool[s]" that involve "the business of accepting wagers on sporting events or other events by any system or method of wagering." Nev. Rev. Stat. §§ 463.160(1)(a), (3), 463.0193.

Under Nevada law, a business may offer sports betting only if it obtains a license—a process that involves a rigorous investigation of the

---

[1] *See* NRA, *History of Gaming in Nevada* (accessed Mar. 2, 2026), https://perma.cc/S2SG-4K9T.

5

business's internal controls and compliance track record (among other considerations). *See id.* § 463.170. Licensees are required to pay up to 6.75% in state gaming taxes on their sports betting revenues. *See id.* § 463.370(1). These and other payments from licensees contribute significant revenue the State uses to fund "statewide education programs, transportation services and general budgetary needs."[2] The gaming and resort industry accounts for 37% of Nevada's total gross domestic product, 34% of its general fund, 22% of its total wages and salaries, and 28% of its total employees.[3]

Additionally, licensees must comply with regulations designed to protect consumers and the integrity of sporting events—for example by prohibiting wagers by game officials, owners, coaches, players, or other team staff, and by requiring organizations that facilitate sports betting to report suspicious activity. *See* Nev. Gaming Reg. §§ 22.1205, 22.121. These regulations and many others, ensure that Nevada's gaming

---

[2] American Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, 85 (May 2025), https://perma.cc/9H4Y-69GJ.

[3] NRA, *The Facts: 2025 Nevada Gaming Fact Book* (accessed Mar. 2, 2026), https://perma.cc/4F2C-S58R.

industry is conducted honestly and free from corruptive elements, and they promote the "public confidence and trust" upon which the "continued growth and success of gaming is dependent." Nev. Rev. Stat. § 463.0129(1)(b)-(d). These benefits are particularly important to the NRA, the preeminent advocacy voice for the gaming and resort industry in Nevada, and its more than seventy members.[4] Those companies have made significant investments in obtaining and maintaining their gaming licenses under the expectation that the same rules apply to all competitors.

### B.    The CFTC Regulates Futures and Derivatives Markets.

Congress enacted the CEA in 1936 to regulate futures—contracts to buy or sell a specific quantity of a commodity at a specific price on a specific date. Pub. L. No. 74-675, § 3, 49 Stat. 1491, 1491 (1936). The Act was originally limited to futures contracts for agricultural commodities, such as wheat. *See Dunn v. CFTC*, 519 U.S. 465, 475 n.11 (1997). "A futures contract enables an investor to hedge the risk that the price of the commodity will change between the date the contract is entered and

---

[4] For a list of the NRA's members, see Nevada Resort Association, *About the Nevada Resort Association*, https://perma.cc/37ZH-W388.

the date delivery is due—without having to take physical delivery of the commodity." *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995).

In 1974, Congress amended the CEA to strengthen federal regulation of futures markets and extend the Act's coverage to derivatives contracts (like options) and non-agricultural commodities. *See* Pub. L. No. 93-463, 88 Stat. 1389 (1974). To facilitate those objectives, the amendments established the CFTC and charged it with enforcing the CEA's requirements. *See id.* § 101(a). Congress provided that the CFTC would have "exclusive jurisdiction" over trading of futures and other derivatives on designated "contract market[s]" ("DCMs") registered with the agency, or any other market. *Id.* § 201(b), *codified as amended*, 7 U.S.C. § 2(a)(1). Despite its use of the word "exclusive" in Section 2(a), the statute limits the agency's jurisdiction in several respects: some categories of transactions are expressly carved out from the exclusivity provision (including foreign currency, mortgages, and hybrid products), 7 U.S.C. § 2(c)(1), 2(f), and the CEA's savings clause reserves jurisdiction "at any time conferred" on the SEC or other regulatory authorities (including state governments), *id.* § 2(a)(1)(A)(I).

8

After the 2008 financial crisis, Congress again amended the CEA through Dodd-Frank. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010). Dodd-Frank authorized the CFTC to regulate "swaps"—contracts that allow parties to exchange (and so hedge risk on) their financial obligations—that had been a "contributing cause" of the financial crisis. *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). If a contract meets the statutory definition of a "swap," 7 U.S.C. § 1a(47)(A), it must be traded on a DCM, unless the counterparty is an Eligible Contract Participant (i.e., a sophisticated investor).[5] *See id.* § 2(e) (generally prohibiting "any person" from "enter[ing] into a swap" that is not "entered into on, or subject to the rules of" a DCM). Persons who fail to comply with this DCM trading requirement are subject to monetary penalties and other sanctions. *See id.* § 13a-1(a), (d)(1).

Finally, Dodd-Frank added a "Special [R]ule" that authorizes the CFTC to categorically ban any contract that involves, among other things, "gaming" or any "activity that is unlawful under any Federal or

---

[5] "[E]ligible contract participants" include sophisticated entities like "financial institutions" and "highly capitalized trading counterparts." *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 888 (7th Cir. 2019); *see* 7 U.S.C. § 1a(18); ER-26 n.12.

State law." *Id.* § 7a-2(c)(5). In 2011, the CFTC exercised that authority by adopting a legislative rule that prohibits DCMs from "list[ing] for trading" any "agreement, contract, transaction, or swap … that involves, relates to, or references … gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a). That prohibition remains in effect.

DCMs can submit event contracts to the CFTC for review and pre-approval. *Id.* § 40.3(a). Alternatively, DCMs may self-certify that new contracts comply with the CEA and begin offering them without further action by the CFTC. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2. The CFTC retains authority, at any time, to review self-certified contracts for compliance with Section 40.11. *See* 17 C.F.R. § 40.11(c).

## C.    Crypto.com Offers Sports Bets in Violation of Nevada's Laws.

Crypto.com is not licensed to offer sports betting in Nevada. *See* ER-122. Crypto.com was founded in 2016 and originally served as a platform for users to buy and sell cryptocurrencies.[6] In 2021, Crypto.com acquired

---

[6] *See* Crypto.com, *Crypto.com Surpasses 100 Million Global Users*, (May 5, 2024), https://perma.cc/WN4B-FNRK.

the North American Derivatives Exchange,[7] which was first approved as a DCM in 2004. ER-173. For most of their existence, these companies did not offer sports bets.

That changed in early 2025. Shortly before Super Bowl LIX in February 2025, Crypto.com began offering sports bets on its DCM and self-certified to the CFTC that these sports bets comply with the CEA and relevant CFTC regulations. Br. 21-22; ER-126. In May 2025, Nevada regulators responded by ordering Crypto.com "to immediately cease and desist from offering in Nevada any event-based wagering contracts concerning sporting events," citing Nevada law. ER-121-22.

Crypto.com allows users to bet on football, basketball, hockey, and other sports.[8] These wagers mirror garden-variety sports bets, such as wagers on whether Team A will "win the game" against Team B, whether Team A "will win the game after a point spread is applied," and "whether

---

[7] *See* Crypto.com, *Crypto.com Agrees to Acquire Nadex and the Small Exchange from IG Group* (Dec. 1, 2021), https://perma.cc/ZYM7-M7V4.

[8] *See* Crypto.com, *Predict: Sports | Events* (accessed Mar. 2, 2026), https://perma.cc/BR4W-GDYC.

the combined score" of Team A and Team B "will be above ('over') or below ('under') a set total number of points ('the line')."[9]

Crypto.com offers other wagers that have long been standard sportsbook fare, such as proposition bets and parlays. Proposition bets are wagers on statistics and other in-game outcomes. For example, Crypto.com offered a bet on whether the total number of points scored would be odd or even in the recent Super Bowl matchup between the New England Patriots and the Seattle Seahawks.[10]

---

[9] Crypto.com, *Sports Event Trading* (accessed Mar. 2, 2026), https://perma.cc/EEM4-U57P.

[10] This image and those that follow are true and correct screenshots of wagers presented on Crypto.com's website and smartphone application between February 8-26, 2026. The Court can take judicial notice of this information available on Crypto.com's website, the accuracy of which is "not subject to reasonable dispute." Fed. R. Evid. 201; *see Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010).



Crypto.com also allows users to create parlays, called "combos," that combine several different wagers and pay off only if *all* the listed outcomes occur.[11] These wagers have a structural look and feel similar to that of a parlay offered by a traditional sportsbook. For example, users can bet that: (1) the Dallas Mavericks will defeat the Brooklyn Nets by seven points or more in an NBA game, *and* (2) the University of

---

[11] *See* Crypto.com, *Crypto.com Sports Combos* (accessed Mar. 2, 2026), https://perma.cc/G3E5-C67U.

Louisiana-Lafayette's Ragin' Cajuns and the Troy University Trojans will combine for fewer than 134 points in a college basketball game, *and* (3) Brighton & Hove Albion F.C. and Nottingham Forest F.C. will tie in a soccer match, *and* (4) Curaçao will defeat Germany in the FIFA World Cup.



Crypto has listed all of these wagers through the CEA's self-certification process. ER-126-128.

## D. Procedural History

Crypto.com filed this action on June 3, 2025, seeking a declaratory judgment and injunction "restraining [the State] from enforcing Nevada law" based on its theory that Nevada's gaming laws are preempted by the CEA. ER-179-181, ¶¶ 92, 98. Shortly thereafter, Crypto.com sought a preliminary injunction blocking the State's "enforcement of Nevada gaming laws to prohibit trading of federally regulated event contracts" on Crypto.com, thereby insulating all its contracts—past, present, and future—from Nevada law. ECF No. 15 at 2.

The District Court denied Crypto.com's preliminary injunction motion on October 14, 2025. ER-9-36. The court concluded that "Crypto ha[d] not met its burden to show that it is likely to succeed in demonstrating that its event contracts based on the outcome of live events are swaps that fall within the CFTC's exclusive jurisdiction." ER-11. The District Court further held that allowing Crypto.com's sports bets "imposes substantial hardships on the defendants, who are statutorily charged with the duty to preserve public confidence and trust in licensed gaming," and the court determined that "the public has an interest in

15

ensuring that unlicensed sports wagering does not occur on CFTC-designated exchanges." ER-30 (cleaned up).

Eleven days later, the State and Crypto.com reached an agreement under which Crypto.com would not offer sports bets to Nevada residents while this appeal is pending and Nevada would not enforce its gaming laws against Crypto.com during that period. ER-5-8.

After Crypto.com filed its opening brief in this Court, the CFTC moved to file an amicus brief out of time and to extend the briefing schedule. Dkt. 30-1. The CFTC's amicus brief presents a new perspective. Previously, the CFTC took steps to prevent trading of sports bets on DCMs, including by adopting 17 C.F.R. § 40.11(a). When Crypto.com began offering sports bets despite that rule, the CFTC initiated a review of Crypto.com's sports contracts on January 14, 2025, and requested that "any listing and trading" of the contracts be "suspend[ed]."[12] Shortly thereafter, four Commissioners departed from the CFTC and Crypto.com began submitting new self-certified sports contracts, on which the CFTC has taken no action to date. Currently, the CFTC has a single

---

[12] *See* CFTC, *CFTC's Review of Nadex Sports Contract Submissions*, Release Number 9033-25 (Jan. 14, 2025), https://perma.cc/GVE5-VH3A. ("CFTC Nadex Review").

Commissioner, who took office in December 2025, and the other four seats are vacant.

In its brief, the CFTC asserts—for the first time in its history, and in a reversal of its past positions—that the CEA should be interpreted to vest the agency with exclusive jurisdiction to regulate sports-based event contracts, thereby preempting states' long-standing authority over sports betting within their borders. The CFTC does not suggest that its new interpretation is entitled to deference or attempt to square that interpretation, advanced only in an amicus brief, with its existing rule that prohibits gaming contracts. 17 C.F.R. § 40.11(a). Indeed, the CFTC's brief remarkably does not mention that legislative rule at all.

## SUMMARY OF THE ARGUMENT

Gaming has been a core part of Nevada's economy for more than a century. The NRA intervened in this suit because its members—licensed casino operators—adhere to Nevada's gaming laws. These companies pay state gaming taxes, comply with rigorous licensing requirements, and adhere to detailed regulations designed to protect consumers and the integrity of sporting events.

17

Crypto.com seeks to bypass those critical safeguards. It would have this Court believe that Congress concealed an elephant-sized override of all fifty states' gaming laws in the mousehole of obscure provisions in a federal derivatives statute. Congress did no such thing: It designed the CEA to address soybean futures, not sports bets. The CEA fits within a broader, "coherent federal policy" that "respect[s] the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484; *see also* 15 U.S.C. § 3001 ("Congress finds that ... the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders.").

The District Court saw through Crypto.com's legal maneuvering and came to the commonsense conclusion that Crypto.com offers sports bets, not swaps. It further found that Crypto.com's sports bets "impos[e] substantial hardships on the defendants," and that the public interest weighs against allowing Crypto.com's unlicensed sports bets.

This Court should affirm because all the preliminary injunction factors weigh against Crypto.com. To start, Crypto.com is unlikely to succeed on the merits because its sports bets are not swaps under the CEA. Those bets—for example on whether Team A will cover the point

spread against Team B—are a form of entertainment, not a tool to hedge against economic risk. Because Crypto.com's bets do not involve the kind of potential financial, economic, or commercial consequences required by the statute, they are not subject to the CFTC's exclusive jurisdiction. And even if Crypto.com's sports bets qualified as swaps, Nevada could still regulate them. The presumption against preemption demands that Congress speak clearly when it seeks to preempt state law, particularly with respect to matters (such as gaming) traditionally regulated by state governments. Yet the CEA contains no evidence—express or implied— that Congress intended to authorize nationwide sports betting, designate the CFTC as the nation's sole sportsbook regulator, and override Nevada's sophisticated, longstanding scheme of gaming regulation.

Crypto.com also fails to show irreparable harm. Because of an agreement with the State, Crypto.com faces no imminent threat of enforcement. And any purported injury Crypto.com has suffered from obeying the law—such as lost profits or reputational harm—is self-inflicted. Crypto.com operated for many years without offering sports bets and entered that market only last year. The District Court, state regulators, and the CFTC warned Crypto.com and other prediction

19

markets that they were "proceeding at [their] own risk and creating [their] own harms." *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *8 (D. Nev. Apr. 9, 2025) (*KalshiEX I*).

Finally, the balance of the equities and public interest weigh against a grant of preliminary injunctive relief. Crypto.com's operations have harmed the NRA's members (who must now compete on an uneven playing field) and the State (which has a sovereign interest in enforcing its laws). Crypto.com's sports bets also harm the public. Contrary to Nevada law, Crypto.com serves sports-betting customers as young as 18, and it fails to provide important consumer protections, such as tools allowing problem gamblers to self-exclude from wagering. This Court should affirm.

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When a district court denies a preliminary injunction, this Court reviews the denial for abuse of discretion and underlying issues of law de novo. *See Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1126 n.7 (9th Cir. 2005). In applying these standards, the Court must

"pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982), "balance the competing claims of injury," and "consider the effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24.

## ARGUMENT

### I.    Crypto.com Is Unlikely to Prevail on the Merits.

Crypto.com is unlikely to prevail on the merits, for two reasons. *First*, as the District Court correctly held, the contracts offered by Crypto.com are sports bets, not swaps or other derivatives governed by the CEA. Those wagers, such as whether Team A will defeat Team B by more than 2.5 points, do not involve the type of "potential financial, economic, or commercial consequence[s]" required to qualify as swaps. 7 U.S.C. § 1a(47)(A)(ii). This Court should reject the CFTC's and Crypto.com's contrary interpretation, which lacks any limiting principle and would give the CFTC exclusive jurisdiction over all sports betting nationwide—including trivialities such as the result of a coin toss and whether the total points scored in a game will be odd or even. *Second*, Crypto.com cannot overcome the presumption against preemption, which

21

applies here given the States' traditional role in regulating gaming. Although Crypto.com invokes the CEA's grant of exclusive jurisdiction to the CFTC, that provision allocates authority among federal agencies, reserves authority to the States, and does not come close to authorizing sports betting or designating the CFTC as the nation's sole sportsbook regulator—both of which would be inescapable consequences of Crypto.com's theory.

### A. Crypto.com's Sports Bets Are Not "Swaps," "Options," or "Contracts of Sale of a Commodity for Future Delivery."

Rather than apply for a gaming license to offer sports bets in Nevada—as the NRA's members have done—Crypto.com advances a novel interpretation of decades-old federal laws under which ordinary sports bets are "swaps" and thus subject to the CFTC's exclusive jurisdiction. For its part, the CFTC now departs from its own long-standing interpretations of the CEA and Dodd-Frank and joins Crypto.com's argument that the CFTC alone sets the rules for sports betting across the nation.

That is not the law. Precedent calls on courts to exercise "common sense" in deciding whether Congress delegated "a policy decision of"

major "economic and political magnitude" to a federal agency such as the CFTC. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *see also Learning Resources, Inc. v. Trump*, 607 U.S. __, 2026 WL 477534, at *7-8 (2026) (opinion of Roberts, C.J.). Here, the District Court correctly exercised common sense in holding that Crypto.com's sports bets likely do not qualify as "swaps" or other derivatives governed exclusively by the CEA. The District Court had (and this Court has) authority to decide that routine question of statutory interpretation, contrary to Crypto.com's objections. And on the merits, there are numerous signs that Congress did not authorize the CFTC power grab that the agency and Crypto.com envision.

### 1. Federal Courts Have Authority to Interpret the CEA.

Crypto.com gestures at a threshold argument that Nevada had to bring suit against the CFTC under the Administrative Procedure Act ("APA") to obtain an order "prohibit[ing] [Crypto.com] from listing sports-events contracts on its DCM." Br. 62-63. But *Crypto.com*—not the State or the NRA—brought this lawsuit seeking an injunction against enforcement of Nevada law. The District Court merely decided a question

of law posed by Crypto.com and foundational to its claims: whether Crypto.com's sports bets fall within the statutory definition of a "swap."

Nothing in the CEA ousts the federal courts of jurisdiction to decide that question. "[C]ourts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). And the CEA expressly provides that it does not "supersede or limit the jurisdiction conferred on courts of the United States." 7 U.S.C. § 2(a)(1)(A).

Resisting this straightforward conclusion, Crypto.com argues that the CEA's self-certification process creates a "passive approval system," and the CFTC's tacit "approval" constitutes "final agency action" that must be challenged in an APA lawsuit. Br. 63. Because of this "approval," Crypto.com suggests, the threshold statutory question can only be decided in that APA suit.

But by its own admission, the CFTC has not "taken any official action to approve the listing for trading of sports-related event contracts," CFTC Letter No. 25-36 at 2 n.4 (Sept. 30, 2025),[13] and there is thus no

---

[13] Although the CFTC recently withdrew Letter No. 25-36, *see* CFTC Letter 26-04 (Feb. 4, 2026), it remains true that the CFTC has not taken

24

final agency action that the NRA or its members *could* challenge in court, *see* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). This case is therefore not like *Brotherhood of Locomotive Engineers & Trainmen v. FRA*, in which the agency's regulations were "explicit" that its silence "mark[ed] the consummation of [its] decisionmaking process," and it would "not issue a 'formal approval document'" or take any other further action. 972 F.3d 83, 100 (D.C. Cir. 2020). By contrast, the CFTC has not taken steps to approve Crypto.com's sports bets or to repeal 17 C.F.R. § 40.11(a), which categorically prohibits them. And under 17 C.F.R. § 40.11(c), the agency has authority to review any self-certified contract to determine whether it involves gaming or another prohibited activity, and there is no time limit prescribing when the agency must conduct that review. Even if the CFTC were to ultimately approve Crypto.com's sports bets, nothing in the APA requires that Crypto.com's preferred interpretation be insulated from judicial scrutiny in a suit like this where Crypto.com seeks to enjoin enforcement of state laws. Tellingly, the CFTC's brief does not argue that this Court cannot decide

---

official action to approve the sports contracts at issue here. The CFTC's brief confirms (at 28) that these contracts were "self-certified," and there is no suggestion that the agency has formally approved them.

whether Crypto.com's sports bets are "swaps," but instead offers argument (at 3) "to assist the Court in resolving" that issue.

Crypto.com also errs in its reference (at 63) to this Court's decision in *Big Lagoon Rancheria v. California*, 789 F.3d 947 (9th Cir. 2015) (en banc). As the NRA has elsewhere explained, this case does not present the type of "garden-variety APA claim" at issue in *Big Lagoon*, *id.* at 953, and that decision thus has no bearing on this Court's authority to decide whether Crypto.com's sports bets qualify as "swaps." Br. of Nevada Resort Ass'n at 26-27, *Robinhood Derivatives, LLC v. Dreitzer*, No. 25-7831, Dkt. 27-1 (9th Cir. Feb. 6, 2026) ("NRA *Robinhood* Br."). That is especially true here because Congress has expressly preserved courts' jurisdiction to decide these questions. 7 U.S.C. § 2(a)(1)(A); *see Loper Bright*, 603 U.S. at 412 ("Judges have always been expected to apply their 'judgment' *independent* of the political branches when interpreting the laws those branches enact.").

## 2. The District Court Correctly Interpreted the Statute.

### a) *Crypto.com's Sports Bets Are Not Swaps.*

Under the text of the CEA and Dodd-Frank, the "sports event contracts" offered by Crypto.com are not "swaps" or any other type of

derivative subject to the CFTC's jurisdiction. They "are sports wagers and everyone who sees them knows it." *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282, at *8 (D. Nev. Nov. 24, 2025) (*KalshiEX II*). Crypto.com has attempted to dress up these sports wagers as "event contracts" by self-certifying that they qualify as "swaps," and the CFTC now generally agrees with Crypto.com's novel interpretation and the resulting expansion of the agency's own authority. Those creative, result-oriented legal maneuvers, however, do not change the substance of the transactions.

At bottom, the CFTC's and Crypto.com's arguments falter because a "swap" must be based on the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A). That does not describe Crypto.com's sports bets.

A substantial number of Crypto.com's sports bets transparently lack the "potential financial, economic, or commercial consequence[s]" required by the CEA. For instance, Crypto.com offers bets on a wide range of sporting event outcomes, including whether the first scoring play in a football game will be a touchdown, field goal, or safety; whether a

27

football player other than the quarterback will attempt a pass; and whether one basketball team will defeat another team by a "spread" of nine points or more, *see* pp. 29-30, *infra*.



These wagers, and many others like them, cannot fit within the statutory definition of a "swap" because they are not associated with any bona fide "financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A). That defect alone sinks Crypto.com's and the CFTC's novel argument because the injunction Crypto.com seeks would cover *all* its sports bets (past, present, and future), and it therefore must show that *all* of them qualify as swaps—a tall order given the constantly evolving

nature of Crypto.com's sports bet offerings.[14] Indeed, Crypto.com cannot meet its evidentiary burden to justify all its sports bets because it has not identified or disclosed the full range of wagers that it has offered or intends to offer in the future.

And even if bets on the *winner* of a sporting event created an outcome that satisfied the CEA's test for "potential economic, commercial, or financial consequences" (they do not), Crypto.com has not shown that bets on the *point spread* or the *over-under* meet that test. Yet Crypto.com routinely offers those bets. *See, e.g.*, pp. 11-13, *supra*. Take the February 26, 2026, regular season NBA game between the Indiana Pacers and the Charlotte Hornets, for example. Crypto.com offered bets on whether the teams would score more than 230.5 or (alternatively) 238.5 points combined, as shown below:

---

[14] In February 2026, Crypto.com launched "OG," its "new prediction market experience" for "sports fans." *Crypto.com Launches "OG" – A New Prediction Market Experience* (Feb. 3, 2026), https://perma.cc/JD7A-ZQBT ("Crypto.com Release").



There is no credible argument that real-world economic, financial, or commercial risk turns on whether the teams score 230 points or 231 points. That over/under wager is a form of entertainment that synthetically *creates* economic risk, rather than offering a means to hedge risk that already exists in the marketplace. In other words, the sports bets offered by Crypto.com do not, as the CFTC contends (at 4), facilitate "price discovery."

The CEA's "swaps" definition, 7 U.S.C. § 1a(47)(A)(ii), also requires that the consequence be "associated with" the event. That phrase demands a nexus between the event and the consequence—the consequence must flow from the event itself, not merely from the parties' decision to wager on it. If wagers on synthetic risks of this kind—i.e., risks that would not exist but for the wager being offered—are swaps, then every outcome (however minute or insignificant, even a coinflip), would qualify, stripping the statutory requirement of any meaning. *See, e.g., Corley v. United States*, 556 U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

Rather than directly confront the many inconsequential wagers that litter Crypto.com's betting platform, the CFTC encourages this Court to ignore them, asserting (at 20) that the Court need not "resolve the outer limits of the definition of a swap or engage in line drawing between a swap and a wager." That assertion is incorrect. The CFTC and Crypto.com seek a sweeping interpretation and injunction that would drastically increase the CFTC's authority and undercut state autonomy. It strains credulity to suggest that the Court could punt away the

implication of the CFTC's and Crypto.com's argument: a decision concluding that sports bets are "swaps" would unleash every conceivable type of sports wager—regardless of whether it has economic consequences—and place them all under the CFTC's jurisdiction. *See* pp. 40-43, *infra*.

### b) The CEA's Text and Structure Confirm That Crypto.com's Offerings Are Not Swaps.

The CFTC and Crypto.com fail to offer any compelling argument to justify their novel interpretation. Starting with the statutory text, the CFTC attempts to slice and dice individual terms from the definition of "swap"—including "any," "event," and "contingency"—to build a "broad definitio[n]" under which the results of sporting events constitute "swaps." CFTC Br. 15. But the agency's interpretation flouts the well-established principle that courts should not interpret statutory phrases "in isolation" or based "on the broadest imaginable definitions of [their] component words." *Dubin v. United States*, 599 U.S. 110, 120 (2023). Instead, a statute is interpreted "by reviewing text in context," *Pulsifer v. United States*, 601 U.S. 124, 133 (2024), and in a way that "fit[s] all parts" of the statute "into an harmonious whole," *Brown & Williamson*, 529 U.S. at 133; *see also Learning Resources*, 2026 WL 477534, at *7

(opinion of Roberts, C.J.) (even when "the statutory text might 'as a matter of definitional possibilities' have been read to delegate the asserted power," the "'context' counseled 'skepticism'" (quoting *West Virginia v. EPA*, 597 U.S. 697, 721, 732 (2022))).

Here, every contextual indicator shows that Congress sought to regulate quintessential financial-market transactions—not to tacitly authorize nationwide sports bets under the CFTC's exclusive jurisdiction. The CEA addresses transactions with "potential financial, economic, or commercial consequence[s]," such as "interest rate swap[s]," instruments to hedge "financial risk," "foreign exchange swap[s]," and so on. 7 U.S.C. § 1a(47)(A). And Congress enacted these provisions as part of Dodd-Frank, which sought to address the systemic risks that arose during the 2008 financial crisis. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010). As the CFTC itself explained in 2012, expanding the statute's reach beyond contracts that have historically been considered swaps would "not serve the statutory purposes of" guarding against risks presented by unregulated derivatives that helped cause the financial crisis. *See Further Definition of "Swap," "Security-Based Swap," and "Security-*

*Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48,208, 48,211 (Aug. 13, 2012).

But rather than interpret the CEA in harmony with that context, the CFTC now claims that the statute's "broad language" should be read to "encompas[s] contracts based on the margin of victory or *any other quantifiable result* of a sports event." CFTC Br. 15 (emphasis added). That cannot be right, *see Yates v. United States*, 574 U.S. 528, 543 (2015) (Courts must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress"), particularly when the CFTC's interpretation is entitled to no deference, *see Loper Bright*, 603 U.S. at 395-96.[15]

Read in light of the context and structure of the CEA, an event contract has the requisite "financial, economic, or commercial consequence[s]" if it has the same kinds of effects as the other types of transactions listed in section 1a(47)(A)—i.e., if the underlying event itself

---

[15] The CFTC has described its past "interpretations regarding event contracts" as "a sinkhole of legal uncertainty." CFTC Press Release No. 9046-25, *CFTC Announces Prediction Markets Roundtable* (Feb. 5, 2025), https://perma.cc/42VH-N77Z.

34

has real-world economic effects and presents a bona fide need to hedge risk exposure. *See KalshiEX II*, 2025 WL 3286282, at *7; *see also Dubin*, 599 U.S. at 120 (finding the terms "use" and "in relation to" to be "indeterminate" and thus relying on "surrounding words" and "statutory context"); *Yates*, 574 U.S. at 532 (narrowing meaning of "tangible object" based on statutory context). Sports bets differ fundamentally from the contracts that have historically been traded on CFTC-regulated markets, such as interest rate swaps and agricultural commodities futures.

When Congress enacted Dodd-Frank's amendments to the CEA, no one had *ever* offered a sports bet on a futures exchange. To help ensure that no one ever would, Dodd-Frank included a "Special [R]ule" that allows the CFTC to prohibit contracts that involve "gaming" or any "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C). And the following year, the CFTC exercised that authority by mandating that DCMs "shall not list for trading" any contract that "involves, relates to, or references" the activities enumerated in the Special Rule—including "gaming" and "an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1). Although the CFTC

fails to mention Section 40.11(a) in its brief, this regulation remains in effect and serves to *prohibit*—not authorize—gaming contracts on DCMs.

Despite these many indicators, the CFTC and Crypto.com insist that sports bets still should be considered "swaps" because of the "possibility" that businesses "will benefit financially, commercially, or economically," such as a "local retaile[r]" whose sales could turn on whether the hometown team wins or "[h]otels and restaurants in the city hosting the Super Bowl," which could "expect more business" but also experience property damage "if there's fan unrest." Br. 48; CFTC Br. 19-20 (citing "economic risk[s]" for hotels, restaurants, vendors, and cities); *see also KalshiEX LLC v. Orgel*, 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026) (similar).

That reasoning fails several times over. To start, Crypto.com offers no evidence that retailers, hotels, and restaurants could be affected in any way by the wagers it offers. Whether the total number of points scored in a game is odd or even, for example,[16] has no bearing on how much food a nearby restaurant will sell or how many fans will book nearby hotel rooms. Crypto.com notably makes no effort to defend *that*

---

[16] *See* pp. 12-13, *supra*.

bet or countless others that turn on trivial matters without any economic consequences of their own.[17]

The practical problems with the CFTC's and Crypto.com's arguments are particularly clear regarding proposition and parlay bets. Proposition bets can include an almost infinite number of possible outcomes—for example, whether the first score of a football game will be a touchdown, a field goal, or a safety, and whether a football player other than the quarterback will attempt a pass. *See* pp. 27-28, *supra*. Meanwhile, parlays allow bettors to "add two or more picks to a single prediction," creating a situation in which "the odds of winning are lower than a single-pick prediction" and "the potential payout is … higher."[18] A parlay could involve whether the Seattle Mariners, Nashville Predators, and Novak Djokovic all win particular matchups by more than a specified margin—despite playing different sports, in different cities, on different

---

[17] Contrary to the CFTC's assertion (at 19-20), *Pennsylvania v. NCAA*, 948 F. Supp. 2d 416 (M.D. Pa. 2013), is immaterial because the effects it addressed—e.g., exclusion of a college football team from postseason play, *see id.* at 421-22—differ from the outcomes underlying Crypto.com's sports bets. The harm alleged in *Pennsylvania* turned on whether the games would occur at all, not whether one team would defeat another by more than 2.5 points, whether the final score will be odd or even, etc.

[18] *Crypto.com Sports Combos*, *supra* n.11.

dates. *See also* pp. 13-14, *supra*. Sportsbooks offer these multi-leg wagers to increase potential prizes at the cost of longer odds.

Just like the bets already discussed, *no one* needs to hedge economic risk based on whether (1) the Dallas Mavericks will defeat the Brooklyn Nets by seven points or more in an NBA game *and* (2) the University of Louisiana-Lafayette's Ragin' Cajuns and the Troy University Trojans will combine for fewer than 134 points in a college basketball game *and* (3) Brighton & Hove Albion F.C. and Nottingham Forest F.C. will tie in a soccer match *and* (4) Curaçao will defeat Germany in the FIFA World Cup. Yet Crypto.com offered that parlay bet. *See* pp. 13-14, *supra*. Crypto.com and the CFTC have not even attempted to show that these wagers, which make up a significant proportion of prediction market offerings, meet the statutory test.[19]

Crypto.com insists (at 48) that its sports bets nonetheless constitute "swaps" because a hypothetical "[l]icensed sportsboo[k]" may seek to use Crypto.com's sports bets to hedge risk on a particular sports bet offering.

---

[19] For example, Kalshi's "combo bets" "ma[de] more money in fees" in one day "than non-sports events have ever made in a single day." Daniel O'Boyle, *Kalshi Parlays Break Records, Make More Money Than Non-Sports Markets, After Robinhood Launch*, Yahoo Finance (Jan. 30, 2026), https://perma.cc/5NPT-HY6F.

Far from supporting Crypto.com's interpretation, this example confirms that Crypto.com's "sports contracts" are, in reality, nothing more than sports bets that could be hedged only against other sports bets. The bets offered on Crypto.com such as over/under wagers and parlays involve synthetic risk created by gambling, divorced from any independent, pre-existing economic risks.

Moreover, under the CFTC's and Crypto.com's limitless conception of a "swap," *any* wager placed on *any* event that could have *any potential* "financial, economic, or commercial consequence" would fall under the CFTC's exclusive purview—even if the consequence existed solely because of the wager. Prediction markets would thus be permitted to offer contracts on anything they wanted as long as someone, somewhere is willing to bet on it—including spins of a roulette wheel or coin flips. None of the other types of swaps enumerated in Section 1a(47) works in that way, and regulated futures markets existed for nearly a century without anyone ever interpreting the governing statutes to allow sports betting. Read in context and with the required dose of "common sense," *Brown & Williamson*, 529 U.S. at 133, the statute does not support such a boundless approach.

39

### c) *History and Other Interpretive Tools Confirm that Sports Bets Are Not "Swaps."*

History also cuts against the CFTC's and Crypto.com's argument. Before 2025, no one had *ever* traded a sports contract on a CFTC-regulated exchange. That includes the 15-year period from Dodd-Frank's enactment in 2010 until prediction market operators began to offer Super Bowl wagers in early 2025. This absence of sports betting makes sense: As the CFTC previously observed when implementing Dodd-Frank, Congress did not intend every type of agreement, contract, or transaction that *could* fall within the broadest reaches of the swaps definition to be subject to CFTC regulation. *See* 77 Fed. Reg. at 48,211 ("agreements, contracts, and transactions that previously have not been considered swaps" should not "be regulated as swaps" under Dodd-Frank); *Loper Bright*, 603 U.S. at 386 ("the longstanding practice of the government … can inform a court's determination of what the law is" (cleaned up)).

Accepting the CFTC's and Crypto.com's newfound interpretation and concomitant lack of limitation would mean that the CFTC—which previously considered "certain consumer and commercial contracts" as outside the definition of swaps—could at any time determine that mortgages, consumer loans, life insurance policies, employment

contracts, or retirement benefit arrangements are swaps subject to the agency's exclusive jurisdiction. 77 Fed. Reg. at 48,211. After all, the "swap" definition includes "any agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery" associated with a potential economic consequence, 7 U.S.C. § 1a(47)(A)(ii)—a category the CFTC and Crypto.com argue essentially covers everything other than "onions" and "movie box office receipts," CFTC Br. 16.

The CFTC's limitless approach runs headlong into the major-questions doctrine. As the Supreme Court has repeatedly explained, courts are "skeptic[al]" "[w]hen an agency claims to discover in a long-extant statute an unheralded power" over questions of vast economic and political significance. *Utility Air*, 573 U.S. at 324; *West Virginia*, 597 U.S. at 724 (agency "located … newfound power" in "vague language"). That is precisely what the CFTC seeks to do here by reinterpreting the CEA and Dodd-Frank to give itself authority to regulate sports betting. The market for sports betting nationwide accounted for more than $13 billion in total revenues in 2024 alone and has grown rapidly in recent years.[20] And as the Supreme Court recognized in *Murphy*, "legalization of sports

---

[20] *See* American Gaming Ass'n, *supra* n.2, at 10-11.

gambling" has long been "a controversial subject" that involves "important policy choice[s]." 584 U.S. at 486. The "lack of historical precedent" for nationwide sports betting, "coupled with the breadth of authority that the [CFTC] now claims, is a telling indication that the [newfound policy] extends beyond the agency's legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022); *Learning Resources*, 2026 WL 477534, at *9 (opinion of Roberts, C.J.) ("It is also telling that in IEEPA's half century of existence, no President has invoked the statute to impose *any* tariffs.").

The implications of the CFTC's position are extreme: Under the definition proposed by the CFTC and Crypto.com, any wager involving "any … quantifiable result of a sports event" is a "swap" under the CFTC's jurisdiction. CFTC Br. 15. But the CEA requires that all consumer swaps *must* be traded on CFTC-regulated DCMs, *see* 7 U.S.C. § 2(e),[21] and authorizes substantial penalties (including a fine of up to $100,000) for each violation of that requirement, *see id*. § 13a-1(a), (d)(1). If the CFTC and Crypto.com were correct that the CEA preempts all state

---

[21] Sophisticated "eligible contract participants" are exempted from this requirement. *See* n.5, *supra*.

42

gaming laws, then their "swap" definition would necessarily imply that the CFTC is the Nation's *sole* regulator of sports betting, and that *every* sports wager placed at a Las Vegas sportsbook is a violation of the CEA. *See* 7 U.S.C. § 2(e) (swaps may not be traded off DCMs). But there is no evidence that Congress intended to reach that far in enacting Dodd-Frank's swaps provisions. And courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance"—such as nationwide regulation of sports betting. *NFIB*, 595 U.S. at 117 (citation omitted); *see also West Virginia*, 597 U.S. at 723-24.

Crypto.com resists this conclusion by attempting (at 61) to distinguish "sports wagering" from "sports-event contracts." But its efforts are disproved by the many comparisons discussed above. *See* pp. 13-14, 27-30, *supra*. Crypto.com offers the same bets as traditional sportsbooks, and its fellow prediction market operators regularly advertise their offerings as such. *See* Br. of State Defendants at 10-11, *KalshiEX, LLC v. Hendrick*, No. 25-7516, Dkt. 33-1 (9th Cir. Jan. 23, 2026). According to Crypto.com, none of that matters because its contracts involve parties "trad[ing] with each other on an open and

43

neutral market" rather than "placing wagers with" sportsbooks that "set the odds." Br. 61. But Crypto.com never explains why that purported distinction is legally relevant. The identity of the counterparty is not part of the test for whether a transaction qualifies as a swap, and a bet on whether the final score will be odd or even is equally bereft of economic consequences regardless of who offered it. Besides, the distinction fails on its own terms because Crypto.com (like other prediction market operators) works closely with "market makers" that serve the same role as the house in a traditional sportsbook operation.[22] Indeed, Crypto.com fails to mention that it is hiring employees to work on a team that "trade[s] against customers" in much the same way as sportsbooks "set the odds."[23]

For its part, the CFTC urges that excluding sports bets from the definition of "swap" would permit states to "characterize any derivative as prohibited gambling," subjecting swaps "to a patchwork of state

---

[22] *Market Maker Program*, Crypto.com (accessed Mar. 2, 2026), https://perma.cc/9JH3-SU4H.

[23] Emily Nicolle, *Crypto.com Hiring Sports Market Maker to Trade Against Customers*, Bloomberg (Dec. 23, 2025), https://perma.cc/2NZ7-NLKW. Like traditional sportsbooks, this in-house organization will focus on "maximiz[ing] profits while carefully managing risks." *Id.*

restrictions." CFTC Br. 17. But the agency overlooks that the threshold question whether a contract *is* a "swap" solves the problems that it imagines. Despite more than a decade of experience following Dodd-Frank, the CFTC does not cite any examples of states attempting to regulate bona fide "swaps." Although the CFTC cites (at 17) a cease-and-desist letter Nevada sent in a related case, this case is squarely about sports. Indeed, the letter Nevada regulators sent to Crypto.com orders Crypto.com to cease and desist from offering "any event-based wagering contracts *concerning sporting events*." ER-122 (emphasis added). In other words, Nevada has not even attempted to limit Crypto.com from offering events-based contracts concerning agriculture, metals, energy, financial outcomes, or *any other industry* that comfortably fits within the CFTC's jurisdiction. If a state regulator sought to take such action, prediction market operators and the CFTC could challenge it in court. But those issues are not presented here.

### 3. Crypto.com's Sports Bets Are Not "Options."

Crypto.com and the CFTC fall back on the argument that even if Crypto.com's sports bets are not "swaps," they are "'options' subject to the

CFTC's exclusive jurisdiction." Br. 63; CFTC Br. 16. This newly-discovered litigation position also fails.

To start, this Court need not reach this argument because Crypto.com did not raise it in the District Court, *see Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 901 (9th Cir. 2025), and because Crypto.com self-certified to the CFTC that all of its contracts are "swaps" rather than "options," ER-126, 129; *see* 17 C.F.R. § 38.4(b) (requiring DCM's self-certification to identify whether a contract is a swap, option, or future). Crypto.com cannot now retreat from its contrary certification. *See Risotto v. Plumbers & Steamfitters Loc. 848*, 94 F.3d 597, 604 (9th Cir. 1996) (judicial estoppel applies to representations made to agencies).

In any event, Crypto.com's sports bets are not options. An "option" is a contract that "grants to the purchaser 'the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price.'" *CFTC v. White Pine Tr. Corp.*, 574 F.3d 1219, 1226 (9th Cir. 2009) (citation omitted); *see also Saberi v. CFTC,* 488 F.3d 1207, 1210 n.2 (9th Cir. 2007).

A sports event contract does not grant the purchaser the right to buy or sell anything at any price. Crypto.com does not address this shortcoming or provide support for its argument that its sports bets should be considered "binary options" that fall within the CFTC's jurisdiction.

The CFTC suggests that Crypto.com's sports bets may qualify as "binary options," which are a "type of option whose payoff is either a fixed amount or zero," such as a contract that "pays $100 if a hurricane makes landfall in Florida before a specified date and zero otherwise." CFTC Br. 16. But the CFTC has itself recognized that binary options do not extend to "general events" that "do not reflect the occurrence of any commercial or environmental event," "such as whether a [c]onstitutional amendment will be adopted or whether two celebrities will decide to marry." *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,671 (May 7, 2008). The outcomes of sporting contests—and trivial aspects of those contests, such as the parlays and proposition bets described above—fall on the "general events" side of this line. That interpretation makes sense to avoid the extreme scenario in

47

which an "option" could include every possible outcome that may or may not occur. *See* pp. 40-43, *supra*.

Moreover, the reference in Section 1a(36) to "of the character of" is informed by the specific instruments enumerated. *See Yates*, 574 U.S. at 543 ("[A] word is given more precise content by the neighboring words with which it is associated." (citation omitted)). Every item on this list—whether an "'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'"—is defined in reference to an underlying commodity or financial interest that has an independent economic existence. 7 U.S.C. § 1a(36).[24] Crypto.com's sports bets are different: their settlement value is determined solely by their own terms, and those terms neither refer to nor contemplate delivery of, or control over, any underlying asset or commodity.

## B.    The CEA Does Not Preempt Nevada's Gaming Laws.

Even if Crypto.com's sports bets qualified as "swaps" under the CEA, the preemption arguments advanced by the CFTC and Crypto.com would still fail. The presumption against preemption demands that

---

[24] Even contracts commonly settled on a cash basis refer to a deliverable reference asset, such as a Treasury bill or reference debt asset.

Congress speak clearly when it displaces state law, and nothing in the CEA evinces Congress's intent to preempt long-established state gaming laws.

### 1. The Presumption Against Preemption Applies.

"[I]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied," courts "start with the assumption that the historic police powers of the States" are not preempted absent a clear statement to that effect. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up). The power to regulate gambling is "a function that lies at the heart of a state's police powers." *Artichoke Joe's*, 353 F.3d at 737. Accordingly, the presumption against federal preemption applies and can be overcome only if the CFTC and Crypto.com show that it was Congress's "clear and manifest purpose" to preempt state gambling regulations. *Medtronic*, 518 U.S. at 485 (citation omitted).

Crypto.com incorrectly asserts (at 40) that the presumption against preemption does not apply to its express preemption arguments. It is true that courts determine the *scope* of express preemption clauses according to their "plain wording" and without reference to "any presumption

49

against preemption." *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016). But the principle that courts should not artificially narrow an express preemption provision assumes that such a provision exists in the first place. In *Franklin*, for instance, there was no dispute that the statute contained an express preemption clause. *See id.* at 123 (Bankruptcy Code provision directed what "a State law … may not" do). The question instead was merely whether the provision covered Puerto Rico. *See id.* at 124; *see also Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1032 (9th Cir. 2024) ("*When a statute contains an express preemption clause*, we look only to the text 'without any presumptive thumb on the scale for or against preemption.'" (emphasis added, citation omitted)).

Here, the issue is whether the CEA's "exclusive jurisdiction" provision *is in fact* an express preemption clause. Put differently, before determining the scope of any express preemption in the CEA, Crypto.com must establish that the statute *contains such a provision*. The presumption against preemption bears on that threshold question.

The CFTC contends (at 27) that the "the Court should not apply a presumption against preemption" because "Congress's 'clear and

50

manifest purpose'" was to preempt "historic police powers." (citation omitted). But that confuses the applicability of the presumption with the standard for overcoming it.

### 2. Express Preemption Does Not Apply.

Crypto.com contends (at 39) that the CEA expressly preempts Nevada gaming law through 7 U.S.C. § 2(a)(1)(A)—the "exclusive jurisdiction" provision. That argument conflicts with the statute's text, structure, and legislative history.

**Text and Structure.** "Express preemption arises when the text of a federal statute explicitly manifests Congress's intent to displace state law." *Assurance Wireless*, 100 F.4th at 1031-32 (cleaned up). Provisions of this kind typically leave little doubt about Congress's preemptive intent, often using language like "preempt" or "no state may." *See, e.g.*, *Jones v. Google LLC*, 73 F.4th 636, 642 (9th Cir. 2023) ("No State or local government may impose any liability … that is inconsistent with the treatment" under federal law); *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 458 (2012) (additional or conflicting requirements "may not be imposed by any State").

The CEA's "exclusive jurisdiction" provision looks nothing like those express preemption clauses. It provides that the CFTC has "exclusive jurisdiction" over "accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future delivery …, traded or executed on" a DCM. 7 U.S.C. § 2(a)(1)(A).[25] That language says nothing about preemption or state law. Indeed, the best reading of the "exclusive jurisdiction" provision is that Congress "ma[de] clear that as among *federal agencies*, the CFTC would have exclusive authority, rather than the SEC." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 678 (D. Md. 2025). As the Supreme Court explained in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, the "exclusive jurisdiction" provision reflects Congress's "inten[t] only to consolidate federal regulation of commodity futures trading in the [CFTC]" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." 456 U.S. 353, 386-87 (1982). The CFTC and Crypto.com notably do not address this binding precedent.

---

[25] The "exclusive jurisdiction" provision does not extend to all contracts traded on DCMs—rather, only to those specifically enumerated.

The absence of clear preemptive language in Section 2(a)(1)(A) is glaring in light of the statutory context. Elsewhere in the CEA, Congress used exactly the kind of language that it typically employs to expressly preempt state law. *See* 7 U.S.C. § 16(e)(2) ("This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops");[26] *id.* § 16(h)(2) ("A swap … may not be regulated as an insurance contract under the law of any State."). Importantly, the latter provision was added in Dodd-Frank, which "demonstrate[s] that Congress knew how to preempt state authority when it wanted to." *ACA Connects v. Bonta*, 24 F.4th 1233, 1246 (9th Cir. 2022). Yet, the CFTC fails to acknowledge these provisions—much less explain why Congress would use ambiguous language like "exclusive jurisdiction" to apply preemptive force rather than a clear preemption clause.

The CFTC and Crypto.com nonetheless insist that Section 2(a)(1)(A) expressly preempts state law. Crypto.com focuses

---

[26] This provision applies only to certain "agreement[s], contract[s], or transaction[s]" offered by "electronic trading facilit[ies]." 7 U.S.C. § 16(e)(2). Because Crypto.com is not an "electronic trading facility" and its sports bets are not within the specified "agreement[s], contract[s], or transaction[s]," Section 16(e)(2) does not apply here.

myopically on the dictionary definition of the word "exclusive," but the term "exclusive" alone does not answer the critical contextual question: *exclusive as to what?* As the Supreme Court and other courts have observed, Congress sought to clarify that the CFTC has "exclusive jurisdiction" as among federal agencies to regulate commodities futures. *See Merrill Lynch*, 456 U.S. at 386-87; p. 52, *supra*.

Many of the cases the CFTC cites (at 23-25) to support its preemption theory are thus inapposite because they involved horizontal conflicts, i.e., whether the CEA supersedes other *federal* laws, and whether the CFTC ousts other *federal* agencies of jurisdiction. *See, e.g.*, *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 539 (7th Cir. 1989) (jurisdictional dispute between CFTC and SEC); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 584 (D.C. Cir. 2001) (jurisdictional dispute between CFTC and FTC); *Hunter v. FERC*, 711 F.3d 155, 156 (D.C. Cir. 2013) (jurisdictional dispute between CFTC and FERC). Nor can the CFTC rely on cases considering whether to "infer" that the CEA provides a "private cause of action in damages"—a separate question from whether the "exclusive jurisdiction" provision categorically preempts state law. *Leist v. Simplot*, 638 F.2d 283, 314, 322 (2d Cir. 1980) ("The purpose" of the

"exclusive jurisdiction provision" "was to separate the functions of the new CFTC from those of the SEC and other regulators.").[27] These cases thus have no bearing on whether the "exclusive jurisdiction" provision preempts state gaming law.

The CFTC gets no further by relying on cases that address state law preemption but that nowhere conclude that the "exclusive jurisdiction" provision is an express preemption clause. *See, e.g.*, *Effex Capital*, 933 F.3d at 894 ("[T]he Commodity Exchange Act does not expressly preempt state law."). These cases, at most, show that the CEA impliedly preempts state law under some circumstances not present here.[28]

Without helpful authority interpreting the CEA, the CFTC looks elsewhere in the U.S. Code. It asserts (at 21) that its "exclusive jurisdiction" means that "state laws attempting to regulate the same subject matter must give way." But in many of the cases the CFTC cites,

---

[27] *See also Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*, 795 F.2d 415, 417 (5th Cir. 1986); *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 219 (6th Cir. 1980).

[28] *See also, e.g.*, *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 206 (N.D. Ala. 1981); *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001).

the statute at issue did not use the phrase "exclusive jurisdiction" and the court did not address express preemption. *See Arizona v. United States*, 567 U.S. 387, 399 (2012); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); CFTC Br. 21 (citing additional cases). And in the one case that did involve an "exclusive jurisdiction" provision, the court held that state law was *not* preempted. *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024) (provision granting federal court "original and exclusive jurisdiction over any civil action" did not expressly preempt state administrative action).

Crypto.com next contends (at 42) that the savings clause in Section 2(a)(1)(A) "confirm[s] that the CEA preempts state law as applied to conduct that falls within the CFTC's jurisdiction." But whatever inference that can be drawn from the savings clause is offset by the CEA's use of traditional express preemption language elsewhere. *See* p. 53, *supra*. Congress did not use such language here. *See Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222, 225 (9th Cir. 1994) (applying "the familiar principle of statutory construction, *expressio unius est exclusio alterius*," in express preemption context).

It would be especially strange to construe the "exclusive jurisdiction" provision as an express preemption clause given the CEA's self-certification regime. If Section 2(a)(1)(A) effected express preemption, a DCM could displace state law any time it self-certifies a contract. And because the CFTC is not required to review self-certifications, on Crypto.com's theory, the force of state gaming laws would turn entirely on the private parties' actions. That result cannot be squared with the federalism principles underlying the presumption against preemption.

**Legislative History.** Nothing in the CEA's legislative history changes this conclusion. Crypto.com cites (at 44-45) committee reports and drafting decisions from the CEA's 1974 amendments purportedly showing that CFTC jurisdiction "supersedes" state regulatory authority. But as Crypto.com recognizes, "[t]he express preemption analysis focuses on '*the language of the statute itself*.'" Br. 40 (quoting *Franklin,* 579 U.S. at 125) (emphasis added). It would be a strange express preemption provision that conveys its displacing intent only in the Congressional Record. So Congress's choice *not* to use express preemptive language in Section 2(a)(1)(A)—after it used such language elsewhere in the CEA—is

57

"the best evidence of Congress' preemptive," or lack of preemptive, "intent." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011); *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) ("[L]egislative history is not the law.").

Even considering legislative history, nothing in the Congressional Record supports Crypto.com's theory. If the legislative history behind the 1974 amendments reveals *some* intent to preclude state regulation of futures markets, those materials do not show that Congress (silently) unwound *all* state sports betting regulations nationwide. To the contrary, the history behind Dodd-Frank suggests that Congress intended to preserve state regulations.

Congress enacted Dodd-Frank to address the "systemic risks in the financial sector that undermined U.S. financial stability" during the 2008 financial crisis. *KalshiEX II*, 2025 WL 3286282, at *7. And during deliberations on the bill, Members of Congress contemplated—and then rejected—any notion that Dodd-Frank might authorize federally-regulated sports betting. *See* 156 Cong. Rec. 13,173 (July 15, 2010) (statement of Sen. Feinstein); *id.* (statement of Sen. Lincoln); *see also Martin*, 793 F. Supp. 3d at 684. That makes sense: By the time of Dodd-

58

Frank—and well after enactment of the CEA—the Professional and Amateur Sports Protection Act ("PASPA") prohibited the expansion of sports betting nationwide but permitted grandfathered states to continue offering sports betting. *See* 28 U.S.C. § 3702 (later invalidated in *Murphy*, 584 U.S. at 486). Unsurprisingly then, Dodd-Frank said nothing about authorizing nationwide sports betting. *See Martin*, 793 F. Supp. 3d at 682.

The recent introduction of sports-based event contracts also supports this conclusion. Although Dodd-Frank was enacted in 2010, no one suggested that it allowed nationwide sports betting until late 2024.[29] That nearly 15-year gap suggests that Crypto.com is straining, rather than faithfully applying, the statute's text.

Amicus Paradigm Operations points to state "bucket shop" statutes, claiming that Congress enacted the 1974 amendments "to resolve the tension between state gambling laws and federal financial regulation." Paradigm Br. 5; *see also* CFTC Br. 5-6. But nineteenth- and early twentieth-century "bucket shop" laws targeted a quintessential form of financial activity: futures trading on the price of grain without

---

[29] *See* CFTC Nadex Review, *supra* n.12.

59

delivery of the underlying commodity. At most, then, Paradigm's history shows states treating heartland derivatives activity—i.e., transactions that allocate pre-existing, real-world economic risk, such as potential interest rate movements and commodity price changes—as unlawful gambling. That historical dispute, resolved decades ago, does not permit a federal agency to make the opposite error: treating heartland gambling as derivatives activity.

The upshot is this: even if legislative history justifies *some* preemption of state law, "that does not necessarily establish that the 'field' that Congress intended to 'occupy' included gambling." *Martin*, 793 F. Supp. 3d at 677. To the extent the CEA displaces some state laws, Nevada's gaming regulations do not fall within the preempted domain.

### 3. Field Preemption Does Not Apply.

Crypto.com also argues that the "comprehensive" federal framework for regulating DCMs shows that the CEA implicitly "preempts the field of *all* trading on DCMs." Br. 51. The CFTC advances a similarly sweeping theory of field preemption; on its view, the CEA occupies the field of derivatives exchanges, and the fact "[t]hat the instruments at issue here involve swaps on sports events does not change

60

the preemption framework." CFTC Br. 21, 24. This argument fails twice over.

*First*, the CEA does not comprehensively regulate derivatives. Field preemption applies only "[i]n rare cases" where "Congress [has] 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (citation omitted). But here, the inclusion of a "saving[s] clause negates the inference that Congress 'left no room' for state causes of action" in the derivatives space.[30] *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987). Put differently, the savings clause confirms that the CEA is insufficiently comprehensive to occupy the field of derivatives regulation.

The CFTC insists (at 25) that the "savings clause" is narrow and merely "preserves traditional, non-conflicting state powers," while also limiting those powers "against transactions on CEA governed markets." But that "means that the CEA *does not displace*" state authority to

---

[30] The savings clause provides: "Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on … regulatory authorities … of any State …. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A).

"enforce state criminal or civil antifraud laws," or "regulate purely intrastate conduct or transactions." *Id.* (emphasis added). In other words, even under the agency's view, Congress still "contemplated that state and local governments would play a role" in regulating derivatives. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1219 n.18 (9th Cir. 2020); *see also Effex Capital*, 933 F.3d at 894 (CEA does "not manifest an intent to occupy completely the entire field of commodity futures regulation").

*Second*, even if Congress has legislated comprehensively as to *derivatives*, the presumption against preemption still demands that Congress speak clearly if it intends to displace the States' historic authority over *gaming*. After all, "[t]he presumption … accounts for the historic presence of state law but does not rely on the absence of federal regulation." *Wyeth*, 555 U.S. at 565. Neither Crypto.com nor the CFTC identifies anything in the CEA's text or legislative history reflecting a "clear and manifest purpose" to displace states' sports betting regulations, which remain "at the heart of [a] state's police power." *Monarch Content*, 971 F.3d at 1028; *see also Martin*, 793 F. Supp. 3d at 677. The absence of such language is unsurprising: Because no one had

*ever* traded a sports wager on a DCM until prediction markets began doing so last year, Congress had no reason to establish an exclusive federal domain for such wagers through the CEA and Dodd-Frank.

That the CEA does not mandate federal standards for sports betting makes sense. Across federal gaming statutes, Congress has consistently incorporated state law as a touchstone for determining violations of federal law. *See* NRA *Robinhood* Br. 54-55 (giving examples).[31] Hardly displacing state policy, Congress has thus chosen to make state gaming law a core part of the federal regulatory framework.

### 4. Conflict Preemption Does Not Apply.

Crypto.com and the CFTC finally invoke conflict preemption. But these theories fare no better than the previous two. Conflict preemption exists when a "state requirement actually conflicts with [a] federal requirement—either because compliance with both is impossible, or because the state requirement 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

---

[31] When Congress deviated from this federal-state balance in PASPA, it *restricted* sports betting. *See* 28 U.S.C. § 3704. That approach is the opposite of what Crypto.com advocates here: reading federal law to *expand* sports wagering.

Congress.'" *Medtronic*, 518 U.S. at 507 (citation omitted). Because of the presumption against preemption, this Court must assume that the CEA does not preempt Nevada's gaming regulations "absent a 'clear and manifest purpose of Congress.'" *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 623 (9th Cir. 2024) (citations omitted).

Crypto.com contends that Nevada's gaming law "poses an obstacle to the CEA's objective of bringing derivatives markets under a uniform set of regulations." Br. 50 (cleaned up). The CFTC similarly frets (at 27) that state gaming laws will "create the very 'patchwork' that Congress set out to prevent." But obstacle preemption cannot exist here because Congress has not established any federal "purposes" or "objectives" with respect to sports betting. *Medtronic*, 518 U.S. at 507 (cleaned up). To the contrary, Congress has largely left gaming regulation up to the States. *See* pp. 4-5, *supra*. Nevada law therefore cannot stand as an obstacle to federal public policies that do not exist.

An abstract interest in "uniformity" falls well short of the "'clear and manifest purpose of Congress'" needed to overcome the presumption against preemption. *Mont. Med. Ass'n*, 119 F.4th at 623 (citations omitted). Moreover, Nevada law *promotes* federal policy. Dodd-Frank

64

authorized the CFTC to prohibit "transactions [that] involve … gaming" "or" any "activity that is unlawful under any Federal or State law," 7 U.S.C. § 7a-2(c)(5)(C)(i), thus expressly preserving state law as an element of the federal scheme. The CFTC exercised that authority, prohibiting DCMs from listing event contracts that "involv[e], relat[e] to, or referenc[e] … gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a). That categorical prohibition, which remains in effect, reflects a conclusion that listing such contracts on a DCM is *per se* contrary to the public interest.[32] Thus, federal law *avoids* a conflict with state law, and Nevada law supports the federal objective expressed in the Special Rule, Section 40.11(a), and throughout federal gaming statutes.

Nor is it impossible to follow both state and federal law. Even if Crypto.com's sports bets were subject to CFTC jurisdiction, the company could still comply with both federal and state law by obtaining a Nevada

---

[32] *See Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776, 44,786 (July 27, 2011) (CFTC's "prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" (citations omitted)).

gaming license or by using geofencing technology to exclude Nevada customers.

Crypto.com protests that the CEA's "Core Principles"—which require DCMs to "provide [their] members ... with impartial access to [their] markets and services"—make it impossible to exclude Nevada users consistent with federal law. Br. 51 (quotation omitted). But Crypto.com's own actions tell a different story. Crypto.com agreed to cease offering sports bets in Nevada shortly after the District Court issued its decision, *see* ER-6, and took similar action in eight other states late last year.[33] Crypto.com never squares its theoretical argument with its actual conduct.

The CFTC and *Orgel* embrace the same flawed argument. The CFTC argues (at 25-26) that DCMs have a "mandate to provide impartial national access," and *Orgel* concluded that Kalshi could not "allow impartial access nationwide" if Tennessee bettors faced different requirements. 2026 WL 474869, at *10.

---

[33] *See* Tom Nightingale, *Crypto.com Pulls Sports Contracts in Several States Amid Pushback*, SBC Americas (Dec. 16, 2025), https://perma.cc/DL2H-M2TC.

But as the agency's regulation makes clear, the "impartial access" principle at most discourages access restrictions based on wealth, not geography. Comments and responses to the proposed "impartial access" rule addressed "fee structures," "fee restrictions," "fee equality," and "financial soundness," nowhere mentioning location.[34] Unsurprisingly, the final rule prohibits "discriminatory" access criteria and requires "[c]omparable fee structures." 17 C.F.R. § 38.151(b). The CFTC's conduct confirms that the rule has nothing to do with geography. Last year, the agency warned DCMs to make contingency plans for enforcement by state regulators—a step that would have made no sense if geographic uniformity was mandatory. CFTC Letter No. 25-36 at 2 (Sept. 30, 2025). And several prediction market operators openly offer sports bets only in select jurisdictions.[35] If the "impartial access" requirement demands

---

[34] *Core Principles and Other Requirements for Designated Contract Markets*, 77 Fed. Reg. 36,612, 33,624-25 (June 19, 2012).

[35] *See* NRA *Robinhood* Br. 14 ("Robinhood has changed its approach to the Nevada market over time."); *FanDuel, CME Group Launch Prediction Markets in Five States*, Reuters (Dec. 22, 2025), https://perma.cc/FG8F-ZDJU (FanDuel initially rolled out prediction markets only in five states); Nathan Borney, *DraftKings launches prediction market amid fight over sports betting*, Axios (Dec. 19, 2025); https://perma.cc/9F9Q-LF7Q (similar approach by DraftKings).

uniform geographic availability, these operators would be in obvious violation of the Core Principles. But the CFTC has not initiated, or even hinted at, enforcement against *even one* of them.[36]

## II. Crypto.com Will Not Suffer Irreparable Harm Without a Preliminary Injunction.

Crypto.com cannot show irreparable harm. It contends (at 69) that it faces the threat of imminent enforcement. But after the District Court denied its preliminary injunction motion, Crypto.com agreed not to "offer sports-event contracts in Nevada" in exchange for the State's promise not to "enforce its gaming laws with respect to those contracts." Br. 27. As a result, Crypto.com currently suffers no threat of enforcement from the denial of its motion for a preliminary injunction.[37]

---

[36] *See* Dan Bernstein, *A Frequent Kalshi Claim is Being Undermined by Nevada*, Sportico (Nov. 12, 2025), https://perma.cc/DE6H-B4PF (explaining that, weeks after suspending its operations in Nevada, Crypto.com had not faced a CFTC enforcement action).

[37] Even if Crypto.com faced enforcement action, it would lack irreparable harm. *First*, "the expense and annoyance of litigation is part of the social burden of living under government." *FTC v. Standard Oil Co.*, 449 U.S. 232, 244 (1980) (cleaned up). *Second*, exposure to enforcement for engaging in unlawful acts—such as operating an unlicensed sportsbook—cannot constitute irreparable harm, or else every lawbreaker would satisfy this requirement for injunctive relief.

Even so, Crypto.com contends that Nevada's efforts to prevent unlicensed sports betting will harm the company in other ways, including by causing it to lose business and incur expenses to implement geolocation technology. But under these circumstances—where Crypto.com manufactured its own injuries—none of these harms is a basis for a preliminary injunction permitting Crypto.com's sports bets while this litigation proceeds.

**Lost Business.** Crypto.com and its DCM, North American Derivatives Exchange, operated for more than two decades without offering sports betting. *See* pp. 10-11, *supra*. After Crypto.com began offering those wagers in early 2025, it waited four months to file this lawsuit. *Id.* Despite that history, Crypto.com argues that, because of its choice to cease offering sports betting, it "has lost business in Nevada." Br. 69.

Such "self-inflicted" harm cannot justify an injunction. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020). At all relevant times, state law and CFTC regulations (17 C.F.R. § 40.11(a)) have prohibited the sports bets at issue here, yet Crypto.com nevertheless began offering such contracts. And it continued doing so even after the District Court in

69

*KalshiEX I* warned a competitor that it was "proceeding at its own risk and creating its own harms," 2025 WL 1073495, at *8, and after the CFTC warned prediction market operators in September 2025 to prepare for state enforcement actions, CFTC Letter No. 25-36, at 2 (Sept. 30, 2025).

Crypto.com has induced its alleged harms by agreeing to cease offering new sports bets in Nevada while the District Court's decision remains in effect. *See* ER-6. And even if Crypto.com loses some business, it has failed to offer *any* evidence regarding the magnitude of its lost profits. *See Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989) (denying injunction when "[t]he record [was] barren of evidence of lost profits").

**Customers' Confidence and Goodwill.** Crypto.com also cannot establish irreparable harm based on the alleged "undermin[ing]" of its "goodwill and reputation." Br. 69. Crypto.com could avoid this harm by simply issuing refunds to affected users (for example, by closing out their contracts at current prices). Moreover, any resulting reputational harm is self-inflicted; Crypto.com gambled when it chose to flout state law and Section 40.11(a), and it was on notice of the risks. *See KalshiEX I*, 2025

WL 1073495, at *8; *KalshiEX II*, 2025 WL 3286282, at *13 (customers were "on notice" that their "contracts could be disrupted"); *see also Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129-30 (9th Cir. 2024) ("[A] self-inflicted posture should not suffice for purposes of th[e] extraordinary equitable remedy" of a preliminary injunction.).

**Geofencing Technology.** Crypto.com finally argues that "to fully comply with Nevada law," it "must invest significant sums to implement technology preventing access to" its platform in Nevada. Br. 69. But Crypto.com has already promised that it will not "offer sports-event contracts in Nevada," Br. 27, and geofencing is a standard operating requirement in the gaming industry, including for companies both large and small.[38] Crypto.com cannot now invoke this problem to obtain an injunction.

## III. The Balance of Hardships Weighs Against Crypto.com.

The District Court also did not clearly err in determining that the balance of hardships and public interest tip against injunctive relief. In

---

[38] *See* Dan Bernstein, Eben Novy-Williams, Michael McCann, *Kalshi Puts Geolocation Tech Providers On Edge Amid Rapid Rise*, Sportico (Oct. 16, 2025), https://www.sportico.com/business/tech/2025/kalshi-geolocation-technology-prediction-markets-1234873796/.

particular, the court found that Crypto.com's sports bets "impose substantial hardships" on the State and that "the public has an interest" in preventing unlicensed sports bets. ER-30. The record abundantly supports those conclusions. *See* NRA *Robinhood* Br. 62-73.

Crypto.com does not seriously contest the District Court's findings. Nor could it. Crypto.com claims to operate free from state laws designed to prevent problem gaming and preserve the integrity of sports betting, and it skirts gaming taxes that Nevada uses to fund crucial services. *See id.* at 66-70. Rather than grappling with these interests, Crypto.com refers back to its merits arguments and claims that the public interest supports an injunction. Br. 70. That is insufficient to satisfy the third and fourth *Winter* factors.

The CFTC is equally misguided in contending (at 28) that declining to enjoin Nevada's laws "[w]ould [h]ave [d]estabilizing [e]conomic [e]ffects" because thousands of event contracts have been self-certified with the CFTC. Although the CFTC says that "the vast majority of these contracts" do not relate to sports, *id.*, it ignores that nearly all *betting volume* on prediction market contracts *is* tied to sports. For example, 87% of Kalshi's trading volume in 2025 related to sports bets, and sports bets

have comprised an even larger share in recent months.[39] Crypto.com likewise has "experienced 40x weekly growth in [its] prediction market business" since mid-2025, shortly after it began offering sports betting.[40]

Meanwhile, an injunction blocking enforcement of Nevada law and permitting Crypto.com's unlicensed sports wagers would inflict competitive harm on the NRA's members, which have invested substantial sums to obtain their gaming licenses under the assumption that market participants will all play by the same rules. *KalshiEX II*, 2025 WL 3286282, at *14. If Crypto.com's sports bets are permitted, the NRA's members would operate at a considerable competitive and economic disadvantage to Crypto.com, which bypasses regulatory compliance and tax burdens under Nevada law. Avoiding those costs allows prediction markets to invest in marketing campaigns (such as

---

[39] *See* Dustin Gouker, *Prediction Markets Have Big US Ambitions. For Now, They're Mostly Sports Betting Exchanges*, Event Horizon (Feb. 20, 2026), https://perma.cc/R6PZ-SJ7A; Dustin Gouker, *Kalshi Just Hit $900 Million in Volume in Two Days*, Event Horizon (Jan. 13, 2026), https://perma.cc/P8UT-VDRW ("sports betting accounted for 95% of volume" over the preceding "weekend" and "91% of all volume for the past week").

[40] *See* Crypto.com Release, *supra* n.14.

Crypto.com's $500 sign-up reward for new customers)[41] and new services that compete with the sportsbooks operated by NRA members. An injunction would also allow Crypto.com to resume offering sports betting to anyone 18 years and older, in violation of Nevada law requiring bettors to be at least 21. *See* NRA *Robinhood* Br. 66-69. And given the option to place wagers on Crypto.com from anywhere, tourists may decline to travel to Nevada altogether. That outcome would severely harm Nevada's economy, which relies on the billions of dollars in revenue generated from casino gaming, as well as gaming licensees like the NRA's members.[42]

## CONCLUSION

Crypto.com offers sports bets, not swaps, and there is no evidence that Congress sought to authorize nationwide sports betting when it enacted Dodd-Frank. This Court should affirm the District Court's order and reject Crypto.com's brazen attempt to evade Nevada's gaming laws.

---

[41] *See id.*

[42] NRA, *Tracking the Industry's Performance* (accessed Feb. 6, 2026), https://perma.cc/GF96-W47K (Nevada's annual gross casino gaming revenue as of November 2025 totaled $1.3 billion).

**McDONALD CARANO LLP**

*/s/ Adam Hosmer-Henner*

Adam Hosmer-Henner
A.G. Burnett
Jane Susskind
Katrina Weil
Thaddeus C. Houston
2300 West Sahara Avenue, Suite 1200
Las Vegas, NV 89102
ahosmerhenner@mcdonaldcarano.com

*Attorneys for Intervenor-Defendant-Appellee Nevada Resort Association*

March 3, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**: **25-7187**

I am the attorney or self-represented party.
**This brief contains 13,969 words,** including 190 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
    29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated
_____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Adam Hosmer-Henner*  **Date** ____March 3, 2026____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 3, 2026, I caused the foregoing brief to be electronically submitted to the U.S. Court of Appeals for the Ninth Circuit via this Court's electronic filing system and served on counsel electronically in accordance with the E-Service Master List.

*/s/ Jacqueline Carstenbrook*