**Nos. 25-7187, 25-7516, and 25-7831**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D / B / A CRYPTO.COM | DERIVATIVES NORTH AMERICA,

*Plaintiff-Appellant,*

v.

THE STATE OF NEVADA, ET AL.,

*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court for the District of Nevada,
No. 2:25-cv-978-APG-BNW (Hon. Andrew P. Gordon)

**AMICUS BRIEF BY STOP PREDATORY GAMBLING IN SUPPORT OF
DEFENDANTS-APPELLEES AND IN SUPPORT OF AFFIRMANCE**

Andrew L. Schlafly
939 Old Chester Rd.
Far Hills, NJ 07931
908-719-8608
908-934-9207 (fax)

Attorney for Amicus Curiae

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form34instructions.pdf

**9th Cir. Case Number(s)** 25-7187, 25-7516, and 25-7831

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

Stop Predatory Gambling

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
   ○ Yes  ◉ No

   If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
   ○ Yes  ◉ No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                     *1*                     *New 12/01/24*

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

   Not applicable.

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

   Not applicable.

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?

   ○ Yes    ⦿ No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

⦿ this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** s/ Andrew L. Schlafly    **Date** 03/09/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                    *2*                    *New 12/01/24*

# TABLE OF CONTENTS

Page

Disclosure Statement......................................................................................i

Table of Contents ....................................................................................... iii

Table of Authorities ....................................................................................iv

Identity, Interest and Authority to File ......................................................1

Summary of Argument ...............................................................................2

Argument.....................................................................................................5

   I. The CFTC's Amicus Brief Fails to Justify Overriding 75 Years of the
   Regulation of Sports Gambling by Nevada, or Provide a Bona Fide
   Economic Risk Which Sports Event Contracts Might Hedge............................7

   II. The Harm Caused by Commercialized Gambling to Individuals and
   to the Integrity of Sports Weighs Strongly Against the Preliminary
   Injunction Sought by Crypto.com.......................................................12

     A. The Enormous Harm to Individuals Caused by Unrestricted
     Commercialized Gambling.......................................................13

     B. The Harm Caused by Commercialized Gambling to the Integrity of
     Sporting Events. .......................................................18

Conclusion .......................................................................................21

Certificate of Compliance .........................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                Page(s)

*Bd. of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236 (1905)........................7, 8

*Biden v. Nebraska*, 600 U.S. 477 (2023) ........................................................5

*Corales v. Bennett*, 567 F.3d 554 (9th Cir. 2009)........................................5

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)......................12

*Lochner v. New York*, 198 U.S. 45 (1905)............................................................7, 8

*MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.,*
    512 U.S. 218 (1994)...........................................................................12

*Murphy v. NCAA*, 584 U.S. 453 (2018) ......................................................1

*N. Am. Derivatives Exch., Inc. v. Nevada et al.*, No. 2:25-cv-00978-APG-BNW,
    2025 U.S. Dist. LEXIS 202104 (D. Nev. Oct. 14, 2025)..............................5

*Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916 (9th Cir. 2004) ..........................5

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) .........................................11

*Robert Bogetti & Sons v. Bank of Am. N.T. & S.A. (In re Robert Bogetti &*
    *Sons*, No. 98-15319, 1999 U.S. App. LEXIS 8359 (9th Cir. Apr. 29,
    1999) ............................................................................................6

*Simo v. Union of Needletrades*, 322 F.3d 602 (9th Cir. 2003) ...............................5

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014)..........................................5

*West Virginia v. EPA*, 597 U.S. 697 (2022) .......................................................5

**Statutes, Regulation, and Rules**

7 U.S.C. § 1a(47)(A)(ii) ..............................................................................2

Nev. Rev. Stat. § 463.350 ............................................................................16

FED. R. APP. P. 29(A)(4)(E) ........................................................................1

FED. R. EVID. 201(f) ...................................................................................6

## Other Authorities

American Gaming Association, "New Updates to AGA Responsible Marketing Code for Sports Wagering Prohibit "Risk Free," Enhance College-Aged Protections" (Mar. 28, 2023) https://www.americangaming.org/new-updates-to-aga-responsible-marketing-code-for-sports-wagering-prohibit-risk-free-enhance-college-aged-protections/................................................................17

American Psychiatric Association, "More Than a Quarter of Americans Gamble Online Daily, But Frequent Gamblers Likely to Self-Impose Breaks" (Mar. 17, 2025) https://www.psychiatry.org/news-room/news-releases/more-than-a-quarter-of-americans-gamble-online-dai ...................15

M. Arain, et al., "Maturation of the adolescent brain," 9 *Neuropsychiatr Dis Treat.*, 449 (Apr. 3, 2013) https://pmc.ncbi.nlm.nih.gov/articles/PMC3621648/ ..................................17

David S. Bogen, "The Free Speech Metamorphosis of Mr. Justice Holmes," 11 Hofstra L. Rev. 97 (1982).........................................................................7

C.A. Bridges, "Calling in for 'Super Sick Monday' after Super Bowl? You won't be alone," Tallahassee Democrat (Feb. 9, 2026). https://www.tallahassee.com/story/news/2026/02/09/super-sick-monday-super-bowl-call-in-record-prediction/88586500007/ ......................................4

Cleveland Clinic, "How Super Bowl stress can affect your heart," *Newsroom* (Feb. 5, 2025) https://newsroom.clevelandclinic.org/2025/02/05/how-super-bowl-stress-can-affect-your-heart ............................................................4

*Conversation between Felix Frankfurter and Louis Brandeis in the Frankfurter Papers* (Aug. 8, 1921) ....................................................................7

Joey Flechas, "Rise in prop bets sets off alarms on gambling addiction; Scandals could compromise leagues' integrity," *Boston Globe* A1 (Nov. 13, 2025)..............................................................................10

T.W. Fong, "The biopsychosocial consequences of pathological gambling," 2 *Psychiatry* (Edgmont) 22-30 (2005)............................................16

Tania Ganguli, "Sports-Betting Scandals Are Ubiquitous. Whether Fans Will Care Is an Open Question," *The New York Times* (Jan. 21, 2026) .......20

John Gramlich, "Americans increasingly see legal sports betting as a
bad thing for society and sports," *Pew Research Center* (Oct. 2, 2025)
https://www.pewresearch.org/short-reads/2025/10/02/americans-
increasingly-see-legal-sports-betting-as-a-bad-thing-for-society-
and-sports/..................................................................................................15

Chumani Heard, "Sacred Heart poll shows sports betting scandals hurt
trust in pro sports," Fairfield County News (Mar. 4, 2026)
https://www.wshu.org/connecticut-news/2026-03-04/video-sacred-
heart-poll-shows-sports-betting-scandals-hurt-trust-in-pro-sports...............20

John W. Kindt, "The Failure to Regulate the Gambling Industry Effectively:
Incentives for Perpetual Non-Compliance,"
27 S. Ill. U. L. J. 219 (2003).........................................................................15

Paula Lavigne, "Youth coaches face gambling charges," ESPN
(Oct. 29, 2012) https://www.espn.com/espn/otl/story/_/id/8568724/
nine-south-florida-youth-football-coaches-face-gambling-charges ...............3

Letter from State of Connecticut Department of Consumer Protection to an
affiliate of Plaintiff, Foris DAX Asia Pte. Ltd. d/b/a Crypto.com
(Dec. 2, 2025)
https://tinyurl.com/2p9j62s4.................................................................. 16-17

Major League Baseball, "MLB in collaboration with major sportsbook
partners announce new limits on pitch-level markets" (Nov. 10, 2025)
https://www.mlb.com/press-release/press-release-mlb-in-
collaboration-with-major-sportsbook-partners-announce-new-limits-
on-pitch-level-markets...................................................................................19

"NFHS 'concerned' about Supreme Court decision on sports betting"
(May 17, 2018)
https://www.highschoolot.com/story/nfhs-concerned-about-
supreme-court-decision-on-sports-betting/17561561/ ........................... 20-21

Robert O'Connell and Jared Diamond, "For Sportsbooks, Prop Bets
Remain Serious Moneymakers," *The Wall Street Journal* A14
(Nov. 17, 2025)......................................................................................10, 11

E.T. Ozel-Kizil, "A case of frontotemporal dementia with amyotrophic lateral
sclerosis presenting with pathological gambling,"
9 *J Clin Neurol* 133-137 (2013)
https://pmc.ncbi.nlm.nih.gov/articles/PMC3633192/ ...................................16

David Purdum, "Guardians' Clase allegedly rigged pitches in 48 games, document says," *ESPN* (Feb 5, 2026) https://www.espn.com/mlb/story/_/id/47842376/guardians-clase-allegedly-rigged-pitches-48-games-document-says ...................................... 18

Isaac Rose-Berman, "The rise of sports betting is a growing public health crisis," STAT (Nov. 11, 2025) https://www.statnews.com/2025/11/11/sports-betting-apps-public-health-crisis/ .................................................................................... 14

Ford Turner, "Neurochemicals Blamed for Compulsive Gambling," 8 Compulsive Gambling (Winter 1995-96) ..................................................... 16

Alan Williams, "Gambling impacts people's quality of life as severely as chronic medical conditions, alcohol and illegal drugs," *Medical Xpress* (Feb. 7, 2026) https://medicalxpress.com/news/2026-02-gambling-impacts-people-quality-life.html ................................................................................. 13

Joshua Winneker, Ira Sprotzer, and Lindsay Demery, "Sports Gambling and the Expanded Sovereignty Doctrine," 13 Va. Sports & Ent. L.J. 38 (2013) ......... 6

World Health Organization, "Gambling" (Dec. 2, 2024) https://www.who.int/news-room/fact-sheets/detail/gambling ..................... 16

## IDENTITY, INTEREST AND AUTHORITY TO FILE[1]

*Amicus curiae* Stop Predatory Gambling is a nonprofit, nonpartisan national organization that for decades has advocated for improving the lives of the American people by exposing the harms from state-sanctioned gambling. In 2008 it held a much-acclaimed conference at the National Harbor in Maryland which featured anti-gambling speakers including Taylor Branch, a Pulitzer Prize-winning biographer of the Rev. Martin Luther King Jr. and historian of the civil rights movement, and Bishop John R. Schol, who at the time was the head of the Baltimore/Washington United Methodist Conference. Stop Predatory Gambling led a remarkably diverse coalition, which included the Center for Popular Democracy, the Islamic Society of North America, Public Good Law Center, Public Health Advocacy Institute, United for a Fair Economy, Louisiana Baptist Convention, and the Lutheran Church – Missouri Synod, in an amicus brief filed in the landmark case of *Murphy v. NCAA*, and their amicus brief was cited favorably by the Supreme Court majority opinion. 584 U.S. 453, 460 n.16 (2018).

*Amicus* has a direct interest in opposing the override of many state constitutions, laws and regulations that prohibit or limit commercialized gambling,

---

[1] All parties have consented to the filing of this amicus brief. Pursuant to FED. R. APP. P. 29(a)(4)(E), undersigned counsel certifies that: counsel for the *Amicus* authored this brief in whole; no counsel for a party authored this brief in any respect; and no person or entity – other than *Amicus*, its members, and its counsel – contributed monetarily to this brief's preparation or submission.

as attempted by Appellant North American Derivatives Exchange, Inc. d/b/a Crypto.com ("Crypto.com") in this lawsuit.

## SUMMARY OF ARGUMENT

There is no economic consequence – and no legitimate risk to hedge – in whether a pitch to a particular batter in a baseball game is a ball or a strike, and yet this is the type of wager that Crypto.com seeks to transfer to the exclusive jurisdiction of the Commodity Futures Trading Commission (CFTC). Known as "prop bets" or "player props," these sports wagers are particularized to a single play or player within a game. A "parlay" or "combo" is a wager that bundles several particularized bets, or "legs", for a bigger payout if all of the bets within the bundle succeed, while paying out nothing if any one of the legs fails. These types of bets are central to event contracts on sports, as sold by Crypto.com. (State Defs. Br. 9-10; Nev. Resort Ass'n Br. 12-14, 37-39, 47) The prop bets and parlays are prone to corrupt the sports themselves, as individual players can easily adjust their performances slightly and occasionally to trigger payouts without affecting the outcome of the game. Prop bets and parlays are not "associated with a potential financial, economic, or commercial consequence," and thus cannot possibly fall within the definition of a "swap" under the Commodity Exchange Act (CEA). *See* 7 U.S.C. § 1a(47)(A)(ii).

In their briefs filed here, both Crypto.com and the Commodity Futures Trading Commission (CFTC) fail to address this very lucrative aspect of sports gambling, and fail to provide any reason why prop bets and parlays should be treated as swaps regulated by the CFTC. There is no plausible basis for considering prop bets and parlays to be swaps under the regulatory authority of the CFTC. Recognition of this is fatal to the attempt by Crypto.com and the CFTC to take authority over sports event contracts generally, because prop bets and parlays are central to this business model.

The public interest, which is a factor in reviewing a denial of a preliminary injunction, further requires retaining full State regulatory authority over sports event contracts. This and other forms of gambling injure those who become addicted to it, and undermines the integrity of the sports themselves. The CFTC lacks the police power necessary to limit this harm, which when left unrestrained quickly spreads to corrupt college, high school, and even youth sports. *See, e.g.*, Paula Lavigne, "Youth coaches face gambling charges," ESPN (Oct. 29, 2012).[2] The police power of the States is necessary to curb such harm from gambling. Nevada has 75 years of experience in regulating sportsbooks, and has a fully developed police power utterly lacking at the CFTC. Nevada sensibly prohibits

---

[2] https://www.espn.com/espn/otl/story/_/id/8568724/ nine-south-florida-youth-football-coaches-face-gambling-charge (viewed Mar. 7, 2026).

gambling by those under 21 years old, while the CFTC does not and it lacks adequate enforcement ability even if it did seek to establish that age limit.

More than 26 million Americans missed work the day after this year's Super Bowl, on which millions of people wagered, which set a new record of absenteeism costing our economy in excess of $5 billion. *See* C.A. Bridges, "Calling in for 'Super Sick Monday' after Super Bowl? You won't be alone," Tallahassee Democrat (Feb. 9, 2026).[3] *See also* Cleveland Clinic, "How Super Bowl stress can affect your heart," *Newsroom* (Feb. 5, 2025) ("[T]he emotional stress of watching the game can trigger surges of adrenaline. In turn, this can elevate blood pressure, increase your heart rate and even provoke dangerous heart rhythms—particularly in those with an underlying cardiovascular disease.").[4] Physical harm caused by gambling includes cardiovascular disease, hypertension, peptic ulcer disease, and loss of sleep. Research further suggests a link between gambling and dementia, and even Parkinson's disease. Psychiatric harm from gambling includes severe depression, suicide, anxiety, substance use disorders, and intense shame.

---

[3] https://www.tallahassee.com/story/news/2026/02/09/super-sick-monday-super-bowl-call-in-record-prediction/88586500007/ (viewed Mar. 7, 2026).

[4] https://newsroom.clevelandclinic.org/2025/02/05/how-super-bowl-stress-can-affect-your-heart (viewed Mar. 7, 2026).

4

The CFTC filed an amicus brief here seeking exclusive jurisdiction over these sports event contracts that it is ill-equipped to regulate, and for which the CFTC never received authorization by Congress. Overreach by a federal agency to vastly expand its own jurisdiction is not new, and the U.S. Supreme Court has repeatedly rejected analogous attempts by other agencies. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 502-03 (2023) (The "eviction moratorium implemented by the Centers for Disease Control and Prevention triggered analysis under the major questions doctrine."); *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (while quoting Justice Kagan, the majority opinion emphasized that "we 'typically greet' assertions of 'extravagant statutory power over the national economy' with 'skepticism'") (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

## ARGUMENT

The decision below should be affirmed. *N. Am. Derivatives Exch., Inc. v. Nevada et al.*, No. 2:25-cv-00978-APG-BNW, 2025 U.S. Dist. LEXIS 202104 (D. Nev. Oct. 14, 2025). This Court should affirm not merely on the grounds stated below, but also on additional grounds as discussed here. "'We may affirm on any grounds supported by the record.'" *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009) (quoting *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004), citing *Simo v. Union of Needletrades*, 322 F.3d 602, 610 (9th Cir. 2003)).

This Court may also affirm by taking "judicial notice of facts not in the record." *Robert Bogetti & Sons v. Bank of Am. N.T. & S.A. (In re Robert Bogetti & Sons*, No. 98-15319, 1999 U.S. App. LEXIS 8359, at *5 (9th Cir. Apr. 29, 1999) (citing FED. R. EVID. 201(f)).

The CFTC makes an unusual appearance here with its filed amicus brief, and demands exclusive jurisdiction over this type of sports gambling in displacement of the Nevada regulatory system that has developed for 75 years. *See* Joshua Winneker, Ira Sprotzer, and Lindsay Demery, "Sports Gambling and the Expanded Sovereignty Doctrine," 13 Va. Sports & Ent. L.J. 38, 40 (2013) ("Gambling was legalized in Nevada in 1931. … [S]ports wagering was illegal until 1951 when Congress passed legislation imposing a ten percent tax on all sports bets."). But the CFTC's amicus brief here fails to recognize the CFTC's lack of ability or expertise to minimize harm from sports gambling. The CFTC's brief leaves little doubt that, in practice, the CFTC would not enforce sensible limits on sports wagering through event contracts. Teenagers could wager on their own school's sporting events, and even on individual plays within those games, which would quickly lead to corruption and possibly tragic consequences. Jurisdiction over gambling regulation requires a local police power to enforce limitations, which the CFTC utterly lacks. The public interest is strongly against the preliminary injunction sought by Crypto.com, and requires affirmance of the denial below.

I.   **The CFTC's Amicus Brief Fails to Justify Overriding 75 Years of the Regulation of Sports Gambling by Nevada, or Provide a Bona Fide Economic Risk Which Sports Event Contracts Might Hedge.**

The CFTC relies early in its brief on a lengthy, 120-year-old quotation of a sweeping statement by Justice Oliver Wendell Holmes, Jr., stating "that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn." *Bd. of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 247 (1905) (quoted by CFTC Br. 2). The CFTC implies that Justice Holmes preferred a hands-off approach to futures or event contracts, as Holmes went on to say that the "natural evolutions of a complex society are to be touched only with a very cautious hand." *Id.* This is vintage, eloquent Holmes,[5] but in fact he never stood against State regulation to limit social harm, as at issue here.

The very same year that Holmes wrote the *Bd. of Trade* decision, he famously wrote in favor of a State law limiting the workday and work week in paternalistic protection of workers from potential harm, in *Lochner v. New York*, 198 U.S. 45 (1905) (Holmes, J., dissenting). Justice Holmes explained that:

_____

[5] Justice Brandeis later quipped about Justice Holmes, "Of course you must also remember that when Holmes writes, he doesn't give a fellow a chance – he shoots so quickly." David S. Bogen, "The Free Speech Metamorphosis of Mr. Justice Holmes," 11 Hofstra L. Rev. 97, 170 n.407 (1982) (quoting *Conversation between Felix Frankfurter and Louis Brandeis in the Frankfurter Papers* at 23 (Aug. 8, 1921) (available in the manuscript room of the Harvard Law School Library and at the *Hofstra Law Review*)).

> It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious or if you like as tyrannical as this, and which equally with this interfere with the liberty to contract. Sunday laws and usury laws are ancient examples. ***A more modern one is the prohibition of lotteries***.

*Lochner*, 198 U.S. at 75 (Holmes, J., dissenting, emphasis added). It is clear from Justice Holmes' foregoing dissent in *Lochner*, which was ultimately vindicated, that he fully deferred to the authority of States to regulate, and even prohibit, lotteries. This Court should rule likewise in deferring to, and upholding the application of, Nevada's regulation of sports gambling against Crypto.com's attempt to bypass these laws.

Justice Holmes did grant an injunction requested by the Plaintiff Chicago Board of Trade, which operated under a charter by the State of Illinois, but the injunction was merely a "restraint on the acquisition for illegal purposes of the fruits of the plaintiff's work." *Bd. of Trade.*, 198 U.S. at 252. In no way did Justice Holmes express there or anywhere else a desire to invalidate a State regulation of gambling.

Justice Holmes explained the legitimate reasons for entering into futures or event contracts, which the CFTC quotes approvingly: "as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Id.* at 247 (quoted by CFTC Br. at 2). Sports event contracts do none of that, and do not otherwise hedge against any genuine economic risk. Despite this, the CFTC

8

argues that sports event contracts are swaps under the CFTC's exclusive jurisdiction because sporting events themselves have potential financial consequences. (CFTC Br. 19-20)

It is pure fiction for the CFTC to argue or imply here that prop bets, parlays, and wagers on the outcome of a game constitute "swaps" similar to contracts that have traditionally been within its exclusive jurisdiction. Swaps have a beneficial economic value as hedges of economic risk, while gambling does not. The availability of swaps facilitates increased investment in a commodity or activity, while the availability of sports event contracts facilitates nothing but harm.

The CFTC argues that because "sporting events are economic enterprises that generate billions of dollars in economic activity," wagers related to the events are subject to the CFTC's exclusive jurisdiction. (CFTC Br. 19) The contests themselves qualify as events which are economically beneficial to hedge against the risk of cancellation, such as due to weather, but the specific outcome of the events as to which side wins or loses has zero or negligible economic impact. Of even less economic significance are individual plays within a game, such as how often a particular running back carries the football or the speed by which a certain pitch is thrown to a certain batter. Parlays are even further removed from any economic significance whatsoever.

9

Prop bets and parlays have become a substantial portion of wagering on sports, and should not be ignored here:

> The prop bet is not just a piece of the economy of legal sports betting. It has become **the backbone of the most popular, and profitable, wagers** – the single most efficient means of turning a sports fan into a profit engine for betting companies. …
>
> In Illinois, [during September 2025], more than 55% of online sports betting revenue came from parlays.

Robert O'Connell and Jared Diamond, "For Sportsbooks, Prop Bets Remain Serious Moneymakers," *The Wall Street Journal* A14 (Nov. 17, 2025) (emphasis added) [hereinafter, "*Prop Bets, WSJ*"]. *See also* Joey Flechas, "Rise in prop bets sets off alarms on gambling addiction; Scandals could compromise leagues' integrity," *Boston Globe* A1 (Nov. 13, 2025) ("Former Massachusetts governor Charlie Baker, now president of the NCAA, has called for a ban on prop bets in college sports. In Massachusetts … prop bets on college athletes are already prohibited ….").

Notably absent from the CFTC's brief is any discussion of prop bets and parlays, which belie the CFTC's central assertion that sports event contracts have financial consequences justifying treating them as swaps. These prop bets and parlays, which have "become the backbone of the most popular, and profitable, wagers," have utterly no financial or economic impact. *Prop Bets, WSJ*, *supra*. Sports leagues recognize that they are particularly pernicious and prone to

10

corruption, such that MLB, the NBA, and NFL have all acted to sharply limit or

prohibit them:

> Leagues have taken measures to limit prop bets. In the wake of the spot-fixing scandal, MLB said it had worked with sportsbooks to cap the amount of money someone could wager on an individual pitch and to exclude those bets from parlays. The NBA had worked with sportsbooks to remove easily manipulable offerings such as missed free throws or turnovers even before federal indictments alleged that Rozier and other league figures had fed information to gamblers. This week, the NFL circulated a memo to teams explaining prohibited wager categories, such as a play that could be determined by one person alone (a quarterback throwing an incompletion on his first pass, for example).

*Id.* The decision below did not reach this issue, but it is too important to ignore on

appeal and judicial notice of it can be taken. The State Defendants cite public

statements by Crypto.com in offering these products. (State Defs. Br. 9-10)

The leading professional sports leagues are doing what they can to limit this

"backbone" of sports gambling, because it is so harmful to the integrity of the

games, and yet the CFTC and Crypto.com argue that States may not take similar

steps to protect its own citizens and athletes against this same devastating harm.

Congress never expressly or implicitly denied States their traditional authority over

the regulation of gambling to reduce harm that flows from it. *See Rice v. Santa Fe

Elevator Corp.*, 331 U.S. 218, 230 (1947) (Courts should "start with

the assumption that the historic police powers of the States were not to be

superseded by the Federal Act unless that was the clear and manifest purpose of

Congress.").

11

The CFTC should not prevail here on its power grab without any explicit grant to it of the authority it seeks by Congress. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160-61 (2000) (O'Connor, J., writing for the majority) ("As in *MCI*, we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.") (citing *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218 (1994)). Congress has never transferred vast regulatory authority over gambling from Nevada and other States to the CFTC, not even in a cryptic manner found to be insufficient in *Brown & Williamson Tobacco*.

## II. The Harm Caused by Commercialized Gambling to Individuals and to the Integrity of Sports Weighs Strongly Against the Preliminary Injunction Sought by Crypto.com.

The public interest – which is an important factor in deciding a motion for a preliminary injunction – is overwhelmingly against Crypto.com's request for a preliminary injunction, due to the substantial harm caused by Crypto.com's product to individuals and to the integrity of sporting events. Both Crypto.com and the CFTC are notably silent in their briefs as to the immense harm caused by sports gambling. Allowing Crypto.com to bypass Nevada's regulation of gambling would worsen an ongoing pandemic of predatory gambling, and leave States powerless to rein in the exploitation of the public and protect the integrity of sporting events.

### A. The Enormous Harm to Individuals Caused by Unrestricted Commercialized Gambling.

In the first comprehensive effort to evaluate the impact of gambling on individual health in Great Britain, university researchers reported in February 2026 that the harm from gambling to capability well-being and health utility (quality of life) is "comparable to those experiencing the highest levels of harm driven by cocaine and alcohol use, as well as those with health conditions including depression and opiate dependence." Alan Williams, "Gambling impacts people's quality of life as severely as chronic medical conditions, alcohol and illegal drugs," *Medical Xpress* (Feb. 7, 2026).[6] In other words, gambling is just as harmful as drug abuse, and of course no one would insist that a relatively small federal agency like the CFTC has exclusive jurisdiction over combatting the trafficking in illegal drugs such that States would not even be allowed to try to limit the public health harm.

"The research found that experiencing gambling harm can result in a 16% reduction in a person's ability to carry out everyday tasks," the researchers found. *Id.* They discovered that "tools currently used to identify 'problem gambling' underestimate the full extent of harm it causes to individuals and those close to them." *Id.*

---

[6] https://medicalxpress.com/news/2026-02-gambling-impacts-people-quality-life.html (viewed Mar. 6, 2026).

13

This is "a public health crisis in the making," as wagering by Americans on sports as exploded from less than $5 billion annually in 2018 to $150 billion in 2024. Isaac Rose-Berman, "The rise of sports betting is a growing public health crisis," STAT (Nov. 11, 2025).[7] Sports betting has skyrocketed further with the advent of wagering through event contracts as offered by Crypto.com and others on prediction markets, in bypass of State regulations. The strong interest in sports and the ease of gambling over the ubiquitous cell phone is a potent combination:

> Today 90% of bets are placed on phones, not at casinos or racetracks. More than half are live bets, placed while games are in progress. Open any betting app and you'll find hundreds of options per game: not just who wins but whether the next pitch will be a ball or a strike, whether Shohei Ohtani will get a home run *and* five strikeouts, whether LeBron James will score 30 points. You don't need to drive anywhere, get cash from an ATM, or even get out of bed. It has never been easier to gamble.

*Id.*

An immense harmful impact is being felt by the American public, which is turning against allowing sports gambling. The esteemed Pew Research Center reports that as of last fall:

> Today, 43% of U.S. adults say the fact that sports betting is now legal in much of the country is a bad thing for society. That's up from 34% in 2022. And 40% of adults now say it's a bad thing for sports, up from 33%.

---

[7] https://www.statnews.com/2025/11/11/sports-betting-apps-public-health-crisis/ (viewed Mar. 6, 2026).

14

John Gramlich, "Americans increasingly see legal sports betting as a bad thing for society and sports," *Pew Research Center* (Oct. 2, 2025).[8]

The American Psychiatric Association reported last year that:

over a quarter of American adults (28%) have a daily habit of gambling online. … Nine percent of adults reported online gambling for upwards of four hours daily, with 2% of individuals indicating they regularly gamble for over 10 hours a day. Like online shopping, scrolling social media, or playing app-based games, online gambling can become a problematic behavior.

American Psychiatric Association, "More Than a Quarter of Americans Gamble Online Daily, But Frequent Gamblers Likely to Self-Impose Breaks" (Mar. 17, 2025).[9]

"'Gambling is an addictive behavior, make no mistake about it. ... Gambling has all the properties of a psychoactive substance, and ... changes the neurochemistry of the brain.'" John W. Kindt, "The Failure to Regulate the Gambling Industry Effectively: Incentives for Perpetual Non-Compliance," 27 S. Ill. U. L. J. 219, 223 (2003) (quoting Associate Professor Howard Shaffer of the

---

[8] https://www.pewresearch.org/short-reads/2025/10/02/americans-increasingly-see-legal-sports-betting-as-a-bad-thing-for-society-and-sports/ (viewed Mar. 6, 2026).
[9] https://www.psychiatry.org/news-room/news-releases/more-than-a-quarter-of-americans-gamble-online-dai (viewed Mar. 6, 2026).

Division on Addictions at Harvard Medical School).[10] The rate of suicide among gamblers is estimated to be 15 times the rate in the general population.[11]

Psychiatric harm from gambling includes exacerbation and initiation of major depressive episodes, anxiety disorders, or substance use disorders, and intense shame, deceptive conduct, and rash decision-making.[12] Pathological gambling has also been linked to Parkinson's disease, frontotemporal dementia, and amyotrophic lateral sclerosis.[13] More familiar harm includes "hypertension, sleep deprivation, cardiovascular disease, and peptic ulcer disease."[14]

Gambling by those under age 21 is sensibly prohibited by Nevada, *see, e.g.*, Nev. Rev. Stat. § 463.350, yet "Crypto allows for individuals under 21 years of age to place wagers." Letter from State of Connecticut Department of Consumer Protection to an affiliate of Plaintiff, Foris DAX Asia Pte. Ltd. d/b/a Crypto.com

---

[10] Quoting Ford Turner, "Neurochemicals Blamed for Compulsive Gambling," 8 Compulsive Gambling 1 (Winter 1995-96) (citing an article in the *Beacon-News* (Springfield, Mass.), May 10, 1995).

[11] World Health Organization, "Gambling" (Dec. 2, 2024) https://www.who.int/news-room/fact-sheets/detail/gambling (viewed Mar. 7, 2026).

[12] *Id.*

[13] E.T. Ozel-Kizil, "A case of frontotemporal dementia with amyotrophic lateral sclerosis presenting with pathological gambling," 9 *J Clin Neurol* 133-137 (2013) https://pmc.ncbi.nlm.nih.gov/articles/PMC3633192/ (viewed Mar. 7, 2026).

[14] T.W. Fong, "The biopsychosocial consequences of pathological gambling," 2 *Psychiatry* (Edgmont) 22-30 (2005).

16

(Dec. 2, 2025).[15] Alcohol and cigarette purchases are banned in every state by those under 21, and the ban by states of gambling by teenagers and 20-year-olds is medically justified. "In fact, there are characteristic developmental changes that almost all adolescents experience during their transition from childhood to adulthood. It is well established that the brain undergoes a 'rewiring' process that is not complete until approximately 25 years of age." Mariam Arain, "Maturation of the adolescent brain," 9 *Neuropsychiatr Dis Treat.* 449, 449 (Apr. 3, 2013).[16] The immaturity of teenagers for smoking and drinking likewise applies to gambling, as the prefrontal cortex is responsible for decision-making, planning, problem-solving, and controlling impulses and is not fully developed until age 25. "The adolescent brain is structurally and functionally vulnerable to environmental stress, risky behavior .…" *Id.* at 458-49. The American Gaming Association encourages a minimum age limit of 21 years old for gambling,[17] even though more profits for its corporate members could be obtained by accepting wagers from impulsive younger patrons.

---

[15] https://tinyurl.com/2p9j62s4 (viewed Mar. 7, 2026).

[16] https://pmc.ncbi.nlm.nih.gov/articles/PMC3621648/pdf/ndt-9-449.pdf (viewed Mar. 7, 2026).

[17] American Gaming Association, "New Updates to AGA Responsible Marketing Code for Sports Wagering Prohibit "Risk Free," Enhance College-Aged Protections" (Mar. 28, 2023) https://www.americangaming.org/new-updates-to-aga-responsible-marketing-code-for-sports-wagering-prohibit-risk-free-enhance-college-aged-protections/ (viewed Mar. 7, 2026).

The demand by Crypto.com and the CFTC to bypass State regulations amid a sports gambling crisis is plainly contrary to the public interest. The denial of the preliminary injunction below was proper, as it averted additional harm to the public caused by sports gambling and equivalent products.

## B. The Harm Caused by Commercialized Gambling to the Integrity of Sporting Events.

In addition to the personal harm caused by predatory gambling, there is a worsening corruption of sports due to sharply increased wagering on it. Major League Baseball successfully kept gambling from destroying the game for more than a century after the devastating scandal of the 1919 World Series, but now gambling is back with a vengeance due to prop bets and parlays that Crypto.com and similar trading platforms exploit.

A two-time American League Reliever of the Year and three-time All-Star, Emmanuel Clase of the Cleveland Guardians, is being prosecuted in federal court on accusations of having thrown suspicious pitches for the benefit of gamblers in at least 48 games over a two-year span. David Purdum, "Guardians' Clase allegedly rigged pitches in 48 games, document says," *ESPN* (Feb 5, 2026).[18] He was in the fourth season of a five-year contract worth $20 million, illustrating (if there is

---

[18] https://www.espn.com/mlb/story/_/id/47842376/guardians-clase-allegedly-rigged-pitches-48-games-document-says (viewed Mar. 6, 2026).

validity to the charges) that even highly paid professional athletes can be influenced by gambling. His teammate Luis Ortiz is also charged.

The day after ESPN reported on federal charges against these players, Major League Baseball responded by announcing an agreement with all of its authorized sportsbooks that:

> all MLB Authorized Gaming Operators will cap wagers on pitch-level markets at $200 and exclude those bets from parlays. …
>
> Most prop bets present limited integrity risk because they take into account multiple events that are influenced by more than one actor. However, "micro-bet" pitch-level markets (e.g., ball/strike; pitch velocity) present heightened integrity risks because they focus on one-off events that can be determined by a single player and can be inconsequential to the outcome of the game.

Major League Baseball, "MLB in collaboration with major sportsbook partners announce new limits on pitch-level markets" (Nov. 10, 2025).[19]

Crypto.com, however, is not limited by this attempt of MLB to rein in corruption by sports gambling. Under the fallacious arguments of Crypto.com and the CFTC, Nevada cannot regulate Crypto.com either. The result is an inevitable corruption of sporting events if Crypto.com and the CFTC were to prevail here. In addition to the MLB scandal, multiple gambling scandals have also recently

---

[19] https://www.mlb.com/press-release/press-release-mlb-in-collaboration-with-major-sportsbook-partners-announce-new-limits-on-pitch-level-markets (viewed Mar. 6, 2026).

plagued the NBA and college basketball due to the recent expansion in sports

gambling. The *New York Times* reported that:

> Sports-betting charges are becoming a regular occurrence. Last Thursday, the Eastern District of Pennsylvania unsealed indictments against 20 college basketball players at 17 schools, accusing the players as well as gamblers of engaging in point shaving during games.

> The N.C.A.A. does not allow its athletes to bet on sports, nor does it allow sponsorships from gambling companies. But ***gambling is so pervasive in sports that those rules may not matter***.

Tania Ganguli, "Sports-Betting Scandals Are Ubiquitous. Whether Fans Will Care

Is an Open Question," *The New York Times* (Jan. 21, 2026) (emphasis added).

    Polling shows how this is undermining trust by the public in the integrity of

professional sports. A recent poll conducted by Sacred Heart University in

conjunction with GreatBlue Research found that the sports gambling scandals have

weakened the trust in the integrity of NBA games by 79% of active bettors, and

"many believe concerns extend beyond one league." Chumani Heard, "Sacred

Heart poll shows sports betting scandals hurt trust in pro sports," Fairfield County

News (Mar. 4, 2026).[20]

    Former U.S. Senator and basketball star Bill Bradley was prophetic when he

stated in 2018 that "I think the game will be corrupted" by sports gambling.

"NFHS 'concerned' about Supreme Court decision on sports betting" (May 17,

---

[20] https://www.wshu.org/connecticut-news/2026-03-04/video-sacred-heart-poll-shows-sports-betting-scandals-hurt-trust-in-pro-sports (viewed Mar. 6, 2026).

2018).[21] He added, "Do you really want to go to your son's high school basketball or football game and see people in the crowd who are betting, who are not rooting for your child to win or lose, but are betting on a spread?" *Id.*

Nevada properly protects against this harm to the public. The CFTC does not and cannot safeguard against this, and thus a preliminary injunction for Crypto.com's sports event contracts was properly denied below.

## CONCLUSION

The decision below should be affirmed.

Dated:     March 9, 2026                    Respectfully Submitted,

                                            /s/ Andrew L. Schlafly

                                            Andrew L. Schlafly
                                            Attorney at Law
                                            939 Old Chester Rd.
                                            Far Hills, NJ 07931
                                            aschlafly@aol.com
                                            Voice: 908-719-8608
                                            Fax:    908-934-9207

                                            Attorney for *Amicus Curiae* Stop
                                            Predatory Gambling

---

[21] https://www.highschoolot.com/story/nfhs-concerned-about-supreme-court-decision-on-sports-betting/17561561/ (viewed Mar. 6, 2026).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**   _25-7187, 25-7516, and 25-7831_

I am the attorney or self-represented party.

**This brief contains**   **4,724**   **words,** including   _0_   words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**   _s/ Andrew L. Schlafly_   **Date** _March 9, 2026_
*(use "s/[typed name]" to sign electronically-filed documents)*

22