**Nos. 25-7187, 25-7516, 25-7831**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

NORTH AMERICAN DERIVATIVES EXCHANGE, INC. d/b/a
Crypto.com | Derivatives North America,

*Plaintiff-Appellant*,

v.

STATE OF NEVADA, on Relation of the NEVADA GAMING
CONTROL BOARD; MIKE DREITZER, in his official capacity as
Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in
his official capacity as a member of the Nevada Gaming Control Board;
CHANDENI K. SENDALL, Deputy City Attorney, in her official
capacity as a member of the Nevada Gaming Control Board; AARON D.
FORD, in his official capacity as Attorney General of Nevada,

*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee*,

On appeal from the United States District Court for the District of Nevada
Hon. Andrew P. Gordon, Case No. 2:25-cv-978-APG-BNW

**BRIEF OF AMICI CURIAE**
**NORTH AMERICAN GAMING REGULATORS ASSOCIATION AND**
**INTERNATIONAL ASSOCIATION OF GAMING REGULATORS**
**IN SUPPORT OF DEFENDANTS-APPELLEES**

Evan Bianchi
SPIRO HARRISON & NELSON LLC
100 Pearl Street, Suite 1803
New York, New York 10004
(646) 412-5616
ebianchi@shnlegal.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... ii

INTEREST OF AMICI CURIAE ............................................... 1

INTRODUCTION .................................................................. 3

ARGUMENT ........................................................................ 5

I.    States have comprehensive gaming regulatory regimes. ............... 5

    A.    Licensing and Suitability Requirements ............................. 6

    B.    Prohibitions on Certain Betting Events ............................. 10

    C.    Prevention of Insiders and Vulnerable Individuals from Betting ................................................................................. 12

    D.    Identity, Age, and Location Verifications ............................ 16

    E.    Self-Exclusion and Responsible Gaming Mechanisms ........ 19

    F.    Credit and Financial Instruments Restrictions ................... 22

    G.    Advertising and Marketing Restrictions and Responsible Gaming Disclosures ............................................................ 24

    H.    Funding for Problem Gaming Treatment and Employee Training ............................................................................... 26

    I.    Complaint and Dispute Resolution Procedures ................... 29

    J.    Game Integrity and Technical Standards ............................ 30

II.    The CEA lacks a comprehensive gaming regulatory regime. ....... 32

CONCLUSION .................................................................... 35

CERTIFICATE OF COMPLIANCE ....................................... 37

# TABLE OF AUTHORITIES

## Cases

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
  584 U.S. 453 (2018) .................................................................. 5

*R.J. Reynolds Tobacco Co. v. Durham County,*
  479 U.S. 130 (1986) ................................................................. 5

## Statutes & Regulations

1 Colo. Code Regs. § 207-1:30-2901(1) ..................................25

1 Colo. Code Regs. § 207-2:R.5 ...............................................12

1 Colo. Code Regs. § 207-2:R.6.17 ..........................................24

1 Colo. Code Regs. § 207-2:R.7.5(20) ......................................18

1 Colo. Code Regs. § 207-2:R.7.10(2) ......................................18

1 Colo. Code Regs. § 207-3:R.6 ...............................................30

4 Pa. Cons. Stat. § 1326(b) ..................................................... 8

4 Pa. Cons. Stat. § 13B13(a)(1)(ii)–(iii) ....................................17

4 Pa. Cons. Stat. § 1408(a) .....................................................27

4 Pa. Cons. Stat. § 1517 ......................................................... 8

4 Pa. Cons. Stat. § 1518 ......................................................... 6

10-200-204 Del. Admin. Code § 10.0 ......................................25

10-200-206 Del. Admin. Code § 13.7 ......................................18

11 Va. Admin. Code § 5-60-20 ................................................19

11 Va. Admin. Code § 5-60-30 ................................................19

11 Va. Admin. Code § 5-70-170 ..............................................12

11 Va. Admin. Code § 5-80-80(C)(6) ........................................28

11 Va. Admin. Code § 5-80-120(B)(3) ......................................21

16-633-013 Me. Code R. § 4 ...................................................19

16-633-014 Me. Code R. § 2 ...................................................25

38-8 Wyo. Code R. § 1(d) ....................................................27

58 Pa. Code § 503a.4 .........................................................20

58 Pa. Code § 513a.2 .........................................................15

58 Pa. Code § 501a.3(a) .....................................................27

58 Pa. Code § 513a.4 .........................................................15

68 Ind. Admin. Code 16-1-5 ...............................................22

68 Ind. Admin. Code 18-1-2 ...............................................30

68 Ind. Admin. Code 27-13-4 ..............................................25

205 Mass. Code Regs. 133.06 .............................................20

205 Mass. Code Regs. 138.43 .............................................22

205 Mass. Code Regs. 238.19 .............................................19

205 Mass. Code Regs. 248.16 .............................................20

205 Mass. Code Regs. 256.04 .............................................24

205 Mass. Code Regs. 256.05 .............................................24

230 Ill. Comp. Stat. 10/13.1(a) ...........................................26

230 Ill. Comp. Stat. 45/25-100 ...........................................19

Ariz. Admin. Code § R19-4-104 ............................................9

Ariz. Admin. Code § R19-4-110(A)–(G) ...............................24

Ariz. Rev. Stat. § 5-1311(B)(2) ...........................................22

Ark. Code R. 006.06.5-5.120(3) ..........................................22

Colo. Rev. Stat. § 44-30-102(1)(a)–(b) ..................................9

Colo. Rev. Stat. § 44-30-501 ................................................6

Colo. Rev. Stat. § 44-30-510(3) ...........................................7

Colo. Rev. Stat. § 44-30-514 ................................................7

Colo. Rev. Stat. § 44-30-815 ..............................................22

Conn. Gen. Stat. § 12-864(a)(1)–(2) ....................................13

D.C. Mun. Regs. tit. 30, § 2131 ..........................................24

iii

Del. Code tit. 6, § 1204C ................................................................24

Fla. Stat. § 551.121(2)...................................................................22

Ill. Admin. Code tit. 11, § 1900.1030 .......................................... 9

Ill. Admin. Code tit. 11, § 1900.1120 ...........................................12

Ill. Admin. Code tit. 11, § 1900.1140 ...........................................12

Ill. Admin. Code tit. 86, § 3000.680(e) .........................................24

Ill. Admin. Code tit. 86, § 3000.680(e)(7)–(14)............................24

Ind. Code § 4-38-9-3 ....................................................................14

Ind. Code § 4-38-9-3(5)................................................................13

Iowa Code § 99F.6(4)(a)(1) ........................................................... 7

Iowa Code § 99F.9(7)....................................................................23

Kan. Stat. § 74-8787(a)(5) ............................................................14

La. Admin. Code tit. 42, § VI-517(A) ...........................................25

La. Stat. § 27:27.1(C)(3) ...............................................................17

La. Stat. § 27:101(A) .....................................................................23

Mass. Gen. Laws ch. 23K, § 1(3) ................................................... 9

Mass. Gen. Laws ch. 23K, § 1(9) ................................................... 8

Mass. Gen. Laws ch. 23K, § 12 ..................................................... 7

Mass. Gen. Laws ch. 23K, § 12(a) ................................................. 7

Mass. Gen. Laws ch. 23K, § 27(f) .................................................23

Mass. Gen. Laws ch. 23N, § 11(a)(iii) ..........................................14

Md. Code, State Gov't § 9-1A-24(f)(1) .........................................23

Md. Code, State Gov't § 9-1E-11(a)(8) .........................................14

Me. Stat. tit. 8, §1031(3) ...............................................................22

Mich. Admin. Code R. 432.633a(1) ..............................................21

Mich. Admin. Code R. 432.639......................................................30

Mich. Admin. Code R. 432.641(1), (3), (5)–(6), (8) ....................29

Mich. Admin. Code R. 432.641(7) .................................................29

Mich. Admin. Code R. 432.651a....................................................17

Mich. Admin. Code R. 432.1206(2) ............................................... 9

Mich. Comp. Laws § 432.206 ....................................................... 6

Mich. Comp. Laws § 432.206(7) ................................................... 7

N.J. Admin. Code § 13:69E-1.28 ..................................................31

N.J. Admin. Code § 13:69G-2.4....................................................20

N.J. Admin. Code § 13:69O-1.2.....................................................31

N.J. Admin. Code § 13:69O-1.2(b), (z) .........................................26

N.J. Admin. Code § 13:69O-1.2(h) ...............................................21

N.J. Admin. Code § 13:69O-1.2(x)................................................27

N.J. Admin. Code § 13:69O-1.4.....................................................17

N.J. Admin. Code § 13:69O-1.7.....................................................31

N.J. Admin. Code § 13:69O-1.9.....................................................31

N.J. Admin. Code § 13:69N-1.11(a) .............................................11

N.J. Admin. Code § 19:41A-5.1 .................................................... 8

N.J. Stat. § 5:12-1(b)(7)................................................................ 9

N.J. Stat. § 5:12-70(a)(16) ...........................................................26

N.J. Stat. § 5:12-82 ..................................................................... 6

N.J. Stat. § 5:12-84 ..................................................................... 7

N.J. Stat. § 5:12-95.29(d) ............................................................27

N.J. Stat. § 5:12-119 .................................................................... 6

N.J. Stat. § 5:12-119(a) ...............................................................15

N.J. Stat. § 5:12-119(b) ...............................................................15

N.J. Stat. § 5:12-145(a) ...............................................................27

N.J. Stat. § 5:12A-10...................................................................11

N.J. Stat. § 5:12A-11(f)(2) ..........................................................14

N.M. Stat. § 60-2E-20 ......................................................................... 8

N.Y. Comp. Codes R. & Regs. tit. 9, § 5330.44(a) ...................................18

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1317 ..................................... 8

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1332(a) ................................15

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1338(1) ................................23

Neb. Rev. Stat. § 9-1118 ......................................................................19

Nev. Gaming Comm'n Regs. § 5.225(5) ................................................16

Nev. Gaming Comm'n Regs. § 5.225(7) ................................................17

Nev. Gaming Comm'n Regs. § 22.120 ...................................................10

Nev. Gaming Comm'n Regs. § 22.1201(2) .............................................11

Nev. Gaming Comm'n Regs. § 22.1205 ..................................................10

Nev. Gaming Comm'n Tech. Standard No. 1 ..........................................31

Nev. Gaming Comm'n Tech. Standard No. 1.020 ....................................32

Nev. Gaming Comm'n Tech. Standard No. 1.045 ....................................32

Nev. Gaming Comm'n Tech. Standard No. 1.070 ....................................32

Nev. Gaming Comm'n Tech. Standard No. 1.400 ....................................32

Nev. Gaming Comm'n Tech. Standard Nos. 2–6 .....................................32

Nev. Rev. Stat. § 463.0129(1)(b) ........................................................... 9

Nev. Rev. Stat. § 463.0129(1)(c) ........................................................... 9

Nev. Rev. Stat. § 463.0129(2) ............................................................... 8

Nev. Rev. Stat. § 463.160 ..................................................................... 6

Nev. Rev. Stat. § 463.165 ..................................................................... 8

Nev. Rev. Stat. § 463.167 ..................................................................... 8

Nev. Rev. Stat. § 463.170 ..................................................................... 7

Nev. Rev. Stat. § 463.170(2) ................................................................. 7

Nev. Rev. Stat. § 463.350(1) ...........................................................15, 17

Nev. Rev. Stat. § 463.350(3) ................................................................15

Nev. Rev. Stat. § 463.360 ...................................................................... 6

Nev. Rev. Stat. § 463.637 ...................................................................... 8

Ohio Admin. Code 3772-12-01(C)–(D) ...............................................21

Ohio Admin. Code 3772-13-02 ............................................................24

Ohio Admin. Code 3775-16-08 ............................................................24

Ohio Admin. Code 3775-16-21(B) .......................................................30

Ohio Rev. Code § 3772.10(E)(1) ........................................................... 8

Ohio Rev. Code § 3772.10(E)(3) ........................................................... 8

Or. Admin. R. 177-046-0155 .................................................................20

Tenn. Code § 4-49-112(8)–(9), (14) ....................................................13

Tenn. Code § 4-49-118(a)(2) ................................................................22

Tenn. Comp. R. & Regs. 1350-01-.06(8)(j) ........................................28

Va. Code § 58.1-4039 .............................................................................12

W. Va. Code § 29-22D-15(g) .................................................................14

W. Va. Code St. R. § 179-4-154 ...........................................................22

Wash. Rev. Code § 9.46.075 ................................................................... 8

**Rules**

Fed. R. App. P. 29(a)(4)(E) ..................................................................... 2

**Other Sources**

*Approved Leagues/Events for Sports Wagering*, Department of Law and
    Public Safety: Division of Gaming Enforcement (Dec. 3, 2025),
    https://www.nj.gov/oag/ge/docs/SportsBetting/ApprovedEventsList.pdf
    .................................................................................................11

Event Contracts, 89 Fed. Reg. 48968 (proposed June 10, 2024) ...........34

*File a Complaint, Make an Inquiry or Report a Crime*, Ohio Casino
    Control Commission, https://casinocontrol.ohio.gov/for-the-public/01-fc
    .................................................................................................30

*Internet Gaming and Sports Betting Complaint*, Michigan Gaming Control Board, https://www.michigan.gov/mgcb/patron-disputes/internet-gaming-and-sports-betting-complaint ...................29

Press Release, *AG's Office Secures Guilty Pleas from Owners of Unlicensed Basement Casinos in Chinatown and Quincy* (Oct. 9, 2025), https://www.mass.gov/news/ags-office-secures-guilty-pleas-from-owners-of-unlicensed-basement-casinos-in-chinatown-and-quincy .................................................................................... 6

Press Release, *Illinois Gaming Board and Attorney General's Office Issue more than 60 Cease-and-Desist Letters to Illegal Online Casino and Sweepstakes Operators* (Feb. 5, 2026), https://www.illinois.gov/news/release.html?releaseid=32173 .............. 6

Press Release, *Michigan Regulator Targets Illegal Online Gambling: Six Unlicensed Operators Ordered to Halt Services in State* (June 2, 2025), https://www.michigan.gov/mgcb/news/2025/06/02/six-unlicensed-operators-ordered-to-halt-services-in-state........................ 7

Press Release, *PA Gaming Control Board Fines Casino $50,000 for Permitting Self-Excluded Persons to Gamble*, Pennsylvania Gaming Control Board (Oct. 23, 2024), https://gamingcontrolboard.pa.gov/news-and-transparency/press-release/pa-gaming-control-board-fines-casino-50000-permitting-self .................................................................................20

*Responsible Gaming*, North Carolina State Lottery Commission, https://ncgaming.gov/responsible-gaming/ ...........................................20

*Responsible Gaming Regulations and Statutes Guide: 2025*, American Gaming Association (July 2025), https://www.americangaming.org/wp-content/uploads/2025/07/AGA-2025-Responsible-Gaming-Regulations-and-Guidelines.pdf...............20

Salim Adatia, *What is Geolocation? 5 Things You Should Know*, Gaming Laboratories International LLC (Feb. 1, 2022), https://gaminglabs.com/blog/5-things-you-should-know-about-geolocation/ ......................................................................................18

*State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, American Gaming Association (May 2025), https://www.americangaming.org/wp-content/uploads/2025/05/AGA-State-of-the-States-2025.pdf?mod=article_inline ...........................6, 19

*Technical Standards for Video Gaming Terminals in Illinois: Version 1.5*, Illinois Gaming Board (June 2024), https://igb.illinois.gov/content/dam/soi/en/web/igb/documents/video/law/technical-standards-for-video-gaming-terminals-v1.5.pdf ..............30

*Tennessee Voluntary Sports Wagering Self-Exclusion Application*, Tennessee Sports Wagering Council (Dec. 14, 2023), https://www.tn.gov/content/dam/tn/swac/documents/forms/Self-Exclusion.pdf......................................................................................21

## INTEREST OF AMICI CURIAE

Amici are associations of gaming regulators. The North American Gaming Regulators Association ("NAGRA") is a non-profit organization and the leading North American industry body for gaming regulators. NAGRA's members represent jurisdictions throughout North America, including within the United States. The International Association of Gaming Regulators ("IAGR") is a non-profit organization and the leading international industry body for gaming regulators. IAGR's members represent jurisdictions worldwide, including within the United States.

Amici's members oversee gaming within their respective jurisdictions and are charged with ensuring that gaming is conducted lawfully, fairly, and in the public interest. These responsibilities include the implementation of consumer protection safeguards, responsible gaming programs, and regulatory systems designed to mitigate the social risks associated with wagering activity.

A central aspect of this case concerns the comprehensiveness of state gaming regulatory regimes in the United States. Amici submit this brief to assist the Court by providing context regarding the scope and

objectives of contemporary gaming regulation in the United States.[1] A clear understanding of the depth and breadth of state gaming regulatory regimes is essential to this Court's determination of whether Congress intended to preempt those state regimes through the passage of the Commodity Exchange Act.

---

[1] Amici have authority to file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) because all parties have consented to its filing. Amici's counsel authored the brief in whole, no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

## INTRODUCTION

States across the nation have enacted extensive regulatory regimes that govern virtually every dimension of gaming activity. An exhaustive survey of those regulations would far exceed the bounds of a single brief; accordingly, the discussion below highlights representative categories of gaming regulations that illustrate the breadth and depth of state gaming oversight. For example, States and their gaming regulators:

- investigate and determine who may operate gaming activities;

- define what types of gaming activities may be offered and who is permitted to engage in those activities;

- impose age, identity, and geolocation verification requirements;

- require the creation and maintenance of self-exclusion programs and responsible-gaming tools;

- prohibit specified advertising and marketing practices while mandating the publication of certain disclosures;

- limit or prohibit the offering of house credit and the use of certain financial instruments;

- fund programs that research and treat problem gambling;

- establish formal complaint and dispute-resolution procedures; and

- enact technical standards designed to ensure the fairness and integrity of gaming equipment and online gaming platforms.

These regulatory systems exist not merely to authorize gaming activity, but to manage the risks associated with wagering markets, including

those posed to vulnerable individuals and those experiencing gambling-related harm. In pursuit of that objective, state gaming regulations do not operate in a vacuum; they function together as cohesive regulatory frameworks designed to protect consumers and ensure public confidence.

In contrast, the Commodity Exchange Act ("CEA")—a federal law governing commodity futures and derivatives markets—does not comprehensively regulate gaming. In fact, even the Commodity Futures Trading Commission ("CFTC"), which is responsible for administering and enforcing the CEA, has recognized that it lacks the appropriate expertise to oversee gaming nationwide. That self-awareness accords with the absence of any indication in the CEA that Congress intended to preempt the field of gaming, as the statute lacks the structural features and hallmarks of a comprehensive gaming regulatory regime.

The disparity between comprehensive state regulatory regimes and the CEA has important implications for this case. One of the primary questions before this Court—whether the CEA preempts state gaming laws—asks whether Congress has "so comprehensively" regulated gaming that there is no room for state law. As this brief explains, States comprehensively regulate gaming, while the CEA does not. Appreciating

the breadth of state gaming regulations is thus critical to understanding the regulatory landscape Appellants argue the CEA should displace.

## ARGUMENT

One of the central issues in this appeal is the application of field preemption. Field preemption applies "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018) (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)).

The parties offer competing framings of the inquiry as applied to this case. *Compare* Appellant's Opening Brief at 43–44 (arguing the CEA "preempts the field of swap-trading on DCMs"), *with* State Appellees' Answering Brief at 53–55 (arguing the CEA does not preempt the field of gaming). If this Court adopts State Appellees' framing (as it should, for the reasons stated in their brief), a critical point bears emphasis: States comprehensively regulate the field of gaming; the CEA does not.

## I. States have comprehensive gaming regulatory regimes.

While the specifics of gaming regulations vary between the States, there are core categories of regulatory oversight that appear consistently

across jurisdictions. The following discussion highlights these recurring components to illustrate the depth and extensiveness of state gaming regulatory regimes.

## A. Licensing and Suitability Requirements

States across the country generally condition gaming activity on licensure and ongoing governmental oversight.[2] Licensing requirements typically apply to casino operators, sports wagering operators, internet gaming platforms, and even related service providers whose functions are integral to gaming operations (such as gaming equipment manufacturers and distributors). Operating without a license can subject the violator to significant criminal or civil penalties.[3]

---

[2] *See, e.g.*, Nev. Rev. Stat. § 463.160; N.J. Stat. § 5:12-82; Colo. Rev. Stat. § 44-30-501; Mich. Comp. Laws § 432.206; *cf. State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, American Gaming Association at 16–24 (May 2025) ["AGA Analysis"] (tables comparing state casino licensing requirements, among other things), https://www.americangaming.org/wp-content/uploads/2025/05/AGA-State-of-the-States-2025.pdf?mod=article_inline.

[3] *See, e.g.*, 4 Pa. Cons. Stat. § 1518; Nev. Rev. Stat. § 463.360; N.J. Stat. § 5:12-119; *see also* Press Release, *Illinois Gaming Board and Attorney General's Office Issue more than 60 Cease-and-Desist Letters to Illegal Online Casino and Sweepstakes Operators* (Feb. 5, 2026), https://www.illinois.gov/news/release.html?releaseid=32173; Press Release, *AG's Office Secures Guilty Pleas from Owners of Unlicensed Basement Casinos in Chinatown and Quincy* (Oct. 9, 2025) https://www.mass.gov/news/ags-office-secures-guilty-pleas-from-owners-

Central to state licensing regimes are rigorous "suitability" reviews and background investigations.[4] These processes, which can be far-reaching, are designed to assess applicants' character, integrity, honesty, financial responsibility, and ability to comply with applicable laws.[5] Applicants are typically required to disclose extensive information regarding ownership structure, sources of financing, business history, litigation and regulatory matters, and criminal background. Regulators

---

of-unlicensed-basement-casinos-in-chinatown-and-quincy; Press Release, *Michigan Regulator Targets Illegal Online Gambling: Six Unlicensed Operators Ordered to Halt Services in State* (June 2, 2025), https://www.michigan.gov/mgcb/news/2025/06/02/six-unlicensed-operators-ordered-to-halt-services-in-state.

[4] *See, e.g.*, Mass. Gen. Laws ch. 23K, § 12; Colo. Rev. Stat. §§ 44-30-510(3), 44-30-514; Mich. Comp. Laws § 432.206(7); N.J. Stat. § 5:12-84; Nev. Rev. Stat. § 463.170; Iowa Code § 99F.6(4)(a)(1).

[5] Massachusetts, for example, conditions licensure on an applicant's "overall reputation," which includes consideration of the applicant's "integrity honesty, good character and reputation," "financial stability, integrity and background," "business practices and business ability," and "history of compliance" with other States' licensing regulations, among other factors. Mass. Gen. Laws ch. 23K, § 12(a). Nevada conditions licensure on a finding that an applicant is "[a] person of good character, honesty and integrity" and "whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest" of the State, among other characteristics. *See* Nev. Rev. Stat. § 463.170(2).

are authorized to independently investigate these disclosures and deny licensure where suitability standards are not met.[6]

Suitability requirements are not limited to the licensed operator itself. Recognizing that influence over gaming operations may be exercised indirectly, States commonly extend background and suitability review to a broad range of associated persons. These persons may include officers and directors, senior executives, key employees, significant equity holders, lenders, financiers, and other persons or entities capable of exercising material influence over gaming operations.[7]

States regularly treat licensure as a revocable privilege subject to continuous oversight, rather than a one-time clearance.[8] These ongoing obligations often include periodic renewals, continuing duties to disclose

---

[6] *See, e.g.*, 4 Pa. Cons. Stat. § 1517; Ohio Rev. Code § 3772.10(E)(1); N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1317.

[7] *See, e.g.*, N.J. Admin. Code § 19:41A-5.1; Nev. Rev. Stat. §§ 463.165, 463.167, 463.637; N.M. Stat. § 60-2E-20.

[8] *See, e.g.*, Ohio Rev. Code § 3772.10(E)(3); 4 Pa. Cons. Stat. § 1326(b); Wash. Rev. Code § 9.46.075; Nev. Rev. Stat. § 463.0129(2); Mass. Gen. Laws ch. 23K, § 1(9).

material changes (*e.g.*, ownership, financing, key personnel), compliance audits, and potential suspension or revocation if suitability lapses.[9]

The policy rationale underlying these licensing and suitability regimes is consistent across States. Nevada's legislature has found that "[t]he continued growth and success of gaming is dependent upon public confidence and trust that licensed gaming . . . [is] conducted honestly and competitively, . . . and that gaming is free from criminal and corruptive elements."[10] Colorado's legislature has made identical findings.[11] Findings of other States' legislatures are in accord.[12] Because gaming

---

[9] *See, e.g.*, Ariz. Admin. Code § R19-4-104 (establishing licensing periods); Mich. Admin. Code R. 432.1206(2) (requiring licensees or applicants to "disclose promptly any material changes in information"; Ill. Admin. Code tit. 11, § 1900.1030 (governing audits).

[10] Nev. Rev. Stat. § 463.0129(1)(b); *see also id*. § 463.0129(1)(c) ("Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments . . .").

[11] Colo. Rev. Stat. § 44-30-102(1)(a)–(b).

[12] *See, e.g.*, N.J. Stat. § 5:12-1(b)(7) (recognizing that "[l]egalized casino gaming in New Jersey can attain, maintain and retain integrity, public confidence and trust, and remain compatible with the general public interest only under such a system of control and regulation as insures, so far as practicable, the exclusion from participation therein of persons with known criminal records, habits or associations"); *see also* Mass. Gen. Laws ch. 23K, § 1(3) (declaring that "gaming licensees shall be held to the highest standards of licensing and shall have a continuing duty to maintain their integrity and financial stability").

enterprises handle large cash flows, depend on public trust, and present heightened risks of undue influence, States may insist on robust licensing, extensive background and financial suitability review, and ongoing compliance to preserve the integrity and stability of the regulated gaming environment.

### B.     Prohibitions on Certain Betting Events

States routinely regulate the types of bets that are allowed. These regulations affirmatively define, limit, and structure the types of bets that may lawfully be offered and accepted.

For example, Nevada law expressly defines categories of permitted and prohibited wagers. Under Nevada's regulations, wagers may be accepted or paid on certain professional sport or athletic events, Olympic sports, and collegiate sporting or athletic events.[13] In contrast, Nevada regulations prohibit wagers on amateur sporting or athletic events (other than the Olympics), political elections, and more.[14] Gaming authorities

---

[13] Nev. Gaming Comm'n Regs. § 22.120.

[14] Nev. Gaming Comm'n Regs. § 22.1205.

are empowered to approve or disapprove wagers on other events based on considerations such as event integrity and the public interest.[15]

Similarly, New Jersey draws clear lines between permissible and impermissible wagers. New Jersey's Division of Gaming Enforcement has the right "to prohibit the acceptance of wagers, and may order the cancellation of wagers and require refunds on any event for which wagering would be contrary to the public policies of the State."[16] The Division publishes a regularly updated list of approved leagues and events.[17] And New Jersey law defines "prohibited sports event" to mean New Jersey-associated collegiate sport or athletic events, high school sports events, and minor-associated electronic sports and competitive video games.[18]

---

[15] Nev. Gaming Comm'n Regs. § 22.1201(2).

[16] N.J. Admin. Code § 13:69N-1.11(a).

[17] *See Approved Leagues/Events for Sports Wagering*, Department of Law and Public Safety: Division of Gaming Enforcement (Dec. 3, 2025), https://www.nj.gov/oag/ge/docs/SportsBetting/ApprovedEventsList.pdf. The list currently includes sports, eSports, and entertainment events.

[18] N.J. Stat. § 5:12A-10.

Other States' gaming regulatory regimes follow a similar model.[19] These approaches reflect a consistent policy judgment: defining what bets are allowed is essential to effective regulation of wagering markets. By specifying permissible bets, States protect consumers, reduce opportunities for fraud and manipulation, preserve the integrity of underlying events, and provide regulated entities with clear and enforceable rules of operation.

## C. Prevention of Insiders and Vulnerable Individuals from Betting

Not only do States regulate the types of events that may be bet on, but they also regulate *who* may place bets. One such method of regulation is prohibiting insiders—such as athletes, coaches, referees, and other persons with a direct connection to sporting events—from wagering on those events, and placing affirmative compliance obligations on licensees to enforce those prohibitions. These requirements are standard traits of state sports-betting regulation and are typically implemented through a

---

[19] *See, e.g.*, 1 Colo. Code Regs. § 207-2:R.5; Va. Code § 58.1-4039; 11 Va. Admin. Code § 5-70-170; Ill. Admin. Code tit. 11, §§ 1900.1120, 1900.1140.

combination of statutory prohibitions and regulatory mandates requiring operators to verify bettor eligibility and prevent prohibited wagering.

Tennessee is an example of a State with robust regulations designed to prevent insider betting. Among other groups of prohibited bettors, Tennessee law prohibits the following categories of people from wagering or betting on sporting events:

- "Any professional athlete if the wager is based on any sport or athletic event overseen by the athlete's sports governing body,"

- "Any owner or employee of a team, player, umpire or sports union personnel, or employee, referee, coach, or official of a sports governing body, if the wager is based on a sporting event overseen by the person's sports governing body," and

- "Any person having the ability to directly affect the outcome of a sporting event."[20]

Indiana similarly prevents certain athletes, coaches, managers, and game officials (and even relatives living in the same household as each of these groups) from placing wagers on associated sporting events.[21] The burden is on "certificate holder[s] and vendor[s] to take

---

[20] Tenn. Code § 4-49-112(8)–(9), (14).

[21] *See* Ind. Code § 4-38-9-3(5); *see also* Conn. Gen. Stat. § 12-864(a)(1)–(2).

commercially reasonable measures to ensure" they do not accept wagers placed by any prohibited individuals.[22]

Other insiders prohibited from betting are individuals associated with the operators of gaming activity. Maryland bans wagers on sporting events from the "operator, director, officer, owner, or employee of the sports wagering licensee or online sports wagering operator."[23] New Jersey's gaming regulatory regime contains a similar prohibition.[24] West Virginia likewise prohibits "licensed gaming facility employee[s]" from placing wagers at their employer's facility.[25] In addition to these types of prohibitions, some States—like Massachusetts and Kansas—broadly prohibit the placement of wagers by individuals who have "access to nonpublic confidential information held by the operator."[26]

In addition to insiders, States set limitations on the age of gaming participants. Many States, including Pennsylvania, Nevada, New Jersey,

---

[22] *See* Ind. Code § 4-38-9-3.

[23] Md. Code, State Gov't § 9-1E-11(a)(8).

[24] N.J. Stat. § 5:12A-11(f)(2).

[25] W. Va. Code § 29-22D-15(g).

[26] Mass. Gen. Laws ch. 23N, § 11(a)(iii); *see also* Kan. Stat. § 74-8787(a)(5).

and New York, require that individuals be over the age of 21 in order to engage in most gaming activities.[27] Licensees or employees who allow underage gaming commit varying degrees of offenses.[28]

While these are just a few of the myriad types of bettor restrictions States employ, they are exemplative of the core integrity and consumer-protection goals underlying such exclusions. Insider betting prohibitions reduce conflicts of interest and the risk of match manipulation by barring those with influence or access to nonpublic information from wagering. Age restrictions likewise protect vulnerable populations and align gaming with other age-restricted activities (such as consuming alcohol), reflecting concerns about financial harm and problem gambling among

---

[27] *See, e.g.*, 58 Pa. Code § 513a.2; Nev. Rev. Stat. § 463.350(1); N.J. Stat. § 5:12-119(a); N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1332(a).

[28] *See, e.g.*, Nev. Rev. Stat. § 463.350(3); N.J. Stat. § 5:12-119(b). Pennsylvania law further requires that slot machine licensees post signs within 50 feet of each entrance and exit of a gaming floor stating: "It is unlawful for any individual under 21 years of age to enter or remain in any area where slot machines or table games are operated. It is unlawful for any individual under the age of 21 to wager, play or attempt to play a slot machine or table game. Individuals violating this prohibition will be removed and may be subject to arrest and criminal prosecution." 58 Pa. Code § 513a.4.

young individuals.[29] These measures safeguard public confidence in the fairness of sporting events and ensure that sports betting operates within a controlled, accountable framework.

## D. Identity, Age, and Location Verifications

States often impose detailed identity, age, and location verification requirements across casinos, racetracks, state lotteries, and online sports wagering and iGaming platforms. These requirements ensure that only legally eligible individuals within authorized jurisdictions participate in gaming activities.

Identity verification is foundational to modern gaming regulation. In Nevada, for instance, a licensee may only create a wagering account for a patron after it has "[o]btained, recorded, and verified" the patron's identity, date of birth, physical address, and last four digits of their Social Security number (if a United States resident).[30] Additionally, licensees "shall not allow a patron to make any wagers . . . until the patron's

---

[29] Age limits are not the only regulatory mechanisms employed by States in recognition that certain individuals may be particularly vulnerable to harms associated with wagering activity. *See, e.g.*, *infra* I.E (discussing self-exclusion programs and other responsible gaming tools).

[30] Nev. Gaming Comm'n Regs. § 5.225(5).

identity is confirmed."[31] Identity verification is particularly important in the online context. States such as New Jersey impose strict standards and controls "to ensure patron access" to an internet or mobile gaming system "is appropriately limited to the account holder."[32]

To facilitate regulations (like those discussed above) that prohibit minors and young individuals from engaging in gaming activities, States impose strict age-verification requirements. Michigan law, for example, requires internet gaming operators to verify an individual's age before allowing that individual to create an internet wagering account.[33] A similar law can be found in Pennsylvania.[34] Age verification regulations apply equally in the brick-and-mortar setting.[35] Across jurisdictions, failure to prevent underage gaming may result in substantial fines, license suspension, or revocation.

---

[31] Nev. Gaming Comm'n Regs. § 5.225(7). The regulation allows for in-person identity verification as well as a remote option requiring additional verification methods.

[32] N.J. Admin. Code § 13:69O-1.4.

[33] Mich. Admin. Code R. 432.651a.

[34] 4 Pa. Cons. Stat. § 13B13(a)(1)(ii)–(iii).

[35] *See, e.g.*, La. Stat. § 27:27.1(C)(3); Nev. Rev. Stat. § 463.350(1).

With the expansion of internet and mobile gaming, States have also required sophisticated geolocation controls to ensure that bets are placed only within authorized boundaries.[36] These systems typically rely on multi-source data—*e.g.*, IP, WiFi, GPS, and Bluetooth information[37]— and may be subject to independent laboratory certification.[38]

Taken together, these identity, age, and location verification requirements are designed to confirm that individuals engaging in gaming activities meet all eligibility criteria. They prevent underage gambling, fraud, and participation by excluded or prohibited persons, and they also ensure that wagers are placed only within authorized jurisdictions, supporting state regulatory authority and compliance with applicable gaming laws.

---

[36] *See, e.g.*, 1 Colo. Code Regs. §§ 207-2:R.7.5(20), 207-2:R.7.10(2); 10-200-206 Del. Admin. Code § 13.7.

[37] Salim Adatia, *What is Geolocation? 5 Things You Should Know*, Gaming Laboratories International LLC (Feb. 1, 2022), https://gaminglabs.com/blog/5-things-you-should-know-about-geolocation/.

[38] *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 9, § 5330.44(a) ("Geolocation software used by mobile sports wagering licensees shall be approved by a licensed independent testing laboratory, including applicable field testing, before the software is deployed in this State.").

### E.    Self-Exclusion and Responsible Gaming Mechanisms

Many States have incorporated "self-exclusion" programs and responsible gaming tools as core components of their regulatory frameworks.[39] Such mechanisms allow individuals to limit or prohibit their own participation in gaming activities and impose enforceable obligations on operators to implement those protections.

Self-exclusion programs are widely recognized as one of the most important consumer protection tools in regulated gaming markets. Such programs allow individuals who recognize that they have (or may have) a gambling problem to voluntarily remove themselves from wagering environments. Self-exclusion programs typically vest regulatory agencies with responsibility for maintaining centralized exclusion lists and defining the terms of participation.[40] Licensed operators are prohibited

---

[39] *See, e.g.*, 230 Ill. Comp. Stat. 45/25-100; 11 Va. Admin. Code § 5-60-20; 205 Mass. Code Regs. 238.19; *see also* AGA Analysis at 11 (noting that, in 2024, "new responsible gaming programs or funding streams were announced in Michigan, New Jersey and the District of Columbia" and "[s]tatewide self-exclusion programs were established or enhanced in Maine, New Jersey and North Carolina").

[40] *See, e.g.*, 11 Va. Admin. Code § 5-60-30; 16-633-013 Me. Code R. § 4; Neb. Rev. Stat. § 9-1118.

from permitting excluded individuals to participate and are subject to enforcement action for failures to comply.[41]

In addition to self-exclusion, States mandate a range of responsible gaming tools designed to give participants ongoing control over their activity.[42] These tools often include deposit and wager limits,[43] time-based limits,[44] timers or alerts notifying patrons of the time spent

---

[41] *See, e.g.*, 205 Mass. Code Regs. 133.06; N.J. Admin. Code § 13:69G-2.4; 58 Pa. Code § 503a.4; *see also* Press Release, *PA Gaming Control Board Fines Casino $50,000 for Permitting Self-Excluded Persons to Gamble*, Pennsylvania Gaming Control Board (Oct. 23, 2024), https://gamingcontrolboard.pa.gov/news-and-transparency/press-release/pa-gaming-control-board-fines-casino-50000-permitting-self.

[42] *See Responsible Gaming*, North Carolina State Lottery Commission, https://ncgaming.gov/responsible-gaming/. For an in-depth collection "of the statutes and regulations concerning responsible gaming in the 38 states and the District of Columbia with commercial casinos, sports betting or internet gaming as of January 31, 2025," *see generally Responsible Gaming Regulations and Statutes Guide: 2025*, American Gaming Association (July 2025), https://www.americangaming.org/wp-content/uploads/2025/07/AGA-2025-Responsible-Gaming-Regulations-and-Guidelines.pdf.

[43] *See, e.g.*, 205 Mass. Code Regs. 248.16.

[44] *See, e.g.*, Or. Admin. R. 177-046-0155.

gaming,[45] and cooling-off periods that allow participants to temporarily suspend their own access to gaming platforms.[46]

Self-exclusion programs and responsible gaming tools are often required to apply uniformly across all licensed operators within a jurisdiction.[47] These measures ensure that self-imposed limits are honored through regulatory oversight and prevent individuals from bypassing their own protections by simply switching from one operator to another. By mandating uniform implementation across licensed operators, States promote consistency and balance individual autonomy with effective consumer safeguards.

---

[45] *See, e.g.*, N.J. Admin. Code § 13:69O-1.2(h); Mich. Admin. Code R. 432.633a(1).

[46] *See, e.g.*, 11 Va. Admin. Code § 5-80-120(B)(3).

[47] *See, e.g.*, Ohio Admin. Code 3772-12-01(C)–(D); *see also Tennessee Voluntary Sports Wagering Self-Exclusion Application*, Tennessee Sports Wagering Council (Dec. 14, 2023) ("I understand that [self-exclusion] means I am not merely closing my account with one operator, but I am opting out of **ALL** online sports wagering with **ALL** operators licensed in Tennessee for the selected timeframe . . . ." (emphasis in original)), https://www.tn.gov/content/dam/tn/swac/documents/forms/Self-Exclusion.pdf.

### F. Credit and Financial Instruments Restrictions

States routinely restrict the way patrons can fund betting activity. Two forms that are particularly common are restrictions on house credit and restrictions on the use of certain financial instruments.

Many States prohibit gaming operators from lending credit to patrons.[48] By preventing operators from extending credit, these rules help ensure that individuals gamble only with funds they actually possess, rather than borrowed money that could exacerbate losses and indebtedness. Even in States where extending credit is not prohibited in its entirety, licensees' ability to engage in such conduct is often tightly regulated.[49]

Similar policy objectives are furthered by state regulations that restrict the type of financial instruments patrons may use to fund gaming activities. Iowa, for example, prohibits licensees from accepting credit cards for sports wagering "or to purchase coins, tokens, or other forms of

---

[48] *See, e.g.*, Tenn. Code § 4-49-118(a)(2); Ariz. Rev. Stat. § 5-1311(B)(2); Fla. Stat. § 551.121(2); Ark. Code R. 006.06.5-5.120(3); Colo. Rev. Stat. § 44-30-815; Me. Stat. tit. 8, §1031(3).

[49] *See, e.g.*, 68 Ind. Admin. Code 16-1-5; W. Va. Code St. R. § 179-4-154; 205 Mass. Code Regs. 138.43.

credit to be wagered on gambling games."[50] Louisiana prohibits licensees from cashing or accepting, "in exchange for the purchase of tokens, chips, or electronic cards": (1) employee payroll checks; (2) documents stating title to or ownership of motor vehicles, homes, or immovable property; or (3) checks representing a Family Independence Temporary Assistance Program, Temporary Assistance for Needy Families, or supplemental security income payment.[51] Some States have regulations limiting the number, location of, and maximum withdrawal amounts from ATMs.[52]

Restrictions on the availability of house credit and the use of certain financial instruments for gaming activities are intended to promote responsible gaming and protect consumers from excessive financial harm. By limiting the ability to gamble with borrowed funds or high-risk instruments—such as credit cards or funds reflecting government assistance payments—these measures help ensure that individuals wager only with money they can afford to lose.

---

[50] Iowa Code § 99F.9(7).

[51] La. Stat. § 27:101(A); *see also, e.g.*, Mass. Gen. Laws ch. 23K, § 27(f).

[52] *See, e.g.*, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1338(1); Md. Code, State Gov't § 9-1A-24(f)(1).

### G. Advertising and Marketing Restrictions and Responsible Gaming Disclosures

States regularly regulate the substance of gaming advertising by prohibiting a variety of false, misleading, or deceptive claims, including misrepresentations about the likelihood of success, the nature of promotions, or the risks associated with participation.[53] States also impose targeting and placement restrictions designed to limit exposure to minors and other young persons.[54] These rules often prohibit advertising in media or locations primarily directed at underage audiences and restrict the use of imagery, themes, or endorsements likely to appeal to minors.[55] Regulators further require operators to withhold marketing communications to individuals who have self-excluded or

---

[53] *See, e.g.*, Ariz. Admin. Code § R19-4-110(A)–(G); D.C. Mun. Regs. tit. 30, § 2131; Ill. Admin. Code tit. 86, § 3000.680(e); 1 Colo. Code Regs. § 207-2:R.6.17; 205 Mass. Code Regs. 256.04; Ohio Admin. Code 3772-13-02, 3775-16-08.

[54] *See, e.g.*, Del. Code tit. 6, § 1204C; 205 Mass. Code Regs. 256.05.

[55] *See, e.g.*, Ill. Admin. Code tit. 86, § 3000.680(e)(7)–(14) (mandating, among other requirements, that advertising and marketing materials shall not "directly advertise or promote gambling to individuals under 21 years of age," "contain images, symbols, celebrity or entertainer endorsements, or language designed to appeal specifically to those under 21 years of age," or be published or distributed "in outlets that appeal primarily to individuals under 21 years of age").

opted out of promotional materials.[56] States further regulate promotional materials by requiring advance regulatory approval or adherence to prescribed conditions.[57]

Not only do States prohibit and limit certain forms of advertising and marketing, but many also require affirmative responsible gaming disclosures or on-property signage. Licensees in Colorado must, at minimum, display the message "Gambling problem? Call or TEXT 1-800-GAMBLER," and provide additional information and statements regarding responsible gaming and resources for potential gambling problems.[58] Indiana requires that licensees post signs "with a statement regarding obtaining assistance with gambling problems" be located at each entrance and exit of a gambling facility and near each credit

---

[56] *See, e.g.*, 68 Ind. Admin. Code 27-13-4; La. Admin. Code tit. 42, § VI-517(A).

[57] *See, e.g.*, 16-633-014 Me. Code R. § 2; 10-200-204 Del. Admin. Code § 10.0.

[58] 1 Colo. Code Regs. § 207-1:30-2901(1).

location.[59] New Jersey imposes numerous specific messages that must be displayed in advertisements and online.[60]

Advertising restrictions and responsible gaming disclosure requirements are designed to ensure that gaming is promoted in a truthful, transparent, and socially responsible manner. These measures aim to prevent misleading claims about odds or potential winnings, reduce the risk of targeting vulnerable populations such as minors or individuals with gambling problems, and provide consumers with clear information about the risks associated with wagering.

## H. Funding for Problem Gaming Treatment and Employee Training

States frequently also embed funding, education, and treatment requirements into their gaming regulatory frameworks, ensuring that gaming is paired with dedicated resources to mitigate potential harms and promote responsible play.

For example, many States earmark a portion of gaming fees and revenues specifically for problem-gambling prevention and treatment.

---

[59] 230 Ill. Comp. Stat. 10/13.1(a).

[60] *See, e.g.*, N.J. Stat. § 5:12-70(a)(16); N.J. Admin. Code § 13:69O-1.2(b), (z).

Pennsylvania, for example, directs a percentage of slot machine and interactive gaming revenues to the Compulsive and Problem Gambling Treatment Fund, which supports treatment services, public awareness campaigns, and research.[61] And New Jersey requires casino licensees with internet gaming permits to pay an annual fee that is allocated between the Council on Compulsive Gambling of New Jersey and compulsive gambling treatment programs within the State.[62]

States also often require licensees to ensure that employees and staff are adequately educated and trained on problem gambling.[63] Pennsylvania, for example, provides detailed requirements for employee training programs, which must include instruction on "[c]haracteristics and symptoms of compulsive behavior," "[p]rocedures designed to prevent serving alcohol to visibly intoxicated gaming patrons," and "[p]rocedures for removing an excluded person, an underage individual or a person on the self-exclusion list from a licensed facility."[64] Virginia requires licensees to adopt "[m]easures to ensure staff understand the importance

---

[61] 4 Pa. Cons. Stat. § 1408(a).

[62] N.J. Stat. § 5:12-95.29(d); *see also id.* § 5:12-145(a).

[63] *See, e.g.*, 38-8 Wyo. Code R. § 1(d); N.J. Admin. Code § 13:69O-1.2(x).

[64] 58 Pa. Code § 501a.3(a).

of responsible gaming," including: educating staff on "problem gaming and its impact," teaching them "skills and procedures required of them for assisting players who may have problems with gambling," and training them "to avoid messages that reinforce misleading or false beliefs."[65] And a license applicant in Tennessee must propose a plan "for providing comprehensive responsible gaming training to employees who may interact with" patrons, which "should equip the trainee to respond to circumstances in which Player account activity may indicate signs that are consistent with gambling addiction."[66]

States have determined that gaming must be accompanied by structured efforts to address and mitigate problem gambling. By dedicating revenue streams to prevention and treatment and ensuring that gaming operator staff and employees are trained to identify and assist patrons who may have gambling problems, States seek to balance the economic benefits of regulated gaming with consumer protection and public health objectives.

---

[65] 11 Va. Admin. Code § 5-80-80(C)(6).

[66] Tenn. Comp. R. & Regs. 1350-01-.06(8)(j).

## I.     Complaint and Dispute Resolution Procedures

States likewise often impose comprehensive complaint and dispute-resolution processes as an integral component of their gaming regulatory frameworks. Licensed operators are not free to address patron complaints informally or at their discretion; rather, they must adhere to regulator-prescribed procedures.

For example, in Michigan, internet gaming operators must advise patrons of their right to make complaints, must investigate complaints and provide a written response within 10 days, must promptly notify the Michigan Gaming Control Board of unresolved complaints, and must maintain complaint-related records for five years and provide such records to the Board upon request.[67] If a complaint cannot be resolved between the patron and operator, the patron may file a complaint with the Board.[68] Ohio has similar regulations, including that sports gaming proprietors provide a written response to patron complaints within 10

---

[67] Mich. Admin. Code R. 432.641(1), (3), (5)–(6), (8).

[68] Mich. Admin. Code R. 432.641(7); *see also Internet Gaming and Sports Betting Complaint*, Michigan Gaming Control Board, https://www.michigan.gov/mgcb/patron-disputes/internet-gaming-and-sports-betting-complaint.

business days and that an unsatisfied patron may submit a complaint to the Ohio Casino Control Commission.[69] Other States impose similarly structured regulatory oversight.[70]

By mandating formalized complaint procedures and providing for independent regulatory review, States protect consumers, promote fair dealing, and preserve confidence in the integrity of regulated gaming markets. Structured dispute-resolution mechanisms also deter misconduct and create transparent records for oversight.

### J.    Game Integrity and Technical Standards

States frequently regulate game integrity and technical standards. These standards govern the design, testing, certification, deployment, and ongoing operation of gaming equipment and software, and they are often enforced through detailed regulations, independent laboratory testing, and regulator access to systems and data.[71]

---

[69] *See* Ohio Admin. Code 3775-16-21(B); *see also File a Complaint, Make an Inquiry or Report a Crime*, Ohio Casino Control Commission, https://casinocontrol.ohio.gov/for-the-public/01-fc.

[70] *See, e.g.*, 1 Colo. Code Regs. § 207-3:R.6; 68 Ind. Code § 18-1-2.

[71] *See, e.g.*, Mich. Admin. Code R. 432.639; *Technical Standards for Video Gaming Terminals in Illinois: Version 1.5*, Illinois Gaming Board (June 2024),

New Jersey, for example, requires that electronic gaming equipment—including slot machines, electronic table games, account based wagering systems, and automated shufflers—be tested and approved by the State's Division of Gaming Enforcement.[72] The State further provides detailed regulations concerning requirements for internet and mobile gaming.[73]

Nevada also maintains an incredibly comprehensive regulatory framework governing standards applicable to gaming devices and systems. The Nevada Gaming Commission has adopted regulations that include extensive technical standards. One of those standards is devoted to the integrity of gaming devices.[74] That standard regulates areas such as electrical interference immunity, printer mechanisms on gaming

---

https://igb.illinois.gov/content/dam/soi/en/web/igb/documents/video/law/technical-standards-for-video-gaming-terminals-v1.5.pdf.

[72] N.J. Admin. Code § 13:69E-1.28.

[73] N.J. Admin. Code § 13:69O-1.2; *see also, e.g.*, *id.* § 13:69O-1.7 (regulating communication standards for gaming systems); *id.* § 13:69O-1.9 (requiring online gaming systems to be designed to generate, among others, patron account reports and wagering reports).

[74] *See generally* Nev. Gaming Comm'n Tech. Standard No. 1.

devices, error conditions, random number generating, and more.[75] Nevada's other technical standards regulate areas including gaming device accounting, mobile gaming systems, cashless wagering systems and kiosks, and interactive gaming systems.[76]

By mandating independent testing, technical specifications, and regulatory oversight and approval, States ensure that games operate fairly, that wagers are properly recorded and settled, and that gaming systems are secure from manipulation or intrusion. These safeguards protect consumers, deter fraud and corruption, and maintain public confidence in the legitimacy of regulated gaming.

## II.   The CEA lacks a comprehensive gaming regulatory regime.

As the prior Section demonstrated, States across the country have enacted comprehensive gaming regulatory regimes that regulate virtually every aspect of gaming operations. While the particulars of such regulations vary between States, each State's regulatory framework can be described as comprehensive with respect to the gaming it regulates.

---

[75] *See, e.g.*, Nev. Gaming Comm'n Tech. Standard Nos. 1.020, 1.045, 1.070, 1.400.

[76] *See generally* Nev. Gaming Comm'n Tech. Standard Nos. 2–6.

The CEA stands in stark contrast to these state regulatory regimes. While the CEA establishes oversight of designated contract markets and swap execution facilities, it does not impose the foundational elements typically found in state gaming laws, such as operator licensing requirements, suitability determinations and background checks, or technical standards. Nor does the CEA include many of the core consumer protection safeguards that are hallmarks of comprehensive gaming regulation, such as age and identity verification requirements, responsible gaming programs and tools, insider betting protections, complaint and dispute resolution frameworks, or advertising restrictions. Such protections illustrate a broader point: Contemporary state gaming regulation is not limited to licensing or market oversight. Instead, it reflects a comprehensive public policy framework designed to address the consumer protection and social risk dimensions of wagering activity. The CEA contains no comparable safeguards, reflecting that it was not designed to regulate wagering activity or the social risks associated with gambling.[77] In short, although the CEA provides a framework for

---

[77] Take, for example, the fact that individuals who have voluntarily placed themselves on legally enforceable self-exclusion lists may nevertheless be permitted to participate in wagering activity through

financial market oversight, it lacks the broad regulatory architecture that States routinely apply to gaming operations.

It is not surprising that the CEA lacks a comprehensive gaming regulatory regime—Congress never intended it to do so. As State Appellees explain in their brief, *see* State Appellees' Answering Brief at 46–48, there is no evidence that Congress intended to federalize sports betting and appoint the CFTC as the United States' exclusive sports-betting regulator. To the contrary, the CFTC itself has recognized that the CEA and its regulations "are focused on regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling." Event Contracts, 89 Fed. Reg. 48968, 48983 (proposed June 10, 2024), *withdrawn*, 91 Fed. Reg. 5386 (Feb. 6, 2026); *see also id.* ("Gambling is a rapidly evolving field, and the Commission does not believe it has the statutory mandate

_____

prediction market platforms. This outcome undermines one of the foundational principles of modern state gaming regulation. Individuals should be able to rely upon a consistent system of protections across the regulated marketplace. Allowing wagering activity that replicates the economic characteristics of sports betting to occur outside these protections exposes vulnerable individuals to the very risks that state regulatory frameworks are designed to mitigate.

nor specialized experience appropriate to oversee it, or that Congress intended for the Commission to exercise its jurisdiction or expend its resources in this manner.").[78]

The CFTC's argument that the CEA preempts state gaming laws, *see* CFTC's Amicus Brief at 26, conflates commodity-futures regulation with sports wager and gaming regulation. And even if this Court determines that gaming is a form of commodity-futures trading, there can be no doubt that many of the state gaming regulations identified above (*e.g.*, licensing requirements) have no direct impact on commodity-futures markets. Such regulations, at minimum, would thus not be preempted by the CEA.

## CONCLUSION

States do not lightly touch gaming—they comprehensively govern it. The regulatory safeguards described above reflect decades of experience managing the risks associated with wagering markets. Allowing wagering activity to occur without those protections would undermine the carefully constructed regulatory systems developed by

---

[78] The CFTC's amicus brief notably ignores these prior statements and fails to explain its change in position.

States to protect consumers and preserve public confidence in lawful gaming. In contrast to those systems, the CEA is a financial-markets statute that does not replicate, much less replace, States' gaming regulatory architecture. A full understanding of that contrast is essential to resolving the issue of field preemption in this case. Should this Court reach that issue, it should hold that the CEA does not, and was never intended to, comprehensively regulate gaming. The CEA thus does not preempt state gambling laws.

Dated: March 10, 2026

Respectfully submitted,

*/s/ Evan Bianchi*
Evan Bianchi
SPIRO HARRISON & NELSON LLC
100 Pearl Street, Suite 1803
New York, New York 10004
(646) 412-5616
ebianchi@shnlegal.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,332 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*/s/ Evan Bianchi*
Evan Bianchi