SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

———

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON
———
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
202-371-7370
EMAIL ADDRESS
SHAY.DVORETZKY@SKADDEN.COM

April 9, 2026

Molly C. Dwyer
Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
James R. Browning Courthouse
95 Seventh Street
San Francisco, CA 94103

> RE:  *North American Derivatives Exchange, Inc. v. State of Nevada, et al.*, No. 25-7187; *KalshiEX, LLC v. Assad, et al.*, No. 25-7516; *Robinhood Derivatives, LLC v. Dreitzer, et al.*, No. 25-7831: Response to Nevada's Federal Rule of Appellate Procedure 28(j) letter (Letter) regarding *KalshiEX, LLC v. Flaherty*, No. 25-1922 (3d Cir. April 6, 2026) (slip opinion (Op.) attached)

Dear Ms. Dwyer:

*KalshiEX*'s holdings confirm that the Commodity Exchange Act (CEA) preempts Nevada's gaming laws as applied to sports-event contracts.

*First*, the CEA's "text … preempts otherwise applicable state laws that purport to regulate sports-related event contracts on CFTC-licensed DCMs," because 7 U.S.C. § 2(a)(1)(A) "grants the CFTC exclusive jurisdiction over" swap-trading on DCMs. Op. 9-10. Two savings clauses, 7 U.S.C. §§ 2(a)(1)(A) and 16(e)(1)(B)(i), confirm that the CFTC alone regulates on-DCM trading. Op. 14-15. Indeed, "Congress created the CFTC and amended the Act to do away with the patchwork of state regulations and bring futures trading on DCMs under the exclusive jurisdiction of the CFTC." Op. 11-12. "[S]tate

regulation" of sports-event contracts "is exactly the patchwork that Congress replaced." Op. 13.

*Second*, sports-event contracts are swaps. They're "associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii), because sports events can affect "sponsors, advertisers, television networks, franchises, and local and national communities." Op. 8. A sports event's outcome need not be "joined or connected" with "a financial, economic, or commercial instrument or measure." Op. 7-8. That supposed "requirement"—like Nevada's "inherently financial" requirement—"raises the bar beyond what the Act requires." Op. 8.

Indeed, the dissent accepts that the "plain … text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition" of "swap." Dissent 2. But the dissent (at 4, 7-8) and Nevada (Letter 1-2) insist there's a presumption against preemption because states historically regulated gambling. Given the CEA's express preemption provision, however, no such presumption applies, as Supreme Court precedent makes clear. CDNA Br. 40. "Even accepting the dissent's premise that states have long regulated gambling, the text preempts state gambling laws that seek to regulate futures trading"—which "the federal government has regulated … for over a century." Op. 13-14 (footnote omitted).

*Finally*, the CFTC has authority "to 'further define' swaps" and has "exclud[ed] certain 'consumer transactions.'" Op. 8-9 (citing 15 U.S.C. § 8302(d)(1); *Further Definition of "Swap*," 77 Fed. Reg. 48,208, 48,246 (Aug. 13, 2012)). Given that further definition, sports bets aren't swaps. CDNA Br. 61; Reply 22-24. *Contra* Letter 1.

Respectfully submitted,

*/s/ Shay Dvoretzky*

Shay Dvoretzky

*Counsel for Plaintiff-Appellant*
  *North American Derivatives*
  *Exchange, Inc. d/b/a Crypto.com |*
  *Derivatives North America*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that (1) this letter complies with the type-volume limitation of Federal Rule of Appellate Procedure 28(j) because, as calculated by Microsoft Word, its body contains 348 words, and (2) this letter complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: April 9, 2026 */s/ Shay Dvoretzky*

Shay Dvoretzky

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2026, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: April 9, 2026 */s/ Shay Dvoretzky*

Shay Dvoretzky

# ADDENDUM

*KalshiEX, LLC v. Flaherty*, No. 25-1922 (3d Cir. April 6, 2026) (slip op.)

# U.S. Court of Appeals
# for the Third Circuit

No. 25-1922

KalshiEX, LLC

v.

Mary Jo Flaherty; Division of Gaming Enforcement; James T. Plousis; Alisa Cooper; Casino Control Commission; Matthew J. Platkin; Joyce Mollineaux

Mary Jo Flaherty; Matthew J. Platkin,
Appellants

_____

Appeal from the U.S. District Court, D.N.J.
Judge Edward S. Kiel, No. 1:25-cv-02152

Before: Chagares, *Chief Judge*, Porter, and Roth, *Circuit Judges*
Argued Sep. 10, 2025; Decided Apr. 6, 2026

Opinion of the Court

Porter, *Circuit Judge*.

KalshiEX LLC ("Kalshi") moved preliminarily to enjoin the New Jersey Division of Gaming Enforcement from enforcing state law against Kalshi's sports-related event contracts. The District Court granted Kalshi's motion. Because Kalshi has demonstrated a reasonable chance of success on its

argument that the Commodity Exchange Act ("the Act") preempts otherwise applicable state law, we will affirm.

I

Kalshi is a financial services company that operates a designated contract market ("DCM") licensed by the Commodity Futures Trading Commission ("CFTC"), on which it offers event contracts, a type of derivative. Derivatives are financial tools that mitigate risk and derive their value from some underlying asset. Kalshi's event contracts "identify an event with multiple possible outcomes, a payment schedule for those outcomes, and an expiration date. The contract's value is determined by market forces, which means its price fluctuates from the time of its creation to its expiration based on perceptions about the event's likelihood." Appellee's Brief at 9. Kalshi customers can buy and trade on predictions about all sorts of events: political elections, movie box office numbers, and even the weather. For example, an event contract could ask whether an earthquake will take place in a certain city on a certain date. A purchaser may then trade on either "yes" or "no." If the earthquake does occur in the city on the date, the "yes" positions would be paid out.

In December 2024, one of Kalshi's competitors started offering event contracts on the outcome of sports events. A month later, Kalshi began offering the same type of event contract. Two months later, New Jersey sent Kalshi a cease-and-desist letter stating that Kalshi's listing of sports-related event contracts violates New Jersey's constitution and gambling laws that prohibit betting on collegiate sports. It threatened to seek "any measures available under New Jersey law" if Kalshi did not promptly end its sports betting activities in New Jersey and void any existing wagers. Joint Appendix ("J.A.") at 38.

Violations of the applicable law are punishable as "crime[s] of the fourth degree" subject to fines up to $100,000. N.J. Stat. Ann. §§ 5:12A-11(c), 2C:43-2.

Kalshi immediately commenced this action in the United States District Court for the District of New Jersey, seeking preliminarily to enjoin New Jersey from enforcing its law. The District Court granted the injunction, finding that Kalshi had a reasonable likelihood of success, faced irreparable harm, and that the public interest is not served by enforcing an unconstitutional law. New Jersey appealed.

## II

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

We review the District Court's "findings of fact for clear error, its conclusions of law de novo, and the ultimate decision granting the preliminary injunction for an abuse of discretion." *Mallet and Co. Inc. v. Lacayo*, 16 F.4th 364, 379 n.17 (3d Cir. 2021) (quoting *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010)). Preliminary injunctions are governed by a well-established four-part test. The first two are the most important threshold factors: "likelihood of success on the merits" and whether the party seeking the injunction "is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* at 380 (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). If those two factors are met, the court balances them along with two others: the balance of equities and the public interest. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024). Factors three and four "merge when the Government is the

3

opposing party." *Id.* at 205 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

III

Kalshi has met its burden for preliminary injunctive relief. The parties contest whether the CFTC's exclusive jurisdiction over DCMs as conferred by the Act preempts New Jersey gambling laws and the state constitution's prohibition on collegiate sports betting. New Jersey frames the issue broadly (regulating all sports gambling) rather than narrowly (regulating trading on federally designated contract markets). The text of the Act suggests that the narrow framing is the better reading. The Act preempts state laws that directly interfere with swaps traded on DCMs. Kalshi's sports-related event contracts are swaps traded on a CFTC-licensed DCM, so the CFTC has exclusive jurisdiction. The District Court did not abuse its discretion by finding that Kalshi would more likely than not suffer irreparable harm absent the preliminary injunction and that the remaining preliminary injunction factors also weigh in favor of Kalshi.

A

The parties' arguments focus on the first factor: likelihood of success on the merits. For that factor, the moving party must show that "there is a reasonable chance, or probability, of winning." *Mallet*, 16 F.4th at 380 (citation modified). "Reasonable" does not mean "more likely than not," but it does mean "significantly better than negligible." *Id.* The District Court concluded that Kalshi demonstrated a likelihood of success on its argument that the Act preempts New Jersey law from reaching into CFTC-licensed DCMs. We agree.

1

The Act, first passed in 1936, regulates derivatives markets. At first, the law did not preempt state regulation in the area. But that resulted in a patchwork of state regulations, so Congress amended the Act in 1974 and created the CFTC to oversee trading on federally designated "contract market[s]." 7 U.S.C. § 2(a)(1)(A). The CFTC has an array of powers to investigate and prohibit contracts. Initially, there is a long and involved process before the CFTC will officially "designate" a prospective contract market. *See generally* 7 U.S.C. § 7. Once designated, a DCM does not need pre-approval before listing contracts, although it must self-certify compliance with the applicable laws and regulations. 7 U.S.C. § 7a-2(c)(1).

The 1974 amendments also expanded the Act's reach from just agricultural products to all "goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). And in 2000, Congress expanded the Act to qualifying events, defined as an "occurrence" or "contingency" that is "beyond the control of the parties to the . . . transaction; and associated with a financial, commercial, or economic consequence." 7 U.S.C. §§ 1a(19)(iv), (iv)(I)–(II).

The Dodd-Frank Act of 2010 amended the Act again, this time adding a new class of futures known as "swaps" and expanding the CFTC's exclusive jurisdiction "with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a [DCM.]" 7 U.S.C. § 2(a)(1)(A). The Act defines "swap" to include "any agreement, contract, or transaction . . . that provides for any . . . payment[ ] or delivery . . . that is dependent on the occurrence, nonoccurrence, or the

5

extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §§ 1a(47)(A), (A)(ii). In other words, "swap" includes event contracts.[1]

The Dodd-Frank Act also implemented a "[s]pecial rule" for event contracts, giving the CFTC discretionary power to review and prohibit six categories of contracts if it concludes they are "contrary to the public interest." 7 U.S.C. §§ 7a-2(c)(5)(C), (C)(i). Relevant here, those categories include contracts that involve "gaming" or "other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest." 7 U.S.C. §§ 7a-2(c)(5)(C)(i)(V)–(VI). The CFTC has codified this power in a regulation, 17 C.F.R. § 40.11, but it has not yet acted to review or prohibit any sports-related event contracts. *Cf.* Prediction Markets, 91 Fed. Reg. 12516, 12521 (proposed March 16, 2026) (inviting comment on the scope and public interest implications of "gaming," and "sports competition").

Although the Act grants the CFTC exclusive regulatory jurisdiction over event contracts, there are two savings clause carveouts that permit state regulation in certain areas not covered by the Act. The first says: "*Except as hereinabove provided*, nothing contained in this section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A) (emphasis added). And the sec-

---

[1] The CFTC recently published an advance notice of proposed rulemaking regarding "event contract derivatives traded on markets commonly referred to as 'prediction markets,'" which include sporting events contracts. Prediction Markets, 91 Fed. Reg. 12516, 12516–17 & n.9 (proposed March 16, 2026).

ond follows: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*

## 2

### a

In 2020, the CFTC certified Kalshi's online exchange as a DCM after a nine-month review period. *See KalshiEX LLC v. CFTC*, No. 23-cv-3257, 2024 WL 4164694, at *4 (D.D.C. Sept. 12, 2024) ("In 2020, the CFTC authorized Kalshi . . . to list event contracts for public trading as a DCM."). About five years later, Kalshi began offering sports-related event contracts on its DCM exchange. Kalshi self-certified compliance with the applicable laws and regulations, so those event contracts were presumptively approved under federal law. *See* 7 U.S.C. § 7a-2(c)(1). To date, the CFTC has not determined that Kalshi's sports-related event contracts are contrary to the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C)(ii); 17 C.F.R. § 40.11.

And though the dissent labels Kalshi's event contracts "gaming contracts" and argues that they fall under the "special rule," Dissent at 17–18, the CFTC has chosen not to enforce its regulation against the type of sports-related event contracts at issue here. In fact, it has already certified many "sporting events" contracts for listing. 91 Fed. Reg. at 12517 n.9 (citing *Designated Contract Market Products*, CFTC, https://perma.cc/93Y2-K6ZT (last visited Mar. 17, 2026)).

New Jersey argues that Kalshi's event contracts are not "swaps" covered by the Act "because the *outcome* of a sports game is not 'joined or connected' with a financial, economic, or commercial instrument or measure." Appellant's Brief at

23–24. But its proposed "joined or connected" requirement raises the bar beyond what the Act requires.

As always with statutory interpretation, "we begin with the text." *United States v. Johnson*, 114 F.4th 148, 153 (3d Cir. 2024). The Act provides that the relevant event or occurrence need only be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). As the dissent concedes, "[a] plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition." Dissent at 2. That is correct. The outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence. The District Court did not clearly err when it identified numerous affected stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities. The analysis need not go further. Because Kalshi's sports-related event contracts are traded on a CFTC-licensed DCM and depend on event outcomes associated with economic consequences, they fit within the Act's definition of "swaps" subject to the CFTC's jurisdiction. *See* 7 U.S.C. §§ 2(a)(1)(A), 1a(47)(A)(ii).

New Jersey and the dissent "pile inference upon inference" and postulate that anything from bingo games to ping-pong matches will fall under the CFTC's jurisdiction. *See United States v. Lopez*, 514 U.S. 549, 567 (1995); *see also* Transcript of Oral Argument at 18 (lines 12–22), *KalshiEX, LLC v. Flaherty, et al.*, No. 25-1922 (Sept. 24, 2025). But Kalshi makes no such claim, and the District Court does not so broadly hold. In such far-fetched scenarios, Congress's express delegation to the CTFC and the Securities and Exchange Commission to "further define" swaps would prove useful. 15 U.S.C. § 8302(d)(1); *see, e.g.*, *Further Definition of "Swap,"*

77 Fed. Reg. 48208, 48246 (Aug. 13, 2012) (excluding certain "consumer transactions" from the statutory definition).

b

New Jersey contends that the contracts can be regulated by the states and are not preempted by the Act. Under the Supremacy Clause, "federal law is supreme in case of a conflict with state law." *Murphy v. Natl. Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018); U.S. Const. art. VI, cl. 2. It can preempt state law either expressly or impliedly. *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021). Implied preemption falls into two categories, field or conflict preemption, although the Supreme Court has recognized that "the categories of preemption are not rigidly distinct" and that "field preemption may be understood as a species of conflict preemption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (citation modified). We hold that both field and conflict preemption apply.

i

The District Court considered whether the Act impliedly preempted state regulation of DCMs and concluded that "at the very least field preemption applies." J.A. 11–14. We agree. Kalshi has demonstrated a reasonable chance of success in showing that the text of the Act preempts otherwise

9

applicable state laws that purport to regulate sports-related event contracts on CFTC-licensed DCMs.[2]

As we have recognized, "all preemption arguments[ ] must be grounded in the text and structure of the [federal] statute at issue." *Klotz*, 991 F.3d at 463 (quoting *Kansas v. Garcia*, 589 U.S. 191, 208 (2020)). Field preemption sounds a lot like express preemption—"it concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law." *Murphy*, 584 U.S. at 479. That conflicting state law is field preempted when "federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Id.* (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty,* 479 U.S. 130, 140 (1986); *see also Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016).

Here, the Act grants the CFTC exclusive jurisdiction over "swaps . . . traded or executed on a [DCM]," which include Kalshi's sports-related event contracts. 7 U.S.C. § 2(a)(1)(A); *see supra* § III.A.2.a. The Act does have a limiting principle: it "shall [not] supersede or preempt . . . the application of any Federal or State statute . . . to any transaction . . . *that is not conducted on or subject to the rules of a registered entity*." 7 U.S.C. § 16(e)(1)(B)(i) (emphasis added). But here, registered entities include DCMs, so that limiting principle does not apply. 7 U.S.C. § 1a(40)(A).

---

[2] We need not address the parties' extra-textual arguments related to whether the Act preempts all state gambling regulation, because Kalshi does not argue that the Act preempts all state gambling regulation.

The dissent contends that DCM trading is a subfield of futures trading, and that the Act is not "sufficiently comprehensive . . . to preclude enforcement of state laws on the same subject." Dissent at 9. But as our sister circuits have held, the Act preempts state law purporting to regulate futures trading. *See, e.g.*, *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 591–92 (D.C. Cir. 2001); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1157 (7th Cir. 1992); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). This is consistent with Congress's longtime regulation of futures trading dating back to the early twentieth century. *See Bd. of Trade of Chi. v. Olsen*, 262 U.S. 1, 43 (1923). Because Kalshi's sports-related event contracts are swaps under the Act, the District Court properly defined the scope of field preemption as the regulation of trading on a DCM (a form of futures trading) rather than as gambling (a broader and traditionally state-regulated field).[3] *See Schaffner v. Monsanto Corp.*, 113 F.4th 364, 392 (3d Cir. 2024) ("[O]ur understanding of the scope of a pre-emption statute . . . must rest primarily on a fair understanding of *congressional purpose* . . . [drawn] primarily from the text of the statute and from its surrounding framework.") (citation modified); *Sikkelee*, 822 F.3d at 689 (cautioning that, when assessing preemption, courts should avoid "interpreting the scope of the preempted field too broadly"). Thus, the District Court did not

---

[3] While there are two savings clauses in the Act, those do not mean that "Congress decided to allow room for state law" on futures trading. Dissent at 13. Unlike other statutes that allow for states to impose stricter standards or other coterminous regulation, the Act has no such allowance and preserves jurisdiction only for state common-law actions. *See infra* § III.A.2.c.

err in holding that New Jersey law is field preempted by the Act.

ii

Though the District Court limited its analysis to field preemption, conflict preemption also prohibits New Jersey from regulating sports-related event contracts on CFTC-licensed DCMs. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 276 (3d Cir. 2019) ("[W]e may affirm on any ground supported by the record . . . .").

Conflict preemption "occurs when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible, or when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law." *Sikkelee*, 822 F.3d at 688 (citation modified); *see also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

To determine whether New Jersey's laws and constitution stand as an obstacle to the Act, we first determine Congress's "full purposes and objectives" of the Act as evidenced by "the text and structure of the [federal] statute at issue." *Klotz*, 991 F.3d at 463 (citation omitted). Here, there's little doubt that the Act is "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). As detailed above, Congress created the CFTC and amended the Act to do away with the patchwork of state regulations and bring futures trading on DCMs under the exclusive jurisdiction of the CFTC. *Supra* § III.A.1.

Second, we ask whether the state law "stands as an obstacle" to those objectives. *Sikkelee*, 822 F.3d at 688 (citation modified). It does. Allowing New Jersey to enforce its gambling laws and state constitution would create an obstacle to executing the Act because such state enforcement would prohibit Kalshi, which operates a licensed DCM under the exclusive jurisdiction of the CFTC, from offering its sports-related event contracts in New Jersey. This state regulation is exactly the patchwork that Congress replaced wholecloth by creating the CFTC. Because that prohibition directly conflicts with the full purposes and objectives of the Act, we need not determine whether it would be impossible for Kalshi to comply with both state and federal regulations. *See Am. Agric. Movement, Inc.*, 977 F.2d at 1156 (holding that state laws "directly affect[ing] trading on or the operation of a futures market" are conflict preempted by the Act).

iii

Our dissenting colleague emphasizes the "strong presumption against preemption in areas of the law that States have traditionally occupied." *Sikkelee*, 822 F.3d at 687. But neither "[b]asic abductive reasoning" nor construing "silence" one way or the other can overcome the Act's text. Dissent at 7, 21. Even accepting the dissent's premise that states have long

13

regulated gambling,[4] the text preempts state gambling laws that seek to regulate futures trading, i.e., Kalshi's sports-related event contracts traded on a DCM under the exclusive jurisdiction of the CFTC. 7 U.S.C. § 16(e)(1)(B)(i). Again, the federal government has regulated the derivatives market for over a century. *See Olsen*, 262 U.S. at 43 (upholding the constitutionality of the Grain Futures Act, predecessor to the Act). And it delegated that regulation to the CFTC, which has expertise in swaps like event contracts. *See* 7 U.S.C. §§ 1a(47)(A), (A)(ii); 2(a)(1)(A); 91 Fed. Reg. at 12517 (noting that the CFTC has regulated event contracts since at least 2008); Michael S. Selig, Chairman, Commodity Futures Trading Comm'n, Remarks: *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026) ("[T]he [CFTC] has the expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives").

c

New Jersey argues that the Act's savings clause carve-outs preserve state jurisdiction over sports-related event contracts on CFTC-licensed DCMs. But the clear text of the Act says otherwise. Both carveouts follow the Act's grant of CFTC exclusive jurisdiction over swaps. The first preserves state

---

[4] States have long regulated intrastate gambling, but not interstate gambling. *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025) ("[S]ince the regulation of *interstate* gambling isn't a traditional area of state regulation, the presumption against preemption doesn't apply.") (emphasis in original); *see also* Wire Act of 1961, 18 U.S.C. § 1084 (federal gambling law prohibiting the interstate wire transmission of bets or wagers on any sporting event or contest).

14

jurisdiction "*except* as hereinabove provided." 7 U.S.C. § 2(a)(1)(A) (emphasis added). That prefatory clause indicates that swaps fall under the CFTC's exclusive jurisdiction. And as the District Court recognized, the second carveout preserves jurisdiction for state courts in common-law actions but does not contravene the grant of CFTC's exclusive jurisdiction.[5] *Id.*

Congress gave the CFTC exclusive jurisdiction over trades on DCMs, provided for continued state regulation of trades conducted off DCMs, and recognized that while event contracts could involve gaming, the CFTC has discretionary power to review and prohibit those contracts. Thus, it was reasonable for the District Court to conclude that Kalshi was

---

[5] We agree with other circuits that carveouts for state actions like negligence and fraud do not undermine the Act's preemptive regulation of commodity futures. *See, e.g.*, *Kerr v. First Commodity Corp. of Boston*, 735 F.2d 281, 288 (8th Cir. 1984) ("[T]he continued existence of common law fraud actions permitting punitive damage awards does not conflict with the regulatory scheme established by the Act. Congress recognized this by including [the] savings clause . . . ."); *Kotz v. Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207 (9th Cir. 1982) ("Congress clearly intended to create a single agency to regulate the field [of futures trading] . . . It does not follow, however, that creation of a central regulatory authority [the CFTC] means abolition of common law rights, unless their retention would render the regulatory scheme ineffective."); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("While courts have held that the CFTA preempts state regulation of commodities futures, it has also been held that the CFTA does not preempt state general antifraud statutes.") (citation omitted).

likely to succeed in showing that the Act preempts New Jersey law from reaching into Kalshi's CFTC-licensed DCM to ban sports-related event contracts.[6]

B

The remaining preliminary-injunction factors, on balance, tip the scale in favor of Kalshi. As for irreparable harm, the moving party must demonstrate "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 262 (3d Cir. 2020) (quotation omitted). New Jersey threatened Kalshi with civil and criminal penalties. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."). The District Court did not abuse its discretion when it held that, absent injunctive relief, Kalshi would suffer

---

[6] Other courts considering this question have also determined that Kalshi's sports-related event contracts on its DCM are subject to the exclusive jurisdiction of the CFTC. *Kalshiex LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("The court finds that Kalshi is likely to succeed on the merits because sports event contracts are "swaps" and conflict preemption applies."); *Blue Lake Rancheria v. Kalshi Inc.*, No. 3:25-cv-6162, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025) ("Plaintiffs have not shown the Court has jurisdiction to decide whether Kalshi's event contracts violate the [Act]. That decision belongs to the [CFTC], which has 'exclusive jurisdiction' over its contract markets."); *see also KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ("I am persuaded that Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction . . . .").

economic and reputational harm, including loss of business and goodwill. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will."). The District Court pointed to a concrete example of lost business: a trading partner refused to list Kalshi event contracts in New Jersey because of a similar cease-and-desist letter.

The District Court also did not abuse its discretion by balancing the equities and public interest factors in favor of Kalshi. If the Act preempts New Jersey law, then the public interest is best served by enforcing the Act. *See N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 389 (3d Cir. 2012) ("[T]he public interest [is] not served by the enforcement of an unconstitutional law."). Because we agree with the District Court that Kalshi has shown likelihood of success on its argument that the CFTC's exclusive jurisdiction over DCMs preempts New Jersey gambling laws and the state constitution, we conclude that the public interest factors tip toward Kalshi.

\* \* \*

Because the likelihood-of-success and irreparable-harm factors favor Kalshi, and the last factors largely turn on a determination of the merits, the District Court did not abuse its discretion by granting the preliminary injunction. We will affirm.

17

Matthew J. Platkin
Liza B. Fleming
Stephen Ehrlich **[ARGUED]**
Emily M. Bisnauth
Vivek N. Mehta
Office of the New Jersey Attorney General
  *Counsel for Appellants*

Andrew L. Schlafly
  *Counsel for Amicus Appellants Stop Predatory Gambling, Texans Against Gambling, and Association of American Physicians and Surgeons*

Elizabeth A. Bower
Joseph H. Webster
Hobbs Straus Dean & Walker LLP

Scott D. Crowell
Crowell Law Offices

Michael C. Hoenig
Yuhaaviatam of San Manuel Nation
  *Counsel for Amicus Appellant Indian Gaming Association, et al.*

Kevin F. King
Eli Nachmany
Covington & Burling LLP
  *Counsel for Amicus Appellant American Gaming Association*

Zachery P. Keller
Office of Attorney General of Ohio
Office of the Solicitor General

Heidi P. Stern
Jessica E. Whelan
Office of Attorney General of Nevada
    *Counsel for Amicus Appellants 34 States, District of Columbia, and Northern Mariana Islands*

Alexander H. Loomis
Derek Shaffer
Quinn Emanuel Urquhart & Sullivan, LLP
    *Counsel for Amicus Appellant Casino Association of New Jersey Inc.*

Neal K. Katyal
William E. Havemann **[ARGUED]**
Samantha K. Ilagan
Gurbir S. Grewal
Milbank LLP
    *Counsel for Appellee*

Tyler R. Green
Consovoy McCarthy PLLC
    *Counsel for Amicus Appellee Paradigm Operations LP*

Michael M. Rosensaft
Katten Muchin Rosenman LLP
    *Counsel for Amicus Appellee Bitnomial Exchange LLC*

Megan Barbero
Kyle Keraga
Carlos H. Salguero, Jr.
Venable LLP
    *Counsel for Amicus Appellees Max Baucus, Blanche L.*
    *Lincoln, Saxby Chambliss, K. Michael Conaway, Collin*
    *Peterson, Cheri Bustos, and Cindy Axne*

Scott D. Brenner
Parlatore Law Group, LLP
    *Counsel for Amicus Curiae New Finance Institute*

ROTH, *Circuit Judge*, dissenting.

When I went on the Kalshi page for the Carolina Panthers vs. Tampa Bay Buccaneers football game scheduled for January 3, 2026, I could have bet on the winner (game outcome).[1]  I could have also bet on whether I believed Tampa Bay would win by more than 2.5 points (point spread), whether the two teams would collectively score 45 or more points (game props), or whether former Tampa Bay wide receiver Mike Evans would score a touchdown (player props).[2]  These offerings are virtually indistinguishable from the betting products available on online sportsbooks, such as DraftKings and FanDuel.  While online sportsbooks are regulated by states such as New Jersey, Kalshi asserts that it is outside the bounds of state regulation because it does not offer gambling products.  Instead, Kalshi contends its offered sports-event contracts are swaps, subject to the exclusive jurisdiction of the CFTC.  The Majority agrees, holding that Kalshi's registration as a DCM and branding of its wagers as sports-event contracts are acts of alchemy that transmute its products from sports gambling to futures trading.  I see Kalshi's actions as a performative sleight meant to obscure the reality that Kalshi's products are sports gambling.  Because Kalshi is facilitating gambling, it can be subjected to state regulation.

The Majority's preemption analysis fails to adequately consider the presumption against preemption, which applies

---

[1]    *Carolina    at    Tampa    Bay*,    Kalshi, https://kalshi.com/markets/kxnflgame/professional-football-game/kxnflgame-26jan04cartb    [https://perma.cc/ZG4E-RPAH?type=image] (last visited Jan. 2, 2026).
[2] *Id.*

with special force here because gambling has traditionally been regulated by the states.[3]  I believe that when taking into account the presumption against preemption, the application of New Jersey's gambling laws to Kalshi's sports-event contracts is not field preempted.  I would also hold that conflict preemption does not apply because Kalshi is not precluded from complying with both New Jersey and federal law, and because New Jersey's regulations do not undermine the congressional objectives behind the Act.  Accordingly, because Kalshi cannot demonstrate a likelihood of success on the merits and show that New Jersey's gambling laws are federally preempted, I respectfully dissent.

## I.

Before I delve into the preemption analysis, I would like to briefly address the Majority's holding that Kalshi's sports-event contracts fall within the Act's definition of swaps.  Both parties make compelling arguments in support of their respective positions.  On the one hand, Kalshi is correct that the statutory definition of swaps is broad, with the Act defining swaps as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."[4]  A plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition.

On the other hand, we should not read statutes literally "if reliance on that language would defeat the plain purpose of

---

[3] *See infra* Section II.
[4] 7 U.S.C. § 1a(47)(A).

the statute,"[5] or would "def[y] rationality."[6]  As New Jersey argues, Kalshi's proffered definition would likely encompass virtually every kind of wager that could exist, including classic casino games and charity raffles.  After all, even a bet over the outcome of a friendly neighborhood ping pong match may have a "*potential* financial . . . consequence" because one of the bettors would reap a financial reward based on the match's outcome.[7]  Moreover, because the trading of swaps outside DCMs is illegal under 7 U.S.C. § 2(e), any individual who engages in gambling outside of a DCM would commit a felony were we to take the definition of swaps to its logical extreme.  Congress could not have intended for such a rationality-defying outcome.

The Majority contends that my concerns with the potential consequences of Kalshi's proffered swaps definition are based on a pile of "inference upon inference,"[8] but I rely on no inferences whatsoever.  I simply apply the definition to the real world and articulate the ramifications as I see them.  In any event, because I would rule against Kalshi on the basis of preemption,[9] I need not—and will not—decide whether Kalshi's sports-event contracts fall within the statutory definition of swaps.  That said, as I have laid out above, the question of whether sports-event contracts are swaps is a thorny issue with the potential to radically upend the legal

---

[5] *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983).
[6] *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 588 (3d Cir. 2020) (internal citation and quotation marks omitted).
[7] 7 U.S.C. § 1a(47)(A) (emphasis added).
[8] Maj. Op. 8.
[9] *See infra* Sections III and IV.

landscape governing the gambling industry, and I am not convinced the Majority's analysis does this issue justice.

## II.

Turning to preemption, I believe it is first important to provide a brief overview of the presumption against preemption, a bedrock principle of preemption law that the Majority incorrectly believes to be inapplicable. Courts cannot find preemption unless Congress's "clear and manifest purpose" was for the federal law to supersede "the historic police powers of the States."[10] Preemption principles counsel that a close call weighs against a finding of preemption. The presumption against preemption applies with special force when Congress has legislated in a field traditionally occupied by the states.[11]

Throughout U.S. history, gambling regulation has been largely left to the state legislatures.[12] Courts have noted that

---

[10] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

[11] *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (citing *Medtronic, Inc. v. Lohr*, 518 U.S 470, 485 (1996)).

[12] *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a state."); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) ("It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme."); *Flynt v. Bonta*, 131 F.4th 918, 932 (9th Cir. 2025) ("Gambling does not involve an inherently national system of regulation, given the states' long-understood authority in this area.").

4

gambling is a potentially harmful "vice activity,"[13] which states may regulate under their police powers to promote the "welfare, safety, and morals" of their citizens.[14] While federal gambling laws exist, they generally supplement state laws by targeting areas outside state jurisdiction, such as U.S. territorial waters,[15] Native American lands,[16] and the channels and instrumentalities of interstate commerce.[17] These federal laws also contain non-preemption provisions allowing for state gaming regulations.[18] Congress in 1978 summarized the federal-state balance in gambling laws as follows:

> [T]he States should have the *primary responsibility* for determining what forms of gambling may legally take place within their borders; the Federal Government should prevent interference by one State with the gambling policies of another, and should act to protect identifiable national interests; and in the *limited* area of interstate off-track wagering on horseraces, there is a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate

---

[13] *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 185 (1999).

[14] *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003).

[15] 18 U.S.C. §§ 1081–83 (Gambling Ship Act).

[16] 15 U.S.C. § 1175 (Johnson Act).

[17] 18 U.S.C. § 1084 (Wire Act).

[18] *See e.g.*, 18 U.S.C. §§ 1082(a), 1083(a) (Gambling Ships Act); 15 U.S.C. § 1172(a) (Johnson Act); 18 U.S.C. § 1084(b) (Wire Act).

wagers.[19]

Several states allowed certain forms of sports betting until Congress in 1992 passed the Professional and Amateur Sports Protection Act (PASPA), which barred states from authorizing sports betting.[20] This federal prohibition on sports betting continued until 2018, when the Supreme Court in *Murphy v. NCAA* held that PASPA's preemption provision was unconstitutional and without effect.[21] The Court explained that "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own."[22] Congress did not, so states did. As of July 2025, nearly 40 states have legalized sports gaming in some form or another. Many of these states use gaming taxes to fund public programs, and have adopted comprehensive regulatory schemes to protect the public from gambling addiction.

Of course, if Kalshi is correct that its products are not gambling, then discussion about the states' preeminent role in regulating gambling is moot. It is difficult, however, to take Kalshi's argument at face value when its marketing materials, such as the Instagram posts below, routinely refer to its products as "sports betting:"[23]

---

[19] 15 U.S.C. § 3001(a) (emphasis added).

[20] *See* 28 U.S.C. §§ 3701–04.

[21] *Murphy v. NCAA*, 584 U.S. 453, 479–80 (2018).

[22] *Id.* at 486.

[23] Casino Ass'n of New Jersey Br. at 24 (citing Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3, 2025), https://tinyurl.com/5a6x8kan.



Marketing materials such as these, coupled with the fact that Kalshi's sports related offerings are a dead ringer for the products offered by state-regulated online sportsbooks, make it difficult for me to accept the proposition that Kalshi is not facilitating gambling. Basic abductive reasoning tells us that if it looks like gambling, talks like gambling, and calls itself gambling, it's gambling.

The Majority believes the presumption against preemption does not apply because federal law governs interstate gambling. That fact is inapposite, however, because New Jersey does not seek to regulate interstate gambling—it only claims jurisdiction over Kalshi's sports betting activity

occurring within the state. The historical tradition of states having the dominant interest in intrastate gambling regulations means that our court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act"[24] when applying the preemption analysis to New Jersey's gambling laws. As the party asserting preemption, Kalshi bears the burden of overcoming this presumption.

## III.

The Majority holds that New Jersey's gambling laws as applied to Kalshi are field preempted because the Act grants the CFTC exclusive jurisdiction over trading on DCMs. The Majority believes the CFTC's occupation of the field of DCM trading gives it the sole authority to regulate Kalshi because it is a DCM. There are two issues with the Majority's holding. *First*, the Majority assumes that the relevant field is trading on DCMs when DCM trading is in fact better thought of as a subfield of futures trading. Because the federal occupation of a subfield cannot overcome the presumption against preemption, the CFTC's occupation of the subfield of DCM trading is insufficient to preempt state gambling laws. *Second*, the Majority inadequately addresses the fact that the Act contains savings clauses, which are incompatible with field preemption.

## A.

Although I agree with the Majority that the Act's text indicates that federal law occupies the field of DCM trading, I

---

[24] *Medtronic, Inc.*, 518 U.S. at 485 (internal quotation mark omitted).

disagree with the Majority's holding that DCM trading is the relevant field for our preemption analysis. In fact, the Majority does not bother with methodically determining the proper field for preemption purposes and instead assumes that the pertinent field is trading on DCMs because "Kalshi's sports-related event contracts are swaps under the Act."[25]

The Majority is mistaken in doing so because identifying the appropriate field is fundamental for this analysis.[26]   Not all fields are created equal.   For field preemption to apply, the field must be "sufficiently comprehensive" or "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."[27]  Subjects where field preemption have been found to apply include broad areas of law such as foreign affairs, international relations, and immigration.[28] DCM trading is not the sort of comprehensive field where the federal interest is so dominant that Congress intended for the "complete ouster of state power."[29]  Rather, DCM trading is a subfield of futures

---

[25] Maj. Op. 11.

[26] *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) ("In order to determine whether Congress has implicitly ousted the States from regulating in a particular field, we must first identify the field in which this is said to have occurred.").

[27] *Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010) (citations omitted).

[28] A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 290, 291 (2013) ("Field preemption is much more likely to be found when the federal statute deals with an area that the federal government has traditionally controlled, such as foreign affairs, international relations, and immigration.").

[29] *DeCanas v. Bica*, 424 U.S. 351, 357 (1976).

trading, which the Supreme Court has noted is "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."[30]

The CFTC's occupation of the subfield of DCM trading is insufficient to preempt state gambling laws because of the presumption against preemption. When Congress gave the CFTC jurisdiction over swaps, there was no "clear and manifest purpose" for federal law to supersede states' "historic police powers" over gambling regulation.[31]  After all, the CFTC has no expertise in the sports gaming industry.[32]  If Congress wanted the CFTC to serve as a kind of national sports gaming commission, it would not have stated its intention "in so cryptic a fashion."[33]

Both Kalshi and the Majority argue that the presumption against preemption is inapplicable because "the federal government has regulated the derivatives market for over a century."[34]  Yet, the presence of federal regulation, however longstanding, "does not by itself defeat the

---

[30] *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982).

[31] *Rice*, 331 U.S. at 230.

[32] *See West Virginia v. EPA*, 597 U.S. 697, 729 (2022) ("When [an] agency has no comparative expertise in making certain policy judgments, we have said, Congress presumably would not task it with doing so.") (internal quotation marks omitted).

[33] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 123 (2000).

[34] Maj. Op. 14.

application of the presumption."[35] The only federal law in this area that touches on gaming is the Dodd-Frank Act's "special rule" for event contracts (Special Rule), which gives the CFTC the authority to prohibit event contracts involving gaming.[36] The Special Rule, however, has only existed since the passage of Dodd-Frank in 2010, and can hardly be considered longstanding. In addition, Dodd-Frank's legislative history has only a brief discussion of "gaming,"[37] further highlighting the lack of federal regulation in this field.

The question of whether the federal occupation of a subfield can preempt state law, especially when the federal law overlaps with an area traditionally dominated by the states, cannot be answered by field preemption principles. Federal law may fully occupy a discrete subfield while leaving adjacent or overlapping fields to be governed under the conflict

---

[35] *Farina*, 625 F.3d at 116. *See also Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009) (applying presumption despite federal regulations existing "for more than a century").

[36] 7 U.S.C. § 7a-2(c)(5)(C)(i).

[37] 156 Cong. Rec. S5906–07 (2010).

preemption framework.[38]    Ultimately, the Majority errs because it fails to recognize that DCM trading is a subfield and disregards the presumption against preemption.

**B.**

The Majority also fails to reconcile its finding of field preemption with the existence of two savings clauses in the Act that preserve certain state law causes of action.  7 U.S.C. § 2(a)(1)(A) provides that (1) "[n]othing in this section shall . . . supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of the United States or of any State" (state law carveout), and that (2) "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State" (state court carveout).[39] Such clauses are "fundamentally incompatible with complete field preemption" because they indicate that

---

[38] *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) ("If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." (internal citations omitted)); *see also Farina*, 625 F.3d at 121 (rejecting field preemption claim upon concluding that Federal Communications Commission's regulation of radiofrequency emissions occupied the limited subfield of "areas of technical standards and competitive market structure for cellular service").

[39] 7 U.S.C. § 2(a)(1)(A).

Congress envisioned a role for state law in the field.[40]  A Swiss cheese-like field that allows for enclaves of state authority cannot preempt state law because field preemption requires *complete* occupation on the part of the federal government.

The Majority waves away the presence of these savings clauses by noting that the state law carveout applies "*except* as hereinabove provided" by the grant of exclusive jurisdiction to the CFTC.[41]  In the Majority's view, that prefatory clause means that Congress intended to occupy the field of DCM trading regulation because the state law carveout does not apply to matters within the CFTC's exclusive jurisdiction.  The Majority misses the point, however.  It does not matter if § 2's preservation of state law causes of action is not meant to infringe on the CFTC's exclusive jurisdiction.  The very fact that Congress decided to allow room for state law means that Congress chose to not completely occupy the field.

The Majority's position is even weaker with regard to the state court carveout.  While true that the state law carveout is restricted by the "except as hereinabove provided" language, the state court carveout is in a completely different sentence.[42]  The text of the Act therefore places no limits on the carveout for state court jurisdiction—it is absolute and completely unaffected by the grant of exclusive jurisdiction to the CFTC.  For that reason, I disagree with the Majority's holding that the

---

[40] *Farina*, 625 F.3d at 121.

[41] Maj. Op. 15 (citing 7 U.S.C. § 2(a)(1)(A)) (emphasis in original).

[42] 7 U.S.C. § 2(a)(1)(A).

13

state court carveout "does not contravene the grant of CFTC's exclusive jurisdiction."[43]

Consequently, I would hold that the presence of such clauses is evidence of Congress's intent to allow a certain amount of complementary state regulation in this field. Accordingly, field preemption does not apply.

## IV.

Conflict preemption can occur if it is impossible to comply with both state and federal law[44] (impossibility), or if state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (obstacle).[45]  Kalshi claims both forms of conflict preemption, arguing that it is impossible to comply with both New Jersey's gambling laws and CFTC requirements, and that the application of New Jersey's gambling laws to Kalshi's sports-event contracts "subverts Congress's aim of bringing futures markets 'under a uniform set of regulations.'"[46]

While the Majority does not address impossibility preemption, it does agree with Kalshi that obstacle preemption prevents New Jersey from regulating Kalshi's sports-event

---

[43] Maj. Op. 15.

[44] *See MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013).

[45] *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985).

[46] Appellee Br. 30 (quoting *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992).

contracts. I would instead hold that neither form of conflict preemption applies here. Kalshi can comply with both New Jersey and federal law, and New Jersey's gambling laws as applied to Kalshi do not frustrate the congressional objectives behind the Act.

### A.

Kalshi contends that impossibility preemption applies because New Jersey requires that the gaming it regulates "shall only occur within the State"[47] and because New Jersey bans wagering on college sports events involving New Jersey college teams or taking place in the state.[48] In order to comply with these requirements, Kalshi argues that it would have to exclude New Jersey from contracts it offers in other states, which would violate the CFTC requirement that a DCM provide "impartial access to its markets and services."[49] I disagree. The impartial access requirement does not mandate that a particular market exist for event contracts.[50] Congress simply wanted the CFTC to regulate access to a market to the extent it exists.[51]

In fact, the purpose behind the impartial access requirement was to prevent DCMs from using discriminatory access requirements, like the creation of exclusive membership

---

[47] N.J. Admin. Code § 13:69O-1.2(e)(2).

[48] N.J. Const. art. IV, § 7, ¶ 2(D).

[49] 17 C.F.R. § 38.151(b).

[50] *See Just Puppies, Inc. v. Brown*, 123 F.4th 652, 664 (4th Cir. 2024).

[51] *Id.*

15

standards that focus on high net worth.[52]  It has nothing to do with ensuring that event contracts are available in all states. Kalshi can still establish different categories of market participants, such as a separate market for New Jersey residents, as long as it does not "discriminate within [that] particular category."[53]  Kalshi has therefore not shown that it is impossible to comply with both federal and state laws.

## B.

The Majority states "that "[a]llowing New Jersey to enforce its gambling laws and state constitution would create an obstacle to executing the Act" because it would subvert Congress's aim of ensuring that futures markets operate under a uniform set of regulations.[54]  While uniformity is an important goal of the Act, "no legislation pursues its purposes at all costs," and it "frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law."[55]  Such broad purposes arguments "ignor[e] the complexity of the problems

---

[52] *See* Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 n.51 (Dec. 22, 2010).

[53] *Id.* at 80579.  During oral argument, counsel for New Jersey noted that Sporttrade is a company that offers event contracts in the state and has been able to comply with both New Jersey and federal regulations.

[54] Maj. Op. 13.

[55] *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (emphasis in original).

16

Congress is called upon to address."[56]  Courts cannot use the Supremacy Clause "to elevate abstract and unenacted legislative desires above state law."[57]

The analysis of this issue should be grounded in the text of the statute and relevant regulations.  The Special Rule, which was added to the Act following the passage of Dodd-Frank,[58] is the only provision in the statute that addresses gaming contracts.  Therefore, I must analyze this provision to discern whether New Jersey's gambling laws undermine congressional objectives.  The Special Rule states that the CFTC "may determine that . . . [event] contracts . . . are contrary to the public interest" if they involve "gaming."[59] Kalshi is correct that this statutory provision alone does not prohibit the trading of gaming contracts in DCMs, as it merely gives the CFTC the authority to prohibit them.  The CFTC did use that authority, however, enacting Rule 40.11(a)(1), which prohibits DCMs from trading, or accepting for clearing, event contracts that involve, relate to, or reference gaming.[60]  Under the plain text of this regulation, Kalshi's sports-event contracts are being offered in violation of federal law.  If gaming contracts, such as sports-event contracts, violate federal law, state gambling laws as applied to such contracts cannot be conflict preempted.  Far from undermining congressional

---

[56]

*Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp,* 4 74 U.S. 361, 373–74 (1986) (internal quotation marks omitted).

[57] *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019).

[58] Pub. L. No. 111-203, 124 Stat. 1737 (2010).

[59] 7 U.S.C. § 7a-2(c)(5)(C)(i).

[60] 17 C.F.R. § 40.11(a)(1).

objectives, New Jersey's gambling laws arguably complement them.

The legislative history of Dodd-Frank also indicates Congress's general disdain for gaming contracts. While it is important to be mindful "that the authoritative statement is the statutory text," and that "legislative history can be murky, ambiguous, and contradictory,"[61] I believe that the legislative history can be useful in providing important context in this case because of the paucity of references to gaming contracts in both the Act and Dodd-Frank.

The congressional record for Dodd-Frank includes a colloquy from then Senator Blanche Lincoln of Arkansas, who said that the Special Rule's purposes are "to prevent the creation of futures and swaps markets that would allow citizens to profit from devastating events," "prevent gambling through futures markets," and "strengthen the government's ability to protect the public interest against gaming contracts and other event contracts."[62] She continued:

> The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament.

---

[61] *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 697 (3d Cir. 2016) (internal quotation marks and citation omitted).
[62] 156 Cong. Rec. S5906 (2010).

18

These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.[63]

In short, Dodd-Frank's history undermines Kalshi's obstacle preemption claim. Congress intended to prohibit gambling on DCMs, and the CFTC effectuated that intention through its enactment of Rule 40.11(a)(1). Kalshi asserts that its sports-event contracts comply with this regulation because the CFTC has not taken any action against its contracts. The Majority similarly notes that "the CFTC has chosen not to enforce its regulation against the type of sports-related event contracts at issue here."[64] Kalshi and the Majority overlook that agency inaction alone cannot preempt state law,[65] especially not when that inaction constitutes a failure to "adhere to its own rules and regulations."[66] While the CFTC has recently issued an Advance Notice of Proposed Rulemaking on regulating prediction markets,[67] Rule 40.11(a)(1)'s prohibition of gaming contracts continues to be in place. Accordingly, neither the CFTC's failure to enforce its own regulation nor nonexistent rules governing event contracts are sufficient to coat Kalshi's self-certified gaming contracts with a sheen of legality. They cannot be a basis to argue conflict preemption.

---

[63] *Id.* at S5906–07.

[64] Maj. Op. 7.

[65] *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 247 (3d Cir. 2008) (citing *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65–70 (2002)).

[66] *Reuters Ltd. v. FCC,* 781 F.2d 946, 950 (D.C. Cir. 1986).

[67] *See* Prediction Markets, 91 Fed. 12516 (Mar. 16, 2026).

Further, a federal law does not preempt state laws where the activity regulated by the state is merely a peripheral concern of the federal law.[68] The lack of references to gaming contracts in Dodd-Frank indicates that such contracts were a peripheral concern when the Special Rule was enacted. This is in contrast to New Jersey's laws, which have the explicit purpose of governing the gaming industry and are not intended to intrude on federal regulation of the futures markets.[69]

Finally, Kalshi's argument that New Jersey's gambling laws pose an obstacle to the accomplishment of Congress's goals behind the Act is undercut by the lack of a clear congressional statement that the Special Rule was intended to have preemptive effect. The Act contains both a preemption and non-preemption provision, neither of which cover trading on DCMs. 7 U.S.C. § 16(e)(2) specifies that the Act preempts the application of state gaming laws to certain enumerated transactions that are exempted or excluded from the Act.[70]

---

[68] *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007); *see also Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981).

[69] *Ford Motor Co. v. Ins. Comm'r of Pa.*, 874 F.2d 926, 939 (3d Cir. 1989) (finding no implied preemption because "the intent of the federal scheme was to regulate the *operation* of federally insured thrifts," and thus federal law "did not preclude supplemental state regulations which . . . imposed a restriction upon the *affiliations* that the thrift could have and were designed more to regulate the insurance industry rather than to control the operation of the savings and loan industry" (alteration in original)).

[70] 7 U.S.C. § 16(e)(2).

Transactions "conducted on or subject to the rules of a registered entity," like a DCM, are not on the list of enumerated transactions.[71] 7 U.S.C. § 16(e)(1) expressly states that the Act does not preempt the application of state laws to any futures contract conducted *outside* regulated exchanges like DCMs.[72] Since Congress's silence can be construed in more than one way, I would apply the presumption against preemption and interpret the lack of reference to DCM trading as weighing against conflict preemption.

***

For these reasons, I would hold that Kalshi cannot demonstrate a reasonable likelihood of success on the merits on its preemption claims. I therefore respectfully dissent.

---

[71] *See id.*

[72] 7 U.S.C. § 16(e)(1).