

# Milbank

**WILL HAVEMANN**
*Partner*
1101 New York Ave., N.W.  |  Washington, DC 20005
T: +1 (202) 835-7518
whavemann@milbank.com  |  milbank.com

May 7, 2026

**By Electronic Filing**

Molly Dwyer
Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
James R. Browning Courthouse
95 Seventh Street
San Francisco, CA 94103

      Re:    ***KalshiEX LLC v. Assad, et al.***, No. 25-7516
               **FRAP 28(j) Letter**

Dear Ms. Dwyer:

Kalshi respectfully informs this Court of a decision by the District of Arizona that strongly supports reversal.

In a preemption action brought by the United States and CFTC, the court issued a preliminary injunction to prevent Arizona regulators from subjecting Kalshi's event contracts to state law, concluding the U.S. is "likely to succeed" in proving "the CEA preempts Arizona's enforcement of its gambling laws." *KalshiEX LLC v. Johnson*, No. 2:26-cv-1715 (D. Ariz. May 5, 2026), Order 6-15,17.

The court held that Kalshi's contracts are swaps under the CEA's "broad" definitions. Order6-9. It explained that event contracts are "associated with potential financial … consequences because stakeholders have financial exposure to the underlying events' outcomes." Order8. "Event contracts based on sports and election outcomes" "can be used to offset financial exposure," confirming "the association between the event and commercial consequences to stakeholders." Order8.

Regarding field preemption, the court held the CEA "forecloses parallel state regulation of DCM trading." Order11. It explained that "the presumption against preemption does not apply" to the regulation of on-DCM trading, which "has been subject to longstanding federal control," especially given the CEA's "unmistakable preemptive language." Order12. The court also found that the "Special Rule," 7 U.S.C. § 7a-2(c)(5)(C), "confirms" field preemption because, "[b]y directing the CFTC to review event contracts and prohibit those contrary to the public interest,

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | HONG KONG | SEOUL | SINGAPORE | TOKYO

Congress placed event contracts under the CFTC's exclusive authority."  Order12.  Even if "one might object that the CFTC has not properly applied" 17 C.F.R. § 40.11 to Kalshi's sports-event contracts, the court explained that "how the CFTC applies § 40.11 is not the question before this Court.  The question presented is whether the federal government has that authority at all.  And the Court concludes that it does."  Order13.

On conflict preemption, the court determined that application of state laws to on-DCM trading would "frustrate Congress's objectives in creating a unified regulatory regime … and ensuring that DCMs operate as national markets," resulting in the "regulatory patchwork that Congress intended to avoid."  Order14.  The court also held that "the State's enforcement would independently fail under impossibility preemption," given the CEA's "impartial-access" obligation.  Order14-15.

Respectfully submitted,

/s/ William E. Havemann
William E. Havemann

*Counsel for Appellant KalshiEX LLC*


cc:    All Counsel (via ACMS)
       Word Count: 350

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KalshiEX LLC, | No. CV-26-01715-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Jackie Johnson, et al., | |
| Defendants. | |

The Court is called to rule upon a clash between two competing authorities. The first is the regulation of gambling, among the most rudimentary exercises of state police power. The second is Congress's regulation of derivatives, which has been placed under the exclusive oversight of the Commodity Futures Trading Commission ("CFTC"). Here, the Court concludes that federal law preempts state gambling laws insofar as they seek to regulate derivatives exchanged on markets regulated by the CFTC. The Court will grant Federal Plaintiffs' Motion for Preliminary Injunction (Doc. 49).

**I.      BACKGROUND**

The Court previously set forth the factual and procedural background of this case in its Order denying Kalshi's Motion for Preliminary Injunction. (Doc. 51 at 1-6.) The Court recounts here only what is necessary to frame the United States and CFTC's ("Federal Plaintiffs") Motion for Preliminary Injunction (Doc. 49).

Plaintiff KalshiEX LLC ("Kalshi") manages a CFTC-registered Designated Contract Market ("DCM"). (*See* Doc. 1 ¶ 23.) Since 2020, Kalshi's DCM has operated as

an online prediction exchange, listing "event contracts" tied to the outcomes of sporting events, elections, and similar future occurrences. Kalshi's prediction market drew the attention of Arizona state regulators who view its platform as facilitating unlicensed sports and event wagering. The Arizona Department of Gaming sent Kalshi a cease-and-desist letter directing Kalshi to "cease gambling operations in Arizona," warned that Kalshi is participating in illegal "event wagering," and threatened the "filing of criminal charges or a civil action against Kalshi and/or its principals or employees." (Doc. 1-2.)

Kalshi commenced this action in March 2026, seeking to enjoin certain Arizona state officials (the "State") from enforcing its gambling laws against Kalshi on the ground that the Commodity Exchange Act ("CEA") vests exclusive jurisdiction over DCMs in the CFTC. (Doc. 1.) The Court denied Kalshi's request for a temporary restraining order. (Doc. 15.) The Court ordered briefing and heard argument on the Anti-Injunction Act, 28 U.S.C. § 2283, and whether this Court was required to abstain under *Younger v. Harris*, 401 U.S. 37 (1971), in light of a twenty-count criminal information the State had filed against Kalshi in Arizona Superior Court. (Docs. 15, 21.)

On April 2, 2026, Federal Plaintiffs filed their own action against the State, contending that the CEA preempts Arizona's enforcement of its gambling laws against event contracts traded on DCMs. *See United States v. Arizona*, No. 2:26-cv-02246-MTL (D. Ariz. 2026). The Court consolidated the two actions and ultimately denied Kalshi's Motion for Preliminary Injunction. (Docs. 37, 51.) Federal Plaintiffs moved for a temporary restraining order and preliminary injunction on substantially the same grounds as Kalshi's motion. (Doc. 49.) The Court granted Federal Plaintiffs' request for a temporary restraining order and now determines whether a preliminary injunction is appropriate.

This case does not exist in a vacuum. Kalshi has filed materially identical preemptive actions against state officials in jurisdictions across the country, and the resulting decisions are divided. *Compare KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (granting preliminary injunction), *with KalshiEX LLC v. Schuler*, No. 2:25-cv-01165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026)

(denying preliminary injunction); *see also KalshiEX LLC v. Hendrick*, —F.Supp.3d—, 2025 WL 3286282 (D. Nev. Mar. 28, 2025); *KalshiEX LLC v. Martin*, 793 F.Supp.3d 667 (D. Md. Apr. 21, 2025).

Thus far, only one federal appellate court has issued a decision on the merits. On April 6, 2026, the Third Circuit held in *KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026), that Kalshi was entitled to a preliminary injunction because it demonstrated a "reasonable chance of success" on the argument that the CEA preempts state gambling laws as applied to its exchange. The Ninth Circuit's decision on the same issue is imminent. The Ninth Circuit heard oral argument on April 16, 2026, in *KalshiEX, LLC v. Assad, et al.*, Case No. 25-7516*,* where Kalshi has appealed the dissolution of a preliminary injunction previously entered in its favor by the District of Nevada. The CFTC has taken the position, in an amicus brief filed in a case consolidated with *Assad*, that it retains exclusive jurisdiction to regulate DCMs. (Doc. 17 at 7.) The Court issues this Order recognizing that it will likely be tested promptly by the Court of Appeals.

## II.    STATUTORY FRAMEWORK

Two regimes purport to regulate Kalshi's event contracts market. The federal scheme places certain financial instruments, including swaps traded on DCMs, under the exclusive jurisdiction of the CFTC. Arizona's gambling laws regulate event wagering within Arizona. The federal and state provisions, set forth respectively below, bear on the question of whether Kalshi's event contracts qualify as swaps subject to the CFTC's exclusive jurisdiction and whether the CEA preempts Arizona's gambling laws.

### A.    Federal Regulation

The CEA vests the CFTC with "exclusive jurisdiction" over, among other things, transactions "involving swaps or contracts of sale of a commodity for future delivery" traded on DCMs. 7 U.S.C. § 2(a)(1)(A). An entity seeking to operate such a market must register with the CFTC as a DCM and comply with the agency's regulatory framework. *Id.* §§ 2(e), 7(a), (d); 17 C.F.R. §§ 38.1, 38.3(a). Kalshi is a registered DCM. (Doc. 1 ¶ 54.)

The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L.

No. 111-203, 124 Stat. 1376 (2010), brought swaps within the CFTC's exclusive jurisdiction. A "swap" is defined as, among other things

> any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

7 U.S.C. § 1a(47)(A)(ii).

The Dodd-Frank Act also enacted a "Special Rule" for "event contracts," which are defined as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . by a designated contract market." *Id.* § 7a-2(c)(5)(C)(i). An "excluded commodity" includes "an occurrence, extent of an occurrence, or contingency . . . that is . . . (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). The Special Rule authorizes the CFTC to review certain event contracts and prohibit their listing if they are determined "to be contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i)-(ii). The CFTC's implementing regulation, 17 C.F.R. § 40.11, prohibits DCMs from listing event contracts involving enumerated activities, including "gaming." *Id.* § 40.11(a). Section 40.11 also establishes a 90-day review procedure where the CFTC may examine event contracts it determines relate to the enumerated activities. *Id.* § 40.11(c).

### B.    State Regulation

Arizona's Gaming Act, Ariz. Rev. Stat. §§ 5-1301 *et seq.*, authorizes "event wagering" within the State, but only when conducted by licensed operators who submit to the statute's requirements. *Id.* § 5-1303. The Arizona Gaming Act defines "event wagering" as

> [a]ccepting wagers on sports events or other events, portions of sports events or other events, the individual performance statistics of athletes in a sports event or combination of sports events or the individual performance of individuals in other events or a combination of other events by any system or method of wagering, including in person or over the Internet through websites and on mobile devices.

*Id.* § 5-1301(4)(a). A "wager" is "risking . . . something of value for the opportunity to obtain a benefit from a game or contest of chance or skill or a future contingent event." *Id.* § 13-3301(6).

To conduct event wagering, an entity must obtain a license from the Arizona Department of Gaming. *See id.* §§ 5-1302, 5-1303(A). The licensing framework imposes a range of requirements, including provisions designed to prevent persons with insider information over wagered-upon events from operating in the market. *See id.* §§ 5-1301(16), 5-1311(A). Conducting event wagering without a license is a criminal offense, *id.* §§ 13-3303(A), (B), 13-3305(B), and Kalshi does not hold an Arizona event-wagering license, (Doc. 18 at 10).

## III.   DISCUSSION

The Court considers Federal Plaintiffs' request for a preliminary injunction. As it did when it issued the temporary restraining order (Doc. 65), the Court first confirms the movants' standing. The federal government "may sue to protect its interests," *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967), and that authority extends to suits seeking to enjoin the enforcement of preempted state law. *See United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016) (reading *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 325-27 (2015), to permit the United States to seek injunctive relief and invoke preemption to protect its interests); *see also Arizona v. United States*, 567 U.S. 387, 416 (2012) (affirming in part a preliminary injunction in favor of the United States against enforcement of preempted state law). The CFTC therefore has standing to seek to enjoin Arizona's enforcement of its gambling laws against event contracts traded on DCMs.

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, these factors are evaluated on a "sliding scale," under which "a stronger

showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). For the reasons that follow, the Court concludes that Federal Plaintiffs have demonstrated that a preliminary injunction is warranted under these factors.

### A.    Likelihood of Success on the Merits

To obtain a preliminary injunction, a plaintiff must show that it is "likely to succeed on the merits." *Winter*, 555 U.S. at 20. Federal Plaintiffs' Complaint alleges that the CEA preempts Arizona's enforcement of its gambling laws against event contracts traded on DCMs. *United States v. Arizona*, 2:26-cv-02246-MTL, Doc. 1 (Apr. 2, 2026). That theory has two components. First, event contracts must qualify as swaps. Second, the CEA's granting of exclusive jurisdiction to the CFTC over swaps preempts state enforcement against event contracts. The Court concludes that Federal Plaintiffs are likely to succeed on both components of their theory.

### 1.    Event Contracts are Swaps

The CEA grants the CFTC "exclusive jurisdiction" over swaps. 7 U.S.C. § 2(a)(1)(A). The CEA defines swaps, in relevant part, as any "contract . . . that provides for any purchase, sale, payment, or delivery . . . that is [1] dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency [2] associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). Event contracts satisfy both elements.

The first element demands that a swap is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." *Id.* Event contracts are tied to the outcome of certain events, such as a sports team winning a game. The State contends that an outcome is distinct from an "occurrence" or "event." (Doc. 18 at 14-15.) Under the State's reading, an "'event' would be 'the sporting event itself, not who wins it.'" (*Id.* (citation omitted).) But the statute's text does not support that distinction. The ordinary meaning of "event" includes "something that happens," "a noteworthy happening," or "a postulated outcome, condition, or eventuality." *Event*,

Merriam-Webster, https://www.merriam-webster.com/dictionary/event (last visited Apr. 27, 2026). "Occurrence" means "the action or fact of happening or occurring." *Occurrence*, Merriam-Webster, https://www.merriam-webster.com/dictionary/occurrence (last visited Apr. 27, 2026); *see also Occurrence*, Black's Law Dictionary (9th ed. 2009) (defining "occurrence" as "[s]omething that happens or takes place"). Those definitions are broad enough to encompass the result of a contest in addition to the contest itself. *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). Both terms plainly reach observable facts that come to pass, including the result of a game. That an event or occurrence has an antecedent cause does not mean it is not an event or occurrence.

Moreover, in addition to "occurrence" and "nonoccurrence," Congress included the phrase, "*the extent of* the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A) (emphasis added). The term "extent" implies a result that is measurable along a spectrum. *See Extent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/extent (last visited Apr. 27, 2026) (defining "extent" in part as "the range over which something extends" or "the point, degree, or limit to which something extends"). If "occurrence" and "nonoccurrence" capture whether an event happens, "the extent of the occurrence" extends to how an event resolves. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (holding that courts must give effect "to every clause and word of a statute") (citation omitted). The statutory definition of swap therefore reaches how an event unfolds, not just whether it happens. The outcomes of the events that form the basis of contracts are "events" or "occurrences" within the meaning of § 1a(47)(A).

The second element of the definition of a swap requires that the relevant event or occurrence must be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A). The State insists that, to be associated with a financial consequence, an event must be "determined or impacted by any market." (Doc. 57 at 6.) Congress's use of broad language weighs against the State's reading. First, Congress

specified that the relationship between the event and the consequence need only be one of "association." 7 U.S.C. § 1a(47)(A). To "associate" means "to join or connect together" or "to bring together or into relationship in any of various intangible ways." *Associate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/associate (last visited Apr. 27, 2026). An occurrence must therefore be connected to, but not necessarily the direct cause of, downstream effects that flow from an event. Second, Congress requires that an event be associated with a "potential," not actual or probable, consequence. Third, Congress specified that an event may be associated with a "financial, economic, *or* commercial" consequence. The statute's inclusion of three disjunctive categories of consequences sweeps in a wide range of qualifying downstream consequences, not necessarily limited to those that carry a market price. Because the second element of the definition of swap was written broadly, the Court declines to impose a requirement that an event be determined by a market.

Event contracts are associated with potential financial, economic, or commercial consequences because stakeholders have financial exposure to the underlying events' outcomes. The State is incorrect when it asserts that "[t]here is no genuine basis to hedge against happenings that have no inherent financial, economic, or commercial significance." (Doc. 18 at 16.) Temperature and precipitation have no intrinsic financial value. Yet the CFTC and the Securities Exchange Commission have consistently treated weather derivatives as swaps within the meaning of § 1a(47)(A). *See* Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48,208, 48,213 n.41 (Aug. 13, 2012) (Joint CFTC-SEC Final Rule). That is because weather events produce commercial consequences for a wide range of market participants. For example, a ski resort might hedge against an unusually warm winter, or an agricultural producer might hedge against drought. Event contracts based on sports and election outcomes work the same way. That these event contracts can be used to offset financial exposure confirms the association between the event and commercial consequences to stakeholders.

The State argues that this broad reading "offers no limiting principle." (Doc. 57 at 8.) But the outer bounds of the definition of swap are not for this Court to draw. Congress expressly delegated authority to the CFTC and SEC, in consultation with the Board of Governors, to "further define the term[] 'swap.'" 15 U.S.C. § 8302(d)(1). The Third Circuit noted that the authority "would prove useful" "[i]n such far-fetched scenarios" in which an event or occurrence's connection to commercial consequences seems too attenuated to fit within the statutory definition. *See Flaherty*, 172 F.4th at 228. The Court will not, on its own initiative, mark where the periphery of the definition ends when event contracts fit within the core of the definition of swaps.

For these reasons, the Court finds that event contracts traded on DCMs are swaps within the meaning of 7 U.S.C. § 1a(47)(A).

## 2.    Preemption

Having concluded that event contracts traded on DCMs are swaps, the Court turns to whether federal law preempts Arizona's regulation of them. Congress granted the CFTC "exclusive jurisdiction" over all "accounts, agreements . . . , and transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). The question presented is whether that grant displaces the State's authority to enforce its gambling laws against DCM operators for their offering of event contracts.

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. From that clause flows the doctrine of preemption, which "invalidates state laws that interfere with, or are contrary to, federal law." *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712 (1985) (quotation marks omitted). "The Supreme Court has identified 'three different types of preemption' – express, conflict, and field." *Jones v. Google LLC*, 73 F.4th 636, 641 (9th Cir. 2023) (quoting *Murphy v. NCAA*, 584 U.S. 453, 477 (2018)). "[T]he categories of preemption are not 'rigidly distinct,'" and a single statutory scheme may support more than one theory. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000)

- 9 -

(citation omitted). Here, both field and conflict preemption independently bar Arizona's enforcement against Kalshi.

### a.   Field Preemption

The CEA occupies the field of swaps and futures traded on DCMs. Field preemption applies when Congress enacts a "scheme of federal regulation . . . so pervasive . . . that [it] left no room for the States to supplement it," or when a "federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). On materially identical facts, the Third Circuit concluded § 2(a)(1)(A)'s grant of "exclusive jurisdiction" triggers field preemption of state enforcement of gambling laws against event contracts traded on DCMs. *Flaherty*, 172 F.4th at 228-29. This Court agrees.

The CEA grants the CFTC "exclusive jurisdiction" over "transactions involving swaps or contracts of sale of a commodity for future delivery[,] traded or executed on a contract market designated pursuant to section 7 of this title . . . or any other board of trade, exchange, or market." 7 U.S.C. § 2(a)(1)(A). The "plain meaning" of Congress's entrustment of "exclusive" jurisdiction "necessarily denies jurisdiction" to any entity besides the CFTC. *See Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). The CFTC's exclusive jurisdiction therefore preempts state law to the extent that state law purports to regulate contracts that fall within § 2(a). *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (instructing that state law is preempted where a federal agency's jurisdiction is "exclusive"); *see also* H.R. Rep. No. 93-1383, at 5897 (1974) (Conf. Rep.) ("Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned."). A savings clause underscores the CFTC's preemptive effect, as state regulatory authority is preserved only "[e]xcept as hereinabove provided"—that is, except where the CEA has vested exclusive jurisdiction in the CFTC. 7 U.S.C. § 2(a)(1)(A); *see also* S. Rep. No. 93-1131, at 5848 (1974) (explaining that "the Commission's jurisdiction, where applicable supersedes State as well as Federal

agencies").

The framework for regulating swaps traded on DCMs is "so pervasive . . . that [it] left no room for the States to supplement it." *Rice*, 331 U.S. at 230. Congress built "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). The CEA requires DCMs to, among other things, register with the CFTC, 7 U.S.C. §§ 2(e), 7(a); to comply with principles governing trading, *id.* § 7(d); and to self-certify compliance with the CEA's requirements, *id.* § 7a-2(c). These provisions regulate every aspect of DCMs, including what contracts may be listed and how trading may be conducted, leaving no room for state regulation. That comprehensive framework is so pervasive that it forecloses parallel state regulation of DCM trading.

The federal interest in uniform regulation of DCM-traded derivatives is also "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230. For more than a century, Congress has consistently chosen centralized federal regulation of these derivatives, stemming from the Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187, and the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998. Congress reaffirmed and expanded federal regulation in 1974 through amendments that created the CFTC and granted it "exclusive jurisdiction" over futures trading. Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389. Congress enacted its 1974 amendments out of express concern that state-by-state regulation would fracture a national market. *See* H.R. Rep. No. 93-1383, at 5897 ("[I]f any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern."). When Congress amended the CEA in 2010 through the Dodd-Frank Act, it extended the CFTC's exclusive jurisdiction to swaps. *See* 7 U.S.C. § 2(a)(1)(A). Every time Congress has revisited the federal-state allocation of authority in this area, it has chosen to expand federal control. It has done so while expressing unease about the costs of state-by-state regulation. S. Rep. No. 95-850, at 23 (1978) (rejecting proposals to divide the CFTC's exclusive

jurisdiction and citing concerns over "costly duplication and possible conflict of regulation or over-regulation"). The federal interest in regulating swaps traded on DCMs is sufficiently dominant to satisfy the second marker of field preemption.

Gambling remains a traditional field of state concern. The State understandably invokes the presumption that "historic police powers of the States" are not superseded absent a "clear and manifest purpose of Congress." *Rice*, 331 U.S. at 230; *see Wyeth v. Levine*, 555 U.S. 555, 565 (2009). But where a state seeks to regulate conduct that has been subject to longstanding federal control, the presumption against preemption does not apply. *See United States v. Locke*, 529 U.S. 89, 108 (2000) (stating that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence") (citation omitted). Federal Plaintiffs do not contend that the CEA preempts state gambling regulation writ large. Rather, the preempted field is the regulation of trading in swaps on CFTC-registered DCMs, the area over which Congress granted the CFTC exclusive jurisdiction. *See Martin ex rel. Heckman v. Midwest Express Holdings, Inc.*, 555 F.3d 806, 811 (9th Cir. 2009) (field preemption extends to the "specific area" the federal scheme occupies). More plainly, the presumption is also overcome by unmistakable preemptive language, namely Congress's commitment of "exclusive jurisdiction" to the CFTC. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (declining to invoke the presumption against preemption because of the existence of preemptive language).

The "Special Rule," codified as 7 U.S.C. § 7a-2(c)(5)(C)(i)-(iv) and implemented as 17 C.F.R. § 40.11, confirms that the preempted field extends to event contracts traded on DCMs. The Special Rule authorizes the CFTC to prohibit the listing of event contracts relating to certain categories of activities, including "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), after the CFTC determines the contracts to be "contrary to the public interest," *id.* § 7a-2(c)(5)(C)(ii). By directing the CFTC to review event contracts and prohibit those contrary to the public interest, Congress placed event contracts under the CFTC's exclusive authority.

Still, one might object that the CFTC has not properly applied the Special Rule to certain event contracts. The CFTC's implementing regulation prohibits DCMs from listing event contracts related to enumerated activities, such as "gaming," and establishes a 90-day review process with which the CFTC may examine contracts it suspects relate to an enumerated activity. 17 C.F.R. § 40.11(a), (c). While it is true that the ordinary meaning of "gaming" may bring Kalshi's event contracts within § 40.11(a)'s prohibition and trigger the 90-day review process, how the CFTC applies § 40.11 is not the question before this Court. The question presented is whether the federal government has that authority at all. And the Court concludes that it does.

For these reasons, the Court finds that the CEA preempts the regulation of trading in swaps on CFTC-registered DCMs. The State's prosecution of Kalshi intrudes on this field.

### b. Conflict Preemption

Conflict preemption also bars Arizona's enforcement of its gambling laws against Kalshi. Conflict preemption applies in two situations: (1) "compliance with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); and (2) when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Each situation alone is enough to support a finding of preemption. *See Crosby*, 530 U.S. at 372-73.

The State's enforcement stands as an obstacle to Congress's full purposes and objectives in the CEA. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 373. As described above, Congress designed the CEA as "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch*, 456 U.S. at 356 (citation omitted). Congress then expanded federal regulation over derivatives trading "support[ing] the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures." *See* H.R. Rep. No. 97-565, at

44-45 (1982).

The Seventh Circuit has recognized that state laws frustrate the CEA's purposes when their application would directly affect the contracts traded on federally regulated derivatives markets. *See Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (holding that state claims were preempted where they would "directly affect trading on or the operation of a futures market"). Arizona's gambling laws directly affect event contracts traded on DCMs by purporting to impose criminal penalties on anyone who offers event contracts. Ariz. Rev. Stat. §§ 13-3303(B), 13-3305(B). Congress's decision to vest exclusive control over event contracts cannot be reconciled with a state's authority to declare listed event contracts unlawful and to prosecute operators of DCMs for offering them.

The State's enforcement of its gambling laws would also frustrate Congress's objectives in creating a unified regulatory regime that oversees DCMs and ensuring that DCMs operate as national markets. If states could prosecute DCM operators for offering event contracts, the operators would face the prospect of fifty different regulators, each capable of restricting which contracts may be listed on each exchange. The result would be the inconsistent regulatory patchwork that Congress intended to avoid. Because Arizona's gambling laws stand as an obstacle to federal regulation, those laws are preempted.

Even if obstacle preemption did not apply, the State's enforcement would independently fail under impossibility preemption. Impossibility preemption applies when "compliance with both federal and state regulations is a physical impossibility." *Fla. Lime & Avocado Growers*, 373 U.S. at 142-43; *see Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013). CFTC regulations require every DCM to "provide its members . . . with impartial access to its markets and services," including "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b), (b)(1). The State's enforcement of its laws would make compliance with that obligation impossible. Arizona law criminalizes the conduct of "event wagering" by any operator not licensed by the Arizona Department of Gaming. Ariz. Rev. Stat. §§ 5-1301(4)(a),

5-1303(A), 13-3305(B). If event contracts constitute "event wagering," as the State has contended in its prosecution of Kalshi in Arizona Superior Court, a DCM operator must exclude Arizona residents from trading event contracts on its platform, in violation of 17 C.F.R. § 38.151(b) and (b)(1). Compliance with federal and state regimes is therefore impossible, so impossibility preemption applies.

Federal Plaintiffs have therefore made a clear showing that they are likely to succeed on their claim that the CEA preempts Arizona's enforcement of its gambling laws against operators of DCMs that offer event contracts.

### B.      Irreparable Harm

Federal Plaintiffs have clearly shown that they will suffer irreparable harm absent a preliminary injunction. The Ninth Circuit presumes that a likely constitutional violation causes irreparable harm. *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (noting that courts "presume that a constitutional violation causes a preliminary injunction movant irreparable harm") (emphasis omitted). That presumption applies to Supremacy Clause violations in suits brought by the United States to enjoin preempted state laws. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."). In *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019), the Ninth Circuit upheld the district court's application of a presumption of irreparable harm to the United States in regulating the relationship between the federal government and its employees. And in *Arizona v. United States*, 567 U.S. 387, 416 (2012), the Supreme Court affirmed a preliminary injunction against preempted provisions of state law, which was necessarily based on the premise that the United States faced irreparable injury from their enforcement.

As explained in the Court's assessment of Federal Plaintiffs' likelihood of success on the merits, Federal Plaintiffs are likely to prevail on their claim that the CEA's grant of "exclusive jurisdiction" preempts the State's enforcement of its gambling laws against DCM operators offering event contracts. The State's continued prosecution of DCM

operators inflicts the injury that the *California* and *Arizona* courts recognized as grounds for preliminary injunctive relief, the enforcement of preempted state law. Federal Plaintiffs have therefore demonstrated irreparable harm absent a preliminary injunction.

### C.    Balance of Equities and Public Interest

The final two *Winter* factors, which take into account whether granting a preliminary injunction serves the balance of equities and public interest, merge when the federal government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Both factors weigh in Federal Plaintiffs' favor.

The equities favor Federal Plaintiffs, as a preliminary injunction would hold the State to the limits Congress set on its authority, while denying a preliminary injunction would undermine the uniform regime Congress entrusted to the CFTC. There is also a substantial public interest in the enforcement of valid federal law. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). As Congress has spoken, vesting "exclusive jurisdiction" over DCM-traded derivatives in the CFTC, 7 U.S.C. § 2(a)(1)(A), the public interest lies in giving that grant of jurisdiction effect. And while the State may have a general interest in regulating gambling within its borders, a state has no legitimate interest in enforcing a preempted law. *See Otto v. City of Boca Rotan, Fla.*, 981 F.3d 854, 870 (11th Cir. 2020) ("[N]either the government nor the public has any legitimate interest in enforcing an unconstitutional [law]."). Granting Federal Plaintiffs' request for a preliminary injunction would better serve the public interest.

### IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** the Temporary Restraining Order (Doc. 65) is **DISSOLVED**.

**IT IS FURTHER ORDERED** that the CFTC's Motion for Preliminary Injunction (part of Doc. 49) is **GRANTED**.

. . . .

. . . .

. . . .

**IT IS FINALLY ORDERED** that, pursuant to Federal Rule of Civil Procedure 65, Defendants are enjoined and restrained from enforcing Arizona's gambling laws, including Ariz. Rev. Stat. §§ 5-1301 *et seq.*, §§ 13-3301-13-3312, and § 16-1015, through any criminal or civil enforcement actions related to event contracts listed on CFTC-regulated designated contract markets, including by engaging in any subpoena process or other compulsory investigative process related to event contracts listed on CFTC-regulated designated contract markets.

Dated this 5th day of May 2026.

*/s/ Michael T. Liburdi*
United States District Judge