CRAIG A. NEWBY
*First Assistant Attorney General*

CHRISTINE JONES BRADY
*Assistant Attorney General*

**AARON D. FORD**
*Attorney General*

LESLIE NINO PIRO
*General Counsel*

HEIDI PARRY STERN
*Solicitor General*

STATE OF NEVADA
OFFICE OF THE ATTORNEY GENERAL
1 State of Nevada Way, Suite 100
Las Vegas, Nevada 89119

August 14, 2026

Via ECF

Molly Dwyer, Clerk of Court
United States Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

Re: *N. Am. Derivatives Exch. Inc. v. Nevada*, 9th Cir. No. 25-7187
*KalshiEX, LLC v. Assad*, 9th Cir. No. 25-7516
*Robinhood Derivatives, LLC v. Dreitzer*, 9th Cir. No. 25-7831
Argued and submitted April 16, 2026—Judges R. Nelson, Bade, and Lee

Dear Ms. Dwyer:

I write to inform the Court of three decisions denying preliminary injunctions to companies seeking to offer sports-event contracts without complying with state gaming laws: *Coinbase Financial Markets, Inc. v. Nessel* (E.D. Mich. Aug. 6, 2026), *KalshiEX LLC v. Cafferelli* (D. Conn. Aug. 10, 2026), and *Coinbase Financial Markets, Inc. v. Tong* (D. Conn. Aug. 10, 2026), which relied on the reasoning in *Cafferelli*. These decisions join the majority of courts that reject Appellants' extreme view of the Commodity Exchange Act (CEA). *See* No. 25-7187 State Defs.' Br. 19 n.7.

The courts held that sports-event contracts likely are not "swaps" under the CEA. The *Cafferelli* court explained (Op. 16-17) that a contract is based on the "occurrence" of an "event" if it is based on whether the event takes place, and not on "various outcomes of or embedded within that event." The court further explained (*id.* at 17-22) that an event is "associated with" potential economic consequences if the event "by its very nature" has those consequences "embedded within it"; merely having "some downstream economic consequence" is not sufficient and would "render the phrase effectively limitless." The *Nessel* court similarly held (Op. 26-29) that interpreting "swap" to cover sports-event contracts would cause the definition to sweep too broadly; it would mean that "any individual who engages in [sports] gambling outside of a DCM [might] commit a felony."

The courts next held that the CEA likely would not preempt state gaming laws even if sports-event contracts were swaps. On express preemption, the *Nessel* court explained (Op. 31-34) that the "exclusive jurisdiction" language is not an express preemption provision. On field preemption, the courts concluded that there was no indication that Congress sought to occupy the field of gaming regulation. *Cafferelli* Op. 26-27; *Nessel* Op. 37-40. On conflict preemption, the

courts held that compliance with both state and federal law is possible. *Cafferelli* Op. 31-32; *Nessel* Op. 41-45.

Finally, the courts found the balance of equities and public interest heavily favor the States enforcing their police powers over gambling. *Cafferelli* Op. 32-37; *Nessel* Op. 45-46.

Respectfully,

*/s/ Abigail L. Pace*

Abigail L. Pace
Senior Deputy Attorney General
(702) 486-3420
apace@ag.nv.gov

# EXHIBIT 1

EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| COINBASE FINANCIAL MARKETS, Inc.,<br>Plaintiff,<br><br>v.<br><br>DANA NESSEL, et al.,<br>Defendants. | Case No. 25-14092<br>Honorable Shalina D. Kumar<br>Magistrate Judge Kimberly G. Altman |

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 13)**

## I. Introduction

Plaintiff Coinbase Financial Markets, Inc. ("Coinbase" or "Plaintiff"), a financial platform, initiated this action on December 17, 2025. ECF No. 1. In addition to seeking declaratory relief, Plaintiff seeks to permanently enjoin the Michigan Gaming Control Board ("MGCB"), its members in their official capacities, and the Michigan Attorney General in her official capacity (collectively, "Defendants") from pursuing civil or criminal enforcement against it under Michigan's gambling laws for facilitating access to "sports event contracts" in Michigan. *Id.* at PageID.2–8. Coinbase argues that because these sports event contracts are a type of derivative regulated by

the federal Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. § 1 *et seq.*, concurrent regulation of these contracts under Michigan law is preempted, thereby precluding the Defendants from taking enforcement action against Coinbase. *Id.*

Coinbase moves for a preliminary injunction. ECF No. 13. In addition to the parties' briefs, the Court received amicus briefing from 33 federally recognized Indian Tribes and the City of Detroit; it heard oral arguments on June 24, 2026. ECF Nos. 13, 27, 30, 32, 41–42, 44, 47. For the reasons discussed below, Plaintiff's motion for a preliminary injunction is denied.

## II. Background

Derivatives are a class of financial instruments or contracts that derive their price from " 'the value of one or more underlying assets–for example, commodities (like corn and wheat), securities, or debt instruments.' " *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025) (quoting *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024)). "Derivatives take several forms, including futures contracts, options, and swap agreements." *Inv. Co. Inst. v. U.S. Commodity

*Futures Trading Comm'n*, 891 F. Supp. 2d 162, 168 n.3 (D.D.C. 2012), *as amended* (Jan. 2, 2013), *aff'd sub nom.*, 720 F.3d 370 (D.C. Cir. 2013).

A "future" is "an agreement to purchase or sell a commodity for delivery in the future[,]" and an "option" is a "contract that gives the buyer the right, but not the obligation, to buy or sell a specified quantity of a commodity or other instrument at a specific price within a specified period of time, regardless of the market price of that instrument." *Commodity Futures Trading Comm'n*, 2024 WL 4164694, at *1 n.1 (quoting CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*, https://perma.cc/63HY-DD7E). "Unless the parties cancel their obligations" under a future or option "by buying or selling offsetting positions, the [buyer] must pay the price stated in the contract (e.g., $1.00 per gallon for 1,000 gallons of orange juice) and the [seller] must deliver; usually, however, they settle in cash, with the payment based on changes in the market. If the market price, say, rose to $1.50 per gallon, the [seller] would pay $500 (50¢ per gallon); if the price fell, the [buyer] would pay." *Chicago Mercantile Exch. v. S.E.C.*, 883 F.2d 537, 542 (7th Cir. 1989) (Easterbrook, J.).

"Contrary to futures and traditional options, which contemplate delivery of or performance related to a commodity at some future time,

Case: 25-7187, 08/14/2026, DktEntry: 162.1, (8 of 96)

swaps are 'pure financial instrument[s] . . . based on the difference between two fluctuating values.' " *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (alteration in original) (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 243 (5th Cir. 2010)). Thus, performance under a swap contract does not contemplate delivery by the seller, and the settlement "price is fixed by mechanical computation from the instruments [or other variables] on which the contracts are based." *Chicago Mercantile Exch.*, 883 F.2d at 542.

Congress originally enacted the CEA in 1936 to regulate a select group of agricultural commodity futures offered on futures exchanges. *KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026) (*per curiam*); Derek Fischer, Note, *Dodd-Frank's Failure to Address CFTC Oversight of Self-Regulatory Organization Rulemaking*, 115 COLUM. L. REV. 69, 69 (2015). In its early days, the Act merely required "registration of futures commission merchants and floor brokers[,]" it prohibited "member[s] of a contract market from defrauding any person in connection with the making of a futures contract[,]" and it authorized a rudimentary "commission composed of the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General to fix limits on the amount of

permissible speculative trading in a futures contract." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 361–62 (1982) (internal citations and quotations omitted).

"After considerable deliberation, [in 1974] Congress enacted the Commodity Future Trading Commission Act ('CFTCA'), an extensive overhaul of the CEA that both expanded the statute's coverage and dramatically altered its enforcement scheme." *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). More precisely, this 1974 CEA amendment brought essentially *all* commodities under federal regulation,[1] created the Commodity Futures Trading Commission ("CFTC"), and gave the nascent CFTC "exclusive jurisdiction" over these commodities under a new "comprehensive regulatory structure . . . ." *Id.*; *Curran*, 456 U.S. at 356. To achieve these ends, the Act amended the term "commodity" to "include everything from corn to copper to currencies," *Phillips*, 155 F.4th at 112, and it made it a felony for anyone to "enter into, or offer to enter into, a transaction involving the sale of a" commodity future or option, "unless it is conducted on or through a board of trade designated and regulated by the"

[1] The only commodities excluded under the terms of the Act are "onions . . . and motion picture box office receipts." 7 U.S.C. § 1a(9).

Case: 25-7187, 08/14/2026, DktEntry: 162.1, (10 of 96)

CFTC as a designated contract market ("DCM"), *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993) (citing 7 U.S.C. §§ 2, 6).

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), PL 111-203, 124 Stat. 1376 (July 21, 2010), expanded the scope of the CEA in two ways relevant here. First, "Congress expanded the [CEA]'s reach to include so-called" swaps. *Schuler*, 2026 WL 1295806, at *1. The CEA specifically provides the CFTC with "exclusive jurisdiction" over most swaps traded on DCMs. 7 U.S.C. § 2(a)(1)(A). Under the Act, a swap is, in its broadest configuration, any agreement, contract, or transaction

> (ii) that provides for any . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

7 U.S.C. § 1a(47)(A)(ii). Moreover, and like the regulatory structure for commodity futures and options, by criminalizing non-compliance, the "Act requires 'swap dealers' and 'major swap participants' to register with the CFTC, centralizes risk management of certain swaps, and imposes extensive reporting requirements on swap market participants." *Phillips*, 155 F.4th at 113.

Case: 25-7187, 03/14/2026, DktEntry: 162.1, (11 of 96)

Second, Dodd-Frank implemented a "special rule" with regard to the CFTC's review and approval of, among other things, instruments termed "event contracts." 7 U.S.C. § 7a-2(c)(5)(C). Event contracts have been defined as "a derivative contract for which the 'payoff is based on a specified event, occurrence, or value'—for example, the level of snowfall from a certain storm or the dollar amount of hurricane damage." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 61 (D.C. Cir. 2024) (quoting CFTC, *Contracts & Products: Event Contracts*, https://perma.cc/4FPT-L2SN). These contracts "usually pose a yes-or-no question[,]" with the buyer taking the "yes" position and the seller taking the "no" position. *Commodity Futures Trading Comm'n*, 2024 WL 4164694, at *2. The contract's price fluctuates with the event's perceived probability of occurrence, and it may be purchased or sold at any time before the contract's expiration date. *Id.* "When the contract expires, the seller must pay the buyer if the underlying event on which the buyer took a 'yes' position occurs, but the buyer gets paid nothing if it does not." *Id.*

Despite their recent popularity as derivative instruments,[2] event contracts are not well defined under the CEA. Rather than expound on the statutory basis or definition of event contracts, the Act instead declares, without elaboration, that under its "special rule" it covers those event contracts that include "agreements, contracts, transactions, or swaps in *excluded commodities* that are based upon the occurrence, extent of an occurrence, or contingency[]" which are listed for sale on DCMs. 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). Further confounding this lack of statutory clarity, the CEA's definition of "excluded commodity" at least partially "resembles the relevant definition for swaps: 'an occurrence, extent of an occurrence, or contingency' that is both 'beyond the control of the parties to the relevant contract' and 'associated with a financial, commercial, or economic consequence.' " *Schuler*, 2026 WL 1295806, at *2 (quoting 7 U.S.C. § 1a(19)(iv)). This impenetrable drafting leaves open the question: do the range of event contracts offered on derivative exchanges qualify as swaps under the terms of the statute? *Compare N.*

---

[2] *See* Prediction Markets, 91 Fed. Reg. 12516, 12527 (proposed March 16, 2026) (to be codified at 17 C.F.R. chapter I) (stating that "[s]ince 2021, the Commission has observed a significant increase in the number of event contracts listed for trading on prediction markets[.]").

*Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1179–87 (D. Nev. 2025) (concluding that sports related event contracts are not swaps under the CEA); *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *6–7 (S.D. Ohio Mar. 9, 2026) (same); *QCX, LLC v. Dana Nessel*, 2026 WL 1166362, at *3 (W.D. Mich. Mar. 10, 2026) (same), *with KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 226 (3d Cir. 2026) (concluding that all event contracts are swaps under the CEA); *KalshiEX LLC v. Johnson*, ___F. Supp. 3d___, 2026 WL 1223373, at *4–5 (D. Ariz. May 5, 2026) (same); *Kalshiex LLC v. Orgel*, 2026 WL 474869, at *7–8 (M.D. Tenn. Feb. 19, 2026) (concluding that sports related event contracts are swaps); *United States v. Minnesota*, ___F. Supp. 3d___, 2026 WL 2150211, at *12–16 (D. Minn. 2026) (concluding, at least preliminarily, that the broad statutory definition of swap under § 1a(47)(A)(ii) covers *some* of the event contracts listed on predictions markets).

Whatever the correct categorization of event contracts under the CEA, § 7a-2(c)(5)(C)'s special rule empowers the CFTC to prohibit registered markets from listing event contracts if certain conditions are met. That is, the CFTC may prohibit a registered market from listing an event contract if it concludes that the contract is "contrary to the public interest"

Case: 25-7187, 08/14/2026, DktEntry: 162.1, (14 of 96)

and it involves "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I)–(VI). Under this rule, the CFTC promulgated 17 C.F.R. § 40.11, a regulation that prohibits "registered entities" from, among other things, offering for trading "[a]n agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law[.]" *See id.* § 40.11(a)(1).

Since August 16, 2023, Coinbase has been "a CFTC-registered" futures commission merchant ("FCM"). ECF No. 1, PageID.4, 9. Practically speaking, an FCM "is an agent of its customers; it takes money that customers deposit with it and uses those funds to facilitate trades in [derivative] contracts through" DCMs. *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 169 (S.D.N.Y. 2014), *aff'd sub nom.*, 611 F. App'x 34 (2d Cir. 2015); *see also* 7 U.S.C. § 1a(28). And because this facilitation ultimately concerns derivative trading on DCMs, "FCMs are subject to the CEA and the regulations promulgated thereunder by the

CFTC." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d at 169. Thus, as an FCM, Coinbase must adhere to CFTC "reporting rules, public disclosure obligations, financial requirements, and record keeping demands[,]" as well as establish and enforce "a system of risk management policies and procedures," including conflict of interest rules and trading standards. ECF No. 1, PageID.26, ¶ 51 (citing 17 C.F.R. §§ 1.10, 1.11, 1.12, 1.14, 1.17, 1.18, 1.55, 1.71, 17.00, 155.3).

Coinbase seeks to leverage its FCM status to imminently provide its "customers access to the array of contracts listed on" DCMs "while using Coinbase's simple, familiar, and user-friendly interface[.]" ECF No. 13, PageID.17. Starting in 2026, Coinbase specifically seeks to use its platform to provide customers, including those in Michigan, access to event contracts offered by KalshiEx, LLC ("Kalshi"), a CFTC regulated DCM. *Id.*; *see also* ECF No. 13-2, PageID.317–18. These event contracts "run the gamut from politics to music to climate to movies to sports." ECF No. 13, PageID.245. Moreover, Coinbase's event contract arrangement with Kalshi purportedly complies "with the comprehensive framework of federal laws and regulations that govern derivative trading on federal exchanges." ECF No. 1, PageID.3.

Nevertheless, Coinbase alleges that several actions by the Defendants cast doubt on its ability to facilitate access to event contracts to its Michigan customers without risk of liability. While Coinbase does not point to actions taken against it individually, it does cite evidence of MGCB's 2025 threats against and investigations into those in Michigan who "operate, offer, or facilitate access to prediction markets, where individuals can buy, sell, and trade event contracts that are based on a future event, occurrence, or value." *See* ECF No. 13-2, PageID.300–03, 314–15. It additionally cites 2025 correspondence sent from the Executive Director of the MGCB to the CFTC that raises concerns about the risks of sports-related event contracts offered in Michigan on unlicensed prediction markets. *Id.* at PageID.305–10. Finally, Coinbase cites an amicus brief joined by the state of Michigan that argues "the CEA 'does not preempt States from regulating sport betting via event contracts.' " ECF No. 13, PageID.254 (quoting Brief of Nevada et al. as *Amici Curiae* Supporting Appellants at 14, 43, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026)).

Michigan's authority to potentially regulate Coinbase's activities in this area is derived from the Lawful Sports Betting Act ("LSBA"), which the

Michigan Legislature passed in 2019 in response to the Supreme Court striking down the federal prohibition on state-approved sports betting in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018). ECF No. 27, PageID.440–41 (citing Mich. Comp. Laws § 432.401 *et seq*.). Under the LSBA, internet sports betting is defined as " 'operating, conducting, or offering for play sports betting through the internet.' " *Id.* at PageID.442 (quoting Mich. Comp. Laws § 432.403(s)). The statute provides, in turn, that " '[s]ports betting means to operate, conduct, or offer for play wagering conducted under this act on athletic events and other events approved by the board. Sports betting includes, but is not limited to, single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange betting, in game betting, proposition bets, and straight bets.' " *Id.* (quoting Mich. Comp. Laws § 432.403(bb)). The LSBA further provides that "internet sports betting may only be offered by a sports betting operator, which must be a licensed commercial casino or a federally recognized tribe (operating independently or in partnership with an internet sports betting platform provider)." *Id.* at PageID.443 (citing Mich. Comp. Laws §§ 432.404(7) and 432.406(1)).

Coinbase, facing the specter of enforcement under the LSBA if it offers unlicensed sports event contracts to its Michigan customers, initiated this suit seeking prospective relief against the Defendants. Coinbase specifically seeks declaratory and permanent injunctive relief against the Defendants pursuant to the Declaratory Judgment Act and the U.S. Constitution. ECF No. 1, PageID.6. In support, Coinbase argues that application of Michigan's gambling laws to the sports event contracts at issue is preempted pursuant to the U.S. Constitution's Supremacy Clause, because these contracts are allegedly federally regulated swaps listed on federal exchanges that fall under the exclusive jurisdiction of the CFTC. *Id.* at PageID.16–28, 31–50. Coinbase's motion for preliminary injunction contends, among other things, that it is likely to succeed on the merits of its preemption argument. ECF No. 13, PageID.249–53, 255–79.

In opposition to Coinbase's motion, the Defendants contend, inter alia, that sports event contracts are not swaps under the CEA, and that even if they were, application of Michigan gambling laws to them is not preempted. *Id.* at PageID.448–65. In addition, 33 federally recognized Indian tribes and the City of Detroit filed amicus briefs in support of the Defendants, respectively arguing, among other things, that a decision in

favor of Coinbase would undermine tribal sovereignty over gaming on Indian lands, and that the lost income for Detroit area casinos would negatively impact the City's tax revenue. ECF No. 30, PageID.531–43; ECF No. 42, PageID.870–77.

## III. Analysis

### A. Jurisdictional Barriers

"[T]he Eleventh Amendment is a true jurisdictional bar that courts can—but are not required to—raise *sua sponte* at any stage in litigation, and, once raised as a jurisdictional defect, must be decided before the merits." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). The Court now analyzes the issue of Eleventh Amendment sovereign immunity *sua sponte*.

Unless a State waives the sovereign immunity provided to it under the Eleventh Amendment, or Congress abrogates it, in most circumstances federal courts lack subject matter jurisdiction over suits brought against States. *Id.* This immunity extends to suits against state officials in their official capacities, because " '[a] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against

Case: 25-7187 08/14/2026, DktEntry: 162.1 (20 of 96)

the official's office.' " *Id.* (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

"That said, one 'important exception' exists for suits 'challenging the constitutionality of a state official's *action*.' " *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019) (emphasis in original) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984)). However, this exception, which falls under the doctrine announced in *Ex parte Young*, 209 U.S. 123 (1908), is narrow, and it applies to suits seeking prospective relief to end continuing violations of federal law perpetrated by state officials. *Russell*, 784 F.3d at 1048. Furthermore, "[t]here must be 'a realistic possibility the official will take legal or administrative actions against the plaintiff's interests.' " *Id.* (quoting *Russell*, 784 F.3d at 1048).

Here, Michigan has not waived its sovereign immunity, and there is no indication that Congress abrogated State immunity in this area. Thus, because the Defendants are all official proxies for the State of Michigan, Coinbase's suit must fit within the narrow bounds of the *Ex parte Young* exception.

The subject matter of Coinbase's suit falls squarely within the exception, as it seeks prospective relief to end what it alleges is a continuing violation of federal law—namely, Michigan gambling law supplanting the jurisdiction of the CFTC—by the Defendants. ECF No. 1, PageID.16–28, 31–50. However, although the MGCB directors and the Michigan Attorney General arguably have a "realistic possibility" of taking legal or administrative actions against Coinbase under Michigan gambling law if Coinbase offers sports event contracts to Michigan customers, the MGCB does not, because it is not a state official. *See Harris v. Sec'y of State for Tennessee*, 2024 WL 4225713, at *3 (6th Cir. May 29, 2024), *cert. denied sub nom.*, 145 S. Ct. 594 (2024) ("The *Ex parte Young* exception does not apply to the APD because it is a state agency, not a state official."). As such, the MGCB is immune from suit, and the Court will dismiss it for lack of jurisdiction.

But even if the MGCB's directors and the Michigan Attorney General (together, the "remaining Defendants") are amenable to suit in their official capacities, the Court must still determine, as a threshold matter, whether Coinbase has Article III standing to sue them. *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019). In the

case of pre-enforcement challenges to a statute, standing determinations generally focus on whether the plaintiff has shown that they are " 'under threat of suffering [an] injury in fact.' " *Russell*, 784 F.3d at 1049 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)) (alteration in original) (some internal quotations omitted).

Under such circumstances, "the Supreme Court has 'held that a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.' " *Block v. Canepa*, 74 F.4th 400, 409 (6th Cir. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)) (some internal quotations omitted). For a threat of prosecution to be credible, it must be "founded in fact," which a plaintiff may "demonstrate . . . by pointing to 'past enforcement against the same conduct . . . .' " *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 164).

At this preliminary stage, Coinbase has credibly demonstrated a fear of prosecution by the remaining Defendants. It has provided the Court with materials establishing that: Michigan recently pursued enforcement of its gambling laws against those, like Coinbase, who offer or facilitate access to

event contracts without state licensing (ECF No. 13-2, PageID.300–03, 314–15); Michigan is concerned about the consequences of unlicensed sports betting via event contracts (*id.* at PageID.305–10); and Michigan is disinclined to agree with the argument that state-level regulation of sports event contracts is largely preempted under the CEA, (ECF No. 13, PageID.254). All told, these facts show that Coinbase is subject to a credible threat of prosecution under Michigan gambling laws for offering unlicensed event contracts, and that this may implicate constitutional interests. *Block*, 74 F.4th at 409–11. Thus, Coinbase has Article III standing to sue the remaining Defendants on this basis.

**B. Legal Standard**

A preliminary injunction under Fed. R. Civ. P. 65 "is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). **"**To secure a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.' " *EOG Res., Inc. v. Lucky*

*Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.' " *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). This is because "when constitutional rights are threatened or impaired, irreparable injury is presumed, no cognizable harm results from stopping the conduct, and it's always in the public interest to prevent constitutional violations." *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 642 (6th Cir. 2025) (internal quotations omitted).

**1. Likelihood of Success on the Merits**

In support of its motion, Coinbase contends that it is likely to succeed on the merits of its argument that sports event contracts are swaps under the CEA, and that, consequently, Michigan is preempted from regulating sports event contracts offered on federally regulated exchanges. ECF No. 13, PageID.255–76. The Defendants contend in opposition that sports event contracts are not swaps under the CEA, and that even if they were,

Michigan is not preempted from regulating sports event contracts under its gambling laws. ECF No. 27, PageID.448–65. The Court finds that Coinbase has failed to clearly establish this factor.

### a. Sports Event Contracts are not "Swaps"

To reach its conclusion that sports event contracts are swaps as defined under § 1a(47)(A)(ii) of the CEA, Coinbase relies on the phrases "occurrence . . . of an event or contingency," and "associated with potential financial, economic, or commercial consequence." ECF No. 13, PageID.261, 266–68. However, the CEA does not define those two phrases, and the Defendants dispute the notion that sports event contracts are correctly viewed as swaps under the CEA. ECF No. 27, PageID.449–57. Thus, the Court must start its analysis " 'with the language of the statute.' " *United States v. Bedford*, 914 F.3d 422, 427 (6th Cir. 2019) (quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000)).

As outlined earlier, the CEA provides the CFTC with "exclusive jurisdiction" over most swaps traded on DCMs. 7 U.S.C. § 2(a)(1)(A). The Act, under one definition, broadly defines a "swap" as any agreement, contract, or transaction

> (ii) that provides for . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an

Case: 25-7187, 08/14/2026, DktEntry: 162.1, (26 of 96)

> event or contingency associated with a potential financial, economic, or commercial consequence[.]

7 U.S.C. § 1a(47)(A)(ii). However, under two surrounding definitions, the Act more narrowly defines a "swap" as any agreement, contract, or transaction

> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;
>
> . . . .
>
> (iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred[.]

7 U.S.C. § 1a(47)(A)(i), (iii).

When interpreting a statute, courts do not interpret statutory phrases "in isolation" or based "on the broadest imaginable definitions of [their] component words." *Dubin v. United States,* 599 U.S. 110, 120 (2023).

Instead, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989).

To these ends, where, as here, a contested term is left undefined in a statute, it must first "be given 'its ordinary or natural meaning.' " *United States v. Fitzgerald*, 906 F.3d 437, 442 (6th Cir. 2018) (quoting *United States v. Miller*, 734 F.3d 530, 539 (6th Cir. 2013)). Second, "[i]f a word in isolation is susceptible of multiple meanings," courts then consider the term's "placement and purpose in the statutory scheme." *Id*. Third, "working only within the range of 'textually permissible meanings,' [courts] consider which of those interpretations would serve, rather than frustrate, the statute's manifest purpose." *Id.* at 442–43 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* 57 (2012)).

Coinbase's argument that sports event contracts are swaps relies on a broad interpretation of two phrases from § 1a(47)(A)(ii): "occurrence . . . of an event or contingency," and "associated with potential financial, economic, or commercial consequence." With respect to the phrase "occurrence . . . of an event or contingency," Coinbase argues that "the

ordinary meaning of ‘event’ includes ‘outcome,’ ” such that “event contracts, including sports event contracts, can be phrased to turn on either the occurrence or the outcome of an event[.]” ECF No. 32, PageID.565; *see also* ECF No. 13, PageID.247–48 (describing event contracts that ask whether “the [Detroit] Lions will win their next game” and “will the [Michigan] Wolverines host a College Football playoff game?”). Likewise, with respect to the phrase “associated with potential financial, economic, or commercial consequence,” Coinbase argues that it naturally covers all “economic ramifications” tied to sporting events. *Id.* at PageID.267–68 (“Coinbase’s event contracts . . . plainly track events with significant, predictable, and measurable economic ramifications. Whether a team makes the College Football Playoff, for example, can make all the difference for a college town’s economy. . . . [as] gamedays keep many retail stores or hotels in the area afloat for the whole year.”).

The Defendants counsel a narrower interpretation of these phrases. Echoing analysis from *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169 (D. Nev. 2025), the Defendants first argue that because sports event contracts do not concern just the occurrence of the underlying sporting event, and instead largely

focus on things like outcomes, that they go beyond the ordinary meaning of the phrase "occurrence . . . of an event or contingency." ECF No. 27, PageID.453–55. They additionally argue that sports event contracts are not covered under a natural reading of the phrase "associated with potential financial, economic, or commercial consequence," because "the only people who benefit from the outcome of a sporting event are the participants." *Id.* at PageID.455.

Arguably, both Coinbase's and the Defendants' interpretation of these phrases are textually permissible, because the words and phrases at issue are highly ambiguous and subject to multiple meanings when read in isolation. *See N. Am. Derivatives Exch., Inc.*, 815 F. Supp. 3d at 1182–83 ("Dictionaries define 'event' in various ways, . . . . [m]ost indicate that an event is an occurrence 'of some importance' . . . . [but] some dictionaries suggest 'event' could mean 'outcome[.]' "); *Flaherty*, 172 F.4th at 227 ("[A] plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition. . . . [as] [t]he outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence."); *QCX LLC*, 2026 WL 1166362, at *3 ("One potential limit on Plaintiff's necessarily implied vision

of *events* and *contingencies* is the statutory requirement that they be *associated with a potential financial, economic, or commercial consequence*. . . . Plaintiff puts forward evidence that individual happenings within a sporting event, such as the number of points scored, can have economic ramifications in terms of the team's valuation, retailers' sales of team merchandise, and the hometown economy. [But] [t]hese are all potential consequences dependent on the reactions of parties outside the game.") (emphasis in original) (internal citations and quotations omitted). Where Coinbase's broad interpretation begins to falter, however, is in its disregard of the context of the statute.

Although "occurrence . . . of an event or contingency" and "associated with potential financial, economic, or commercial consequence" are expansive phrases, they must be read in context. Surrounding § 1a(47)(A)(ii) are subsections (i) and (iii), and the definitions of "swap" contained in these two subsections "refer almost exclusively to financial measures, indices, or instruments." *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 (D. Nev. 2025). But if § 1a(47)(A)(ii) is read so expansively that it can "run the gamut from politics to music to climate to movies to sports[,]" ECF No. 13, PageID.245, then it presumably also

covers all financial measures, indices, and instruments, thus meaning that it displaces the definitions in subsections (i) and (iii) and renders them superfluous.

The above helps demonstrate that Coinbase's interpretation of § 1a(47)(A)(ii) and its attendant phrases would frustrate the manifest purpose of the CEA. First, from a structural perspective, by rendering subsections (i) and (iii) superfluous, Coinbase's interpretation of § 1a(47)(A)(ii) undermines the textual coherence of the CEA by failing to fit "all [of its] parts into a harmonious whole[.]" *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Moreover, this expansive interpretation risks violating the "maxim *noscitur a sociis*, that a word is known by the company it keeps," *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961), because, by reaching into the area of sports, Coinbase's interpretation carries § 1a(47)(A)(ii)'s terms far beyond the financial subject matter covered in surrounding subsections (i) and (iii).

Second, Coinbase's read of § 1a(47)(A)(ii) does not comport with the goals of the CEA. The CEA is specifically focused on securing commodity-related derivative markets through deterring and preventing price manipulation; ensuring financial integrity in transactions; avoiding systemic

risks; protecting market participants from fraud and abuse; and promoting responsible innovation and fair competition. *See* 7 U.S.C. § 5. Commodities are the key component here, meaning that these specific goals are best served when "a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly affect commodity prices." *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026) (emphasis in original). By contrast, the overall goal of securing and stabilizing commodity-related derivative markets is not as well served when a sports event contract, something with *zero* direct affect on commodity prices, is considered a "swap."

The statutory canon against absurdity buttresses this conclusion. "Congress[] . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). Thus, "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). Based on Coinbase's construction of § 1a(47)(A)(ii)'s terms, all contracts or transactions centered

around the occurrence or outcome of a sports event potentially qualify as swaps. ECF No. 13, PageID.247–48, 267–68; ECF No. 32, PageID.565. But "because the trading of swaps outside DCMs is illegal under 7 U.S.C. § 2(e)," Coinbase's interpretation also means that "any individual who engages in [sports] gambling outside of a DCM [might] commit a felony . . . ." *Flaherty*, 172 F.4th at 233 (Roth, J., dissenting). However, "[i]n the absence of congressional intent to effect such a sea change, that result is absurd." *Schuler*, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026).

In sum, Coinbase fails to show that sports event contracts qualify as swaps under the CEA. Accordingly, Coinbase fails to clearly establish that it is likely to succeed on the merits.

**b. Even if Sports Event Contracts are "Swaps," the CEA does not Preempt State Gambling Laws**

Coinbase, building on its previous argument, additionally contends that Michigan's gambling laws are expressly and impliedly preempted under the CEA as applied to its sports event contracts. ECF No. 13, PageID.255–60, 268–76. In opposition, the Defendants argue that the text of the CEA does not expressly preempt Michigan's gambling laws, and that Congress did not communicate implied preemptive intent through

occupying the field of gambling regulation or by creating direct conflict with state legislation. ECF No. 27, PageID.458–65.

" 'Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect.' " *Churchill Downs.*, 162 F.4th at 637 (quoting *Arizona v. United States*, 567 U.S. 387, 398 (2012)). But when federal and state law sufficiently overlap, "the Supremacy Clause 'provides a clear rule' that federal law wins out." *Id.* (quoting *Arizona*, 567 U.S. at 399). Therefore, Congress " 'has the power to preempt state law.' " *Id.* (quoting *Arizona*, 567 U.S. at 399).

**i. Express Preemption**

"Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona*, 567 U.S. at 399. However, even where "Congress may indicate pre-emptive intent through a statute's express language . . . . [courts] begin [their] analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76–77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S.

218, 230 (1947)) (third alteration in original). "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States. Thus, when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.' " *Id.* (quoting *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005)).

Coinbase's express preemption argument relies on 7 U.S.C. § 2(a)(1)(A). That provision of the CEA, subject to two savings clauses, provides the CFTC with "exclusive jurisdiction" over "transactions involving swaps" "executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). Coinbase specifically argues that, "[m]ost naturally read," this language "precludes State interference" over transactions involving swaps executed on DCMs, including its sports event contracts. ECF No. 13, PageID.257. For their part, the Defendants argue that if Congress had expressly intended the CEA to preempt state gambling regulations, "it would have done so explicitly[,]" and it would not have included savings clauses in § 2(a)(1)(A). ECF No. 27, PageID.460–62.

The text of § 2(a)(1)(A) fails to rebut the presumption that the CEA does not supersede state gambling laws.

One, § 2(a)(1)(A)'s "exclusive jurisdiction" language "would represent an unusual express-preemption provision." *Kalshiex LLC v. Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026). Indeed, in contrast to other federal statutes like 29 U.S.C. § 1144(a) where courts have found express preemption, § 2(a)(1)(A)'s grant of "exclusive jurisdiction" "identifies the governing *agency* (the CFTC rather than the SEC or a state regulator), not the governing *law* (whether federal or state)." *Id.* Not only that, but expressly preemptive federal statutes typically contain "language that uses words like 'preempt' or 'supersede' when it comes to [preempted] state law[,]" whereas § 2(a)(1)(A) instead uses the phrase "exclusive jurisdiction." *Id.* (first citing 29 U.S.C. § 1144(a); then citing 8 U.S.C. § 1324a(h)(2); then citing 21 U.S.C. § 360k(a); and then citing 49 U.S.C. § 41713(b)).

Two, § 2(a)(1)(A) contains savings clauses. The first savings clause provides that "[e]xcept as hereinabove provided, nothing contained in this section shall [] supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State[.]" 7 U.S.C. § 2(a)(1)(A). At a minimum, this clause indicates that the CFTC's jurisdiction is qualified, not absolute, and that it yields to state law in certain instances, thus casting

doubt on Coinbase's maximalist argument that § 2(a)(1)(A) must operate to expressly preempt state gambling laws. *Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026). Section 2(a)(1)(A)'s second savings clause provides that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A). Again, this clause clearly restricts the CFTC's jurisdiction to some extent with respect to States, and it therefore cuts against Coinbase's argument that § 2(a)(1)(A) must operate to expressly displace state gambling laws. *Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026).

Three, "the [CEA] elsewhere contains *express* preemption provisions." *Id.* (emphasis in original). For instance, one of the Act's provisions says that it "shall *supersede* and *preempt* the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability)" in the case of electronic trading facilities and agreements excluded or exempted from the CEA under enumerated provisions. 7 U.S.C. § 16(e)(2) (emphasis added). "And under basic interpretive principles, [courts] presume that Congress's choice to expressly preempt *only* certain categories of state laws shows that it did not mean to 'withdraw' the States'

power to enact *all* such laws in other circumstances." *Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026) (emphases in original) (quoting *Arizona*, 567 U.S. at 399). Thus, these contrasting and explicitly preemptive provisions, provisions that Coinbase does not argue its sports event contracts fall under, militate against a finding that § 2(a)(1)(A) is itself expressly preemptive.

The textual evidence points to the contrary of Coinbase's position, and Coinbase fails to rebut the presumption that the CEA does not supersede state gambling laws. Accordingly, Coinbase fails to clearly establish a likelihood of success on its express preemption theory.

**ii. Field Preemption**

In addition to being express, preemption may also be implied. One variety of implied preemption is called field preemption, and it represents "the principle that States may not regulate conduct 'in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.' " *Churchill Downs.*, 162 F.4th at 638 (quoting *Arizona*, 567 U.S. at 399). "[I]n the context of field preemption, the Supreme Court has noted 'the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted.' "

Case: 25-7187 03/14/2026, DktEntry: 162.1, (39 of 96)

*Id.* (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015)) (emphases in original). And as with all other species of preemption, there is a presumption against it, "one that operates with special force in cases 'in which Congress has legislated . . . in a field which the States have traditionally occupied.' " *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)).

Coinbase argues that "the CEA's text, structure, and history[,]" "evinces Congress's intent to oust the States from" the field of derivatives, thereby impliedly preempting any state law that may regulate event contracts. ECF No. 13, PageID.269–72. The Defendants respond that "[t]he great weight of the evidence shows that the CEA is not meant as a vehicle to legalize sports betting nationwide or to displace the individual states' ability to regulate it." ECF No. 27, PageID.463.

In support of its argument, Coinbase first points to 7 U.S.C. § 2(a)(1)(A)'s grant of "exclusive jurisdiction" to the CFTC. ECF No. 13, PageID.269. It further cites to three other provisions within the CEA, arguing that they indicate preemptive intent. *Id.* PageID.269–70 (citing 7 U.S.C. §§ 2(a)(1)(A), 13a-2(1), 16(e)(1)). Likewise, it points to the extensive

Case: 25-7187 03/14/2026, DktEntry: 162.1, Page 40 of 96

regulatory regime that DCMs and FCMs are subject to, arguing these regimes are evidence that there is not enough remaining space in the field of derivatives regulation "for assistance or supplementation by state law." *Id.* at PageID.271. Finally, Coinbase cites to evidence suggesting that Congress intended for the 1974 amendments to the CEA to " 'preempt the field insofar as futures regulation is concerned.' " *Id.* at PageID.272 (citing H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.)) (emphasis omitted).

There is some truth to Coinbase's argument. For example, the CEA does erect a comprehensive regulatory regime over DCMs and FCMs. *See, e.g.,* 7 U.S.C. §§ 6f, 7; 17 C.F.R. §§ 1.10(b), 1.10(d), 1.12, 1.14, 1.17, 1.18, 1.55, 17.00, 38. There is also evidence that Congress, through the 1974 amendments to the CEA, at least partly intended for "the CFTC's jurisdiction . . . 'to be exclusive with regard to the trading of futures *on organized contract markets.*' " *Ken Roberts Co.*, 276 F.3d at 590–91 (emphasis in original) (quoting S. Rep. No. 93-1131, at 23 (1974)). It is also certainly true that the 1974 Congress "conveyed some intent for the CEA to displace *some* state laws; a state presumably lacks authority to have a parallel regulatory regime" directly over certain derivatives, such as commodity futures, based on 7 U.S.C. § 2(a)(1)(A)'s conferral of "exclusive

jurisdiction" to the CFTC and its savings clause "providing that state laws are not superseded or limited *other than* as 'hereinabove provided.' " *Martin*, 793 F. Supp. 3d at 678 (quoting 7 U.S.C. § 2(a)(1)(A)) (emphases in original).

That said, Coinbase's argument still fails. First, Coinbase overstates the preemptive effect of the provisions at issue. With respect to 7 U.S.C. §§ 2(a)(1)(A) and 16(e)(1), both contain savings clauses, the presence of which "usually signals that Congress does not mean to preempt *the* [*whole*] *field.*" *Schuler*, 2026 WL 1295806, at *5 (6th Cir. Apr. 24, 2026) (first and third emphasis in original). In fact, despite 7 U.S.C. § 2(a)(1)(A)'s grant of "exclusive jurisdiction" to the CFTC, the Seventh Circuit previously relied on § 2(a)(1)(A)'s savings clauses to hold that " 'Congress did not intend [the CEA] to preempt the field of futures trading.' " *Id.* (quoting *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.,* 977 F.2d 1147, 1155 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle,* 66 F.3d 867, 875 n.7 (7th Cir. 1995)). And with respect to § 13a-2(1), the only correct and modest conclusion that can be drawn from the excerpts cited by Coinbase is that the CFTC is the lone arbiter over violations *of the CEA* committed by registered exchanges. *See* 7 U.S.C. § 13a-2(1) ("Whenever it

shall appear to the attorney general . . . that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (*other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader*) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity . . . .") (emphasis added).

Second, notwithstanding the CEA's comprehensive regulatory regime over DCMs and FCMs, the Act's reliance on and incorporation of state law suggests that the Act was not intended to occupy an entire field. In this regard, the Act's "special rule" provides that the CFTC may prohibit the offering of event contracts on DCMs that it determines are contrary to the public interest and that involve, among other things, "activity that is unlawful under . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). Given this provision, it simply cannot be said that the CEA leaves no room for supplemental state law in this area, because it is explicitly supplemented by state law. *See Martin*, 793 F. Supp. 3d at 680 ("Congress leaves room for supplementary

state legislation where it expressly relies on and incorporates state laws.") (quotations omitted).

Third, Coinbase's evidence of preemptive intent in the overarching field of derivatives regulation is largely unsuitable for this context. Determination of the governing field in preemption cases is narrowly tailored to "the *target* at which the state law *aims*[,]" *Churchill Downs*, 162 F.4th at 638, and the state law in controversy, section 432.404 of Michigan's LSBA, is aimed at the regulation of *sports gambling*. *See* Mich. Comp. Laws § 432.404. Moreover, Coinbase's prospective injury extends only to those sports event contracts that Michigan views as subject to the LSBA—contracts which Coinbase contends are swaps—meaning that the lone overlapping portion of the CEA allegedly at issue is that which covers swaps. Thus, properly framed, the question is not whether Congress intended the CEA to preempt the field of derivatives regulation; the question is instead whether Congress intended the 2010 amendment to the CEA, which added swaps, to preempt the field of sports gambling regulation.

On this score, Coinbase's evidence is plainly insufficient. Coinbase offers evidence that the 1974 amendments to the CEA were enacted to

partially preempt the field of futures regulation and to " 'avoid unnecessary, overlapping and duplicative regulation.' " ECF No. 13, PageID.272 (quoting 120 Cong. Rec. H34,736 (Oct. 9, 1974)). But this only tells half the story, because there is also evidence showing that the 1974 Congress was concerned with preempting only directly "incompatible state laws." *See* 120 Cong. Rec. 30,464 (Sep. 9, 1974) (statement of Senator Curtis noting that the Act would only preempt state law if it "were contrary to or inconsistent with Federal law"). Furthermore, evidence of Congressional intent from 1974 is not particularly germane to the question before the Court, because 2010, not 1974, was the year Congress amended the CEA to include swaps.

Congress's intent in amending the CEA to cover swaps in 2010 was ultimately to bring "risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector, and which had catastrophic ripple effects on the U.S. and world economies during the financial crisis of 2007-2008." *Hendrick*, 817 F. Supp. 3d at 1031. However, this Congressional intent, to which Coinbase offers no contemporaneous alternative, is not remotely connected to preempting the field of sports gambling regulation. *Id.* at 1031–32 ("It is absurd to think that Congress

intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation . . . without ever mentioning that was the goal when Congress added swaps to the CEA in 2010."); *Flaherty*, 172 F.4th at 240 (Roth, J., dissenting) ("When Congress gave the CFTC jurisdiction over swaps, there was no clear and manifest purpose for federal law to supersede states' historic police powers over gambling regulation.") (internal quotations omitted); *Martin*, 793 F. Supp. 3d at 683 ("[W]hen Congress enacted and amended the CEA, it was highly unlikely to have intended to override state laws that regulate sports betting such as Maryland's gaming laws[.]"). What is more, in 2010 "the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3701, *et seq.*, largely prohibited states from authorizing sports betting," meaning that Congress had no reason to preempt an already preempted field when it amended the CEA. *Schuler*, 2026 WL 657004, at *8 (S.D. Ohio Mar. 9, 2026).

In conclusion, the evidence does not favor field preemption, and thus Coinbase fails to rebut the presumption that the CEA does not supersede state law. Accordingly, Coinbase fails to clearly establish that it is likely to succeed on the merits of its field preemption theory.

### iii. Conflict Preemption

Preemption may also be implied where state and federal law " 'directly conflict.' " *Churchill Downs*, 162 F.4th at 638 (quoting *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011)). Direct conflict between state and federal law "occurs when compliance with both is impossible, or when[] . . . state law 'stand[s] as an obstacle to the accomplishment' of Congress's objectives." *Id.* (quoting *Kansas v. Garcia*, 589 U.S. 191, 210–11 (2020)).

Coinbase argues that Michigan's gambling laws are conflict preempted because they frustrate Congress's efforts to create a uniform federal regulatory scheme and because complying with both the CEA and LSBA would be impossible. ECF No. 13, PageID.272–74. The Defendants counter that compliance with both the CEA and LSBA is not impossible, and that the LSBA compliments the objectives of the CEA instead of frustrating them. ECF No. 27, PageID.464.

Coinbase offers three arguments in support of its position. First, that the application of state gambling laws to sports event contracts will require futures market participants to "either navigate varying and potentially contradictory legal standards or leave the market altogether[,]" thus standing as an obstacle to Congress's intent to bring futures markets under

a uniform set of regulations. ECF No. 13, PageID.273. Second, Coinbase contends that complying with both its LSBA licensure requirements and its FCM obligations would be impossible, because it would have to restrict what it offers or seek additional licensing in other states, either of which would be impractical and expensive. *Id.* at PageID.273–74. Third, it contends that because the LSBA employs "the blunt hammer of blanket prohibition" to regulate sports event contracts, instead of the "scalpel of case-by-case review" used under the CEA's "special rule," that the LSBA is preempted for using a "different method of enforcement than the" CEA. *Id.* at PageID.275–76.

Coinbase's averments are, in a word, applesauce. For one, Coinbase's contention that Congress endeavored to bring uniformity to futures markets through the CEA is not, as discussed in the previous section, enough to demonstrate that Congress therefore intended to completely preempt state gambling laws from tangentially regulating purported swaps. *See supra* pp. 38–40. For another thing, it is not impossible for Coinbase to comply with the LSBA simply because it is costly and challenging. *Schuler*, 2026 WL 1295806, at *6 (6th Cir. Apr. 24, 2026) ("True, geofencing may be challenging, time-consuming, and

Case: 25-7187 08/14/2026, DktEntry: 162.1, (48 of 96)

expensive. But expensive does not mean impossible.") (internal citations and quotations omitted).

Finally, Coinbase misconstrues the extent to which enforcement of the LSBA and CEA conflict in this matter. Even if Coinbase is correct that the LSBA and CEA use different methods of enforcement—and it is not clear that is the case—enforcement of the LSBA still does not stand as an obstacle to the objectives of the CEA. Indeed, as Coinbase concedes, the sports event contracts here involve gaming. *See* ECF No. 13, PageID.275 ("Here, enforcing Michigan's gambling laws against Coinbase would topple the careful balance struck by Congress with respect to enforcement of the applicable regulations governing gaming event contracts.") (internal quotations omitted). However, pursuant to 17 C.F.R. § 40.11(a)(1), a regulation promulgated by the CFTC under § 7a-2(c)(5)(C)(i)'s "special rule," registered entities are prohibited "from trading, or accepting for clearing, event contracts that involve, relate to, or reference gaming." *Flaherty*, 172 F.4th at 240 (Roth, J., dissenting). And notwithstanding the fact that the CFTC has currently proposed to amend this regulation, if Coinbase were to offer these sports event contracts today, based on a plain reading of § 40.11(a)(1) it would more than likely violate federal law.

Thus, "state gambling laws as applied to such [sports event] contracts cannot be conflict preempted[,] [because] [f]ar from undermining congressional objectives, [Michigan]'s gambling laws arguably complement them." *Id.*

Therefore, the evidence does not favor conflict preemption, and Coinbase once again fails to rebut the presumption that the CEA does not supersede state law. Accordingly, Coinbase fails to clearly establish that it is likely to succeed on the merits of its conflict preemption theory.

**iv. Irreparable Harm**

Coinbase contends that it will face several potentially irreparable injuries if Michigan is not preliminarily enjoined. ECF No. 13, PageID.276–78. This includes reputational harm, lost opportunity costs, and adverse state action against its constitutional rights. *Id.* Although these alleged harms are serious, because Coinbase fails to succeed on the other three preliminary injunction factors, it is unnecessary to analyze this factor. *See Schuler*, 2026 WL 657004, at *10 (S.D. Ohio Mar. 9, 2026).

**v. Balance of the Equities and Public Interest**

When, as here, a preliminary injunction is sought against a state government, the last two factors merge. *Churchill Downs*, 162 F.4th at 643.

With respect to these factors, Coinbase essentially argues that it is in the public interest to block the application of unconstitutional laws and that state officials have no legitimate interest in enforcing unconstitutional laws. ECF No. 13, PageID.278–79. But as discussed in the previous sections, it is far from clear that the enforcement activity in dispute is unconstitutional. *See supra* pp. 20–44. Further still, "a State 'suffers a form of irreparable injury' any time a court enjoins it 'from effectuating statutes enacted by representatives of its people.' " *Schuler*, 2026 WL 1295806, at *7 (6th Cir. Apr. 24, 2026) (quoting *Maryland v. King,* 567 U.S. 1301, 1303 (2012)). And this is particularly true under the circumstances, because Michigan is seeking to enforce one of its traditional police powers: gambling regulation. *Id.* Considering these things, factors three and four heavily favor the Defendants.

## VI. Conclusion

For the reasons discussed, Coinbase has not carried its burden to establish the factors required for a preliminary injunction against the Defendants. The Court therefore **DENIES** Coinbase's motion for a preliminary injunction (ECF No. 13). Additionally, the Michigan Gaming Control Board is **DISMISSED** as a defendant from this action.

**IT IS SO ORDERED.**

s/ Shalina D. Kumar
SHALINA D. KUMAR
United States District Judge

Dated: August 6, 2026

# EXHIBIT 2

EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KALSHIEX LLC,<br><br>Plaintiff,<br><br>-against-<br><br>BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG, in his official capacity as Attorney General of Connecticut,<br><br>Defendants. | **MEMORANDUM & ORDER**<br><br>25-CV-2016 (VDO) |

**VERNON D. OLIVER**, United States District Judge:

Before the Court is Plaintiff KalshiEX LLC's ("Kalshi") Motion for a Preliminary Injunction (the "Motion"). Kalshi seeks an order enjoining Defendants, various Connecticut officials, and the Connecticut Department of Consumer Protection ("DCP"), from enforcing Connecticut's gaming regulatory scheme against Kalshi. Kalshi contends that federal law preempts Connecticut's gaming regulatory regime and related statutes. For the reasons that follow, the Motion is **DENIED**.

# I. BACKGROUND

## A. Factual Background

### 1. Derivatives, Swaps, and Event Contracts Under the CEA

Derivative contracts, some types of which are at issue in this case, are financial tools that traders use to mitigate risk. "A derivative is a financial instrument or contract whose price is directly depending upon (i.e., derived from) the value of one or more underlying assets–for

example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025) (cleaned up). In a classic example of a derivatives contract, a farmer may enter into an agreement with a buyer to trade a crop, like wheat, at a predetermined price on a specific future date, effectively locking in value and removing the risk of unexpected price drops.[1] A "future" is a type of derivative contract between parties to buy or sell an asset at a predetermined price on a future date that is listed on an organized exchange. *See generally,* Beylin, *supra* n.1.

Congress regulates many derivatives through the Commodity Exchange Act ("CEA"), a federal statute that provides a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). "The CEA was enacted during the Great Depression in response to concerns about manipulation, speculation, and other abuses that could arise from trading derivatives." *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (cleaned up). Originally enacted to regulate futures contracts in agricultural commodities, the CEA has since "expanded well beyond its agricultural-commodity roots." *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026). "In 1974, Congress created the Commodity Futures Trading Commission (CFTC) and gave this agency the authority to

---

[1] To shed some further light on how such a contract would play out, "a farmer could go 'short' through the futures contract (i.e., sell the grain under the contract) to neutralize her risk that grain prices fluctuate. Through selling wheat under the futures contract, the farmer effectively sells at a price fixed at the time of execution with settlement taking place in the future through an exchange of the referenced commodity for cash. If prices for wheat increase, the farmer will (i) lose money under the futures contract because the price of wheat at the time of delivery under the futures contract exceeds what she sold it for, but (ii) experience increased revenues from the harvest. If, on the other hand, prices fall, the farmer will (i) profit under the futures contract, and (b) suffer offsetting losses as she sells her harvest at the lower price." Ilya Beylin, *Event Contracts Are a Step Too Far for Derivatives Regulation*, 4 U. Chi. Bus. L. Rev. 77, 78–79 (2025).

regulate all futures contracts . . ." *Id.* (citing 7 U.S.C. § 2(a)(1)(A); Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1395).

Among other extensive regulatory changes, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act of 2010") "brought much of the swaps market within the CFTC's purview for the first time." *Phillips*, 155 F.4th at 113. As part of the Dodd-Frank Act of 2010, Congress expanded the CEA's reach to include "swap[ ]" contracts, 7 U.S.C. § 2(a)(1)(A), which it defined within the CEA as contracts in which a party's "payment" depends on the "occurrence, nonoccurrence, or [ ] extent of the occurrence of an event" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Swaps generally involve "the exchange of cash flows from financial instruments," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013), allowing parties to trade risky or variable returns for more certain ones and vice versa. "For instance, parties might agree to swap future interest payments at different rates, or future payments in one currency for payments in another."[2] Unlike futures and options, "which contemplate delivery of or performance related to a commodity at some future time, swaps are pure financial instruments based on the difference between two fluctuating values." *Phillips*, 155 F.4th at 112 (cleaned up).

The contracts involved in this case are commonly referred to as event contracts, another category of derivative contracts regulated by the CEA. Although the CEA repeatedly uses the term "event contract," it does not define it; nor do any regulations issued by the CFTC. Courts have used the term to describe financial instruments that identify a future event with several

[2] ECF No. 46 at 7.

possible outcomes, a payment schedule for the outcomes, and an expiration date. *See KalshiEX LLC v. CFTC*, No. 23-CV-3257, 2024 WL 4164694, at *2 (D.D.C. Sep. 12, 2024). Event contracts are typically traded on an exchange, and their value is determined by market forces. This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a unique financial instrument that tracks real-world market perceptions. *Id.* The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *Id.* For example, one might purchase a position on an event contract titled "Will it rain tomorrow?" with a $1 fixed payout.[3] If that person purchased a 70-cent "yes" position "and it rained the next day, [that person] would earn a 30-cent profit when the contract settles" while the person "who didn't predict correctly would lose their [30-cent] investment."[4]

### 2. CFTC Regulation of Swaps and Event Contracts

The CEA "gives the CFTC 'exclusive jurisdiction' 'with respect to,' among other covered contracts, 'transactions involving swaps' 'traded or executed on a contract market' that the agency has designated." *Schuler*, 2026 WL 1295806, at *1 (quoting 7 U.S.C. § 2(a)(1)(A)). An entity that seeks to list and publicly trade its event contracts must apply to the CFTC to be a designated contract market ("DCM"). *See* 7 U.S.C. §§ 2(e), 7(a). Once the CFTC designates an entity as a DCM, the entity must comply with the CEA's "core principle[s]" and the CFTC's regulations. *Id.* § 7(d)(1)(A). Of note, the CFTC has promulgated regulations that

[3] Commodity Futures Trading Comm'n, Understanding Prediction Markets and Event Contracts, https://www.cftc.gov/LearnandProtect/PredictionMarkets.

[4] *Id.*

govern the "access requirements" that a DCM must follow. *Id.* § 7(d)(2)(A)(i). These regulations require a DCM to "provide its members . . . with impartial access to its markets and services." 17 C.F.R. § 38.151(b); *see also id.* § 37.202(a). The DCM must both follow "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner" and set "[c]omparable fee structures." *Id.* § 38.151(b); *see also id.* § 37.202(a).

The CEA also contains a "[s]pecial rule for review and approval of event contracts and swap contracts" created by Congress as part of the 2010 amendments to the Dodd-Frank Act (the "Special Rule"). 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule applies to contracts in certain excluded commodities. As relevant here, the CEA defines an excluded commodity to include "an occurrence, extent of an occurrence, or contingency" that is both "beyond the control" of the contracting parties and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).[5]

Under the Special Rule, DCMs may list relevant contracts without prior CFTC approval by self-certifying that those contracts comply with applicable law and regulations. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2) (listing submission requirements). If a DCM lists contracts "in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," the CFTC can then review and prohibit these contracts when they are "contrary to the public interest" because they involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest." 7 U.S.C.

[5] *Cf.* 7 U.S.C. § 1a(47)(A) (defining "swap" as "any agreement, contract, or transaction" "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence").

§ 7a-2(c)(5)(C)(i).[6] Contracts contrary to the public interest "may [not] be listed or made available for clearing or trading on or through a registered entity," such as a DCM. *Id.* § 7a-2(c)(5)(C)(ii).

### 3. Kalshi's Registration as a CFTC-Designated Contract Market

Kalshi is a financial services company that operates a prediction market, which allows users to buy and sell event contracts on its platform.[7] The CFTC certified Kalshi as a DCM in 2020. *KalshiEX*, 2024 WL 4164694, at *4. Kalshi initially offered event contracts about technology, health, crypto, popular culture, politics, and economics. *Schuler*, 2026 WL 1295806, at *2. But in January 2025, Kalshi self-certified several contracts related to sporting events and began to list them on its exchange.[8] These sports-event contracts allow users to place positions on "for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship."[9] But they may also ask:

> Will Michigan win by more than 7.5 points? Or will Michigan and UConn score more than a combined 144.5 points? Or will a specific player score more than 10 points? Or pretty much anything else that might happen during a sporting event.
>
> *Schuler*, 2026 WL 1295806, at *2.

As of February 11, 2026, the date of the hearing on the Motion, Kalshi's value sat at around $11 billion.[10] The vast majority of the contracts listed on Kalshi's site—between 80%

---

[6] Effective as of 2011, the CFTC issued a similar regulation, providing that a "registered entity shall not list for trading" contracts contrary to the public interest—the same types of contracts enumerated above. 17 C.F.R. § 40.11(a)(1).

[7] Compl., ECF No. 1 ¶ 18.

[8] *Id.* ¶ 43.

[9] *Id.*

[10] Oral Arg. Tr., ECF No. 82 at 68:21–69:3.

and 90%—were sports-events contracts;[11] between 80% and 90% of Kalshi's revenue came from its sports-events contracts;[12] and the CFTC had not subjected a single one of these contracts to review under the Special Rule, let alone prohibited any contract after such review.[13]

#### 4. The Connecticut Regulatory Scheme for Gaming

The Gaming Division of the DCP "regulates gaming in the state of Connecticut by licensing or permitting all individuals and entities that are involved with legalized gaming, and by monitoring and educating to ensure compliance with [the state's] gaming laws."[14] It does so pursuant to Connecticut's long-held police powers. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a State …."); *Marvin v. Trout*, 199 U.S. 212, 224 (1905) ("The power of the state to enact laws to suppress gambling cannot be doubted …."); *Murphy v. NCAA*, 584 U.S. 453, 486 (2018) (noting that "Congress can regulate sports gambling directly, but if it elects not to do so, *each State is free to act on its own.*") (emphasis added); *see also id.* at 467–68 (referring to "old laws banning sports gambling," and noting that as of 1992, "all forms of sports gambling were illegal in the great majority of States").

Connecticut regulates gambling via a "tightly controlled, exclusive sports wagering market" created in 2021 by the Connecticut General Assembly.[15] 2021 Conn. Acts, No. 21-

[11] *Id.* at 41:4–13.

[12] *Id.* at 68:15–20.

[13] *Id.* at 16:16–17; 101:19–24.

[14] ECF No. 1 ¶ 20.

[15] Defs. Opp'n, ECF No. 46 at 5.

23; Conn. Gen. Stat. § 12-850 *et seq.* The Gaming Division is the DCP's largest division, made up of "64 employees . . . that include[] investigators, sworn law enforcement officers, [and] six attorneys."[16] Eight of these employees are specifically dedicated to sports-related enforcement.[17]

Under Connecticut law, an "online gaming operator" includes entities that operate an "electronic wagering platform" to offer "Internet games" (which are defined to include "online sports wagering"). Conn. Gen. Stat. §§ 12-850(27), 12-850(13). Such online gaming operators must obtain a license from the DCP by contracting directly with one of the state's three master wagering licensees to offer its services.[18]

"Sports wagering," per Connecticut law, is defined as "[r]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform; and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event; or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a

[16] ECF No. 82 at 113:2–7.

[17] *Id.* at 115:22.

[18] Conn. Gen. Stat. § 12-857(a). Connecticut law defines a "master wagering licensee" as "(A) the Mashantucket Pequot Tribe, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; (B) the Mohegan Tribe of Indians of Connecticut, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; or (C) the Connecticut Lottery Corporation, if licensed pursuant to section 4 of this act to operate retail sports wagering, online sports wagering, fantasy contests and keno and to sell tickets for lottery draw games through the Internet, an online service or a mobile application[.]" 2021 Conn. Acts, No. 21-23 § 1(16); *see also* Conn. Gen. Stat. § 12-850(21).

Case: 25-7187, 03/14/2026, DktEntry: 162.1, Page 61 of 96

combination of sporting events." Conn. Gen. Stat. § 12-850(34). Offering gaming in Connecticut in a manner that violates the state's gaming laws can constitute a class A or class B misdemeanor, exposing any violators to civil and criminal penalties. Conn. Gen. Stat. §§ 53-278b, 53-278d.

### 5. The Department of Consumer Protection's Cease-and-Desist Letter

In 2025, Kalshi's sports-event contracts drew the attention of the DCP. On December 2, 2025, the DCP sent Kalshi an email containing a cease-and-desist letter, stating that Kalshi was "conducting unlicensed online gambling, more specifically sports wagering" by offering its contracts in Connecticut in violation of state law.[19] The letter directed Kalshi to "immediately cease and desist advertising and offering its Contracts to Connecticut residents."[20]

The cease-and-desist letter elaborated that Kalshi's contracts "constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events."[21] It went on to say that "[e]ven if Kalshi possessed an online gaming operator's license, Kalshi's contracts still violate numerous other Connecticut laws and public policies" that bar individuals under 21 from placing wagers and prohibit wagers involving Connecticut intercollegiate sports teams.[22] The letter further contended that Kalshi's contracts are "void" under state law prohibiting wagering

---

[19] Porter Decl. Ex. 1 (C&D Letter), ECF No. 30-3 at 2.

[20] *Id.*

[21] *Id.* (citing Conn. Gen. Stat. § 12-850(34)).

[22] *Id.* at 3 (citing Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30)).

Case: 25-7187, 08/14/2026, DktEntry: 163.1, Page 62 of 96

contracts and that Kalshi's "promotion of unlicensed and illegal gambling services is also an unfair trade practice" in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA") because they are "deceptive" and "unfair" as Kalshi "is able to gain a competitive advantage over appropriately licensed entities" by "operating outside of the regulatory environment."[23] The letter warned Kalshi that "[f]ailure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d."[24]

Though Plaintiff initially asserted that the cease-and-desist letter "did not limit itself to Kalshi's sports-event contracts, but rather suggested that *all* of Kalshi's event contracts are unlawful,"[25] Defendants limited their briefing to Kalshi's sports-event contracts and later clarified at oral argument that the scope of the letter only extended to sports gaming contracts.[26]

On December 8, 2025, per the parties' joint stipulation, the Court ordered Defendants "to refrain from taking enforcement action against Kalshi" for conduct mentioned in the cease-and-desist letter pending disposition of the Motion.[27]

---

[23] *Id.*

[24] *Id.* at 3.

[25] Pl. Mem., ECF No. 30-1 at 16.

[26] ECF No. 82 at 76:2–3.

[27] ECF No. 35.

### B. Procedural History

Kalshi initiated this action on December 3, 2025.[28] On December 5, 2025, Kalshi filed the Motion.[29] Defendants responded on January 9, 2026,[30] and Kalshi replied on January 30, 2026.[31] A number of Indian tribes and gaming associations also filed an amicus brief in this case.[32] The Court held oral argument on the Motion on February 11, 2026.[33]

### C. Nationwide Litigation

Numerous courts have considered similar motions by Kalshi, seeking to enjoin state gaming commissions from enforcing state law against it.[34] Federal courts have found both in Kalshi's favor, granting its preliminary injunction motions, and against it, denying such motions. *Compare KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, No. 26-CV-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (granting preliminary

[28] ECF No. 1.

[29] ECF No. 30.

[30] ECF No. 46.

[31] ECF No. 75.

[32] ECF No. 56-1. The Brief was filed by the Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Minnesota Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Native American Finance Officers Association, San Manuel Gaming and Hospitality Authority, and 16 tribes: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Sandia; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuuhaviatam of San Manuel Nation.

[33] ECF No. 81.

[34] The Court is aware of 14 lawsuits that Kalshi has brought against states in their respective federal district courts: Nevada, New Jersey, Maryland, Ohio, New York, Connecticut, Illinois, Tennessee, Utah, Iowa, Arizona, Montana, Minnesota, and Rhode Island.

injunctions) *with KalshiEX LLC v. Schuler* ("*Schuler II*"), No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Cox*, No. 26-CV-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026); *KalshiEX LLC v. Williams*, No. 25-CV-8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026); *KalshiEX LLC v. Johnson*, No. 26-CV-1715, 2026 WL 958171 (D. Ariz. Apr. 8, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) (denying preliminary injunctions).

Many state courts are likewise considering similar actions involving Kalshi.[35] In contrast to the federal courts that have addressed this issue, every state court to have issued a ruling has ruled against Kalshi. *See Massachusetts v. KalshiEX, LLC*, 2584-CV-2525, Order on Plaintiff's Motion for a Preliminary Injunction and Defendant's Motion to Dismiss (Mass. Sup. Ct. Jan. 20, 2026), available here; *Nessel v. KalshiEX LLC*, 26-1087-CZ, Order Granting Temporary Restraining Order (Mi. Circuit Ct. June 29, 2026), available here; *Nevada v. KalshiEX, LLC*, 26-0C-50, Joint Stipulation and Order (Nev. Dist. Ct. July 24, 2026), available here. Massachusetts, Nevada, and Michigan state courts have all ordered Kalshi to implement geofencing in order to bar Kalshi's offerings to users in those respective states. While Massachusetts's order has been stayed pending appeal, Kalshi has pledged to implement geofencing in Nevada by August 12, 2026, and faces the same deadline for doing so in Michigan.

[35] The Court is aware of four civil enforcement actions brought by states against Kalshi that remain pending in their respective state courts. Each of those cases—filed in Nevada, Washington, Massachusetts, and Michigan—was remanded to state court after removal. In addition, a criminal enforcement action is pending against Kalshi in Arizona state court. Numerous other state-filed actions have also been removed by Kalshi, and the question of whether those cases should be remanded is currently being litigated.

## II. DISCUSSION

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "In general, '[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023)). As discussed below, the Court concludes that all factors weigh in favor of Defendants and accordingly **denies** the motion for a preliminary injunction.

### A. Likelihood of Success on the Merits

The Court begins with assessing Plaintiff's likelihood of success on the merits. "In general, to establish a 'likelihood of success on the merits' the movant for injunctive relief 'need only make a showing that the probability of his prevailing is better than fifty percent.'" *Abrams v. Waters*, No. 17-CV-1659 (CSH), 2018 WL 1469057, at *4 (D. Conn. Mar. 26, 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Here, the merits of the case center on whether (1) Kalshi's sports-event contracts constitute "swaps" within the meaning of the CEA, and, if so, (2) whether Connecticut gambling laws are preempted by federal law as applied to Kalshi's sports-event contracts. Kalshi has not demonstrated that it is likely to succeed on the merits on either of these issues, as explained below.

#### 1. Whether Sports-Events Contracts Are Swaps

As noted in Section I.A.1–2, *supra*, to fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A), a contract must be a "swap[ ]. . . traded or executed on" a DCM.

Connecticut argues that the sports-event contracts at issue are not "swaps" within the meaning of the CEA and therefore fall outside the CFTC's exclusive jurisdiction. For the reasons that follow, the Court largely agrees.

First, the Court notes that it has the authority to interpret the CEA, including its definition of a swap. "[T]he CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap." *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1180 (D. Nev. 2025) ("*Crypto*") (comparing *Batterton v. Francis*, 432 U.S. 416, 430–31 (1977) (evaluating a statute that expressly "authorize[d]" the Secretary of Health, Education, and Welfare the power to define a statutory term through statutory language: "unemployment (as determined in accordance with standards prescribed by the Secretary)" (cleaned up)), with 7 U.S.C. § 2(a)(1)(A) (granting the CFTC "exclusive jurisdiction" over "accounts, agreements . . ., and transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC). "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("Congress expects courts to handle technical statutory questions."). Nothing in the CEA takes statutory interpretation away from courts. *See* 7 U.S.C. § 2(a)(1)(A).

Kalshi agrees, but states that "a challenge to the CFTC's determination [of what constitutes a swap] *must* be brought against the CFTC itself."[36] The Court is not persuaded. In support of its argument, Kalshi relies on a wholly inapposite Ninth Circuit case, *Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 (9th Cir. 2015). That case indeed holds, as Kalshi

[36] ECF No. 75 at 2 (emphasis added).

states, that a "collateral attack on agency decision would be prohibited 'end-run.'"[37] But unlike in *Big Lagoon*, where California challenged a Bureau of Indian Affairs decision to hold a parcel of land in trust for an Indian tribe, Kalshi has failed to identify what exact CFTC decision Connecticut is seeking to collaterally attack here. Kalshi's reliance on *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156–57 (7th Cir. 1992) is similarly misplaced. That case held that certain state law claims asserted by soybean farmers were preempted by the CEA; it did not address whether a court may determine, in the first instance, whether the contracts at issue fall within the CFTC's exclusive jurisdiction. Nothing in *American Agricultural Movement* precludes a court from resolving that threshold question here.

As noted above, the CEA defines swaps as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define "occurrence" or "event," so the Court may "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). Although dictionaries may illuminate ordinary meaning, *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568–69 (2012), statutory language must be construed in context, not in isolation. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Thus, the Court must "attempt to give effect to the plain meaning of each word," *Assocs. Against Outlier Fraud v. Huron*

[37] *Id.*

*Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016), including Congress's decision to use the distinct terms "occurrence" and "event."

The Court finds that the statutory phrase "occurrence, nonoccurrence, or the extent of the occurrence of an event" is concerned with whether an event takes place and to what extent it occurs, not various outcomes of or embedded within that event. The Court finds persuasive the analysis of the District of Nevada in *Crypto*, which reached the same conclusion after examining contemporaneous dictionary definitions of "occurrence" and "event." *See* 815 F. Supp. 3d at 1181–83. That court ultimately interpreted "occurrence" to mean "something [that] happened," and "event" as "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Id.* Crucially, though "some dictionaries suggest 'event' could mean 'outcome,' Webster's and Merriam-Webster's noted this definition of event is an 'archaic' use of the word," not its ordinary meaning. *Id.* at 1182 (quoting Webster's New College Dictionary (2009) (definition of event), Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (definition of event)). Thus, "event" as used in the CEA cannot also encompass "outcome," and, conversely, the statutory phrase cannot be read to make every outcome an "occurrence . . . of an event."

In the context of sporting events, "the ordinary meaning of event . . . would be the sporting event itself, not who wins it." *Crypto*, 815 F. Supp. at 1183. For example, a boxing match would constitute the relevant "event," and it "could either take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence)." *Id.* The term "event" does not encompass the result of the event, meaning who wins the boxing match is not a separate event in and of itself. Indeed, "[a]n ordinary American interpreting the word 'event'

would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself." *Id.*

Kalshi's sports-event contracts fail to satisfy this portion of the statutory definition of a swap because they do not depend on whether an underlying sporting event occurs, fails to occur, or occurs to a particular extent. Instead, Kalshi's sports-event contracts depend on the event's outcomes or discrete in-game occurrences. Treating those outcomes as separate "events" would depart from the ordinary meaning of the term. Thus, Kalshi's sports-event contracts do not fall within § 1a(47)(A)(ii). [38]

Separately, the Court finds that Kalshi's sports-event contracts are also not swaps because they are not "associated with a potential financial, economic, or commercial consequence," as required by 7 U.S.C. § 1a(47)(A)(ii). Kalshi asserts that "[s]ports events have *actual* and *significant* financial consequences," and that they "readily meet the swap definition, which requires only *potential* consequences."[39] It further contends that—when it comes to a limiting principle—"the definition of swap is broad but not limitless"; to qualify as a swap, an event contract must be based on "an event that has a potential consequence for stakeholders."[40]

The Court agrees with the Defendants and the *Hendrick* court that Kalshi's position that sports-event outcomes are associated with financial consequences "knows no limiting

---

[38] The Court notes that, although neither the statute nor the parties define "sports-event contracts," this holding and the accompanying analysis is limited to contracts that depend on a sporting event outcome or an in-game occurrence—for example, which team wins or advances or whether a player scores a touchdown. The Court does not decide on this limited record whether the same analysis would apply to other types of sports-related event contracts (e.g. whether a game proceeds to overtime or whether a series reaches a seventh game), as the record does not establish that such contracts are offered or are at issue, and the parties have not addressed these types of contracts.

[39] ECF No. 75 at 3.

[40] ECF No. 82 at 36:23; 37:10–12.

principle." *Hendrick*, 817 F. Supp. 3d at 1027. In asserting that an event contract qualifies as a swap if it is based on "an event that has a potential consequence for stakeholders,"[41] Kalshi does little to clarify the scope of the statutory phrase. The proposed limitation simply replaces one undefined concept with another: what qualifies as a "potential consequence," and which "stakeholders" are relevant? Kalshi's formulation provides no meaningful basis for drawing those lines, and its own examples illustrate the difficulty of that proposed limitation.

For example, Kalshi draws a distinction between contracts on the winner of a sporting event, which it contends qualify as swaps, and contracts on the game's exact final score, which it does not offer because, in its view, they are "divorced from . . . an outcome that would have an effect on the team or their sponsors" and thus fall outside the statutory definition of a "swap."[42]But it is not clear to the Court why the identity of the winning team, as opposed to the game's final score, is meaningfully different for purposes of the statutory requirement that the event have a potential financial, economic, or commercial consequence. There are many sporting events in which the winner has little or no practical consequence beyond the contest itself, while the precise score may carry significant financial and commercial implications. For example, the winner of a late-season game between two teams already eliminated from postseason contention may have relatively limited economic significance, whereas a losing team reaching a scoring threshold that secures playoff qualification or advancement under a tournament's rules may have substantial financial consequences for players, coaches, teams,

[41] ECF No. 82 at 37:12.

[42] *Id.* at 101:3–10.

broadcasters, sponsors, and other stakeholders. Kalshi offers no principled basis for concluding that the former satisfies the statutory definition of a swap while the latter necessarily does not.

Or, for instance, Kalshi has represented that it would not list a contract on whether or not a player at a blackjack table wins their hand because "it would be very difficult to argue that that's not gaming" and because that is an example of a "transaction that has implications for the people in the transaction, but no extrinsic implications for people outside of the transaction."[43] But Kalshi has offered "no principled reason" for why a "'combo' on both the Giants and Broncos winning," which is a type of contract Kalshi does offer, is meaningfully different.[44] Whether both the Giants and Broncos happen to win on a given weekend may have no independent financial, economic, or commercial consequence at all, apart from its significance to participants in Kalshi's market and others who have wagered on that particular combination of outcomes. Conversely, a blackjack hand could have significant financial consequences for the casino, the player, or others with contractual or commercial interests tied to the game. If the existence of some downstream economic consequence is sufficient to transform an event into a swap, the statute would encompass virtually any uncertain event with economic ramifications—a construction that is difficult to reconcile with the text Congress enacted.

Nor could Congress have intended to strip states of their ability to regulate sports betting outside of a CEA-regulated DCM. If the Court were to accept that sports-event contracts are, indeed, swaps, and 7 U.S.C. § 2(a)(1)(A) put such contracts under CFTC's

---

[43] ECF No. 82 at 45:8–23.

[44] ECF No. 46 at 18.

exclusive jurisdiction, but 7 U.S.C. § 2(e) requires swaps to be listed on DCMs, "then state-regulated sportsbooks, casinos, or licensed online gaming providers would be violating federal law by offering them outside of a CEA exchange."[45]

Kalshi's argument that § 2(e) applies only to contracts listed on DCMs does not resolve this issue. That interpretation would create an anomalous regulatory gap, allowing entities to offer swaps outside of CEA-regulated exchanges while avoiding the very oversight and standardization requirements Congress enacted through Dodd-Frank. If companies could offer swaps in this regulatory "Wild West," there would be no principled reason why other types of swaps—including credit default swaps—could not similarly be traded outside the CEA framework. Such a reading would undermine Dodd-Frank's objectives and create a regime in which significant categories of derivatives could evade federal regulation. The better reading is that Congress did not intend to transform all sports-event contracts into federally regulated swaps that must be traded on CEA exchanges.

The Court thus interprets the phrase "associated with a potential financial, economic, or commercial consequences" to mean that the event or contingency, by its very nature, has embedded within it some potential financial, economic, or commercial consequence. This interpretation is consistent with the interpretation of the *Hendrick* court, which held that "the event or contingency is itself inherently joined or connected with a potential financial, economic, or commercial consequence."[46] *Hendrick*, 817 F. Supp. 3d at 1027. In reaching that

[45] ECF No. 46 at 19.

[46] In their briefing, Defendants pointed the Court to the *Hendrick* court's definition of a swap and asked the Court to adopt it. ECF No. 46 at 17. At the oral argument on the Motion, however, Defendants suddenly changed course and stated that was no longer their position. ECF No. 82 at 84:21–23. Instead, they urged the Court to require the phrase "associated with" to encompass

conclusion, the *Hendrick* court explained that the relevant consequence must arise from the event or contingency itself, rather than from externalities such as downstream financial effects created by third parties' independent decisions to bet on the event. *Id*.

Although the Court articulates this principle somewhat differently than the *Hendrick* court, it relies on the same considerations that informed *Hendrick*'s interpretation. The *Hendrick* court supported its reading by examining the surrounding statutory text, which primarily concerns financial instruments and economic measures; Dodd-Frank's focus on regulating systemic risks in the financial markets; the CFTC's post-enactment guidance distinguishing swaps from ordinary consumer transactions; and federalism principles recognizing the states' traditional role in regulating gambling. *Id.* at 1027–31. The Court adopts that reasoning and incorporates it here rather than repeating the extensive analysis set forth in *Hendrick*.

It is true, as Kalshi points out, that the text of the CEA does not explicitly require an event to be "inherently joined or connected with" a potential financial consequence.[47] Nor does the statutory text recite "that the event or contingency, by its very nature, has embedded within it" such a consequence, as the Court interprets the statute above. Nevertheless, the Court must give independent meaning to the phrase "associated with" by identifying a meaningful boundary on what it requires. Reading "associated with" to encompass any event that could have some conceivable financial, economic, or commercial consequence would render the

"something that has some logical proximate relationship to the preceding event." *Id*. at 85:5–6. The Court declines to accept this proposed formulation because it was neither briefed nor meaningfully developed at oral argument.

[47] ECF No. 75 at 3–4.

phrase effectively limitless, because virtually any uncertain event could produce some downstream financial effect.

The Court therefore interprets "associated with" to require a connection between the financial, economic, or commercial consequence and the event or contingency itself, rather than consequences arising solely from externalities such as endorsement contracts triggered by a team's success, bonus provisions in player or coaching contracts, side wagers, or other downstream financial arrangements created by independent actors. This interpretation ensures that the statutory phrase "associated with a potential financial, economic, or commercial consequence" captures events that are connected to financial, economic, or commercial consequences by their own nature, while excluding events that acquire such significance only through external market activity.

Applying this framework, the Court concludes that Kalshi's sports-event contracts that are based on outcomes of or discrete moments within sporting events (e.g. who wins, whether there is a fumble, etc.) are not based on events that, by their very nature, have embedded within them potential financial, economic, or commercial consequence (unlike the occurrence of a sports game itself, which has, embedded within it, potential financial consequences arising from ticket sales, broadcast rights, and advertising costs). Rather, these contracts are based on the results of sporting contests—events that may have incidental financial implications for teams, players, sponsors, broadcasters, and others, but that do not themselves become financial, economic, or commercial events merely because third parties may derive economic value from, or assign financial significance to, those results. In other words, the fact that a particular outcome of or within a sporting event may have downstream economic

consequences does not satisfy § 1a(47)(A)(ii), because those consequences arise from externalities surrounding the event rather than from the event itself.

This interpretation is reinforced by the CEA's statement of purpose. The CEA provides that transactions subject to the Act "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Thus, Congress envisioned the Act as facilitating legitimate risk management and price discovery in the nation's commodity markets. It is not apparent to the Court what risk-management or hedging function contracts premised on the outcomes of or within sporting contests actually serve. Kalshi has said so itself, conceding in a previous litigation that "at least in general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Brief of Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

Because Kalshi's sports-event contracts are not swaps under the CEA, they do not fall within the CFTC's exclusive jurisdiction, and the CEA does not preempt state regulation of those contracts.

### 2. Whether Connecticut Gambling Laws Are Preempted

The Court's conclusion that Kalshi's contracts are not swaps is sufficient to resolve the Motion. Nevertheless, even if the contracts were properly characterized as swaps, Kalshi's preemption arguments would still fail for the independent reasons discussed below.

Under the Supremacy Clause, federal law prevails when it conflicts with state law. *See* U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding.”); *Crosby v. Nat’l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (stating that “[a] fundamental principle of the Constitution is that Congress has the power to preempt state law”). “In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.” *N.Y. SMSA Ltd. P’ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (cleaned up).

“The key to the preemption inquiry is the intent of Congress.” *Id.* at 104. “If a federal law contains an express preemption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress’ displacement of state law still remains.” *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). That is, even when a federal statute contains an express preemption clause, the Court must still consider whether Congress’ preemptive intent may be inferred from the scope of the statute such that “Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law.” *Id.* at 76–77 (cleaned up). “[T]he party asserting that federal law preempts state law bears the burden of establishing preemption.” *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

“Traditionally, there has been a presumption against preemption with respect to areas where states have historically exercised their police powers.” *New York SMSA Ltd. P’ship*, 612 F.3d at 104; *see also Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (“There is typically a presumption against preemption in areas of regulation that are traditionally

allocated to states and are of particular local concern.”). “A local government's legislative exercise of ‘historic police powers of the State [ ]’ is not to be superseded by a federal statute unless it was ‘the clear and manifest purpose of Congress’ to do so.” *New York SMSA Ltd. P’ship*, 612 F.3d at 104 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). But this presumption against preemption does not generally apply when a state regulates in an area “where there has been a history of significant federal presence.” *United States v. Locke,* 529 U.S. 89, 108 (2000).

**a. Field Preemption**

Kalshi first asserts that “Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation.”[48] Kalshi asserts that field preemption exists here based on the statutory text of the CEA, the statutory purpose of the CEA, the CEA’s drafting history, and the comprehensive nature of the regulatory scheme created by the CEA. Numerous federal courts have now considered these arguments, and the Court finds persuasive the reasoning of those decisions rejecting Kalshi’s claim that Congress intended the CEA to occupy the field.

Field preemption exists where a federal regulatory scheme is “so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it.” *Fid. Fed. Sav. & Loan Ass’n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (cleaned up). Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption “categories” “are not ‘rigidly distinct,’” and “‘field’ preemption may fall into any of the categories of express,

[48] ECF No. 30-1 at 19.

implied, or conflict preemption"). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)). "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.*

First, Kalshi has not demonstrated that field preemption exists based on "the text and structure of the statute at issue." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Here, the CFTC's "exclusive jurisdiction" with respect to "transactions involving swaps" on a DCM is limited by the CEA's provision that "nothing contained in th[e] section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A). "This provision evinces Congress' intent to leave room for states to regulate certain activities that may have otherwise been covered by the CEA." *Williams*, 2026 WL 2017466, at *7.

Second, the structure of the CEA as a whole, and particularly Congress' enactment of the Special Rule, demonstrates Congress' "intent that some state law and regulation should operate in tandem with the CEA." *Id.* Specifically, because the Special Rule provides the CFTC with authority to prohibit event contracts that are "contrary to the public interest" because they "involve . . . activity that is unlawful under any Federal or State law" or "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), the Special Rule's "plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." *Martin*, 793 F. Supp. 3d at 680 (emphasis in original). Additionally, given that the power to regulate

gambling is a traditional police power exercised by Connecticut, as did the Southern District of New York, this Court "also declines to interpret the CEA's grant of exclusive jurisdiction as leaving no room for supplementary state legislation." *Williams*, 2026 WL 2017466, at *7 (cleaned up).

Next, "Congress' intended scope of preemption under the CEA is demonstrated in the Act's express prohibition of state regulation in certain contexts." *Id.* While not at issue here, Section 16 of the CEA, for example, displaces state gambling and bucket-shop laws as applied to transactions involving swaps in limited circumstances, including certain electronic trading facilities and agreements excluded or exempted from the CEA. 7 U.S.C. § 16(e)(2). It also provides that swaps may not be regulated as insurance contracts under state law. *Id.* § 16(h). "These provisions provide 'strong evidence' that when enacting § 2 of the CEA with a grant of exclusive jurisdiction to the CFTC, Congress did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps." *Williams*, 2026 WL 2017466, at *7 (quoting *Martin*, 793 F. Supp. 3d at 681). Had Congress intended to occupy the field with respect to the types of contracts at issue here, it could have expressly said so, as it did in other contexts under § 16. The absence of such language, coupled with the CEA's preservation of state authority and its recognition of concurrent state regulation in certain areas, weighs against a finding of field preemption.

Lastly, the Supreme Court has cautioned against interpreting ambiguous or obscure statutory language, divorced from its context, as conferring broad and transformative authority on the Executive Branch—what Justice Scalia famously described as "hiding elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The Court finds it unlikely that, through Dodd-Frank, Congress intended to displace the States' historic

police powers over sports betting and instead vest exclusive regulatory authority over such activity in the CFTC—a relatively small financial regulator with no historical role or particular expertise in regulating sports betting. The briefing does not identify, and the Court is not aware of, any congressional appropriation of funds or allocation of resources to the CFTC for the purpose of regulating sports betting, either at the time Dodd-Frank was enacted or at any point thereafter.

Taken together, the CEA's text, structure, and targeted preemption provisions demonstrate that Congress did not intend the statute to occupy the field of state regulation at issue here. Accordingly, Kalshi is unlikely to succeed on its field-preemption claim.

**b. Conflict Preemption**

Kalshi also asserts that Connecticut's gambling laws are conflict-preempted as applied to Kalshi, "because it would be 'impossible' for Kalshi 'to comply with both state and federal law,' and because Connecticut's laws stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in the CEA."[49] Defendants respond that Kalshi has not demonstrated that Connecticut's gambling laws would conflict with the CEA, or that they pose any obstacles to federal objectives.[50] The Court agrees and holds that Kalshi has failed to show a likelihood of success that conflict preemption applies in this matter.

"Conflict preemption of state law occurs where 'it is impossible for a private party to comply with both state and federal law' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Williams*,

[49] ECF No. 30-1 at 25 (quoting *Crosby*, 530 U.S. at 372–73).

[50] ECF No. 46 at 27–29.

2026 WL 2017466, at *7 (quoting *Crosby*, 530 U.S. at 372–73). "Federal law does not preempt state law under conflict preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 436 (2d Cir. 2024) (cleaned up). The "mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (cleaned up).

First, Kalshi has not demonstrated impossibility of compliance with both Connecticut gambling laws and the CEA. Kalshi claims that adhering to Connecticut's gambling laws would be impossible without violating the CFTC's requirement that a DCM provide "impartial access to its markets and services," because Kalshi would be required to limit access to its exchange to persons living only in Connecticut, which would be impossible for a nationwide platform such as Kalshi.[51] The Court does not agree. "The purpose of the impartial access requirement is to prevent DCMs from having certain discriminatory access requirements for their platform; it does not require DCMs to offer contracts nationwide." *Williams*, 2026 WL 2017466, at *8 (citing 17 C.F.R. § 38.151(b) (providing that impartial access includes "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner"); Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ("The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants.").

---

[51] ECF No. 30-1 at 28.

It is unclear why Kalshi could not seek out a license pursuant to Connecticut law and establish a category of Connecticut market participants that does not discriminate within the state. *See* 75 Fed. Reg. at 80579 ("A DCM can satisfy the requirement that membership and participation criteria are impartial, transparent, and non-discriminatory by establishing clear and impartial guidelines and procedures for granting access to its facilities and publishing such guidelines and procedures on its Web site. Such requirements may establish different categories of market participants, but may not discriminate within a particular category."); *Martin*, 793 F. Supp. 3d at 686 ("Kalshi's point is not a basis for holding that conflict preemption exists and that Maryland's laws are preempted simply because *not* obtaining a license limits Kalshi's geographical access . . . . So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland."); *KalshiEX LLC v. Schuler* (*"Schuler I")*, No. 25-CV-1165, 2026 WL 657004, at *9 (S.D. Ohio Mar. 9, 2026) ("Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'"). The fact that Connecticut law imposes an additional regulatory requirement on Kalshi does not, without more, establish a conflict with federal law. Because the two regimes can coexist, Kalshi's attempt to evade Connecticut's requirements fails.

Nor has Kalshi demonstrated that Connecticut's gambling laws frustrate Congress' objectives underpinning the CEA or serve as an obstacle to the CEA's regulatory scheme. Kalshi contends that "once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with

federal law."[52] Penalties imposed by Connecticut's criminal law, Kalshi continues, "substantially interfere with the CFTC's discretion."[53]

The Court, again, disagrees. "The mere fact that state laws . . . overlap to some degree with federal . . . provisions does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211. "Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute [state offenses] is entirely consistent with federal interests." *Id.* at 212. As Defendants point out, the CFTC itself "has *banned* the conduct that the State law seeks to address [when it] expressly outlawed contracts on conduct 'that involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal Law,' 17 C.F.R. § 40.11(a)(1), or activity that is similar thereto, *id.* § 40.11(a)(2)."[54] Kalshi's conduct thus appears unlawful under the scheme that Kalshi claims protects it from regulation by state law.

Additionally, as previously discussed, the CEA's text and structure, as well as the historical context of Connecticut's interest in regulating gambling through its police power, demonstrate that Congress did not intend to preempt all state actions that may relate to DCMs. The "objectives behind federal commodities regulation include standardization, stability, and prevention of unlawful and abusive conduct in the nation's derivatives markets, while Dodd-Frank specifically concerned itself with ensuring the integrity and accountability of the

---

[52] ECF No. 30-1 at 27.

[53] *Id.* at 27.

[54] ECF No. 46 at 29.

marketplace for swaps."[55] Far from determining that a likely conflict exists, the Court holds that "Connecticut gaming law is harmonious with those objectives."[56]

Lastly, "although Kalshi can list any contract that it self-certifies, its self-certification is not tantamount to a declaration that the contract is lawful." *Williams*, 2026 WL 2017466, at *9. It is ultimately the CFTC that holds the authority to conduct a review and determine whether a sports-event contract listed by Kalshi is legal. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Though the CFTC has not subjected any of Kalshi's contracts to such a review, "the agency's inaction is not proof that the sports-event contracts are regulated by or permissible under the CEA—and the Court has concluded they are not." *Schuler I*, 2026 WL 657004, at *9.

Accordingly, the Court holds that Connecticut's gambling laws complement rather than conflict with federal law. Because Kalshi has not demonstrated a likelihood of success on its preemption claim, this factor weighs against granting a preliminary injunction.

**B. Irreparable Harm**

Plaintiff has not demonstrated that in the absence of the injunction it seeks, it is likely to suffer an irreparable harm that cannot be otherwise remedied. In order to satisfy the irreparable harm requirement, a plaintiff must "demonstrate that absent a preliminary injunction [it] will suffer an injury that is . . . actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary

---

[55] *Id.*

[56] *Id.*

circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). "Irreparable harm may be found where damages are difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

Kalshi argues that if it chooses not to comply with the DCP's cease-and-desist letter, it will face "the extraordinary harms associated with the threat of civil liability and criminal prosecution."[57] Next, it claims that compliance "would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation," including the loss of business from its more than 24,000 Connecticut users and millions of dollars in open investments, the substantial time and expense of implementing state-specific geolocation capabilities, and unrecoverable economic losses due to Connecticut's Eleventh Amendment immunity.[58] Finally, Kalshi argues that an injunction is necessary to prevent disruption to its users' existing contracts and the broader market, as well as to avoid irreparable harm to Kalshi's reputation, goodwill, and continued status as a CFTC-designated contract market.[59]

Although the prospect of criminal prosecution can, in appropriate circumstances, support a finding of irreparable injury, *see Black v. Cakor Rest., Inc.*, No. 22-CV-1447, 2022 WL 17689840, at *6 (S.D.N.Y. Dec. 15, 2022), Kalshi has not demonstrated that such harm is actual and imminent here. As Defendants note, the DCP lacks independent authority to initiate criminal prosecutions, and any potential criminal enforcement remains speculative.[60] Moreover, any civil penalties imposed on Kalshi may be challenged and vacated should Kalshi

---

[57] ECF No. 30-1 at 29.

[58] *Id.* at 29–30; *see also* ECF No. 82 at 13:15–20.

[59] ECF No. 30-1 at 30–31.

[60] ECF No. 46 at 30.

ultimately prevail on the merits. As in *Hendrick*, the Court concludes that Kalshi's asserted injuries "are largely monetary" and thus do not constitute irreparable harm. *Hendrick*, 817 F. Supp. 3d at 1035.; *see also Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (holding that where "monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm").

Nor has Kalshi shown that its asserted compliance costs constitute irreparable harm. Its claimed injuries—including the expense of implementing state-specific geolocation capabilities and lost business in Connecticut—are the type of "ordinary compliance costs [that] are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)). Defendants also persuasively argue that these asserted harms are, to a significant extent, self-inflicted, as Kalshi continued offering sports-event contracts despite repeated regulatory warnings and adverse judicial decisions rejecting similar preemption arguments.[61] Additionally, Kalshi represented at oral argument that geofencing in one state, such as Connecticut, "effectively means geofencing everywhere."[62] But courts in other states have already directed Kalshi to cease offering its sports-event contracts in those jurisdictions.[63] To the extent Kalshi will comply with these orders by August 12—as it has already indicated it will in Nevada,—it will have already implemented geofencing restrictions in those states. Accordingly, requiring Kalshi to restrict access in Connecticut would appear unlikely to impose the substantial additional costs Kalshi discusses.

[61] *Id.* at 31.

[62] ECF No. 82 at 12.

[63] *See* Section I.C, *supra*.

Finally, Kalshi has not offered evidence that the CFTC is likely to revoke its designation as a DCM if it complies with Connecticut law. As Defendants point out, Kalshi's assertion that the CFTC *could* take such action is speculative, particularly given that Kalshi has continued to litigate similar disputes in other states without any indication that the CFTC has sought to alter its designation.[64] Likewise, Kalshi's asserted reputational harms and alleged disruption to users and nationwide markets rest on predictions that are too conjectural to support a finding of irreparable injury. The Court finds that monetary damages here would be an adequate remedy. Accordingly, the Court concludes that the balance of the evidence weighs against a finding of irreparable harm.

**C. Balance of Equities and Public Interest**

The Court considers the balance of the equities between the parties and the public's interest together. *See Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025) ("With respect to the factors of the public interest and the balance of the equities, in a suit against the government, balancing of the equities merges into [the Court's] consideration of the public interest." (cleaned up)).

Kalshi argues that the "public has a first-order interest in ensuring that preempted Connecticut laws are not enforced against federally regulated entities."[65] Conversely, Kalshi says, "Defendants cannot show any harm as a result of being prevented from enforcing a statute until after a determination of its constitutionality."[66] And lastly, Kalshi contends, "[i]mmediate compliance with Connecticut law to avoid criminal penalties will harm Kalshi's users in

[64] *Id.*

[65] ECF No. 30-1 at 31.

[66] *Id.* at 32.

Connecticut and impose intractable technological difficulties on a very short timeframe.[67] Defendants respond that "the public has a significant interest in enforcement of laws and regulations that protect the public, specifically minors, from problem gambling and predatory advertising"; "the public has an interest in the revenue received from licensed sports wagering and the benefits therefrom."[68]

Defendants' interests in regulating gaming in Connecticut and ensuring that the DCP has the ability to effectuate statutes enacted to protect the public heavily outweigh the interests articulated by Kalshi. Particularly, the Court agrees that states have a strong interest in reducing "the social costs associated" with gambling, a "vice activity," *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 182, 185 (1999), and to promote the "welfare, safety, and morals" of their citizens. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003). Further, the public has a strong interest "in deterring predatory marketing targeted at Connecticut's youth . . . due to the clear risks to youths and others from sports betting."[69] Additionally, an injunction prohibiting Connecticut's ability to regulate Kalshi would substantially disrupt Connecticut's carefully crafted, decades-old regulatory scheme and prevent the State from enforcing its duly enacted gaming laws, resulting in significant irreparable harm to the State and the public interest. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) ("When

[67] *Id.*

[68] ECF No. 46 at 35–37.

[69] ECF No. 46 at 35 (citing Antonio Pequeno IV, Sports Gambling, Prediction Markets Could Lead to New Credit Risks for Young Men and Low Earners, Bank Warns, Forbes (Nov. 25, 2025)).

a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers) ("Any time [a state is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Lastly, the Court is not persuaded by Kalshi's argument that its users will suffer harm if it is made to unwind ongoing sports-event contracts. Kalshi has been on notice of the potential for state enforcement against its contracts since it began offering them. It has provided no disclosures or warnings to its users, and has instead continued to advertise itself as the "first app for legal sports betting in all 50 states." *Hendrick*, 817 F. Supp. 3d at 1020. Any resulting harm to Kalshi's approximately 24,000 Connecticut users from unwinding existing contracts does not outweigh the State's and the public's strong interests in enforcing Connecticut's gaming laws.

Accordingly, the balance of the equities and the public's interest weigh in favor of Defendants.

## III. <u>CONCLUSION</u>

"Kalshi characterizes its sports-related event contracts in various ways, but at bottom, they are sports wagers." *Hendrick*, 817 F. Supp. 3d at 1029. Kalshi itself has touted its platform as offering legal sports betting nationwide. But sports wagering has long been subject to state regulation pursuant to the states' police powers because of the significant public interests and risks associated with gambling. The Court declines to conclude either that these sports wagers are properly categorized as swaps and fall under the CFTC's authority, or that Congress clearly displaced Connecticut's traditional authority to regulate sports wagering and vested that

authority in the CFTC, an agency that has not historically regulated sports wagering and has not exercised meaningful oversight over Kalshi's sports event contracts.

For the foregoing reasons, the Motion is **DENIED**. Per the Court's previous order at ECF No. 48, the parties are ordered to file their Rule 26(f) Report on or before **August 24, 2026**. Defendants may respond to the Complaint in this matter on or before **August 31, 2026.**

**SO ORDERED.**

Hartford, Connecticut
August 7, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

# EXHIBIT 3

EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| COINBASE FINANCIAL MARKETS, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>WILLIAM TONG, in his official capacity as Attorney General of Connecticut; BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; and KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection,<br><br>Defendants. | : | **MEMORANDUM & ORDER**<br><br>25-CV-2121 (VDO) |

**VERNON D. OLIVER**, United States District Judge:

Before the Court is Plaintiff Coinbase Financial Market's ("Coinbase") Motion for a Preliminary Injunction (the "Motion"). Coinbase seeks an order enjoining Defendants, various Connecticut officials, from enforcing Connecticut's gaming regulatory scheme against Coinbase. Coinbase contends that federal law preempts Connecticut's gaming regulatory regime and related statutes. For the reasons that follow, and largely in line with the Court's companion order in *KalshiEX LLC v. Cafferelli*, No. 25-CV-2016, ECF No. 94, the Motion is **DENIED**. For ease of reference, the Court's opinion in *KalshiEX LLC* is attached to this Order as **Exhibit A.**

## I. BACKGROUND

### A. Factual Background

Because this case presents essentially the same legal issues addressed in the Court's companion opinion in *KalshiEX LLC*, the Court incorporates by reference the background

discussion set forth in Section I.A of that opinion, including the background on derivative contracts, the federal regulation of swaps and event contracts, Kalshi's designation as a designated-contract market ("DCM"), Connecticut's gaming regulatory scheme, and the cease-and-desist letter Connecticut sent to Kalshi. Familiarity with that background is assumed. Accordingly, the Court recounts below only those facts specific to Coinbase and any additional facts necessary to resolve the present Motion.

Coinbase "operates a cryptocurrency exchange platform." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 146 (2024). As relevant here, in January 2026, Coinbase began offering Kalshi's list of event contracts, including sports-event contracts, through its platform.[1] Unlike Kalshi, which is a DCM, Coinbase is a "Futures Commission Merchant ('FCM'), and it serves as an intermediary for customers trading regulated derivatives listed on a DCM, including event contracts on Kalshi."[2] Like Kalshi, however, Coinbase is a CFTC-registered entity, meaning it is regulated by the CFTC under the same regulatory scheme laid out by the Commodity Exchange Act ("CEA").[3]

As did Kalshi in *KalshiEX LLC*, Coinbase seeks a preliminary injunction prohibiting Defendants from enforcing Connecticut's gaming laws against the offering of Kalshi's sports-event contracts. Coinbase advances the same legal theory as Kalshi, contending that the contracts at issue are "swaps" within the meaning of the CEA and that any state regulation of those contracts is therefore preempted by federal law. Coinbase's claims likewise arise from

---

[1] Compl., ECF No. 1 ¶ 3; *see also* Oral Arg. Tr., ECF No. 84 at 11:22.

[2] ECF No. 1 ¶ 5.

[3] *Id.* ¶ 6.

the same cease-and-desist letter the Connecticut Department of Consumer Protection ("DCP") issued to Kalshi.[4] Coinbase does not allege that Defendants directed any separate enforcement action or other conduct specifically toward Coinbase. Thus, apart from Coinbase's status as an FCM rather than a DCM, this case presents the same operative facts and legal questions addressed in the Court's companion opinion.

### B. Procedural History

Coinbase initiated this action on December 18, 2025.[5] On the same day, Coinbase also filed the Motion.[6] Defendants responded on January 9, 2026,[7] and Coinbase replied on January 30, 2026.[8] A number of Indian tribes and gaming associations also filed an amicus brief in this case.[9] The Court held oral argument on the Motion on February 11, 2026.[10]

---

[4] Coinbase does, however, also point to a similar cease-and-desist letter issued by the DCP to Robinhood, a company Coinbase contends is similarly situated to Coinbase as an FCM that offers access to Kalshi's event contracts.

[5] ECF No. 1.

[6] ECF No. 5.

[7] ECF No. 44.

[8] ECF No. 74.

[9] ECF No. 58-1. The Brief was filed by the Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Minnesota Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Native American Finance Officers Association, San Manuel Gaming and Hospitality Authority, and 16 tribes: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Sandia; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuuhaviatam of San Manuel Nation.

[10] ECF No. 82.

## II. DISCUSSION

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "In general, '[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023)). As discussed below, the Court concludes that all factors weigh in favor of Defendants and accordingly **denies** the motion for a preliminary injunction.[11]

### A. Likelihood of Success on the Merits

The Court, in assessing Plaintiff's likelihood of success on the merits, incorporates the analysis set forth in Section II.A of *KalshiEX LLC*. For the same reasons, the Court concludes Coinbase has failed to establish a likelihood of success on demonstrating either that (1) Kalshi's sports-event contracts, offered through Coinbase, constitute "swaps" within the meaning of the CEA, and (2) that Connecticut gambling laws are preempted by federal law as applied to those contracts.

[11] The Court recognizes that Coinbase's briefing is not identical to Kalshi's and that Coinbase advances certain arguments not raised in the companion case, including arguments, for example, that its alleged loss of goodwill among customers in the absence of an injunction demonstrates irreparable harm. The Court has considered each of those arguments and concludes that none alter its analysis or the disposition of the Motion.

### B. Irreparable Harm

The Court, in assessing the irreparable harm faced by Coinbase in the absence of an injunction, incorporates the analysis set forth in Section II.B of *KalshiEX LLC*. For the same reasons, the Court concludes that the balance of the evidence weighs against a finding of irreparable harm.

### C. Balance of Equities and Public Interest

Lastly, in assessing the balance of equities and public interest, the Court incorporates the analysis set forth in Section II.C of *KalshiEX LLC*. For the same reasons, the Court concludes that the balance of the equities and the public's interest weigh in favor of Defendants.

## III. CONCLUSION

For the foregoing reasons, the Motion is **DENIED**. Per the Court's previous orders at ECF Nos. 78, 83, the parties are ordered to file their Rule 26(f) Report on or before **August 24, 2026**. Defendants may respond to the Complaint in this matter on or before **August 31, 2026.**

**SO ORDERED.**

Hartford, Connecticut
August 10, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge