**Nos. 25-7516, 25-7187, 25-7831**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

KALSHIEX LLC,
*Plaintiff-Appellant*,
v.
GEORGE ASSAD, *et al.*,
*Defendants-Appellees*,
NEVADA RESORT ASSOCIATION,
*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Nevada,
No. 2:25-cv-575 (Gordon, C.J.)

# BRIEF FOR AMICUS CURIAE PARADIGM OPERATIONS LP IN SUPPORT OF REHEARING EN BANC

CHRISTOPHER G. MICHEL
ZACHARY J. LUSTBADER
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
christopher.michel@kirkland.com

*Counsel for Amicus Curiae Paradigm Operations LP*

September 18, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

STATEMENT OF INTEREST .......... 1

ARGUMENT .......... 1

I. THE PANEL ERRONEOUSLY REPLACED CLEAR STATUTORY TEXT WITH AN ATEXTUAL AND UNWORKABLE RULE .......... 3

II. SPORTS TRADES ARE NO MORE GAMBLING THAN ARE TRADES ON NON-SPORT EVENTS AND ASSET PRICES .......... 9

CONCLUSION .......... 14

CERTIFICATE OF COMPLIANCE .......... 15

CERTIFICATE OF SERVICE .......... 16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bd. of Trade v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905)....................10, 11

*Brooks v. United States*,
337 U.S. 49 (1949)....................6

*Chevron USA Inc. v. Plaquemines Parish,*
608 U.S. 1 (2026)....................7

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)....................4

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933)....................2

*Dubin v. United States*,
599 U.S. 110 (2023)....................6

*Gatewood v. North Carolina*,
203 U.S. 531 (1906)....................2

*In re Jan. 2021 Short Squeeze Trading Litig.*,
2024 WL 4440230 (11th Cir. Oct. 8, 2024) (per curiam) ....................9

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ....................4

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020)....................4

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*,
797 F.3d 160 (2d Cir. 2015) ....................10

*Marinello v. United States*,
584 U.S. 1 (2018)....................5

*Rocky Patel Premium Cigars, Inc. v. Bonta*,
--- F.4th ---, 2026 WL 2529324 (9th Cir. Aug. 27, 2026)....................................7

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)..............................................................................5

*U.S. Telecom Ass'n v. FCC*,
855 F.3d 381 (D.C. Cir. 2017)..............................................................8

*United States v. Fiorillo,*
186 F.3d 1136 (9th Cir. 1999) (per curiam) ..........................................8

*Vericool World, LLC v. Igloo Prods. Corp.*,
175 F.4th 1045 (9th Cir. 2026) ........................................................4, 13

*West Virginia v. EPA*,
597 U.S. 697 (2022)..............................................................................8

*Zuni Public Sch. Dist. No. 89 v. Dep't of Educ.*,
550 U.S. 81 (2007)................................................................................4

**Statutes**

7 U.S.C. § 1a(47)(A)(ii)...............................................................2, 3, 6, 12, 13

7 U.S.C. § 5 ..........................................................................................11

7 U.S.C. § 7a-2(c)(5)(C)(i) .................................................................4, 8, 9

**Regulations**

17 C.F.R. § 38.151(b) ..........................................................................11

77 Fed. Reg. 48,208 (Aug. 13, 2012) ....................................................12

**Other Authorities**

*2028 Presidential Election Winner? (Party)*, Kalshi,
https://kalshi.com/markets/kxpresparty/party-winning-presidency/kxpresparty-2028........................................................5

*Consecutive Days of Average Temperature in San Diego Above 90°F - Week of Sep 7, 2026*, Kalshi, https://kalshi.com/markets/kxavgtksan/average-weekly-temp-in-san-diego-/kxavgtksan-26sep13 .......... 6

*Digital Option*, Nadex, https://www.nadex.com/glossary/digital-option .......... 12

*Game Stopped? Who Wins and Loses when Short Sellers, Social Media, and Retail Investors Collide, Part II*, Virtual Hearing Before the Committee on Financial Services, 117th Cong. (Mar. 17, 2021) .......... 2

Jack Pitcher, *Popular Leveraged Funds Shock Investors with Huge Losses*, Wall St. J. (Oct. 23, 2025) .......... 10

James Fallows Tierney, *Investment Games*, 72 Duke L.J. 353 (2022) .......... 2

Lynn A. Stout, *Technology, Transactions Costs, and Investor Welfare: Is a Motley Fool Born Every Minute?*, 75 Wash. U. L.Q. 791 (1997) .......... 2

*Rain in Los Angeles this Month?*, Kalshi, https://kalshi.com/markets/kxrainlaxm/rain-los-angeles/kxrainlaxm-26sep .......... 10

Sheldon Natenberg, *Option Volatility and Pricing* (2d ed. 2015) .......... 11

Stephen Blyth, *An Introduction to Quantitative Finance* (2014) .......... 11

Turron Davenport, *Timeline of the NFL COVID-19 Outbreak: How Positive Tests Led to Postponed Games*, ESPN (Oct. 11, 2020) .......... 6

*Which Bills Will Become Law this Year?*, Kalshi, https://kalshi.com/markets/kxbills/bills-become-law-this-year/kxbills .......... 11

*Zeroing in on an Options Trading Strategy: 0DTE*, FINRA (June 4, 2026), https://www.finra.org/investors/insights/zeroing-in-options-trading-strategy .......... 10

## STATEMENT OF INTEREST

Paradigm Operations LP is a frontier-technology investment firm. Paradigm has an interest in this case because prediction markets are a cutting-edge application of technologies in which Paradigm invests. Recently, Paradigm invested in Kalshi because of its leadership in the prediction-market space. Paradigm also has an interest in supporting the broad availability of regulated prediction markets, which are a valuable source of public information and allow market participants (including investors and entrepreneurs) to hedge exposure to specific events.[1]

## ARGUMENT

Apps enabling consumers to risk money in the hopes of securing a profit are not novel—and neither are their critics. Providing easy access to such risk-taking, some say, "harm[s] the lives of people by creating financial fragility through wealth erosion." People may part with their funds "habitually and unreflectively, and more than they might want." And in some concerned eyes, participants "daily waste hours at their computers … in their statistically hopeless quest to beat the market."

A reader would be forgiven for thinking that those are criticisms of access to sports betting. But in fact, they are all critiques of retail access to *securities*

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than amicus and its counsel contributed money that was intended to fund preparing or submitting this brief. All parties consent to the filing of this brief.

*trading*—the ordinary purchase and sale of securities and their derivatives by everyday investors.[2] And though meme stocks and zero-commission trades may be new this century, fears of overspeculation by the masses are not. To skeptical state regulators a century ago, early commodities futures contracts were mere "bets or wagers," *Gatewood v. North Carolina*, 203 U.S. 531, 536 (1906)—a dressed-up version of impermissible "gambling in grain," *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

Urged on by Nevada, the panel in this case had a similarly misplaced impulse. The panel conceded that the text of the Commodity Exchange Act, standing alone, could easily let "Kalshi's sports events contracts fit within the meaning of swap in § 1a(47)(A)(ii)." Op. 24. And the panel acknowledged that a separate provision in the CEA expressly regulates swaps on gaming without imposing a categorical ban. Op. 33. Given the clarity of the statutory text, that should have been the end of the matter. But the panel declined to apply the plain meaning of the CEA because it thought that, in providing for the regulation of "swaps," Congress could not have possibly meant to cover "gambling" at all. Op. 26.

---

[2] *Game Stopped? Who Wins and Loses when Short Sellers, Social Media, and Retail Investors Collide, Part II*, Virtual Hearing Before the Committee on Financial Services, 117th Cong., at 9 (Mar. 17, 2021) (testimony of Prof. Vicki L. Bogan); James Fallows Tierney, *Investment Games*, 72 Duke L.J. 353, 353 (2022); Lynn A. Stout, *Technology, Transactions Costs, and Investor Welfare: Is a Motley Fool Born Every Minute?*, 75 Wash. U. L.Q. 791, 810 (1997).

That judicially imposed carveout was flawed in both concept and execution. As a conceptual matter, courts have no mandate to limit clear statutory text, which would make them master of the legislature and turn the Constitution on its head. Regardless, the panel's proposed limitation fails on its own terms. In the sense the panel understood gambling, the *only* thing that happens on SEC- and CFTC-regulated markets is gambling: After all, a trader's job is to bet on asset prices and the events that shape them. The panel's mistaken belief that it could exempt impermissible sports "gambling" from the definition of "swaps" thus amounts to an improper and illogical judicial override of Congress's direction. This Court should vacate that mistaken approach and rehear the case en banc.

## I. THE PANEL ERRONEOUSLY REPLACED CLEAR STATUTORY TEXT WITH AN ATEXTUAL AND UNWORKABLE RULE

Under the CEA, a regulable "swap" includes any "contract … that provides for … payment … that is dependent on the occurrence, nonoccurrence or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). When a sport-related "event" is "associated with a potential financial, economic, or commercial consequence," the CFTC may regulate trading of a "swap" that pays out based on that event. *Id.* Congress made clear that "gaming" events are included, moreover, because it specially enacted a provision allowing the CFTC to bar "swaps" on "gaming" only if it "determine[s]" that such a swap is "contrary to the public

interest." *Id.* § 7a-2(c)(5)(C)(i). Because the statutory language is unambiguous, this case "begins and ends with the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 676 (2020). The Third Circuit recognized as much when analyzing just this issue, declining to "go further" than that. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026), *petition for cert. filed* (Sept. 2, 2026) (No. 26-299).

The panel justified its departure from plain text under the banner of "context," reasoning that it needed to look to what "Congress intended"—and that it would be "implausible that Congress intended to allow the CFTC to engage in the national regulation of gambling based on expansive definitions of the words 'event' and 'associated with' in a Wall Street reform bill." Op. 24-25, 39 (citing *Vericool World, LLC v. Igloo Prods. Corp.*, 175 F.4th 1045, 1057 (9th Cir. 2026)). But that is simply the age-old temptation to "elevat[e] … judge-supposed legislative intent over clear statutory text." *Zuni Public Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 108 (2007) (Scalia, J., dissenting); *see Vericool*, 175 F.4th at 1064 (Bumatay, J., dissenting) (criticizing majority for "arbitrarily limit[ing]" clear text).

As the Supreme Court "has repeatedly stated," a court "may not 'replace the actual text with speculation as to Congress' intent.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (citation omitted). That principle applies directly here: While the term "swap" may be broad, "breadth is not

the same thing as ambiguity," *Marinello v. United States*, 584 U.S. 1, 25 (2018) (Thomas, J., dissenting); *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985), and sports event contracts fall squarely within the broad meaning of "swaps."

The panel suggested that a statutory "event" cannot include an "outcome" of an event. So according to the panel, while "whether the Super Bowl *happens*" is the occurrence of an event, "whether a certain team will *win* that Super Bowl" is merely the event's outcome. Op. 15-16. The panel cited no fewer than seven dictionary definitions showing that there is no meaningful distinction between events and outcomes. *See* Op. 24-25. But while the panel rejected all those definitions, it never even attempted to offer one of its own.

The reason that the panel did not try to construct a definition of "event" that excludes "outcomes" is because doing so would be an impossible task. Is the inauguration of a Democrat at the White House in 2029 a possible future "event," or is it the "outcome" of an event—namely, the 2028 presidential election?[3] Is a position on whether there will be a heat wave in San Diego a lawful swap, or is that

[3] *See 2028 Presidential Election Winner? (Party)*, Kalshi, https://kalshi.com/markets/kxpresparty/party-winning-presidency/kxpresparty-2028 ("**Resolves Yes** if a representative of the Democratic party is inaugurated as President for the term beginning January 20, 2029").

an impermissible gamble on the "outcome" of climate and weather patterns?[4] For that matter, why isn't Seattle's holding up the Vince Lombardi Trophy at Super Bowl LX an event that "*happens*," rather than just an outcome of the game? And why isn't whether a football game takes place or is canceled due to COVID restrictions itself an "outcome" of a global pandemic?[5] The panel's dividing line between events and outcomes blinks reality—literally, the metaphysical reality that "all human events depend upon what has already transpired," *Brooks v. United States*, 337 U.S. 49, 52 (1949)—because any event can easily be reframed as the outcome of events that preceded it. That is not law, but an invitation to let every court decide cases ad hoc based on that old flawed test of "I know it when I see it," *see* Op. 28.

The panel's exclusion of outcomes from the scope of the word "event" is also at war with the text that "surround[s]" it. *Dubin v. United States*, 599 U.S. 110, 120 (2023). The CEA's swap definition includes not just a payment "dependent on the occurrence" or "nonoccurrence" of an event, but also a payment that depends on "the *extent* of the occurrence of an event." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added).

---

[4] *See Consecutive Days of Average Temperature in San Diego Above 90°F - Week of Sep 7, 2026*, Kalshi, https://kalshi.com/markets/kxavgtksan/average-weekly-temp-in-san-diego-/kxavgtksan-26sep13.

[5] *See* Turron Davenport, *Timeline of the NFL COVID-19 Outbreak: How Positive Tests Led to Postponed Games*, ESPN (Oct. 11, 2020), https://www.espn.com/nfl/story/_/id/30030523/line-nfl-covid-19-outbreak-how-positive-tests-led-postponed-games.

But if an "event" cannot be an "outcome," what would the *extent* of the occurrence even mean? A contract can pay out based on the "extent" of occurrence only if the event is one of scope or scale—like inches of snowfall, yards rushed, or electoral votes cast. (Saying that the event "whether the Super Bowl *happens*," Op. 15, has "greatly" or "somewhat" occurred is like saying a person is "mostly dead." *The Princess Bride* (20th Century Fox 1987).) The panel's test, though, would presumably place such numerical "outcomes" off-limits. Textualist analysis cannot ignore the meaning of the words surrounding a term, yet the panel did just that.

The panel also read the statutory phrase "event or contingency *associated with* a potential financial, economic, or commercial consequence" as meaning an event "*inherently* associated with" that "consequence," not just one with "some potential downstream financial consequence." Op. 31-32 (emphasis added). But the word "inherently" does not appear in the text. And the panel's error is nearly identical to one that the Supreme Court rejected last Term in *Chevron USA Inc. v. Plaquemines Parish,* 608 U.S. 1 (2026). There, in interpreting a different statute, the Court held that the term "relating to"—which the Court said was equivalent to "connected or *associated with*"—required only "a connection that is not 'tenuous, remote, or peripheral,'" not a "strict causal relationship." *Id.* at 12, 15; *see Rocky Patel Premium Cigars, Inc. v. Bonta*, --- F.4th ---, 2026 WL 2529324, at *4 (9th Cir. Aug. 27, 2026) (same). On equivalent text, the panel here adopted something even stricter

still—a rule not just that the event must *cause* economic consequences (as sports clearly do), but that the event *itself* must be "inherently" economic.

That rule also runs headlong into the CEA's separate section on "Event Contracts" providing that the CFTC may in some circumstances bar "swaps" on unlawful activity, "terrorism," "assassination," "war," or "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). That provision would make no sense under the panel's test because all of those events—including those based on "gaming"—are, according to the panel, not *inherently* economic to begin with. *See United States v. Fiorillo,* 186 F.3d 1136, 1153 (9th Cir. 1999) (per curiam) ("One provision of a statute should not be interpreted in a manner that renders other sections of the same statute 'inconsistent, meaningless or superfluous.'"). The panel ignored that Congress differentiated gambles on sports in one way only: by expressly leaving the decision whether to forbid them to the CFTC, not the courts.

The panel's invocation of the major questions doctrine as a relative afterthought, *see* Op. 38-40, represents another failure. That doctrine implements the commonsense principle that "ambiguous statutory text" should be interpreted under the "presum[ption] that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)). But here, Congress

did not leave anyone wondering who should decide the fate of gaming swaps: As just noted, it expressly left it to the CFTC to decide whether "gaming" "swaps" will be barred as "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The panel may disagree with the CFTC's still-evolving approach, but the panel has no license to take over a decision that Congress delegated to the Executive—not the Judiciary.

## II. SPORTS TRADES ARE NO MORE GAMBLING THAN ARE TRADES ON NON-SPORT EVENTS AND ASSET PRICES

The panel's more fundamental error was its insistence that the CEA could not possibly cover what the panel viewed as "gambling" or "wager[s]"—*i.e.*, "[m]oney or other consideration risked on an uncertain event; a bet." Op. 27. That line of reasoning was doomed to fail. As the efforts of early-twentieth-century regulators to crack down on futures trades make clear, virtually *all* securities and commodities trading can be reconceived as "gambling." *See* Brief of Amicus Curiae Paradigm Operations LP, Dkt. 27. Buying a share of stock can readily be understood as a "bet that the stock price [will] rise," while selling it short can be viewed as a "bet that the stock price [will] fall," because profit or loss is determined by the difference between purchase and sale price. *In re Jan. 2021 Short Squeeze Trading Litig.*, 2024 WL 4440230, at *1 (11th Cir. Oct. 8, 2024) (per curiam). Similarly, derivatives contracts like futures and options have payouts that turn on the "fluctuation in the value of a selected security, interest rate, market index, or the like"; they are bets on whether a

price will move, by how much, and by when. *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 165 (2d Cir. 2015).

Traders may place such bets to hedge real-world risks, "secur[ing] themselves against the fluctuations of the market by counter contracts for the purchase or sale." *Bd. of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905). Or they may instead engage in aggressive speculation—from trading highly leveraged ETFs[6] to buying and selling same-day-expiration options.[7] Yet it is common ground that all those transactions are subject to federal securities or commodities futures regulation, not state gambling law.

Event contracts—including sports event contracts—are no different. Rather than seek out costly custom-built insurance contracts, a farming company might hedge its seasonal weather exposure by trading on rainfall.[8] To hedge policy risk, a regulated enterprise might trade on the enactment of legislation affecting its

[6] *See, e.g.*, Jack Pitcher, *Popular Leveraged Funds Shock Investors with Huge Losses*, Wall St. J. (Oct. 23, 2025), https://www.wsj.com/finance/investing/popular-leveraged-funds-shock-investors-with-huge-losses-5714f1ac.

[7] *See Zeroing in on an Options Trading Strategy: 0DTE*, FINRA (June 4, 2026), https://www.finra.org/investors/insights/zeroing-in-options-trading-strategy.

[8] *See Rain in Los Angeles this Month?*, Kalshi, https://kalshi.com/markets/kxrainlaxm/rain-los-angeles/kxrainlaxm-26sep.

business.[9] And to hedge against lower demand, a sponsor of an athlete or a manufacturer of a team's jerseys might trade on the player's or team's performance.[10] Those hedgers will often be trading against pure speculators. But while some speculators may ultimately trade to their own detriment, Congress and the CFTC have judged that the benefits of granting "impartial access" to markets, 17 C.F.R. § 38.151(b)—equal opportunity, greater liquidity, better price discovery, *see* 7 U.S.C. § 5—outweigh the risks that some may trade irresponsibly. In such markets, "[p]eople will endeavor to forecast the future, and to make agreements according to their prophecy," and Congress judged that "[s]peculation of this kind by competent men is the self-adjustment of society to the probable." *Christie Grain*, 198 U.S. at 247.

Take the panel's prime example of what supposedly counts as pure "betting": "a sports bet on the Las Vegas Raiders winning a game by over 7.5 points." Op. 27. In fact, a nearly identical trade exists in securities and commodities futures markets too: the "digital option," a derivative that pays a fixed "predetermined payout" if an asset level sits above or below a predetermined price at a predetermined time. Sheldon Natenberg, *Option Volatility and Pricing* 541 (2d ed. 2015); *see* Stephen

---

[9] *See Which Bills Will Become Law this Year?*, Kalshi, https://kalshi.com/markets/kxbills/bills-become-law-this-year/kxbills (listing, for example, "Export-control chip security" and "Insulin cost cap").

[10] *See* Pet. for Rehearing 16.

Blyth, *An Introduction to Quantitative Finance* 61-62 (2014). For instance, a trader can "speculate on the price of EUR/USD on a five-minute contract"—that is, place a bet that pays out a fixed amount if, five minutes from now, the euro is trading "higher than [$]1.1907." *Digital Option*, Nadex, https://www.nadex.com/glossary/digital-option. That CFTC-regulated contract—which is about as easy for most traders to predict as a coin flip—may be highly speculative. The panel might even say that it "*create[s]* risk, largely for ordinary consumers, where none previously existed." Op. 29 (emphasis added). But one man's speculation is another man's hedge—and the CEA permits a wide range of trades on economically significant events to be executed on uniform, federally regulated exchanges.

What differentiates federally regulated trading from state-regulated gambling is not whether a trade is a kind of wager—in some sense, it always is—but rather *what* it is on and *how* it is placed. To qualify as an eligible event for a swap, that event must be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). And because the Dodd-Frank Act amended the broader CEA, its definition of swaps has always been read to exclude ordinary-course commercial and consumer contracts. *See* 77 Fed. Reg. 48,208, 48,212 & n.29 (Aug. 13, 2012). After all, if the panel's exclusion of sports were really necessary to protect bookies from being covered as swap dealers, Op. 29-30, then the panel's

definition of "swap" would have to include virtually all business insurance contracts—which necessarily "provide[] for … payment … that is dependent on the occurrence … of an event" of economic significance. 7 U.S.C. § 1a(47)(A)(ii).

In short, all financial markets involve what could be called "gambling"—traders make bets on real-world events with real-world economic consequences. In an effort to find *some* way to set sports trades apart from the countless other supposed gambles that investors make every day, the panel, "[f]ighting [the] plain-text reading, … offer[ed] a novel interpretation categorically limiting" the definition of swap. *Vericool*, 175 F.4th at 1062 (Bumatay, J., dissenting). That strained reading should not be this Court's final word on this exceptionally important issue: The Court should rehear the case en banc and correct the panel's error.

## CONCLUSION

This Court should grant rehearing en banc.

Respectfully submitted,

s/Christopher G. Michel
CHRISTOPHER G. MICHEL
ZACHARY J. LUSTBADER
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
christopher.michel@kirkland.com

*Counsel for Amicus Curiae Paradigm Operations LP*

September 18, 2026

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7516

I am the attorney or self-represented party.

**This brief contains** 3,077 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated ________.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Christopher G. Michel **Date** September 18, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Christopher G. Michel
Christopher G. Michel